1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

DIBAKAR BARUA, *et al.*,

        Plaintiffs,

    v.

ZILLOW GROUP, INC., *et al.*,

        Defendants.

Civil Action No. 2:21-cv-01551-TSZ

**CORRECTED CONSOLIDATED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**TABLE OF CONTENTS**

**Page**

I.      NATURE OF ACTION ............................................................................... 1

II.     JURISDICTION AND VENUE ................................................................ 10

III.    PARTIES ................................................................................................... 11

        A.      Plaintiff ......................................................................................... 11

        B.      Corporate Defendant ..................................................................... 11

        C.      Executive Defendants .................................................................... 12

        D.      Relevant Non-Parties – Former Zillow Employees ...................... 13

IV.     FACTUAL ALLEGATIONS .................................................................... 14

        A.      Zillow and Its Pivot from Its Roots to Zillow 2.0........................ 14

        B.      Defendants Considered Zillow's Ability to Accurately Predict
                Home Values As Critical to Zillow Offers' Success ..................... 18

        C.      Defendants Believed That Scaling Zillow Offers and Driving
                Down Costs Was Critical to Its Success ....................................... 21

        D.      Zillow Announces Positive Home Unit Economics in Two
                Consecutive Quarters, Sparking Positive Market Reaction .......... 22

        E.      Despite Purportedly Positive Results, Defendants Decided That
                Zillow's Pricing Model Was Underpricing Homes for the Current
                Economic Environment, Causing It to Miss Volume Targets ........ 25

        F.      Zillow Tells the Market That Zillow Has Improved Its Pricing
                Model to More Accurately Understand Market Trends, Despite
                Deciding to Override It .................................................................. 27

        G.      Project Ketchup: To Increase Volume, Zillow Put Overlays on Top
                of Its Algorithm, Which Caused It to Significantly Overpay for
                Homes ............................................................................................ 28

        H.      Internally, Zillow Employees Repeatedly Raised Concerns That
                the Company Was Overpaying for Homes ..................................... 35

        I.      Project Ketchup: To Increase Volume, Zillow Squeezed Its
                Contractors, Which Caused Contractors to Refuse Jobs and
                Created a Massive Backlog.............................................................. 37

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - i
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

J.     Defendants Materially Misled the Market ........................................... 44

     1.     Defendants Materially Misled the Market About the Reason for Zillow's Increased Volume and Demand ............................... 44

     2.     Defendants Materially Misled the Market About the "Durability" of Zillow's Margin Improvements ........................................ 46

K.     The Relevant Truth Emerges ........................................................ 47

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ............................................................................................. 53

A.     August 5, 2021 Q2 2021 Earnings Conference Call ............................................. 53

B.     September 13, 2021 Piper Sandler 2021 Virtual Global Technology Conference ........................................................ 58

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ....................................... 60

A.     Zillow Offers Was a Core Operation ........................................ 61

B.     Defendants Admitted Their Visibility into Zillow Offers ................................... 63

C.     The Close Temporal Proximity Between Defendants' Misrepresentations and the Partial Revelation of the Relevant Truth Supports a Strong Inference of Scienter ................................... 65

VII.     PARTIAL DISCLOSURE OF THE TRUTH, LOSS CAUSATION, AND ZILLOW'S LOSS OF CREDIBILITY WITH THE ANALYSTS................................... 67

A.     October 4, 2021 ........................................................... 69

B.     October 17-18, 2021 ..................................................... 69

C.     November 1, 2021 ........................................................ 72

D.     November 2, 2021 ........................................................ 73

E.     Analysts Were Shocked and Called for Management Accountability ........................................................... 75

VIII.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................... 79

IX.     THE PRESUMPTION OF RELIANCE ....................................... 80

X.     CLASS ACTION ALLEGATIONS ........................................ 81

XI.     CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT ................................... 83



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
          AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST
          ALL DEFENDANTS) ................................................................................ 83

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
          ACT (AGAINST THE EXECUTIVE DEFENDANTS) .................................... 84

PRAYER FOR RELIEF ........................................................................................ 86

JURY DEMAND .................................................................................................. 86



Lead Plaintiff Jeremey Jaeger, by and through his undersigned counsel, brings this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all other persons or entities who purchased or otherwise acquired common stock A and C shares ("Common Stock") of Zillow Group, Inc. ("Zillow," "ZG," or the "Company") during the period from August 5, 2021, to November 2, 2021, inclusive (the "Class Period"), and were damaged thereby (the "Class"). The claims asserted herein are alleged against Zillow and the Company's senior executives during the Class Period: Chief Executive Officer Richard N. Barton, Chief Financial Officer Allen W. Parker, and Chief Operating Officer Jeremy Wacksman.

Plaintiff alleges the following based upon his own personal knowledge and upon information and belief of others. Plaintiff's information and belief is based, in part, on the ongoing independent investigation of his undersigned counsel, including from the following sources: (i) Zillow's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases, shareholder letters, and reports; (iv) Zillow's website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Zillow Common Stock; (vii) consultation with experts; (viii) accounts from former Zillow employees; and (ix) additional materials and data concerning the Company and industry as identified herein. Plaintiff also believes in good faith that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF ACTION

1.      Zillow is a Washington corporation with principal executive offices located in Seattle, Washington. From 2011 to August 2015, Zillow issued Class A common stock, which traded under the ticker symbol "Z" and entitled holders to one vote per share. In August 2015, Zillow created a new class of non-voting stock—Class C capital stock. Thereafter, Zillow Class C capital stock began trading under the symbol "Z" and Class A common stock began trading under the new ticker symbol "ZG."

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

2.      Zillow is known for operating the most visited real estate website in the United States, "zillow.com," as well as other real estate websites such as Trulia and StreetEasy. Traditionally, it has generated revenue from advertising revenue from these websites and earned referral fees when matching prospective buyers and sellers with real estate agents and brokers. By 2018, however, the growth in Zillow's core business had slowed and its stock price was stagnating. To spur growth, in April 2018 Zillow announced that it would fundamentally shift its business model and enter the "iBuyer"—or "Instant Buyer"—market.

3.      Companies that compete in the iBuyer space use algorithms and technology to buy and resell homes quickly. In particular, these companies make instant cash offers to buy homes based on the values indicated by their pricing algorithms, make repairs and updates, and then quickly relist the homes for sale. Opendoor Technologies, Inc. ("Opendoor"), which launched in 2014, was the earliest iBuyer. Offerpad Solutions, Inc. ("Offerpad") followed shortly thereafter, joining the iBuyer market in 2015. Another iBuyer, Redfin Now, launched in 2017.

4.      Zillow's new iBuying business, which it called Zillow Offers, provided the Company with a brand-new revenue source to revive its decelerating revenue streams. Zillow initially launched Zillow Offers in two test markets, but by the end of 2018, Zillow had expanded its iBuying operations to five metropolitan areas.

5.      In February 2019, Zillow announced that Defendant Barton, one of Zillow's co-founders, would return as CEO. In a February 21, 2019 press release announcing Barton's return, Zillow explained that the change was coming "at a time when Zillow Group is dramatically expanding the scope of its business, entering into buying and selling homes, mortgage lending and other services intended to make real estate transactions easier and more seamless for consumers."

6.      Zillow coined its new business model "Zillow 2.0" and made clear that the model revolved around the success of its new Zillow Offers business. In other words, as one market commentator noted following the announcement, "[t]he company will pin its future on Zillow Offers."

7.      In connection with the shift, Barton announced a goal for Zillow Offers of reaching $20 billion in revenue within five years and purchasing and selling 5,000 homes per month. As

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

one market commentator noted, "[t]o hit the ambitious goal of $20 billion in revenue in three to five years from the Homes segment, which includes Zillow Offers, would be a serious accomplishment. Zillow as a whole brought in $1.3 billion in revenue for all of 2018."

8.     Over the next few years, Zillow rapidly expanded its Zillow Offers business. By the end of 2019, the Company was buying and selling homes directly in 22 markets and Zillow Offers accounted for roughly half of the Company's total revenue in 2019. In early 2020, after the COVID-19 pandemic began, the Company paused its Zillow Offers home purchases, which slowed its growth trajectory for 2020. But by the second quarter of 2021, Zillow Offers was expanding again, so much so that Zillow Offers made up roughly 60% of Zillow's total revenues.

9.     To ensure the success of its Zillow Offers business, the Company had to execute well in at least three areas. *First*, it had to ensure that its algorithms could accurately predict home values. Given the scale at which Zillow operated, if Zillow paid too much for homes, it could expose the Company to massive losses. The Wall Street Journal reported, in a post-Class Period exposé based on interviews of current and former employees, that: "The business model rested on the assumption that Zillow's algorithm, fed by the company's trove of data, would be able to predict home prices with pinpoint accuracy." In the years leading up to the Class Period, Defendants repeatedly touted its algorithm's ability to accurately price homes, representing, for instance, that "we're very accurate on the homes that we're making Zillow Offers on right now."

10.    *Second*, Zillow had to successfully drive down its cost structure, for example, by renovating homes more cheaply and efficiently. Flipping homes quickly was also key to keeping costs down, since the holding costs and interest expenses associated with holding each home were high. Thus, the longer it took Zillow to renovate and sell homes after it purchased them, the higher its costs. Zillow Offers was highly unprofitable during its first few years of operation and market analysts monitored its cost structure closely for signs that it could one day be profitable.

11.    *Third*, it was critical for Zillow to quickly scale its Zillow Offers business by rapidly increasing the number of homes it was purchasing each quarter. Quickly achieving scale was key because it allowed the Company to improve Zillow's cost structure. As Defendant Barton noted in February 2021, "[s]cale is super important" and "as we get bigger and better at this, we're going

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 3
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

to see costs come down." Scaling up was also essential to allow the Company to catch up with competitors. As Defendant Barton noted in February 2019, "we are in a race and we're racing to scale." As a result, in the years leading up to the Class Period, Zillow's executives were laser-focused on increasing Zillow's home purchasing volumes to achieve Barton's targets of 5,000 homes per month by 2024. Heading into 2021, Zillow set lofty volume targets for the Zillow Offers business. But still, Defendants reassured the market that they did not plan to take undue risk, by setting "guardrails" by which they ran the business. For example, on a February 11, 2021 conference call, Parker pointed out the "plus or minus basis point guardrail we set for ourselves while working to scale the business." This reassurance was repeated in May and August 2020.

12.     In the first quarter of 2021, however, Zillow fell well behind its internal home purchasing volume targets. As The Wall Street Journal reported in its post-Class Period exposé:

> As first-quarter [2021] numbers trickled in, it became clear that …
> the company was on track to significantly miss its annual target for
> the number of homes it wanted to buy. Worse, it was falling behind
> its top competitor, Opendoor. 'This is code red,' Joshua Swift,
> senior vice president of Zillow Offers, said during a virtual meeting,
> according to the person who attended.

13.     Zillow determined that it was missing its volume targets because its algorithm was not accurately predicting housing market appreciation, which resulted in its offers being too low to entice prospective sellers. As The Wall Street Journal reported, "[t]he company's algorithm, which was supposed to predict housing prices, didn't seem to understand the market."

14.     During Zillow's May 4, 2021 earnings conference call for the first quarter of 2021, Defendant Parker acknowledged that the Zillow Offers home purchasing volume for the quarter was "not quite at the pace we planned," but represented that "we continue to work on refining our models to catch up with the rapid acceleration in home price appreciation." Then, in mid-June 2021, Zillow told the market that it had improved its pricing model to "react more quickly to current market trends" and thus would be able to more accurately price homes.

15.     But all was not well internally. Defendants knew that they could not keep up with their home purchasing goals by relying on the way they had been pricing homes. They were losing market share to Opendoor. So Defendants threw caution, and everything they had learned, to the


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

wind: "Zillow turned up the dials in the second quarter, according to a person familiar with the decision, who asked not to be named because the matter is private."

16.     As the financial press would later uncover, and former employees have confirmed, in the Spring of 2021:

> Zillow put together a plan to speed up the pace and volume of home purchases, dubbing it Project Ketchup—which employees took as a play on the team's mission to catch up to Opendoor. Zillow planned to buy more homes by spending more money, offering prices well above what its algorithm and analysts picked as market value, people familiar with the matter said.

17.     To do so, Zillow's management decided to systematically overrule Zillow's highly-touted algorithm in order to drive volume and catch up to Zillow's home-purchasing goals. The Wall Street Journal reported that Zillow secretly "retooled the system to raise the analysts' suggested prices. Automatic price add-ons coded into the company system, including one called the 'gross pricing overlay' that could add as much as 7%, would boost offering prices to get more home sellers to say yes."

18.     Zillow's pricing overlays had their intended effect, quickly driving up home purchasing volume. In the first quarter of 2021, Zillow purchased 1,856 homes. But by the second quarter of 2021, when the overlays began in earnest, Zillow purchased 3,805 homes, more than twice as many. By the third quarter of 2021, Zillow had again more than doubled its home purchases, to 9,680 homes.

19.     Internally, however, employees were raising red flags that Zillow was paying way too much for houses. For example, as The Wall Street Journal reported, "[s]taffers grew concerned Zillow was paying too much" and "[s]ome Zillow employees complained about the pricing in company Slack channels and meetings, but their concerns went largely unaddressed or they were told that the model was working as intended."

20.     When Zillow makes a final offer to purchase a home, it typically subtracts its estimated renovations costs. Thus, in the Spring of 2021, in another undisclosed effort to drive volume, Zillow significantly decreased the scope of its renovations, as well as the prices it paid to contractors to complete those renovations. By lowering renovation costs, Zillow hoped to present

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 5
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

sellers with higher final offers that would entice them to sell to Zillow. As Business Insider reported, in another post-Class Period exposé based on the accounts of current and former Zillow employees, "Zillow sought to increase the competitiveness of its bidding by offering sellers fewer deductions from the purchase price," and did so by "reduc[ing] the price it was willing to pay for specific types of renovation work and shrink the scope of many jobs."

21. These changes, however, squeezed Zillow's contractors at a time when Zillow was relying on them to quickly renovate a significantly higher volume of houses. Because Zillow's contractors could no longer be profitable given the narrowed scopes and lowered pricing, they began declining jobs and refusing to work for the Company. Without sufficient contractors to complete its renovations, Zillow's increasing volume of homes sat idle and by July the Company had built up a substantial backlog of homes that needed to be renovated. This renovation inventory backlog impacted Zillow's ability to quickly sell its homes, thereby increasing its costs.

22. As Business Insider reported after the Class Period, Zillow's narrowed scopes and lowered prices "prompted some [contractors] to de-prioritize Zillow jobs or cut ties with the company" and "[t]hey had a lot of difficulty finding contractors because their pricing was terrible." It further wrote that: "[w]ith a scarcity of labor, Zillow's problems began to cascade. Homes it had acquired lingered on its balance sheet for longer periods because it couldn't make the necessary repairs to bring them back to market for resale." Ultimately, "[h]olding onto properties ate into the business' profitability" because, as Business Insider reported, "it cost the company on average about $225 a day to hold a property."

23. At the beginning of the Class Period, when Zillow reported second quarter 2021 earnings on August 5, 2021, it did not disclose any of this information. Instead, it lauded the strong demand for Zillow Offers, claimed that higher volumes were the result of improvements in the Company's algorithm, and told investors that it had made "durable" operational improvements to lower renovation costs.

24. For example, Zillow's quarterly shareholder letter for the second quarter of 2021 represented that: "The record number of homes purchased was more than double that of Q1 2021



and is *a direct reflection of … the progress we have made in strengthening our pricing models*."[1] During the conference call, Defendant Parker similarly represented that: "We made progress this quarter in improving our pricing models, including launching the neural Zestimate[,] which sharpened our offer strength" and "*[t]hese improvements drove rapid gains in conversion rates in Q2 when compared to Q1 resulting in record purchases*."

25.   These statements were materially false and misleading. In reality, the Company's higher volumes and conversion rates did not result from Zillow strengthening and improving its pricing algorithms to be more accurate but, instead, were the result of overlays applied on top of the algorithms for the purpose of driving volume. Investors were thus misled to believe that Zillow had successfully strengthened its pricing model to more carefully predict and react to market trends when, in truth, it was simply increasing offers to make its volume targets, without regard to the manner in which the market was moving.

26.   During the conference call, Defendants also repeatedly represented that Zillow Offers had seen "*significant customer demand*" in the second quarter and had "*continued to see strong growth in customer demand as we entered Q3*." These statements gave investors the misleading impression that there was organic and increasing "strong demand" for Zillow's iBuying service when, in reality, Defendants were artificially creating the impression of the demand through the significant and unsustainable overpayments the Company was offering to entice sellers and drive higher home purchase volumes.

27.   During the August 5, 2021 call, Defendant Parker also highlighted Zillow's "*353 basis point improvement from a year ago in renovation, holding and selling costs*," which he claimed were "*largely durable operational improvements*." These statements were materially false and misleading because Defendants failed to disclose that Zillow's "cost improvements" were not "durable," but instead were causing significant negative impact to the Company,

---

[1] Emphasis added unless otherwise indicated. For ease of reference, Plaintiff has endeavored to highlight the materially false and misleading aspects of Defendants' Class Period statements in *bold and italics*. Additional text is provided often for context, but that context can also contribute to the false and misleading nature of Defendants' statements.



including that its contractors had begun declining to take Zillow jobs, creating a massive backlog of renovation jobs that it could not complete, which in turn impeded Zillow's ability to quickly resell homes and drove up its holding costs.

28.     Analysts echoed Defendants' misleading statements. For example, Barclays wrote that "improved pricing models and increased seller interest helped more than double inventory at quarter end, positioning the segment to continue to scale." Berenberg wrote that: "[i]mportantly, the company highlighted that its pricing model for Homes was improving. We point to that as a key catalyst to delivering profitability for the segment." Piper Sandler wrote that "ZG recently updated its ZOffers algorithm to adapt to a rapidly changing market" and "it appears the updates seem to be working," concluding that "[w]e see the growth inflection back on track."

29.     On September 13, 2021, Defendant Wacksman reiterated "***record demand for Zillow Offers***" and "***durable***" economic improvements at an industry analyst conference, causing Piper Sandler to report: "On the ZOffers side, management feels confident about margin improvements. While home price appreciation has helped, other improvements across renovation, holding, and resale are more durable."

30.     Less than three weeks later, the relevant truth concealed by Defendants' false and misleading statements began to be revealed to the market through a series of partial corrective disclosures. *First*, on October 4, 2021, analysts from RBC Capital Markets lowered their price target for Zillow, warning investors that its internal analysis of Phoenix-area listings suggested that Zillow had "meaningful inventory" that it "bought at too high a price." On this news, the price of Zillow common stock (ZG) declined $5.72 per share, or more than 6%, from a close of $91.40 per share on October 1, 2021, to a close of $85.68 per share on October 4, 2021. Similarly, the price of Zillow capital stock (Z) declined $4.98 per share, or approximately 5.5%, from a close of $90.36 per share on October 1, 2021, to a close of $85.38 per share on October 4, 2021.

31.     *Then*, on October 18, 2021, Zillow delivered the first of two completely unexpected blows to investors in announcing that "[d]ue to a backlog in renovations and operational capacity constraints," Zillow Offers "will not sign any new, additional contracts to buy homes through the end of the year." On this news, the price of Zillow common stock (ZG) declined $8.84 per share,

or more than 9%, from a close of $94.30 per share on October 15, 2021, to a close of $85.46 per share on October 18, 2021. Similarly, the price of Zillow capital stock (Z) declined $8.97 per share, or more than 9%, from a close of $94.97 per share on October 15, 2021, to a close of $86.00 per share on October 18, 2021.

32.     On November 1, 2021, media outlets reported that, pursuant to a detailed analysis by KeyBanc Capital Markets, most of the homes in the Zillow Offers inventory were now worth less than the Company paid for them, and that Zillow was looking to sell off 7,000 homes. In response to this news, the price of Zillow common stock (ZG) declined $20.24 per share over two trading days, or more than 19%, from a close of $105.72 per share on October 29, 2021, to a close of $85.48 per share on November 2, 2021. Similarly, the price of Zillow capital stock (Z) declined $16.43 per share, or nearly 16%, from a close of $103.63 per share on October 29, 2021, to a close of $87.20 per share on November 2, 2021.

33.     Zillow delivered the final blow to investors after the market closed on November 2, 2021. That day, Zillow announced that it was "wind[ing] down" the Zillow Offers program and laying off approximately 25% of its workforce. In doing so, Zillow revealed that it would need to recognize an inventory write-down of $304 million in the third quarter, with an expected additional write-down in the fourth quarter of approximately $240 to $265 million (totaling as high as $560 million), because it had bought and overpaid for over 9,700 homes—with commitments for about the same number still yet to close. Defendants blamed the highly-touted algorithms and pricing models they had extolled just a few months earlier, explaining that: "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." The Company also pinned some of the blame for the Zillow Offers shutdown on the labor issues and resulting renovations backlog that it had concealed during the Class Period, noting that it had "experienced significant capacity and demand planning challenges," which had "caused a meaningful backup in our processing of homes in [the] Zillow pipeline."

34.     On this news, the price of Zillow common stock (ZG) plummeted an additional $19.62 per share, or approximately 23%, to close at $65.86 per share on November 3, 2021.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 9
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  Similarly, the price of Zillow capital stock (Z) fell $21.73 per share, or approximately 25%, to

2  close at $65.47 per share on November 3, 2021.

3      35.   Analysts and market commentators were shocked, calling the announcement a

4  "debacle," a "tremendous setback," a "drastic and unexpected move," a "major strategic retreat

5  and a black eye," "one of the sharpest recent American corporate retreats," and a "financial

6  disaster," which called into question Defendants' actions and credibility. For example, Piper

7  Sandler wrote that: "Events suggest a string of poor decision making by management over a

8  number of months" and "the evidence is accumulating of a considerable execution misstep. *More

9  recent news of internal memos titled 'Project Ketchup' that encouraged ZOffers homebuyers to

10 accelerate purchases to 'catch up' with Open Door are particularly worrying. Management

11 should be accountable*."

12     36.   Stephens called the announcement "the most shocking news that hit the U.S. real

13 estate vertical in 2021." Stephens specifically called out Defendants' false and misleading

14 statements just a few months earlier, writing that "it was the suddenness of the announcement that

15 added to the shock factor as Zillow was coming off a record rate of home purchases, and it was

16 just a few months removed from a quarter (2Q21) in which the Company really applauded the

17 success it was seeing in expanding ZO (*the 2Q21 shareholder letter highlighted Zillow's

18 improvements in 'pricing models* and automation when providing offers to customers')." Stephens

19 concluded that "[c]learly, faster is not always better and *Zillow (and the stock) paid dearly for its,

20 arguably, reckless approach to share gains*."

21     37.   As a result of Defendants' fraudulent acts and omissions, and the resulting declines

22 in the market value of Zillow's Common Stock, Plaintiff and the Class have suffered significant

23 damages.

24                   **II.    JURISDICTION AND VENUE**

25     38.   This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.

26 §§ 78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange

27 Act.

28

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 10
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

39.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

40.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)). At all relevant times, the Company maintained its headquarters in this District and Defendants conducted business in this District. In addition, many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in this District.

41.     In connection with the acts, conduct, and other wrongs alleged in this Consolidated Class Action Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiff

42.     Lead Plaintiff Jeremy Jaeger is an individual investor. As set forth in the certification previously filed in this action, Lead Plaintiff purchased or otherwise acquired Zillow Common Stock during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein. By order dated February 16, 2022, the Court appointed Mr. Jaeger to serve as Lead Plaintiff in this action. ECF No. 61.

### B.     Corporate Defendant

43.     Defendant Zillow Group, Inc. is incorporated in the State of Washington with its principal executive offices located in Seattle, Washington. Zillow's Class A common stock trades on the Nasdaq under the ticker symbol "ZG" and its Class C capital stock trades on the Nasdaq under the ticker symbol "Z." Zillow is the most visited real estate website in the United States and provides its customers an on-demand experience for selling, buying, renting, and financing "with transparency and nearly seamless end-to-end service." Throughout the Class Period, Zillow publicly disseminated SEC filings, press releases, investor presentations, and additional information.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 11
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

C.  **Executive Defendants**

44.     Defendant Richard N. Barton ("Barton"), Zillow's co-founder, is, and was throughout the Class Period, the Company's Chief Executive Officer. He co-founded Zillow in 2005 and served as CEO until 2010, when he became the Company's executive chairman. He returned as CEO in early 2019.

45.     Defendant Allen W. Parker ("Parker") is, and was throughout the Class Period, the Company's Chief Financial Officer. As CFO of Zillow, Parker oversees the Company's accounting, finance, legal, mergers and acquisitions, and treasury functions.

46.     Defendant Jeremy Wacksman ("Wacksman") is, and was since February 2021, the Company's Chief Operating Officer. As COO, Wacksman leads Zillow's business, product, operations, engineering, industry, and brokerage licensing teams, including focusing on the Zillow 2.0 vision for the future of real estate, building a seamless customer experience across Zillow's products and services. Wacksman previously served as President and Chief Marketing Officer of Zillow.

47.     Defendants Barton, Parker, and Wacksman are collectively referred to herein as the "Executive Defendants."

48.     The Executive Defendants were responsible for the day-to-day management and controlled and directed the business activities of Zillow. Each had the authority to, and in fact did, control the contents of the Company's periodic reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

49.     Each Executive Defendant was provided with copies of the Company's shareholder letter, alleged herein to be misleading, prior to or shortly after its issuance, and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and possession of and/or access to material, non-public information, each of the Executive Defendants knew or was reckless to disregard that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were materially false and/or misleading.

HAGENS BERMAN

50.     The Company and the Executive Defendants are collectively referred to herein as "Defendants."

**D.     Relevant Non-Parties – Former Zillow Employees**

51.     Former Employee No. 1 ("FE-1") worked at Zillow from before the Class Period until January 2022 as an acquisitions analyst for a market in a region in the Western United States. FE-1's primary responsibility was pricing homes for Zillow Offers, a role in which he[2] utilized a pre-programmed pricing spreadsheet to price homes. During the Class Period, FE-1 reported to Shannon Foster, a manager on the Acquisitions team.

52.     Former Employee No. 2 ("FE-2") worked at Zillow from before the Class Period until early 2022 as a senior data scientist. Part of FE-2's responsibilities included forecasting the home purchasing volume for Zillow Offers. Among other things, FE-2's team was responsible for a forecasting dashboard called the Goals Pacing dashboard, which was updated daily. The dashboard was reported up to Zillow Offers' management, and Zillow Offers executives had access to the dashboard. FE-2 participated in and assisted with preparing for monthly forecasting and planning meetings, which were attended by FE-2's superiors Krishna Rao (Vice President of Offers and Analytics) and Warren Jackson (Director of Data Science), and Zillow Offers executives, including the President of Zillow Offers. The monthly forecasting and planning meetings included discussion on Zillow Offers' purchasing goals and forecasting, as well as its actual progress against those goals. During the Class Period, FE-2 reported to Warren Jackson and Michael Miller, a Data Science Manager.

53.     Former Employee No. 3 ("FE-3") worked at Zillow from early 2020 to Spring 2021 as a Renovations Superintendent. From Spring 2021 until November 2021, FE-3 worked as a Renovations Field Manager. In or around November 2021, FE-3 was promoted to Assistant General Manager and remained in that position until he left the Company after the end of the Class Period. Part of FE-3's role included managing teams that would scope homes for renovations as well as other teams that would renovate homes after purchase. FE-3's work concerned two markets

---

[2] To maintain confidentiality, the former Zillow employees are referred to in the masculine.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 13
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    in the Southwestern United States. FE-3 attended weekly calls with District Managers, monthly

2    calls with Vice Presidents, and at least one monthly call attended by Defendant Barton where

3    Zillow Offers' renovation backlog was discussed.

4           54.    Former Employee No. 4 ("FE-4") worked at Zillow starting in 2019 as a

5    Renovations Superintendent. As a Renovations Superintendent, FE-4's role was to enforce the

6    scope of work tasked to contractors, draft "change orders" on renovation work, and manage

7    renovations on the homes assigned to him. In the Spring of 2021, FE-4 was promoted to a

8    Renovations Field Manager position in a market in the Southeastern United States, a position he

9    held until after the Class Period ended. As a Renovations Field Manager, FE-4's duties included

10   reviewing renovation scope estimates, training renovation evaluators, and ensuring that Zillow

11   Offers' standards for renovation work were being adhered to. FE-4 attended regional market

12   meetings as well as Renovation All Hands meetings, during which there were discussions about

13   Zillow's offer prices on homes, contractor shortages, Zillow Offers' backlog, and renovation costs.

14          55.    Former Employee No. 5 ("FE-5") worked at Zillow from 2019 until early 2020 as

15   a Renovation Estimator, then as a Renovation Superintendent from early 2020 through March

16   2021. As a Renovation Estimator, FE-5's job was to inspect homes on which Zillow Offers had

17   made an initial offer and prepare a report of the estimated renovations necessary to make the home

18   ready for sale. As a Renovation Superintendent, FE-5's, duties included reviewing the scope of

19   work for Zillow Offers homes, conducting re-inspections as necessary, and working with general

20   contractors in a market in the Southern United States.

21                          **IV.    FACTUAL ALLEGATIONS**

22   **A.    Zillow and Its Pivot from Its Roots to Zillow 2.0**

23          56.    Zillow was founded in 2004 by former Microsoft executives Rich Barton

24   (Defendant in this action) and Lloyd Frink. The Company completed its initial public offering

25   (IPO) in July 2011 at a price of $6.24 per share (split-adjusted), raising about $80 million of capital

26   and trading on the Nasdaq under the ticker symbol "Z." From 2011 until August 2015, Zillow had

27   two classes of stock: (i) Class A common stock, which traded under the ticker symbol "Z" and

28   entitled holders to one vote per share; and (ii) unlisted, Class B common stock, which entitled

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 14
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

**HAGENS BERMAN**

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

holders to ten votes per share. All shares of Class B common stock have been or are held by Defendant Barton and Zillow co-founder Lloyd Frink. In August 2015, Zillow created a new class of non-voting stock—Class C capital stock—and completed a stock dividend, granting all holders of Class A and Class B common stock two shares of Class C capital stock. Thereafter, Zillow Class C capital stock began trading under the symbol "Z" and Class A common stock began trading under the new ticker symbol "ZG." Zillow's Class B stock continues to be unlisted and held entirely by Barton and Frink.

57.     During the Class Period, Zillow had three operating segments: (1) Homes; (2) Internet, Media & Technology ("IMT"); and (3) Mortgages. The Homes segment was involved in the purchase and sale of homes and included the Company's Zillow Offers business, and also provided escrow and title services to purchasers and sellers, along with other real estate closing services through Zillow Closing Services. The IMT segment offered, among other things, Premier Agent, which provided advertising services and marketing and technology products and services to real estate agents and brokers. The Mortgage segment provided mortgage origination services through Zillow Home Loans and also sold advertising to mortgage lenders and professionals.

58.     For most of Zillow's more than 15-year history, the Company has been known for publishing online real estate listings and home-price estimates—called Zestimates—and seeking to profit by connecting real estate agents with potential clients. However, by 2018, growth in Zillow's legacy, media-based operations was slowing. For example, in 2015, the Company achieved 98% year-over-year revenue growth. By the following year, 2016, year-over-year revenue growth had slowed to just 31%. Revenue growth further stagnated, growing just 27% and 24% year-over-year in 2017 and 2018, respectively. Zillow's stock price stagnated along with its slowing revenue growth. Indeed, although Zillow's stock price (ZG) increased nearly four-fold from $11.59 on August 1, 2011, to $44.73 on August 1, 2014, over the next four years its stock price languished, sliding down to $31.43 by December 1, 2018.

59.     Against this backdrop, on April 12, 2018, the Company made a fundamental business shift and entered the "iBuyer" space—where companies use technology to make an offer on a potential seller's home instantly—and launched the new service called Zillow Offers.

Through Zillow Offers, Zillow would make offers to buy homes directly from homeowners. If a homeowner accepted an offer from Zillow Offers, Zillow purchased the home, made certain repairs and updates, and listed it for sale on the open market. Zillow recognized revenue at the time of closing for each home it resold.

60.     Launching Zillow Offers provided Zillow with a new revenue source to reinvigorate the Company's slowing top line. As CNN Business reported:

> Before launching Zillow Offers, the company generated most of its revenue through its Premier Agent business, which sold ads and leads to real estate agents around the country. That segment of the business had started to slow, giving the company another incentive to find new revenue streams, according to experts.

In describing the change, Zillow explained that it "evolved [from] being a media company to delivering more of a full-stack transactional experience for home shoppers." As CNN Business further reported, "[t]he model, known as instant buying, or 'iBuying,' marked a major overhaul for Zillow's core business. Up until then, the company had operated in a purely digital realm, removed from the headaches of owning or renovating actual brick-and-mortar properties."

61.     In addition to generating revenue through home sales, the Company also touted Zillow Offers' ability to drive growth in Zillow's other segments by attaching ancillary services to its Zillow Offers transactions. For example, the Company intended to offer its own closing services and mortgages to buyers and sellers in its Zillow Offers program. Additionally, even when a potential seller turned down a Zillow Offer, the Company would still attempt to realize revenue streams off that transaction by referring the seller to its Premier Agents.

62.     For example, as RBC explained, "Homes provides an easier way to attach adjacent services (Attaching a Mortgage to a Zillow Owned home vs. marketing a mortgage to a customer using a Premier Agent), with high attachment rates already being exhibited within Zillow Closing Services, which has very high attach rates to Zillow Offers." Wedbush similarly reported:

> We believe as iBuyers take greater share, and as the home transaction becomes more digitized over time ancillary revenue streams, like mortgages and seller leads, will become more attainable. We're not expecting 100% attach rates everywhere, but even small inroads can lead to material upside to estimates. For seller leads in particular, the majority of home sellers that come to Zillow for an offer on their home, still don't take that offer, meaning

HAGENS BERMAN

> Zillow has a significant opportunity to offer them leads to agents…. Ancillary revenue streams like title insurance, mortgages, and lead generation will also be critical in helping drive stronger profitability and margins over time.

63.     In announcing its pivot in April 2018, Zillow indicated that it would initiate Zillow Offers in two test markets: Las Vegas and Phoenix. By the end of 2018, Zillow had expanded its Zillow Offers operations to five metropolitan regions: Phoenix, Las Vegas, Atlanta, Denver, and Charlotte.

64.     In February 2019, Zillow announced that Defendant Barton, Zillow's co-founder, would return as Chief Executive Officer, and Zillow's other co-founder and president, Lloyd Fink, would take over in the role of executive chairman from Barton.

65.     This announcement coincided with great fanfare around what Barton called "Zillow 2.0," which would be centered around Zillow Offers. In an interview, Barton compared Zillow's shift to Zillow 2.0 to Netflix's change to emphasize its streaming service over its DVD mailing operation. Zillow also explained that the pivot to Zillow 2.0 would allow it to significantly expand its Total Addressable Market (or "TAM"). This is because the U.S. real estate advertising market had a TAM of just $19 billion, compared to a TAM of $1.9 trillion for U.S. home sales.

66.     Defendant Barton announced a goal of $20 billion in revenue within five years and a goal of purchasing and selling 5,000 homes per month. As one market commentator reported:

> ***The company will pin its future on Zillow Offers***, a program launched last year that lets potential sellers request offers directly from Zillow. To hit the ambitious goal of $20 billion in revenue in three to five years from the Homes segment, which includes Zillow Offers, would be a serious accomplishment. Zillow as a whole brought in $1.3 billion in revenue for all of 2018.

67.     The iBuyer market was already crowded by the time Zillow entered the fray. As analyst Wedbush explained in a January 2021 report, "Opendoor was the market when it first started in 2014. By 2017 it controlled ~75% as competitor Offerpad entered. Zillow then become the third horse in the race in 2018." In conjunction with the February 2019 announcement, Defendant Barton acknowledged that Zillow was behind some of its competitors, but he said that he is up for the challenge, adding "I love a good race."

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

68.     Thereafter, the Zillow Offers program expanded quickly and rapidly became a significant driver of revenue growth for the Company. By the end of 2019, the Company was buying and selling homes directly in 22 markets and Zillow Offers "accounted for nearly $1.4 billion of revenue for the year." In fact, Zillow Offers accounted for roughly half of the Company's total revenue in 2019. Moreover, by 2019, Zillow had captured approximately 15% of the iBuyer market. As analyst Canaccord Genuity wrote in January 2020, "the Homes segment continues to be the primary stock sentiment driver and will likely surpass 50% of total consolidated revenue in 2020."

69.     In early 2020, the COVID-19 pandemic hit, causing Zillow to temporarily pause home purchases through Zillow Offers. But by May 2020, Zillow announced that Zillow Offers would begin purchasing homes again and by August 2020, Zillow was "actively purchasing homes in all 24 markets where it previously operated." Despite the pause, Zillow gained ground in the iBuyer market and, by the end of 2020, it controlled approximately 25% of the market. Zillow Offers continued to rapidly expand in 2021, and by the second quarter of 2021, Zillow Offers accounted for roughly 60% of total Company revenues.

**B.    Defendants Considered Zillow's Ability to Accurately Predict Home Values As Critical to Zillow Offers' Success**

70.     Given the scale at which Zillow Offers operated—buying thousands of homes a year for billions of dollars—Zillow's ability to accurately predict home values was critical to its success and sustainability. That is because, to the extent Zillow offered too much for houses, it would be left with significant overvalued inventory on its books that could ultimately lead to massive losses. On the other hand, if Zillow offered too little, potential sellers would reject its offers and it would not achieve the home purchase volume necessary to grow its business. Oppenheimer reported:

> As iBuyers grow their databases of comparable listings, they are able to more accurately predict the value of homes they make offers on. Not only does this prevent overpayment, which significantly weighs on margins, it prevents underpayment, which improves conversion rates and consumer adoption.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 18
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

71.     Traditionally, Zillow Offers used a multi-step process to determine how much to offer for each home. The first step typically began with the Zestimate, Zillow's proprietary computer algorithm that estimates the current value of over 100 million homes in the United States. Consumers can visit Zillow's website and look up the Zestimate for their home. In the markets where Zillow Offers operated, consumers who liked the estimate they saw could contact Zillow and request that the Company make an initial offer for the consumer's home.

72.     Once contacted, evaluation by human pricing experts would lead to adjustments to the initial offer price. Zillow also applied computer models to estimate how long it would take to sell the home and how the value of the home would change in that timeframe. Ultimately, Zillow would arrive at the value that it estimated it could sell the home for, and then offer that value to the potential seller as an initial offer.

73.     If the homeowner agreed to continue with Zillow Offers after receiving the initial offer, then the Company would work on a final offer. As part of this process, Zillow would send a renovation team to perform an inspection and identify repairs needed to get the house to market (i.e., the "scope of work"). The costs of the necessary renovations would then be subtracted from the initial offer to arrive at a final offer. If the homeowner accepted the final offer, then the homeowner could choose their preferred closing date (in as little as seven days, or as many as 90 days) and complete the transaction.

74.     Given the significant role they played in valuing homes, it was critical that Zillow's algorithms could accurately value homes. Likewise, The Wall Street Journal reported that: "The business model rested on the assumption that Zillow's algorithm, fed by the company's trove of data, would be able to predict home prices with pinpoint accuracy." Wolfe Research similarly explained that: "The backbone of Zillow's iBuying model is from the algorithms it derives from its massive sets of data. Zillow possesses among the most granular per zip code data in the country."

75.     In the years leading up to the Class Period, Defendants repeatedly touted the accuracy of Zillow's algorithms and its ability to accurately price homes. For example, on February 26, 2019, Defendant Barton stated: "[W]e're in the best position to see what's happening

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 19
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

in the housing market on a micro basis, better than anybody else by far, because we have all the traffic. We do all those estimates. We have all these models. We see all the data in real time as it's coming in." On February 19, 2020, Barton said:

> The unit numbers in this business are starting to build … and [] each new unit[] that we transact[,] it pumps data and learning into the machine and the people and we're getting better at pricing homes, we're getting better at price drop[] strategy, we're getting better at all the stuff that is required to price and sell the home.

76.     On May 7, 2020, Defendant Barton stated: "it's just the machines getting smarter …. [W]e have just gotten a whole lot better at how to figure out what to buy, where to buy it, how to rehab it, how to appraise it, how to price drop it, and all of this is informed by data." On November 18, 2020, Barton represented: "[W]e have 15 years of Zestimate and data to inform the AI algorithms that then figure out what we should offer on Zillow Offers. So we start out with a baseline of incredible technology and customer sharing synergies there."

77.     Then, on February 25, 2021, Zillow announced that it had launched its Zestimate offer in certain markets, which meant that in some markets the Zestimate that consumers saw for their home on the Zillow website served as a live First Offer from Zillow Offers. In particular, in a February 25, 2021 press release, titled "Zillow Starts Making Cash Offers For the Zestimate," Zillow reported that: "For 15 years, homeowners and home shoppers have come to rely on the Zestimate as an essential first step. This exciting advancement demonstrates the confidence we have in the Zestimate and the lengths we are willing to go to make selling your home truly seamless and easy." The release further stated: "This is a proud moment for Zillow's tech team and speaks to the advancements they've made in machine learning and AI technology."

78.     In the release, Zillow explicitly emphasized the reliability of its Zestimate by stating: "today's announcement highlights the growth in the reliability of the Zestimate with Zillow standing behind its valuations to provide an initial cash offer on qualifying homes through its Zillow Offers service."

79.     That same day, Zillow Chief Analytics Officer, Stan Humphries, was interviewed on Bloomberg television and gushed about the accuracy of Zillow's home purchase offers: "[F]or homes where we've made an offer for Zillow Offers but sellers have decided to sell their homes

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

traditionally, so not sell to us …, those homes are selling for less than 1% difference than our offers we made to those consumers. So we're very accurate on the homes that we're making Zillow Offers on right now."

80.     Weeks later, on March 10, 2021, Defendant Wacksman similarly stated: "We benchmark our offers against, say, for people that turn us down, what do they go actually end up selling their home for. And it's virtually the same. It's a basis point off." Analyst Stephens echoed that the Live Zestimate "would clearly speak volumes to the efficacy of its pricing algorithms."

**C.      Defendants Believed That Scaling Zillow Offers and Driving Down Costs Was Critical to Its Success**

81.     Although Zillow Offers provided the Company with a significant revenue stream, it was not profitable in the first few years after its launch. The iBuyer segment has notoriously slim margins. That is because iBuyers typically make their money through fees akin to real estate agents' commissions, rather than through "flipping" or reselling houses for a large gain. Zillow was no exception. Indeed, the Company repeatedly stated that the goal of Zillow Offers was to be a market maker in residential real estate sales, not to make money off of the homes it purchased. For example, Defendant Barton explained on February 11, 2021, "we're not targeting making money on the transaction itself." Defendant Parker reassured the market of the "the plus or minus 200 basis point guardrail we set for ourselves while working to scale the business." As reported in The Wall Street Journal's post-Class Period exposé, "Zillow intended to make no more than a 2% profit so that homeowners wouldn't feel lowballed, a problem that could discourage future sellers." Instead, Zillow Offers sought to sell homes as "quickly as possible and earn [its] money off the transaction fee."

82.     To be sure, for Zillow, a multibillion-dollar tech company, these razor-thin margins were only attractive if it could scale its business significantly, to Zillow Offers' $20 billion revenue target or beyond. Scale was also critical to the Company's ability to improve Zillow Offers' cost structure so that the business ultimately could be profitable one day. For example, Barton explained on February 27, 2019, that "scale matters and matters a lot" because "[s]cale is going to drive down every expense line item we have on a unit basis and on an aggregate basis in the



1    model." Likewise, on February 12, 2021, Barton explained that "[s]cale is super important" and

2    "as we get bigger and better at this, we're going to see costs come down."

3        83.     Scaling quickly was also critical to Zillow's ability to catch up with competitors

4    and ensure that it took enough market share to ultimately turn a profit. As Barton explained on

5    February 27, 2019: "[W]e are in a race and we're racing to scale…. How many players can this

6    support, given that scale matters this much? We think the scale effects are pretty strong. It may not

7    be only one. It may be winner take most, but it's certainly not going to be a hyper-fragmented set

8    of competitors in our opinion. And so, we are racing in a rational way to get big." As a result,

9    throughout the Class Period, Defendants understood that it was critical to quickly scale Zillow

10   Offers by rapidly buying more and more homes to drive volume. And as reported by Bloomberg,

11   after the Class Period, the Zillow Offers "business depended on economies of scale, so Barton

12   pushed employees to chase rapid growth."

13        84.     Given Defendants' public statements throughout 2020, analysts closely monitored

14   Zillow's home unit economics for signs that it was improving its cost structure, which would

15   ultimately provide a path to profitability. For example, analyst Guggenheim wrote in a February

16   19, 2020, report that: "ZG has demonstrated that there is demand for the iBuyer service, but at

17   some point it will need to show a path to profitability." BTIG similarly reported on July 14, 2020,

18   that: "A revenue beat is fine (particularly in this environment), but we ultimately need proof that

19   ZG can actually make money selling houses, monetize seller leads and cross-sell ancillary

20   products." On August 7, 2020, Deutsche Bank noted that "until we see more sustainable signs of

21   improvement in the unit economics here, it will be tough for investors to attribute meaningful value

22   upside to this heavily loss-making segment." In a same-day report, RBC similarly explained that:

23   "Without the proven unit economics, especially in a down-market, we think the Homes business

24   will go largely discounted."

25   **D.     Zillow Announces Positive Home Unit Economics in Two Consecutive Quarters, Sparking Positive Market Reaction**

26

27        85.     In advance of Zillow's fourth quarter 2021 and full year 2021 earnings call, the

28   market continued its focus on Zillow Offers' unit economics and profitability. For example, Truist



1   wrote in a February 5, 2021 report that: "Home sales volume, gross margin, and inventory are
2   items to watch in iBuyer …. We expect 3.6% gross margins in the Zillow Homes segment, down
3   30bps Q/Q and flat Y/Y…. The company expects a higher-than-normal mix of newer inventory in
4   4Q, which could lead to modest upside to our ests for iBuyer margins."

5       86.     On February 10, 2021, Zillow announced positive home unit economics of 668
6   basis points before interest. During a same-day earnings conference call, Zillow acknowledged
7   that a large portion of the improvement came from increasing housing prices and represented that
8   250 basis points of the improvement were the result of "meaningful operational progress in
9   improving our cost per home sold."

10      87.     The market's response was positive. For example, on February 11, 2021, Deutsche
11  Bank wrote that Zillow had gotten "the Offers business 589bps profitable in terms of return on
12  homes sold after interest expense, which is much faster than we had expected." As a result,
13  Deutsche Bank took its "Homes segment revenue and valuation up considerably, as we now have
14  distinctly more confidence the business will be a large profit driver for Zillow." BTIG wrote that
15  "ZG has consistently recorded unit-level in Offers and faced questions over whether it might ever
16  make money on a per home basis" so "[o]ne of the highlights of ZG's 4Q was a super-sized per
17  home profit in Offers. While some of that (OK a lot of that) was driven by surging home prices,
18  there was real progress on unit economics below-the-hood and this quarter was a real proof point."
19  JMP wrote that: "Isolating this to more structural renovation and selling improvements, Zillow's
20  margin improved 150bps Q/Q and 220bps Y/Y. Applying these improvements across all of 2021
21  creates a path towards Zillow Homes being operated on a profitable basis per unit going forward."

22      88.     On May 4, 2021, Zillow announced a second-straight quarter of positive home unit
23  economics of 549 basis points before interest expense. During a same-day earnings conference
24  call, Zillow again acknowledged that a large portion of the improvement came from "the ongoing
25  strong housing market," but represented that a large portion of the improvements came from
26  "durable" operational cost improvements that Zillow had implemented: "The durable operational
27  improvements in overall cost per home contributed 280 basis points improvement…." Defendant
28  Parker also highlighted strong growth within the business segment, stating:

HB   HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Growth in Zillow Offers continue to reaccelerate in Q1. We reported Homes segment revenue of $704 million, which exceeded the high end of our outlook with 1,965 home sales. Resale velocity was above our expectations. In Q1, we sold 128% of the beginning inventory of 1,531 homes, which contributed to inventory declining at the end of Q1 to 1,422 homes. Purchases increased to 1,856 homes in the quarter from 1,789 homes purchased in Q4, but not quite at the pace we planned as we continue to work on refining our models to catch up with the rapid acceleration in home price appreciation.

During Q1, we continued to focus on unit costs, automation, adding capacity and sharpening pricing models to improve offer strength as we continue to scale. Our Q1 Zillow Offers unit economics of 549 basis points return before interest expense was above **the plus or minus 200 basis point guardrails we've set for ourselves while working to scale the business**. The outsized unit economic results were impacted by the ongoing strong housing market, which is temporal in nature. **We made progress during the quarter on improving offer strength and sharpened pricing that tightened our unit economics by approximately 120 basis points from that of Q4. The durable operational improvements in overall cost per home contributed 280 basis points improvement from Q1 2020**.

In touting the Company's commitment and confidence in Zillow Offers, Defendant Barton further explained:

But on [Zillow Offers], in particular, Ron, we're leaning in, like -- we're leaning in. We're expanding in the 25 markets. We're heavily staffing, as I think we made an announcement, maybe Allen just talked about it, too. We are planning as a company. I'm hiring a net 2,000 people in 2021, and a lot of that will be for Zillow Offers. And we're making other investments in [Zillow Offers] as well.

**So we are comfortable with that increased investment because of what we're seeing top of funnel** because what we know about the consumer value proposition. And also, we're leaning in because most consumers don't even know what Zillow Offers is yet. They don't even know -- we've got to take Zillow 2.0 out of the kind of quarterly conference call realm and into the consumer awareness realm. And so we've got a lot of work to do there, and we're basis points penetrated in the business overall. So long answer, but we're feeling -- **we're leaning in and feeling good**.

89.     The following day, Deutsche Bank issued a report highlighting that: "importantly, in our view, the company saw a continuation of durable cost savings that they discussed during the 4Q20 call." Similarly, Truist reported that: "[W]e're encouraged by durable gains in home acquisition and renovation costs."



**E.      Despite Purportedly Positive Results, Defendants Decided That Zillow's Pricing Model Was Underpricing Homes for the Current Economic Environment, Causing It to Miss Volume Targets**

90.      As discussed above, for two quarters in a row—the fourth quarter of 2020 and first quarter of 2021—Zillow recorded outsized positive home unit economics resulting in part from housing market appreciation. On the other hand, Defendants decided that Zillow's offers for houses were coming in too low—in the current economic environment of high home price appreciation—to drive the desired customer demand for Zillow Offers in an appreciating market. As The Wall Street Journal later reported in a post-Class Period exposé based on the account of current and former Zillow employees:

> The first quarter delivered home-sale profits that were more than twice as high as anticipated, the company said. Zillow expected to make money primarily from transaction fees and from services such as title insurance-not from making a killing on the flip." As a result "Zillow was also behind on its target for home purchases.

91.      Given the importance of achieving scale, missing the home purchase volume goal created significant concern within Zillow. As The Wall Street Journal reported:

> In the spring, … company executives and managers came together for a tense meeting, according to a person who attended. As first-quarter numbers trickled in, it became clear that even though it was making more money than anticipated, the company was on track to significantly miss its annual target for the number of homes it wanted to buy. Worse, it was falling behind its top competitor, Opendoor. 'This is code red,' Joshua Swift, senior vice president of Zillow Offers, said during the virtual meeting, according to the person who attended.

92.      Multiple accounts by former Zillow employees confirm that Zillow management decided by early 2021 that its pricing model—in an environment of high house price appreciation—was causing the Company to fall behind on its purchase goals. FE-2 participated in monthly Forecasting and Planning ("F&P") meetings, which were attended by approximately 50 Zillow Offers employees, including the leadership of many Zillow Offers teams, such as Krishna Rao, Warren Jackson, and Corey Hill. FE-2 said that Arik Prawer, the President of Zillow Homes, also attended some of the F&P meetings, and FE-2 believed that Jeremy Wacksman also attended some of the meetings. FE-2 explained that the purpose of the F&P meetings was to plan for operations staffing, discuss forecasts and goals tracking, and discuss product initiatives and how

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

they were expected to impact the forecasts. A primary topic of conversation during the F&P meetings, according to FE-2, was future projections and historical performance for topline numbers like home offer requests, homes under contract, and actual homes purchased.

93.     FE-2 said that each Zillow Offers team had quarterly and yearly goals that were tracked and discussed during the monthly F&P meetings. FE-2 explained that the annual goal— called the Annual Operating Plan or "AOP"—was set at the beginning of each year and the quarterly goals were set at the beginning of each quarter.

94.     FE-2's team produced a forecasting dashboard called "Goals Pacing" in Tableau that was updated daily. The Goals Pacing dashboard included, among other things, home offer requests, home offers made, home offers accepted, home evaluations, home offers accepted after evaluation, and home purchases. FE-2's team also measured the accuracy of forecasts and broke them down by day, week, month, and quarter in the Goals Pacing dashboard. Forecast and progress against goals for the metrics tracked by the Goals Pacing dashboard, including home purchasing volume, were reported up to Zillow Offers' management via the Goals Pacing dashboard. FE-2 also said that the Goals Pacing dashboard was used by many of the teams across Zillow Offers and that all Zillow Offers executives had access to the dashboard. FE-2 also knew that Krishna Rao and Warren Jackson checked the dashboard because he had received questions from them about metrics on the dashboard.

95.     FE-2 said that during monthly F&P meetings that he attended during the first half of 2021, a frequent topic of conversation was that Zillow had missed its home purchasing goals and whether corrections were needed to Zillow's home appreciation model. FE-2 said that Zillow tracked home appreciation from the time an offer was made until the time a purchase closed. As a result of Zillow's review of home appreciation during this period, FE-2 said that he was informed that the Company concluded that it was "under-modeling" the level of home appreciation, and that they were making too much money on home sales and not gaining enough market share.

96.     FE-2 was informed that Zillow Offers management discovered that Zillow Offers had been significantly underpricing homes during the first four months of 2021 and was significantly behind its AOP goal for home purchasing volume. FE-3 likewise recalled that in the



first quarter of 2021, Zillow was far behind on its home purchasing goals, as it was brought up on various team calls.

**F.    Zillow Tells the Market That Zillow Has Improved Its Pricing Model to More Accurately Understand Market Trends, Despite Deciding to Override It**

97.    Although Zillow posted another quarter of higher-than-expected Zillow Offers unit profitability in the first quarter of 2021, during the Company's May 4, 2021 earnings conference call, Parker acknowledged that Zillow Offers' home purchasing volume for the quarter was "not quite at the pace we planned," but represented that "[w]e made progress during the quarter on improving offer strength and sharpened pricing" and "we continue to work on refining our models to catch up with the rapid acceleration in home price appreciation" to run the business with "the plus or minus 200 basis point guardrails we've set for ourselves while working to scale the business."

98.    Analysts likewise noted the volume miss, but repeated Parker's representation that Zillow would be able to refine its models to address the issue. For example, BTIG noted that home "purchases trailed expectations and that flows through to a below-Street 2Q guide" but noted that it believed the company could quickly alleviate the issue with "more staffing" and "re-tooling of purchase models." Oppenheimer wrote that "the Z bull case is that its brand would drive Offers traffic and conversion" but that "the company seems challenged with Zillow Offers conversions." Canaccord Genuity reported that "the company purchased homes at a more modest pace while it refines its models to reflect the rapid acceleration of home price appreciation."

99.    Then, in mid-June 2021, Zillow told the market that it had improved its pricing model to "react more quickly to current market trends" and thus more accurately "[predict] a home's current value." In particular, on June 15, 2021, Zillow issued a press release titled "Zillow Launches New Neural Zestimate, Yielding Major Accuracy Gains." The press release stated in relevant part:

> Zillow today launches significant upgrades to its Zestimate® home valuation model. ***The changes allow the algorithm to react more quickly to current market trends*** ….
>
> The new Zestimate algorithm leverages neural networks, the latest machine learning approach, and incorporates deeper history of property data such as sales transactions, tax assessments and public



records, in addition to home details such as square footage and location.

Neural networks are artificial intelligence systems that imitate how the human brain works. They are able to map hundreds of millions of data points efficiently, drawing connections among inputs and using the relationships formed to produce or predict an output. In the case of the Zestimate algorithm, the neural network model correlates home facts, location, housing market trends and home values.

***As a result of this update, the Zestimate can now react more quickly to dynamic market conditions, providing homeowners with a more accurate estimate [prediction] of a home's current value***. In addition, transition to a neural network-based model will reduce Zestimate processing time.

'Since we introduced the Zestimate in 2006, we have never stopped innovating in order to provide consumers with the most accurate home valuations,' said Dr. Stan Humphries, Zillow chief analytics officer and creator of the Zestimate. 'The new architecture we're debuting today represents another significant step forward in our efforts to harness big data to create more certainty for consumers, which leads to better decisions.' …

As a result of the company's ***increasing confidence in Zestimate accuracy***, in February Zillow began using the Zestimate as a live, initial cash offer through its home buying program, Zillow Offers. The Zestimate is an initial cash offer on about 900,000 eligible homes across 23 markets. With this latest update and increased Zestimate accuracy, the number of homes eligible for a cash offer will likely increase by 30%.

In response, Canaccord Genuity reported that:

Zillow announced significant upgrades to its Zestimate home valuation model in June, with the company utilizing neural networks to analyze additional property and transaction data during the calculation process, *enabling Zestimates to react to changing market trends faster and ultimately generating more accurate valuations*....

### G.   Project Ketchup: To Increase Volume, Zillow Put Overlays on Top of Its Algorithm, Which Caused It to Significantly Overpay for Homes

100.    As discussed above, after the first quarter of 2021, Zillow knew it was not meeting its home purchasing goals. As a result, Zillow launched an initiative it called "Project Ketchup"— a play on the words "catch up"—in an effort to speed up the pace of home purchases. Instead of following its algorithms and disclosed pricing models and process, Zillow instead simply applied systematic "overlays" to drive up offers well above the price indicated by its algorithm and pricing

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

analysts to increase offers and boost volume. These overlays caused Zillow to significantly overpay for thousands of homes.

101. As The Wall Street Journal reported after the Class Period, based on interviews with current and former Zillow employees, in the Spring of 2021, "Zillow put together a plan to speed up the pace and volume of home purchases, dubbing it Project Ketchup, which employees took as a play on the team's mission to catch up to Opendoor. Zillow planned to buy more homes by spending more money, *offering prices well above what its algorithm and analysts picked as market value, people familiar with the matter said*."

102. The Wall Street Journal further reported that the increased offers were achieved by applying overlays, or "automatic price add-ons coded into the system":

> Analysts whose job it was to confirm the prices of homes found that they were routinely overruled, those people said, because the company had retooled the system to raise the analysts' suggested prices. Automatic price add-ons coded into the company system, including one called the "gross pricing overlay" that could add as much as 7%, would boost offering prices to get more home sellers to say yes.

103. After the Class Period, Bloomberg reported that:

> [A]fter Opendoor went public, via a special purpose acquisition company, or SPAC, Barton decided to take his BHAG [big hairy audacious goal] to the next level. Zillow introduced an initiative dubbed "Project Ketchup" to close the gap with Opendoor. Employees got merch to mark the occasion, including water bottles made up to resemble condiment containers, as well as an actual bottle of Heinz.

Bloomberg further wrote that Zillow "*raised its bids, sometimes bumping the numbers its pricing software spit out by tens of thousands of dollars* as part of a process known internally as 'offer calibration.'"

104. Following the Class Period, Business Insider likewise published an article, titled "Zillow insiders are blaming an internal initiative called Project Ketchup for the company's home-flipping failures," that told a similar story based on the accounts of Zillow employees. For example, the Business Insider article reported that:

> At the beginning of 2021, four employees told Insider, Zillow launched an initiative to supercharge its homebuying and gain ground on Opendoor, the nation's largest instant buyer, or iBuyer,

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 29
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

and Zillow's chief rival in the emerging business. That effort, a play on the words "catch up," was called "Project Ketchup" internally. The plan worked but began to bleed ink as red as the condiment it was named for, employees said.

105.    The Business Insider article further corroborated that changes made as part of Project Ketchup caused Zillow to pay too much for homes, and that the overpayment was caused not by Zillow's algorithm, but instead by "the overexuberance of human managers":

> The employees' accounts suggested that Zillow's iBuying problems had less to do with a glitch in its computer-driven, algorithmic approach to purchasing homes or unpredictable swings in prices and more to do with the overexuberance of human managers. Employees said leaders at the company failed to heed signs that Project Ketchup was prompting it to pay too much for homes....

106.    The article also included a picture of the Project Ketchup merchandise that Zillow provided to its employees as part of the Project Ketchup initiative:



107.    Statements from numerous former Zillow employees confirm that Zillow launched Project Ketchup in the Spring of 2021 to catch up to its home purchasing goals and gain market

share. FE-2 said that around May or June of 2021, Zillow Offers' management said during an F&P meeting that Zillow would be "aggressively" adjusting the Company's home offer pricing upwards to try to keep up with how "hot" the housing market was at the time. FE-2 also recalled being informed during the meeting that Zillow had an increased appetite for risk. FE-2 believed that the aggressive new strategy was part of Project Ketchup. FE-2 said the shift to a more aggressive home buying strategy was done in conjunction with the Zillow executive level. FE-2 believed that Luis Poggi, Vice President of Product & Engineering at Zillow, was the architect of Project Ketchup.

108.    FE-4 recalled first learning about Project Ketchup in a meeting in May or June 2021. FE-4 understood one of the purposes of Project Ketchup to be to increase Zillow Offers' market share to catch up with competitors. FE-4 indicated that his General Manager told FE-4 that the General Manager discussed the overpayments with the Regional Manager of his area. According to FE-4, his Regional Manager reported to Josh Swift (Senior Vice President, Zillow Offers) and Judith Simon (Vice President, Field Operations).

109.    FE-1 recalled beginning work on Project Ketchup in approximately March or April of 2021. FE-3 learned about Project Ketchup during an All Hands Call in February or March 2021 timeframe, during which Simon, who led the call, explained Project Ketchup. FE-3 also said, however, that Project Ketchup "kicked in" in April 2021. FE-3 said the goal of Project Ketchup was to buy as many homes as possible. FE-3 said that through Project Ketchup, Zillow made more lucrative offers to try to get sellers to sell to Zillow. FE-3 also said, however, that it was widely known within the Company that Zillow's offers to purchase homes during Project Ketchup exceeded the worth of the homes.

110.    According to former Zillow employees, the Company did, in fact, apply coded overlays that caused it to make offers well above what its algorithm and analysts picked as market value. FE-2 explained that over a three-month period between May and July 2021, Zillow made multiple upward adjustments to its home price offers. FE-2 believed that the adjustments amounted to a significant over-adjustment that created a cascade of problems. FE-2 said that the upwards adjustments in home offer pricing were implemented through overlays that were referred to internally as "Gross Pricing Overlays." FE-2 explained that traditionally, a pricing analyst worked

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 31
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

within an underwriting spreadsheet that was used to calculate home offer prices. FE-2 said that to adjust prices upward, Zillow applied the Gross Pricing Overlay on top of the home offer price calculated in the "underwriting spreadsheet." FE-2 stated that Zillow did not make adjustments to its algorithms in order to increase home offer prices.

111.    FE-2 believed that the first Gross Pricing Overlay was implemented around the end of May 2021 or the beginning of June 2021, and that it increased home offers by approximately 400 basis points, on average. FE-2 said that in total he believed the Gross Pricing Overlays applied between May 2021 and July 2021 increased home offer prices by 700 to 800 basis points, on average, across all markets. FE-2 explained that the Gross Pricing Overlays were implemented differently in different regional markets, but that the basis point increase he referred to was the combined nationwide average. FE-2 recalled that one component of the Gross Pricing Overlay was called an OCS adjustment, but he could not recall what OCS stood for (though identified by another FE as the Offer Calibration System). FE-2 believed that the Pricing team was responsible for determining Gross Pricing Overlay and OCS values, and that Krishna Rao also played a role in determining those values.

112.    FE-2 said that the unofficial end of Project Ketchup likely occurred around August 2021 when Zillow Offers knew that it was going to catch up to the target pace it needed to meet its AOP home volume goal. But FE-2 said that he did not think that Zillow Offers removed the Gross Pricing Overlay as a result of reaching this goal.

113.    FE-2 said that it was widely known throughout Zillow Offers that Zillow was using the Gross Pricing Overlay and that it was not a secretive thing. FE-2 recalled that the Gross Pricing Overlays were definitely discussed during the monthly F&P meetings. FE-2 said he would be very surprised if Barton and Parker were unaware of the Gross Pricing Overlay initiative, because it was one of the biggest pricing initiatives Zillow Offers had ever done and would have a huge impact on the business.

114.    FE-1 said that Zillow acquisition analysts calculated home offer prices using a preprogrammed pricing spreadsheet. According to FE-1, after the acquisition analysts populated the spreadsheet with all the information for a home, the machine learning algorithm would take

over and provide the adjusted offer price. Starting in or around March 2021, FE-1 said that Zillow Offers began adding an "OCS"—or Offer Calibration System—value on top of the home offer prices that FE-1 calculated. FE-1 first learned of the OCS via weekly emails where he was told not to be "alarmed" if his values changed due to an OCS addition. After FE-1 calculated a home offer price, FE-1 said that an OCS value was added on top in the spreadsheet. FE-1 said that while he could alter other values in the spreadsheet, the OCS was a hard value that could not be changed. FE-1 worked with other analysts all over the country and from conversations FE-1 had with them, FE-1 understood that Zillow Offers was adding OCS values to home offer prices across the board all over the country. FE-1 believes that the OCS values were added to adjust for where the Machine Learning team believed the home values would be in 60 to 90 days, but he could not provide a specific basis for that belief.

115.     The impact of Project Ketchup is clear in Zillow's home purchasing volume results, as demonstrated in the chart below.



|  | 1Q20 | 2Q20 | 3Q20 | 4Q20 | 1Q21 | 2Q21 | 3Q21 | 4Q21 |
|---|---|---|---|---|---|---|---|---|
| Homes Total Revenue | 769.9M | 454M | 187M | 304M | 704M | 777M | 1.2B | 3.3B |
| Homes Income (Loss) Before Taxes | -98M | -80M | -70M | -67M | -58M | -59M | -422M | -342M |
| Homes Adjusted EBITDA | -75M | -61M | -59M | -47M | -34M | -29M | -381M | -206M |
| ZO Homes Purchased | 1,479 | 86 | 808 | 1,789 | 1,856 | 3,805 | 9,680 | 8,594 |
| ZO Homes Sold | 2,394 | 1,437 | 583 | 923 | 1,965 | 2,086 | 3,032 | 8,353 |
| ZO Homes in Inventory | 1,791 | 440 | 665 | 1,531 | 1,422 | 3,142 | 9,790 | ~10,000 |
| ZO Home Acquisition Cost (% of Revenue) | 89.70% | 90.20% | 91.10% | 85.90% | 87% | 87.10% | 91.70% | 100.80% |
| ZO Renovation Costs (% of Revenue) | 4.80% | 5% | 4.30% | 3.10% | 3% | 2.70% | 1.90% | 1.40% |
| ZO Holding Costs (% of Revenue) | 1.30% | 1.30% | 1.50% | 0.50% | 0.60% | 0.60% | 0.60% | 0.80% |
| ZO Selling Costs (% of Revenue) | 4.30% | 4.30% | 4% | 3.80% | 3.80% | 3.80% | 3.40% | 3.20% |
| ZO Total Operating Costs (% of Revenue) |  | 100.90% | 100.90% | 93.30% | 94.50% | 94.20% | 97.60% | 106.20% |
| ZO Return on Homes Sold Before Interest Expense (% of Revenue) | 4 bps | -89 bps | -90 bps | 668 bps | 549 bps | 576 bps | 237 bps | -619 bps |
| ZO Interest Expense (% of Revenue) |  | 1.30% | 1.50% | 0.80% | 0.50% | 0.50% | 0.50% | 0.70% |
| ZO Return on Homes Sold After Interest Expense (% of Revenue) | -139 bps | -220 bps | -235 bps | 588 bps | 494 bps | 531 bps | 183 bps | -691 bps |

116.    In the first quarter of 2021, Zillow purchased 1,800 homes. But by the second quarter 2021, when the overlays began in earnest, Zillow purchased 3,805 homes. By the third quarter of 2021, Zillow had purchased 9,680 homes. In other words, Zillow purchased twice as many homes in the second quarter than it did in the first quarter, and more than twice as many homes in the third quarter than it did in the second quarter. Zillow also purchased 8,594 homes in

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the fourth quarter of 2021, a staggering number given that Zillow announced it had paused new purchases in October 2021, and therefore this was just the number of homes Zillow had under contract halfway through the third quarter.

117.    Project Ketchup also dramatically altered Zillow's balance sheet. For example, Zillow Homes revenue grew almost *ten* times in the span of a single year—going from $304 million in the fourth quarter of 2020 to over $3.3 billion in the fourth quarter of 2021.

**H.    Internally, Zillow Employees Repeatedly Raised Concerns That the Company Was Overpaying for Homes**

118.    After Zillow applied the overlays on top of the algorithm to increase offers, employees across Zillow Offers repeatedly raised concerns internally that Zillow was paying too much for homes. As The Wall Street Journal later reported, "Zillow also overstretched its staff as it tried to catch up to competitors and ***disregarded internal concerns that it was overpaying for homes***, according to former and current employees."

119.    Likewise, The Wall Street Journal explained that: "***Staffers grew concerned Zillow was paying too much***, people familiar with the matter said…. Some ***Zillow employees complained about the pricing in company Slack channels and meetings, but their concerns went largely unaddressed or they were told that the model was working as intended***, several current and former employees said."

120.    After the Class Period, Bloomberg quoted a former Zillow employee as saying, "People would be so happy when we showed up at their door…. I could tell them, 'Hey, I'm going to start a small fire in your yard just to see if it burns well.' They'd be like, 'Cool, you're paying me $50,000 over the value of my home." Bloomberg further reported that: "When staffers raised concerns with their superiors, management reassured them it was all part of the plan, former employees say."

121.    Former Zillow employees have confirmed that the adjustments Zillow made caused it to significantly increase its offers, and that employees internally raised concerns about the overpayments but were ignored. For example, FE-1 said that OCS increases started small, but by April and May 2021, FE-1 was seeing bigger and bigger jumps in price from the OCS add-ons.



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

FE-1 said that the OCS amounts were initially around $10,000, but then increased thereafter. The largest OCS add-on that FE-1 recalls seeing was $100,000. For example, FE-1 recalled that he priced a home for $800,000 only to have a $75,000 OCS value added on top. FE-1 said that the OCS add-ons eventually got so large that they began throwing off the home offer prices calculated by FE-1 and other members of the Acquisition Team. FE-1 said that Zillow continued to add OCS values to offers until November 2021. FE-1 said that at first, OCS values were only added to about 10% of home offers, but by the Summer of 2021, OCS values were being added to almost every other home offer, and by September 2021, OCS values were added to 90% of home offers.

122.    FE-1 said that the OCS amounts almost always meant that Zillow was overpaying for a home. FE-1 explained that part of his performance was assessed based on the accuracy of his valuations, and recalls being frustrated when large OCS values were added because it would affect his performance metrics. FE-1 also recalled being asked to conduct 60-day or 90-day look-back reviews to determine why certain houses had not sold. FE-1 always determined that while the house would have sold according to his pricing, the house did not sell because the OCS value was too high.

123.    FE-1 told his manager, Shannon Foster, that the OCS was really increasing the price and "screwing the value," but she never followed up. FE-1 also said that as OCS values increased over time, members of the Acquisition Team began "red flagging" and complaining to the Machine Learning team, via a "Slack" channel, that the OCS values were too high and over-adjusted too much and were "screwing" with their offer pricing. According to FE-1, the Machine Learning Team was "completely adamant" that machine learning was working as it should and the OCS amount was correct.

124.    FE-4 also confirmed that the higher offers were discussed during regional market meetings, Renovations All Hands meetings, and at least one company-wide All Hands meeting. During a Renovations All Hands meeting in April or May 2021, FE-4 recalled hearing someone in Zillow management acknowledge paying more to acquire homes. FE-4 recalled that both Josh Swift and Judith Simon participated in the meeting, and at least one of them commented on the

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 36
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

strategy of paying more nationwide to acquire more homes. FE-4 said that the reason given for the increased offer prices was to establish higher market share.

125.    FE-4 said that starting in May 2021, the issue of Zillow overpaying for homes was brought up in regional market meetings FE-4 attended that included all of the managers in FE-4's region (e.g., General Manager, Assistant General Manager, Regional Manager, Field Managers, etc.). FE-4 recalls that during these meetings, the General Manager and Assistant General Manager in his region said that Zillow was intentionally paying too much for homes, and that the overpayment was being done at the direction of Zillow leadership. FE-4 said the fact that Zillow was overpaying on purpose was a constant topic of discussion at the regional market meetings FE-4 attended. FE-4 also recalled hearing about the increased offers on at least one company-wide All Hands meeting that was attended by Rich Barton. Yet, in spite of this "open secret," the overpaying for homes nevertheless continued. FE-4 stated that by mid-summer 2021, Zillow was over-paying $30,000 to $100,000 over the initial Zestimate in order to close on homes in his market in the Southeastern United States.

126.    Around the time the adjustments were made, FE-2 also recalls asking his superior why Zillow was making such aggressive adjustments and whether it was worried about overpricing. FE-2 was told that his supervisor was not the one making the decisions, and that Zillow had an increased appetite for risk.

I.    **Project Ketchup: To Increase Volume, Zillow Squeezed Its Contractors, Which Caused Contractors to Refuse Jobs and Created a Massive Backlog**

127.    As discussed above, after a potential seller accepts a first offer from Zillow Offers, the Company then sends an inspector to inspect the house and determine what renovations are necessary to get it ready to sell. The costs of those renovations are then deducted from the Final Adjusted Offer. Prior to and during the Class Period, another way that Zillow attempted to increase its offers and drive volume was by decreasing the scope of renovations on houses as well as the prices it paid for renovations. Those changes also decreased Zillow's renovation costs, thereby positively impacting its closely-watched home unit economics.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

128. The changes were unsustainable, however, as they significantly squeezed Zillow's longtime contractors, who were being asked to renovate more homes for less money than previously charged for the same renovations. As a result, Zillow's contractors unsurprisingly began declining jobs. Without sufficient contractors to complete its renovations, Zillow's homes languished and it built up a substantial backlog. This backlog impacted Zillow's ability to quickly sell its homes, thereby increasing its holding and interest rate costs and exposing it to additional risks from broader market movements.

129. For example, Business Insider reported after the Class Period that: "Through its Project Ketchup initiative, employees said, *Zillow sought to increase the competitiveness of its bidding by offering sellers fewer deductions from the purchase price*. Homeowners were thrilled—and Zillow began to win thousands of homes." It further reported that: "The higher prices that Zillow was paying left it with precariously thin budgets for repairs, the source, along with another current employee and a contractor who works with the company, told Insider. The contractor, who also worked in Southern California, said *Zillow began to reduce the price it was willing to pay for specific types of renovation work and shrink the scope of many jobs*."

130. Business insider further reported that:

> Those adjustments, rolled out across the company's sprawling portfolio of homes, began to strain the relationships it had with hundreds of contractors whom it relied on to fix up the homes it bought and prepare them for resale. Employees said contractors who were used to tackling a few jobs at a time for Zillow that totaled in the tens of thousands of dollars, were asked to complete as many as dozens of jobs a month, each one now paying only a few thousand dollars. Contractors had to manage a growing number of construction projects across a wider geography and buy a host of materials for a variety of repairs. The work, employees added, was less profitable and more taxing logistically.

131. As a result, according to the Business Insider article, contractors began refusing to work with Zillow:

> The Southern California contractor, along with another contractor in Texas, said that other iBuyers, such as Opendoor and Redfin, often paid more for the same work, which *prompted some to de-prioritize Zillow jobs or cut ties with the company*. "Redfin pays $2.25 a foot to paint a home, and Zillow would give you $1.35," the Southern California contractor said, adding that his company had renovated

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 38
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

over 300 Zillow-owned homes. "***They had a lot of difficulty finding contractors because their pricing was terrible***."

The article further confirmed that Zillow's issues with getting homes renovated was self-imposed:

> The Zillow employee in Southern California said that much of the company's labor problems stemmed from those strains brought on by Project Ketchup, not the economywide shortages that top Zillow executives, including CEO Rich Barton, said were responsible for its backlog of homes. Another former Zillow employee who worked with contractors across all markets told Insider that he believed Project Ketchup had hurt the firm's reputation with contractors. "Our name on the street was squandered," the employee said.

132.    The Business Insider article also explained that: "With a scarcity of labor, Zillow's problems began to cascade. ***Homes it had acquired lingered on its balance sheet for longer periods because it couldn't make the necessary repairs to bring them back to market for resale***." Additionally, Business Insider reported that: "Homebuyers also began to notice the more frugal improvements that Zillow was making to homes, which made them harder to sell. 'The phrase that we heard over and over again was, 'This doesn't look like a Zillow home,'' the Southern California source said. 'Zillow had stopped putting the work in.'"

133.    As Business Insider reported: "***Holding onto properties ate into the business' profitability.*** The Zillow employee said the company told employees who worked within its iBuying business that ***it cost the company on average about $225 a day to hold a property*** — a total that came from the price of the capital it used to acquire homes, plus other charges, such as taxes, insurance, and maintenance."

134.    These accounts are further corroborated by multiple former Zillow employees. For example, FE-5 said that after he left Zillow in March 2021, he learned from colleagues who stayed on at Zillow that around April or May 2021, the Company was lowering its rates for renovation work, squeezing its contractors. After leaving Zillow, FE-5 began working for a general contractor in August 2021 who worked with Zillow and saw for himself that Zillow had dropped its rates for renovation work significantly below market rates. FE-5 gave the example of wooden fencing, relaying that whereas Zillow had previously paid about $22 per linear foot for fencing, in April or May 2021, FE-5 heard that Zillow lowered this rate to $19 per linear foot. FE-5 understood that

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 39
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   Zillow instituted an approximately 20% drop in pricing across the board (interior paint, fencing,

2   roofing, etc.).

3       135.    Former Zillow employees also confirm that Zillow also significantly narrowed the

4   scope of work for its renovations. FE-4 said that in late 2020, Zillow Offers instituted a "Scoping

5   Limit" on homes that were being acquired, which included a three-tiered rating system on how

6   much renovation work could be done on a property. FE-4 explained that Zillow would rate each

7   property with either a "Zero Scope," a "One Scope," or a "Two Scope," which dictated the scope

8   of the work that could be done on that property. FE-4 said that a Zero Scope meant that Zillow

9   would authorize very limited work (e.g., spot painting) on a home to get the home ready for sale.

10  A One Scope meant Zillow would allow for minor improvements and repairs, and a Two Scope

11  would allow for more extensive work like painting, carpeting, and flooring replacements. FE-4

12  explained that the scope assignments for each property came from up high and he did not know

13  how they were assigned.

14      136.    FE-4 recalled that Zillow increased the percentage of houses to which it assigned a

15  Zero Scope on at least two occasions in 2021. First, in the first quarter of 2021, FE-4 said that

16  Zillow increased the number of houses Zero Scope houses to about 40% of houses it acquired. In

17  mid-summer 2021, FE-4 said that Zillow again increased the number of Zero Scope houses to

18  about 50% to 60% of the homes it acquired. FE-4 also recalls being told by his manager that Zillow

19  was trying to reduce the scope of renovations to speed up the time between acquisition and resale.

20  FE-4 also became aware that by June or July 2021, Zillow was also often waiving some or all of

21  the renovation costs normally included as a reduction in setting the adjusted offer price. FE-4 said

22  he heard of this practice in Regional Market meetings as well as in conversations with other

23  managers. FE-4 believed that doing Zero Scope renovations would decrease the ability to resell

24  houses, since it seemed to him like a person would be less likely to buy a house that did not have

25  fresh paint or had stained carpets. FE-3 likewise confirmed that during Project Ketchup, Zillow

26  began covering renovation costs on homes it purchased.

27      137.    FE-3 said that in May 2021, Zillow started shrinking the size of renovation work

28  scopes for houses. FE-3 said that the average renovation amount per house went from $8,000–

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 40
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

$10,000 to closer to $4,500. FE-3 said his team came up with the directive to shrink scope sizes based on what renovations they thought Zillow was doing that it did not need in order to sell a house. FE-3 said the conversations about reducing the scope started in January or February 2021 and the plan was implemented shortly thereafter. FE-3 said the shrinking of renovation scopes spread to certain other markets but not all of them.

138.   Moreover, Plaintiff's investigation has confirmed that, as a result of the lowered prices and narrowed scopes, contractors began refusing to work for Zillow, which meant that Zillow did not have enough contractors to complete renovations. FE-4 said that by the summer of 2021, many contractors were refusing to work on Zillow properties because lowered renovation rates and narrowed scopes of work meant that the contractors wouldn't make enough money on the jobs. Additionally, FE-4 said that some contractors did not want to work on Zero Scope or One Scope jobs because the finished jobs looked unprofessional and they did not want their company names associated with them. FE-4 also explained that some of the contractors who were still willing to take Zillow jobs were overloaded because of the higher volume and did not have the capacity to take on more work. FE-4 said that by July 2021, it was getting harder and harder to find contractors to do renovation jobs.

139.   FE-5 said that before Zillow lowered the rates it paid for renovations, Zillow's renovation rates would typically be in the same price range as its competitors and contractors working for Zillow could make a small profit. However, FE-5 said that after Zillow's rate dropped, contractors could no longer make a profit. FE-5 said that once Zillow lowered rates for renovations, many of its established contractors would no longer bid on Zillow jobs. In April or May of 2021, FE-5 heard from his former colleagues still at Zillow that the Company's long-time contractors were starting to refuse to work for Zillow. FE-5 said that he was aware of at least five contractors in his areas in the Southern United States who walked away from Zillow because they couldn't make money on the jobs. FE-5 also relayed that the contractor he began working for in August 2021 decided not to take on new jobs with Zillow because the work was below market rates.

140.   FE-5 said that when contractors declined jobs with Zillow, they had to provide Zillow's Vendor Management unit with a reason for declining. As a result, Zillow would have

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 41
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

been aware that contractors were declining to take jobs because of the price points. For example, FE-5 said that when the contractor he worked for starting in August 2021 stopped accepting work from Zillow, it indicated through the Vendor Management feedback process that the reason was Zillow's low rates.

141.    FE-4 said that the contractor shortage was discussed at both Market Level Meetings and during Renovations All Hands meetings. FE-4 recalled that at least as early as April or May 2021, Zillow Offers management mentioned that they were trying to increase contractor capacity to address the backlog of homes needing renovation. By July or August 2021, FE-4 recalls one of the Zillow managers mentioning during a Renovations All Hands meeting that Zillow was going to loosen the requirements for contractors to work with Zillow, for example by lowering insurance minimums for contractors to qualify.

142.    Former employees have also confirmed that these issues created a massive backlog of homes in need of renovation. For example, FE-4 said that when he first learned of Project Ketchup in May or June 2021, he understood the role of the Renovations Department in Project Ketchup to be increasing the speed of renovations to reduce the backlog of homes needing work. Despite the backlog that already existed, Zillow pressed ahead with acquiring new homes through Project Ketchup, which only exacerbated the problem. According to FE-3 Zillow's inability to timely renovate homes, and its backlog of homes, resulted from Project Ketchup. According to FE-3, through Project Ketchup Zillow was buying more homes than it had the capacity to renovate. FE-3 said the increase in volume began in July 2021 and continued until Zillow Offers was shut down. FE-3 said that, whereas volume in the Southwestern areas had previously been 70-80 homes per month to renovate, all of a sudden it was up to 300 homes per month.

143.    FE-4 said that by June 2021, Zillow was buying more homes than it could possibly renovate with a quick turnaround and that there were a limited number of contractors available to complete renovation work. FE-4 first noticed the backlog in June 2021, and at that point there were approximately 700 homes in his market in the Southeastern United States that were waiting on renovations. Prior to that point in time, FE-4 said the average number of homes undergoing various stages of renovations in this market at any given time was about 300. FE-4 said that by September

1  2021, the backlog had gotten worse and there were approximately 1,000 homes in his market that
2  needed renovation work.

3  144.   FE-4 said that the backlog was not limited to just the one market where he worked
4  in the Southeast, but rather by June 2021, the entire Zillow Offers portfolio had a backlog of homes
5  that needed renovations. FE-4 recalled the nationwide backlog problem being discussed both at
6  Market Level Meetings and on Renovations All Hands meetings in June 2021. The Renovations
7  All Hands meetings were attended by everyone under the Renovations umbrella companywide,
8  including Renovations upper-management like Josh Swift (Senior Vice President, Zillow Offers)
9  and Judith Simon (Vice President, Field Operations). During those June 2021 meetings, FE-4
10  recalled that there was discussion about figuring out a way to get the number of homes in the
11  backlog down. FE-4 was also aware that other markets were experiencing a backlog based on his
12  conversations with other Renovation employees. For example, FE-4 says he recalls that a market
13  in the Southern United States had a backlog of 400 homes in need of renovation by September
14  2021.

15  145.   FE-3 recalled that in one of his market areas, there were hundreds of homes that
16  were sitting vacant for months, because they could not be renovated because they did not have
17  enough contractors to do the work. FE-3 said that he could review reports for the entire country
18  through the Company's Tableau computer system, which included information about the homes
19  Zillow purchased, renovation costs, how quickly renovations were completed, and when the homes
20  were sold. FE-3 said that the Tableau system was updated constantly, almost contemporaneously.
21  FE-3 checked the Tableau system daily to look at information regarding his area and said that the
22  backlog was climbing continuously. FE-3 said that the information in Tableau was available all
23  the way up to the Company's executives.

24  146.   FE-3 recalled complaining to his direct supervisor, a District Manager, that Zillow
25  did not have the capacity to handle the amount of renovations. FE-3 said that Zillow had two
26  District Managers—one for the West Coast and one for the East Coast. FE-3's District Manager
27  reported to Judith Simon and Josh Swift, who in turn worked directly with Defendant Barton. FE-

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 43
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

3 recalls that during monthly calls with Simon and Swift, and weekly calls with FE-3's District Manager, there were constant complaints about the renovation backlog.

147.    FE-3 also attended monthly calls that included Defendant Barton. During one of these meetings, FE-3 recalls employees asking Barton about the backlog of homes, and Barton responding by saying that the Company was coming up with a plan to address the backlog. FE-3 said Barton mentioned slowing down or stopping purchases to try to clear the backlog. FE-3 thought that this call took place in the July to August 2021 timeframe.

148.    Finally, FE-3 said that Zillow did not have a large enough labor force to renovate the homes it purchased, so it started sitting on homes without selling them and, as a result, started losing money.

149.    FE-3 said that in his areas, it cost $100 per day for each house to just sit there. FE-4 similarly said that the carrying costs on unsold homes—for example, taxes, utilities, and insurance—can be very expensive. FE-4 recalls his General Manager mentioning in May or June 2021 that it was costing Zillow about $300 per day to maintain each unsold house.

150.    Taking the midrange of these three values ($208), and multiplying that by 9,700 (the number of houses in Zillow's inventory at the end of the third quarter of 2021), Zillow's holding costs were about $2 million dollars per day. So if Zillow's average holding period was extended by 14 days, for example, Zillow would be required to pay $28 million in holding costs. An extra 30 days in the holding period could potentially expose Zillow to more than $60 million in holding costs.

**J.    Defendants Materially Misled the Market**

**1.    Defendants Materially Misled the Market About the Reason for Zillow's Increased Volume and Demand**

151.    During Zillow's August 5, 2021 Q2 2021 earnings conference call, the Company reported increased home purchasing volume of 3,805—more than double the 1,856 homes purchased the previous quarter. Defendants did not tell investors, however, that they had achieved this volume by applying overlays to their pricing model (which already assumed as much as a 20% reduction in the cost Zillow would pay for renovations), which caused Zillow to significantly

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

overpay for homes. Instead, Defendants misrepresented that the purported significant improvements in their pricing models had driven the higher volumes and conversions in the quarter. For example, Zillow's August 5, 2021 shareholder letter stated:

> The record number of homes purchased was more than double that of Q1 2021 and is ***a direct reflection of the customer value proposition, <u>the progress we have made in strengthening our pricing models</u> and automation when providing offers to customers. These drivers resulted in rapid gains in our customer conversion rate*** from requested offers to signed agreements, which drove inventory to more than double from the end of Q1, with 3,142 homes in inventory at the end of Q2.

152.    Similarly, during the August 5, 2021, earnings conference call, Parker stated, "***We made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength***" and "***[t]hese improvements drove rapid gains in conversion rates*** in Q2 when compared to Q1, ***resulting in record purchases***, more than catching up to our pre-pandemic pace." As a result, Zillow's executives touted their "***confidence in our ability to scale, resulting from the progress we have made in strengthening our pricing models*** and automating the top of the funnel."

153.    These statements were materially false and misleading. In reality, the Company's higher volumes and conversion rates did not result from Zillow strengthening and improving its pricing algorithms to be more accurate. Instead, and unbeknownst to investors, Zillow was simply slapping overlays on top of its model outputs in an effort to drive higher volumes. Investors were thus misled to believe that Zillow had successfully strengthened its complex "neural network" pricing model to more carefully predict and react to market trends.

154.    During the Q2 2021 earnings conference call, Defendants also repeatedly represented that there was "***strong customer interest***" for Zillow Offers at the start of the quarter, which "***continued to accelerate*** in Q2." These statements, too, were materially false and misleading. Far from the organic and increasing "strong demand" for Zillow's iBuying service, Defendants had, in truth, artificially created "demand" through the significant and unsustainable overpayments the Company was offering to entice sellers and drive higher home purchase volumes.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 45
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

155.   Analyst reports issued in response repeated the Company's representations, highlighting that Defendants' spin worked. For example, on August 5, 2021, Piper Sandler wrote: "Homes Segment Rebounds in 2Q: *ZG recently updated its ZOffers algorithm to adapt to a rapidly changing market* after guiding down 2Q Homes revenue. We wrote about this recently and *it appears the updates seem to be working* …. We see the growth inflection back on track." The following day, Barclays reported that: "Homes segment guide was well ahead (+74% or $645m) as *improved pricing models and increased seller interest helped more than double inventory at quarter end, positioning the segment to continue to scale*…." Berenberg wrote that: "[i]mportantly, the company highlighted that its pricing model for Homes was improving. We point to that as a key catalyst to delivering profitability for the segment...."

156.   On August 6, 2021, BTIG similarly wrote that: "*getting back on track in Offers after having to retool pricing algos back in 1Q was encouraging*" and gave BTIG "increased comfort in the ability to ramp the Offers platform over the next several years." That same day, Wedbush reported that: "*Zillow saw a slow down in purchases in 1Q as its Offers operations were too slow to react to the strong demand market, missing out on opportunities. Zillow created a much more flexible and therefore faster Offers model which is driving the step-up in purchases.*" On August 9, 2021, analyst Stephens reported that: "ZG accredited some of the strength in the quarter to increased automation and its new 'neural Zestimate,' which is helping the Company better price homes relative to the past methods (i.e., largely utilized historical sales comps)."

### 2.   Defendants Materially Misled the Market About the "Durability" of Zillow's Margin Improvements

157.   On August 5, 2021, Zillow also reported second quarter of 2021 Zillow Offers unit economics of positive 576 basis points. During the August 5, 2021 call, Defendant Parker highlighted that the second quarter Zillow unit economics "were 665 basis points higher than Q2 2020" and attributed more than half of that improvement to "durable operational improvements": "We also note that *the 353 basis point improvement from a year ago in renovation, holding and selling costs, were largely durable operational improvements*."

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 46
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

158.    Likewise, during the September 13, 2021 Piper Sandler 2021 Virtual Global Technology Conference, Wacksman again represented that "*some of those unit economic improvements are durable*," explaining that "[t]he work we're doing on more dynamic renovations, the work we're doing on selling costs as our homes brokerage improvements roll out more gradually, you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back on to the customer and eventually to the bottom line."

159.    These statements were materially false and misleading because in truth, Zillow's purported cost "improvements," included slashing the scope of its renovation jobs and the prices it was paying to its contractors, which were causing the Company's contractors to begin declining to take Zillow jobs. As a result, the Company had a massive backlog of renovation jobs that it could not complete, which meant that its homes could not be sold and were instead sitting on Zillow's books accruing significant interest costs. Defendants' statements gave the false impression that Zillow had made "durable" improvements in renovation and holding costs, when in truth Defendants knew or recklessly disregarded that the changes they made were having a material negative impact on the Company that was not durable or sustainable.

160.    Analysts again echoed Defendants' statements. For example, on August 9, 2021, analyst Stephens reported that: "Over half (~350bps) of the YOY boost in net margin expansion stemmed from structural benefits (lower renovation costs per unit, lower selling costs per unit, etc.)." On September 19, 2021, Piper Sandler reported that: "We recently hosted ZG COO Jeremy Wacksman for a fireside chat at the 2021 Piper Sandler TMT Conference." It wrote that: "[o]n the ZOffers side, management feels confident about margin improvements. While home price appreciation has helped, other improvements across renovation, holding, and resale are more durable."

## K.    The Relevant Truth Emerges

161.    Less than three weeks later, investors began to learn the relevant truth concealed by Defendants' false and misleading statements.

162.    First, on October 4, 2021, analysts from RBC Capital Markets lowered their price target for Zillow, warning that "[a]n analysis of Zillow-owned homes for sale in Phoenix" suggests

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 47
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

that Zillow Offers would likely miss quarterly expectations. Specifically, RBC Capital Markets noted that their analysis of home price reductions for Zillow's Phoenix-area listings suggest that "the company likely still has **meaningful inventory** to work through into Q4 that **was bought at too high a price** and thus we would expect Q3 results and Q4 guidance to reflect this."

163.   On this news, the price of Zillow common stock (ZG) declined $5.72 per share, or more than 6%, from a close of $91.40 per share on October 1, 2021, to a close of $85.68 per share on October 4, 2021. Similarly, the price of Zillow capital stock (Z) declined $4.98 per share, or approximately 5.5%, from a close of $90.36 per share on October 1, 2021, to a close of $85.38 per share on October 4, 2021.

164.   Several weeks later, on October 17, 2021, Bloomberg reported that Zillow would pause its buying of homes in its Offers business, through at least year-end, due to capacity constraints. The article quoted a Zillow spokesperson as saying: "We are beyond operational capacity in our Zillow Offers business and are not taking on additional contracts to purchase homes at this time... We continue to process the purchase of homes from sellers who are already under contract, as quickly as possible." Analyst Wedbush explained that: "According to the [Bloomberg] article, Zillow has run into a labor capacity issue in its iBuying business which relies on inspectors visiting a property before purchasing the home as well as contractors to make repairs like replacing appliances and repainting interiors."

165.   The following day, on October 18, 2021, Zillow confirmed the reports in a press release, disclosing that: "[d]ue to a backlog in renovations and operational capacity constraints," Zillow Offers "will not sign any new, additional contracts to buy homes through the end of the year." According to Defendant Wacksman, the Company's Chief Operating Officer, Zillow is "operating within a labor- and supply-constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces," and had "not been exempt from these market and capacity issues." In turn, Wedbush downgraded Zillow to neutral from outperform after the Company confirmed that it would temporarily pause its Zillow Offers purchases due to backlogs in renovations and operational capacity constraints.

HB | HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

166.    On this news, the price of Zillow common stock (ZG) declined $8.84 per share, or more than 9%, from a close of $94.30 per share on October 15, 2021, to a close of $85.46 per share on October 18, 2021. Similarly, the price of Zillow capital stock (Z) declined $8.97 per share, or more than 9%, from a close of $94.97 per share on October 15, 2021, to a close of $86.00 per share on October 18, 2021.

167.    Then, on November 1, 2021, media outlets reported that, pursuant to a detailed analysis by KeyBanc, *most* of the homes in the Zillow Offers inventory were ***now worth less than the Company paid for them***. Specifically, KeyBanc Capital Markets found that: (1) 66% of Zillow's homes are currently listed below the purchase price (at an average discount of 4.5% versus the purchase price); and (2) 94.3% of homes in San Diego, California, 93.4% of homes in Phoenix, Arizona, and 92.6% of homes in Mesa, Arizona, were listed below Zillow's purchase price.

168.    Later that day, Bloomberg reported that Zillow "is looking to sell about 7,000 homes as it seeks to recover from a fumble in its high-tech home-flipping business." According to sources interviewed by Bloomberg, "[t]he company is seeking roughly $2.8 billion for the houses, which are being pitched to institutional investors … as Zillow seeks to recover from an operational stumble that saw it buy too many houses, ***with many now being listed for less than it paid***."

169.    In response to this news, the price of Zillow common stock (ZG) declined $20.24 per share over two trading days, or more than 19%, from a close of $105.72 per share on October 29, 2021, to a close of $85.48 per share on November 2, 2021. Similarly, the price of Zillow capital stock (Z) declined $16.43 per share, or nearly 16%, from a close of $103.63 per share on October 29, 2021, to a close of $87.20 per share on November 2, 2021.

170.    After the market close on November 2, 2021, Zillow released its third quarter 2021 financial results and announced that it was "wind[ing] down" Zillow Offers. Zillow further revealed that it had significantly overpaid for homes and would need to take write-downs of approximately $569 million because Zillow expected to sell the homes in its inventory for significantly less than it had purchased them for. Indeed, during the same-day earnings conference call, Barton disclosed that the Company expected to lose -5 to -7% on the homes in its inventory. Additionally, the Company acknowledged that it would be reducing its workforce by 25%.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

171.    Zillow told the market that it was shutting down Zillow Offers because its algorithm had not been able to accurately forecast home prices. For example, during the earnings conference call, Barton acknowledged Zillow's ability to execute in the Offers business was "*underpinned by the need to forecast the price of homes accurately 3 to 6 months into the future*," but acknowledged that "*[w]e have been unable to accurately forecast future home prices*." Ultimately, Barton explained, the Company's inability to accurately forecast home prices created too much risk to continue: "*fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in*." In other words, "*[w]hat it boils down to is our inability to have confidence in pricing in the future, enough confidence to put our own capital at risk that we don't have to*." The following day, BTIG reported that: "The big news is if of course ZG's plan to exit the iBuyer business given an inability to accurately forecast home prices and the risk that creates for the business."

172.    The Company also pinned some of the blame for the Zillow Offers shutdown on the labor issues and resulting renovations backlog that it had concealed during the Class Period. For example, it noted that:

> We have also **experienced significant capacity and demand planning challenges**, exacerbated by an admittedly difficult labor and supply chain environment. The combination of these factors has **caused a meaningful backup in our processing of homes in the Zillow pipeline**, which we announced 2 weeks ago. We judged future significant volume volatility to be a tough impediment to ramp a scaled operation, and any interruptions in the supply chain like we recently experienced will result in increased holding times, further increasing our exposure to volatility and lowering our return on equity.

173.    Canaccord Genuity echoed these explanations, writing in a November 2, 2021 report that: "*Challenges in forecasting future home prices* as accurately as originally anticipated resulted in significant volatility in Homes segment unit economics, a dynamic that was exacerbated by a *backlog in its renovation pipeline* caused by ongoing labor and supply chain disruptions…." On November 3, 2021, Evercore wrote that Zillow had "to record a $304MM write down on inventory due to *pricing homes inaccurately*." In a same-day report, Piper Sandler similarly

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 50
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

reported that: "***ZG overpaid for 9700 purchased homes in 3Q***, resulting in a $304MM impairment charge (with another ~ $250MM in charges expected next quarter on 8200 homes in contract)...."

174.    On this news, the price of Zillow common stock (ZG) plummeted an additional $19.62 per share, or approximately 23%, to close at $65.86 per share on November 3, 2021. Similarly, the price of Zillow capital stock (Z) fell $21.73 per share, or approximately 25%, to close at $65.47 per share on November 3, 2021.

175.    Analysts were shocked by the sudden announcement, and immediately bombarded Defendants Barton and Wacksman with questions that contrasted Zillow's previous statements— made only months earlier—that Zillow Offers was fundamentally sound with its sudden shift in strategy. For example, Brent Thill from Jefferies observed: "***Just last quarter, we all heard you kind of commit and say you had increasing support for the business [and] that every quarter that passed, you had more conviction.*** And then all of a sudden, the record scratches this quarter and we understand that things change. But what was it versus last quarter to now that really changed your perspective?" Ygal Arounian from Wedbush Securities also noted that: "***The way you're talking about Zillow Offers is really different than how you've talked about it in the past***, that it served a narrow part of your customers. And what you've talked about in the past is really a central piece to the puzzled offering, a central piece to Zillow 360, expecting it to drive partner leads[.]" And Andrew Boone from JMP Securities commented that "[i]t felt like [Zillow Offers] was a key on ramp for Zillow 360."

176.    Major commentators were also stunned by the suddenness of Zillow's move to shut down Zillow Offers, calling it a "debacle," a "tremendous setback," and a "major strategic retreat" that called into question Defendants' actions and credibility. For example, the Silicon Valley Business Journal noted that Zillow's announcement was "made [...] all the more surprising [in light of] the companying seem[ing] to put the petal to the metal on its iBuying service last quarter. The company purchased more homes in th[at] period than it had in the preceding 18 months combined."

177.    Business Insider described it as a "debacle, which sent its shares plummeting and ***shuttered a business line that executives had, until recently, described as essential to its growth***."

The Wall Street Journal reported that "Zillow conceded failure in what amounts to one of the *sharpest recent American corporate retreats*." The New York Times reported: "The announcement was a *major strategic retreat and a black eye for Richard Barton*, Zillow's chief executive." National Mortgage News characterized Zillow Offers as "*a financial disaster* for the parent company."

178.   Wedbush concluded that the wind down "was a *drastic and unexpected move*" as "it was *a central part of what the company was built on over the past three years*." Barclays wrote that "[e]xiting Homes marks a *sharp pivot in strategy vs. just a few quarters ago*, at which time the company was encouraged with progress and leaning in on its efforts to scale the business." Piper Sandler wrote that "*it's a major strategic shift* and *raises questions about future direction and execution capability*." It further noted that: "*management's abrupt strategic shift leaves us questioning the long-term strategy. Execution may be a problem*." On November 5, 2021, Berenberg cut its price target from $162 to $82, explaining that "*Management needs to regain credibility*. On ZG's 8/5 Q221 call, management said the company was on track to meet its long-term iBuying goals of buying 5k a month and reaching $20bn in revenue. However, that was no longer the case by 11/2's Q321 earnings as the company announced it was winding down operations."

179.   Piper Sandler wrote: "In our view, the math matters little until *management takes full ownership for mistakes*…. *Management reiterated their long-term financial targets as recently as August....*" It further noted that: "*Events suggest a string of poor decision making by management over a number of months*" and "the evidence is accumulating of a considerable execution misstep. *More recent news of internal memos titled 'Project Ketchup' that encouraged ZOffers homebuyers to accelerate purchases to 'catch up' with Open Door are particularly worrying. Management should be accountable*."

180.   Stephens reported that Zillow's announcement was "the most shocking news that hit the U.S. real estate vertical in 2021." Stephens specifically called out Defendants' false and misleading statements just a few months earlier, writing that "*it was the suddenness of the announcement* that added to the shock factor as Zillow was *coming off a record rate of home*

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 52
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**_purchases, and it was just a few months removed from a quarter (2Q21) in which the Company_** 1

**_really applauded the success it was seeing in expanding ZO_** (**_the 2Q21 shareholder letter_** 2

**_highlighted Zillow's improvements in 'pricing models and automation when providing offers_** 3

**_to customers')_**." Stephens concluded that "[c]learly, faster is not always better and Zillow (and 4

the stock) paid dearly for its, arguably, **_reckless approach to share gains_**." 5

**V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS** 6

**A.     August 5, 2021 Q2 2021 Earnings Conference Call** 7

181.     On August 5, 2021, Zillow reported its second quarter 2021 financial results, 8

including Zillow Offers' revenue of $772 million (accounting for nearly 60% of total Company 9

revenue). In the Company's earnings release, Defendant Barton specifically highlighted that 10

Zillow's "iBuying business, **_Zillow Offers, continues to accelerate_** as we offer more customers a 11

fast, fair, flexible and convenient way to move" and "is proving attractive to sellers even in this 12

sizzling-hot seller's market." 13

182.     Touting the success of Zillow Offers, the Company exclaimed in its Q2 2021 14

shareholder letter that "**_Zillow is back on track_**," stating: 15

> As we previously discussed, **_the strong customer demand for_** 16
> **_Zillow Offers at the start of the quarter continued to accelerate in_** 17
> **_Q2, resulting in the purchase of 3,805 homes and sale of 2,086_**
> **_homes. The record number of homes purchased was more than_** 18
> **_double that of Q1 2021 and is a direct reflection of the customer_**
> **_value proposition, the progress we have made in strengthening our_** 19
> **_pricing models and automation when providing offers to_**
> **_customers_**. **_These drivers resulted in rapid gains in our customer_** 20
> **_conversion rate from requested offers to signed agreements, which_**
> **_drove inventory to more than double from the end of Q1_**, with 21
> 3,142 homes in inventory at the end of Q2.

The Company also promised that: "[w]e expect homes that we purchase to have tighter pricing 22

assumptions closer to our self-imposed guardrails of plus/minus 200 basis points before interest 23

expense over the course of the second half of the year." 24

183.     In his prepared remarks during Zillow's Q2 2021 earnings conference call held the 25

same day, Defendant Barton stated: 26

> On the sell side, **_Zillow offers continued to accelerate_** in Q2 with **_a_** 27
> **_record 3,805 homes purchased. We sold 2,086 homes, generating_**
> **_a record $777 million in revenue in our Home segment,_** surpassing 28

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 53
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

**HB   HAGENS BERMAN**
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

> our internal expectations for both revenue and EBITDA. ***Importantly, the Zillow Offers*** value proposition of a fast, fair, flexible and convenient close ***has proved more than durable even in the sizzling hot sellers' market***.

Defendant Barton continued:

> As we discussed on our last call, ***we entered Q2 with strong customer interest in ZO [Zillow Offers], which accelerated throughout the quarter and into Q3***. Allen will get into more details. But as we said on our Q1 call, ***we saw significant customer demand at the beginning of Q2*** that we expected would drive revenue growth on a lagged basis in Q3, which is now leading to our strong Q3 outlook. And ***we continued to see strong growth in customer demand as we entered Q3*** that we expect will favorably impact revenue in future quarters.

Defendant Barton also reiterated the purported strength and success of Zillow Offers, stating:

As I said above, ***we are now back on track with our original objective to purchase 5,000 homes per month and to generate annualized revenue of $20 billion within the original 3- to 5-year time line.*** For Zillow Home loans, we are also on course to achieve our stated goal of 3,000 mortgages originated per month within the original time frame we set. Today, ***we are seeing more and more signals from our customers that validate our integration thesis and growth strategy***."

During his prepared remarks, Defendant Parker touted the purported strength and continued improvement of Zillow Offers' pricing models, stating:

> ***Growth in Zillow Offers continued to accelerate in Q2 and exceeded our expectations,*** with 2,086 homes sold, driving $777 million in Home segment revenue. ***We made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength. The neural Zestimate puts more weight on attributes of homes and allows more granularity at the asset level, placing less emphasis on repeat home sales price comparisons.*** In addition, we continue to make progress building automation at the top of the funnel when providing offers to customers. ***These improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases,*** more than catching up to our pre-pandemic pace.

184. Defendant Parker also attributed a significant portion of Zillow Offers' financial performance in the quarter to, among other things, improvements in the segments' renovation costs, stating:

> Our Q2 Zillow Offers unit economics of 576 basis points before interest expense, was above the plus or minus 200 basis point guardrails we set for ourselves while working to scale the business.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 54
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1


HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

> The outsized unit economic results that were 665 basis points higher than Q2 2020 did benefit from the ongoing strong housing market, which we fully recognize as temporal in nature and largely contributed to the 312 basis points lower home acquisition costs of 87.1% in Q2. ***We also note that the 353 basis point improvement from a year ago in renovation, holding and selling costs, were largely durable operational improvements***. Clearly, some portion of the holding costs and a smaller portion of the renovation costs likely benefited from the strong housing market, but we also see opportunities for continued operational improvements over time.

Defendant Parker further stated that:

> In Q3, we expect our Homes segment revenue to increase sequentially from Q2 to $1.45 billion at the midpoint of our outlook range. This step-up in pace demonstrates our confidence in our ability to scale***, resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel***.

185.   During the question and answer portion of the call, in response to a question from Jeffries LLC analyst Brent Thill, Defendant Barton stated: "I confess to being quite excited by how well Zillow Offers is doing in such a hot sellers' market …"

186.   Following Zillow's Q2 2021 earnings call, analysts latched on to Defendants' statements about Zillow Offers. For example, Piper Sandler wrote in an August 5, 2021 report: "Homes Segment Rebounds in 2Q: ***ZG recently updated its ZOffers algorithm to adapt to a rapidly changing market after guiding down 2Q Homes revenue. We wrote about this recently and it appears the updates seem to be working***," and further stated that "***the Home segment looks to have improved its purchasing model. We expect the growth cadence to get back on track***." An August 5, 2021 report from Piper Sandler similarly stated, "***the Home segment looks to have improved its purchasing model. We expect the growth cadence to get back on track***."

187.   Defendants' August 5, 2021 statements in ¶¶ 181-186, including "***Zillow is back on track***," claiming "***strong customer demand***," highlighting "***accelerated***" and "***record number of purchases***," "***improving pricing models***," launching the neural Zestimate, which sharpened "***our offer strength***" and led to "***rapid gains in conversion rates***," Zillow had "***sharpened our offer strength***" and the "***progress we have made in strengthening our pricing models***," as well as a ***353 basis point improvement in "durable" renovation cost improvement*** were materially false and misleading when made. First, Defendants' statements created the false and misleading

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 55
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

impression that the growth of and demand for Zillow Offers was organic and based upon Zillow's frequently-discussed and highlighted algorithm and pricing models. Second, Defendants' statements created the false and misleading impression that Zillow Offers' favorable margins were the result of durable and sustainable operational and cost improvements. Defendants' statements were further materially false and misleading when made because:

    a)    Zillow management overrode the offer prices generated by Zillow's algorithms and pricing analysts, and instead tacked on "overlays" to the offer prices, significantly increasing the prices Zillow Offers would pay for homes in order to entice more home sellers to accept offers to meet Zillow's volume goals. In the April to May 2021 time frame, Defendants initiated Project Ketchup to quickly ramp up the purchases of homes to meet the targets set in Zillow's Annual Operating Plan. To do so, management decided to systematically overrule Zillow's highly-touted algorithm and, unbeknownst to the market, "retooled the system to raise the analysts' suggested prices" in light of what Zillow's management internally told employees was the Company's "increased appetite for risk." These automatic price add-ons were coded into the Company system, including one called the "gross pricing overlay" in order to "boost offering prices to get more home sellers to say yes."

    b)    Rather than "sharpening" its offer prices through Zillow Offers' algorithms and pricing process, Defendants simply tacked price overlays on to prices generated through those procedures to consistently increase offer prices.

    c)    Defendants' claimed operational, unit economic, or renovation "improvements" were the result of non-durable and unsustainable slashing of renovation scopes and the amounts Zillow would pay contractors. In April or May 2021, Defendants began decreasing the scope of its renovations and the prices it would pay contractors for those renovations. Renovation cost-cutting and the squeeze on contractors came at a time when

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 56
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Zillow was relying on those contractors to quickly renovate a significantly higher volume of houses acquired by overpaying for homes using price overlays. As early as April or May 2021, management was already looking to increase contractor capacity to address the backlog of homes needing renovations. By the summer of 2021, Zillow's contractors began deprioritizing Zillow renovations or declining jobs altogether due to Zillow's actions. In turn, an increasing number of homes sat idle and Zillow built up a substantial backlog of homes that needed to be renovated. Homes Zillow had acquired lingered on its balance sheet for longer periods because Zillow could not make the necessary repairs to bring them back to market for resale. This renovation inventory backlog impacted Zillow's ability to quickly sell its homes, thereby increasing its costs and causing Zillow to lose money.

    d)    By failing to disclose that Zillow was overriding its algorithms and pricing model process by applying price overlays to increase its home purchasing volume and conversion rate, Zillow hid from the market the increased risk it took on by deliberately over-paying for homes well beyond the prices set by its algorithms and analyst pricing.

    e)    By failing to disclose that Zillow was reducing the scope of renovations and cutting prices it was willing to pay contractors, Zillow hid the increased risk of creating and exacerbating a backlog of renovations and idle home inventory, thereby increasing costs and compounding the negative financial impact of overpaying for homes through Zillow Offers.

188.    Defendants' August 5, 2021 statements in ¶¶ 181-186 attributing its "*record number of homes purchased*," "*record purchases*," "*rapid gains in our customer conversion rate*," and "*rapid gains in our customer conversion rate*" to "*the progress we have made in strengthening our pricing models*" and "*progress … in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength*," were materially false and

misleading because they gave investors the false and misleading impression that the increased volume, demand, and conversion rates for Zillow Offers were organic and based upon Zillow's frequently-discussed and highlighted algorithm and pricing models, rather than pricing overlays. They were further misleading because they omitted the facts set forth in ¶ 187(a), (b), and (d).

189.   Defendants' August 5, 2021 statements in ¶¶ 181-186 touting "*strong customer demand*" for Zillow Offers, including Defendant Barton's statements that "*we saw significant customer demand at the beginning of Q2 … [a]nd we continued to see strong growth in customer demand as we entered Q3*," was materially false and misleading because they gave investors the false and misleading impression that the touted "demand" for Zillow Offers' was organic, when in truth the Company had artificially created "demand" through the significant and unsustainable overpayments the Company was offering to entice sellers and drive higher home purchase volumes. They were further misleading because they omitted the facts set forth in ¶ 187(a), (b), and (d).

190.   In addition, Defendants' August 5, 2021 statements in ¶¶ 181-186 assuring the investors of the "*largely durable operational improvements*" that contributed to Zillow Offers' financial performance, were materially false or misleading because they gave investors the false and misleading impression that Zillow Offers had made durable and sustainable operational and cost improvements, when in truth the changes were having a material negative impact on the Company that was not durable or sustainable. They were further misleading because they omitted the facts set forth in ¶ 187(c) and (e).

**B.   September 13, 2021 Piper Sandler 2021 Virtual Global Technology Conference**

191.   On September 13, 2021, Defendant Wacksman represented Zillow at the Piper Sandler 2021 Virtual Global Technology Conference. During the conference, Defendant Wacksman engaged in the following colloquy in an interview with Piper Sandler analyst Thomas Steven Champion:

> **CHAMPION**: Let's switch gears and talk a little bit about the Zoffers [Zillow Offers] business. And I think the company was able to really effectively rebuild inventory in the second quarter. And this was more of a challenge in 1Q. Maybe you could talk a little bit about what changed in the interim and how the company is getting



better able to react to the current pricing environment with sharply rising prices.

**WACKSMAN**: Yes. I mean you hit on it. Some of the inventory growth timing was just based on the fastest home price appreciation we -- any of us had ever seen before and much stronger than both our internal and other third-party forecast we're seeing at the beginning of the year..... But I will say *what we've learned is that this business, Zillow Offers, is a business that exists across all housing market cycles, r*ight? And that's been a question that we've touched on over the past few years. Is Zillow Offers more interesting in a hot or a cold or a medium market? Zillow Offers is a really interesting opportunity for our customers in all markets. Now what customers may value continues to shift, right? *In a super hot market, it's not as hard to sell your house, yet we're still seeing record demand for Zillow Offers* .... So we were really encouraged to see while we saw these incredibly hot markets, *the strength and the appeal for Zillow Offers just continues to grow,* and we're even more confident now that this is going to be a service really in all weather markets.

192.   Champion then asked Defendant Wacksman the following about Zillow Offers economics and margin improvements:

**CHAMPION**: So getting the economics right at the unit level is really paramount for this business to be successful and to hit the kind of the long-term margin targets that you've laid out. Kind of -- can you talk about that? How are you feeling about the ability to profitably run the business, especially on some of those line items below gross profit at the unit level?

Defendant Wacksman responded with, among other things:

**WACKSMAN**: And we talk about wanting to run the business at a plus or minus 200-basis point guardrail on the unit level. And n Q2, we saw unit economics of nearly 600 basis points, I think 576 basis points. And so, yes a good chunk of that is home price appreciation, right, and the market and you saw that in HPA itself, but also in kind of holding costs correlated with the velocity of sale. *But some of those unit economic improvements are durable, right.* **The work we're doing on more dynamic renovation**, the work we're doing on selling costs as our Homes brokerage improvements roll out more gradually, *you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back onto the customer and eventually to the bottom line*.

193.   Following the conference, Piper Sandler issued reports echoing Defendant Wacksman's statements. For example, in a September 19, 2021 report, Piper Sandler wrote that: "*iBuying remains a viable opportunity in all housing markets. For instance, in a hot market, sellers appreciate the ability to walk away from the home and avoid the staging and renovation*

*process. In cool markets, iBuying offers certainty.*" The report continued, stating: "*On the ZOffers side, management feels confident about margin improvements. While home price appreciation has helped, other improvements across renovation, holding, and resale are more durable*."

194.    Wacksman's September 13, 2021 statements in ¶¶ 191-193 were materially false and misleading when made for the same reasons set forth in ¶ 187(a)-(e).

195.    Further, Wacksman's statements in ¶ 191 that Zillow Offers was "*a business that exists across all housing market cycles*," and that "*the strength and the appeal for Zillow Offers just continues to grow, and we're even more confident now that this is going to be a service really in all weather markets*" were materially false and misleading because they gave investors the false and misleading impression that Defendants' false and misleading statements in August still held true and omitted the facts set forth in ¶ 187(a)-(e).

196.    In addition, Wacksman's statement in ¶ 192 that "*unit economic improvements are durable*" was materially false or misleading when made because they gave investors the false and misleading impression that Zillow Offers had made durable and sustainable operational and cost improvements, when in truth the changes were having a material negative impact on the Company that was not durable or sustainable. They were further misleading because they omitted the facts set forth in ¶ 187(c) and (e).

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

197.    As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew, or were deliberately reckless in not knowing, that the statements identified in Section V were materially false and misleading when made, and omitted material facts necessary to make their statements not misleading. In particular, Defendants: (i) knew and/or were deliberately reckless in not knowing that the statements issued and disseminated in the name of the Company were materially false and misleading and/or omitted material facts necessary to render those statements not false or misleading; (ii) knew that these statements were issued and disseminated to the investing public; and (iii) knowingly and substantially approved, participated, or acquiesced in, and had control and ultimate authority over,

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 60
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  the issuance or dissemination of such statements as primary violators of the federal securities laws.

2  In addition to the specific facts enumerated above, the following facts also support a strong

3  inference of scienter.

4  **A.     Zillow Offers Was a Core Operation**

5          198.    Zillow Offers was a core operation at Zillow, and a topic that the Executive

6  Defendants—the Company's senior-most executives—regularly and repeatedly spoke to investors

7  on, thus demonstrating that they were knowledgeable about and actively involved in those

8  operations. Indeed, Zillow Offers was the centerpiece of Zillow's transition from a media company

9  into a transaction-focused company offering full-service real estate transaction services. For

10 several years, Defendants consistently represented that Zillow Offers was the future of the business

11 and a key driver of the Company's future growth and success. For example, during the March 2,

12 2020 Morgan Stanley Technology Conference, Defendant Barton emphasized the central nature

13 of Zillow Offers to the Company's success, including the potential for Zillow to profit off the

14 "flywheel" of associated services implicated in buying and selling a home, stating:

15             Yes. I mean I think that we've done -- ***if you think of the new***
               ***business opportunities as kind of a hub-and-spoke opportunity***
16             ***where the hub of the transaction is Zillow Offers***, when we are
               actually buying and selling homes and acting as the market maker,
17             we see a really big consumer demand … and our target is to make
               that hub profitable in and of itself and gain nice attractive return on
18             invested capital there by being a market maker. But then we also
               think that we have opportunity to hang all these spokes off of the
19             hub with these adjacent businesses with things like mortgage and
               title and escrow and perhaps moving and the other leads that come
20             off from – that flow from actually owning these transactions.

21         199.    Defendants made substantially similar, substantive statements to investors

22 concerning Zillow Offers throughout the Class Period. *See* Section V, *supra*. As another example,

23 during the Q2 2021 earnings call, Defendant Parker told investors, "We made progress this quarter

24 in improving our pricing models, including launching the neural Zestimate, which sharpened our

25 offer strength." Later during the same call, Parker also explained that: "What ***we're focused on*** is

26 trying to get the most accurate pricing." Further, during the September 13, 2021 Piper Sandler

27 conference, Defendant Wacksman signaled to investors a deep knowledge of, and focus on, the

28 Zillow Offers business, stating: "some of those unit economic improvements are durable, right.

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 61
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

The work we're doing on more dynamic renovation, the work we're doing on selling costs as our Homes brokerage improvements roll out more gradually, you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back onto the customer and eventually to the bottom line."

200. Commentary from market observers further demonstrates the core nature of the Zillow Offers operation. For example, during Zillow's November 2, 2021 3Q 2021 earnings call, during which the Company announced it was terminating the Zillow Offers business, Wedbush analyst Ygal Arounian noted that Barton "talked about it in the past" that Zillow Offers was "really a central piece to the puzzled offering, a central piece to Zillow 360, expecting it to drive partner leads, expecting it, as Allen just mentioned, on purchase originations on the mortgage side." Similarly, writing about Zillow shuttering the Offers business, Business Insider noted that Zillow Offers was a "business line that executives had, until recently, described as essential to its growth."

201. Zillow Offers was also a significant revenue driver for the Company. Indeed, after launching in April 2018, by the end of 2019, Zillow Offers was operating in 22 markets and accounted for nearly $1.4 billion—roughly half—of Zillow's total 2019 revenue. Market analysts emphasized that Zillow Offers was critical to the Company's valuation, underscoring the core nature of the business. For example, analyst Canaccord Genuity wrote in January 2020: "the Homes segment continues to be the primary stock sentiment driver and will likely surpass 50% of total consolidated revenue in 2020." Thereafter, Zillow Offers continued its rapid expansion, and by the second quarter of 2021, accounted for roughly 60% of total Company revenues. Further, Zillow Homes' revenue grew a staggering ten-fold from the fourth quarter of 2020 to the fourth quarter of 2021, generating $304 million in revenues in 4Q20, and more than $3.3 billion in revenues in the fourth quarter of 2021.

202. The significance of Zillow Offers to the Company's current and future performance and business prospects, and Defendants' Class Period statements to the market about Zillow Offers, supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, that the Company was intentionally overpaying for homes, based on their own pricing models as expressed by current and former employees to the press and as Plaintiff's counsel noted

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 62
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

above, in its Zillow Offers business to gain market share in the iBuying space by implementing internally well-known and systemic overlays on offer prices generated through its pricing model. At the same time, the significance of Zillow Offers to the Company's current and future performance and business prospects, and Defendants' Class Period statements to the market about Zillow Offers, supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, that the Company was ramping up its home acquisitions, it was materially limiting the amount of renovations permitted to be done to a home before listing it for sale, stiffing contractors performing that work, and thereby leading to a growing backlog of unsold homes on Zillow's books with associated carrying costs, demonstrating that Defendants' statements identified above lacked any reasonable basis.

**B.    Defendants Admitted Their Visibility into Zillow Offers**

203.    Defendants repeatedly touted their visibility into Zillow Offers data, telling the market for several years that Zillow maintained near real-time data feeding into the Zillow Offers algorithms—the foundation for Zillow's offering process and suggested intimate knowledge of the offering process. For example, Barton explained in February 2019: "we're in the best position to see what's happening in the housing market on a micro basis … better than anybody else by far because we have all the traffic, we do all these estimates, we have all these models, we see all the data in real-time as it's coming in." A year later, in February 2020, in discussing Zillow Offers, Barton stated:

> The unit numbers in this business are starting to build…. And each new unit that we transact, it pumps data and learning into the machine and people. And we're getting better at pricing homes. We're getting better at price drop strategy. We're getting better at all the stuff that is required to price and sell the home.

204.    In addition, during the COVID-19 pandemic in 2020, Defendants also highlighted their visibility into and intimate awareness of the data to allay market concerns about the impact COVID-19 would have on its business, publishing the following slide in a May 2020 Investor Relations Presentation, which emphasized the Company's "robust, data-based visibility," "dashboards of 50+ datasets," and management controls, including: "Daily dashboards with

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 63
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

leading indicators." Such statements informed investors that management had access to troves of important data about its all-important Zillow Offers business:



In the same presentation, Defendants allayed market concerns that Zillow was able to actively manage and would not take on undisclosed risks highlighting their understanding of the residential real estate market.



CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 64
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

205.    Statements by Zillow's Chief Analytics Officer, Stan Humphries, further bolster this inference. During an interview with Bloomberg on February 25, 2021, focused on Zillow's recent announcement that it would begin using the Zestimate as an initial offer for Zillow Offers homes in certain markets, Humphries made clear his deep familiarity with the data and processes Zillow used to price homes in the Offers business. Specifically, he was asked "what are the inputs into … guesstimating what these home are worth?" Humphries responded that Zillow's "valuation is kind of our combination of two things—high quality data and great algorithms." He continued, further indicating his comprehensive knowledge of Zillow Offers' pricing process, explaining that the high-quality data was "put into algorithms, and essentially the algorithms, and I won't bore you with all the kind of details—essentially they're trying to do something pretty intuitive which is to find a set of homes that are similar to the house we're trying to value then make adjustments for small differences between the subject home and its comparables, and that's how we produce the valuation."

## C.    The Close Temporal Proximity Between Defendants' Misrepresentations and the Partial Revelation of the Relevant Truth Supports a Strong Inference of Scienter

206.    The temporal proximity between Defendants' August 5, 2021 and September 13, 2021 misrepresentations and the corrective disclosures supports a strong inference of scienter. Just a couple of weeks later, on October 4, 2021, the relevant truth began to be partially revealed as analysts began to leak information that Zillow held "meaningful inventory to work through into Q4 that was bought at too high a price."

207.    Then on October 17, 2021—just one month after Wacksman's statements about the positive state of affairs at Zillow Offers—Bloomberg (not Zillow) revealed that Zillow was beyond operational capacity and not taking on additional contracts, forcing Zillow, the very next day, to admit its "***backlog in renovations and operational capacity constraints***" and decision to not sign any new contracts "***through the end of the year***."

208.    Then on November 1, 2021, media outlets again forced Zillow's hand, reporting that the Zillow Offers inventory was now worth less than the Company had paid and that Zillow was looking to offload 7,000 homes.



209.    Still, the proximity of the August and September statements, and Zillow's forced and abrupt November 2, 2021 announcement that it was terminating Zillow Offers, blindsided analysts, who immediately seized on the fact that just a few months earlier, Defendants were touting Zillow Offers.

210.    For example, during the question-and-answer portion of Zillow's third quarter 2021 earnings call on November 2, 2021, Jefferies analyst Brent Thill posed the following question to Defendant Barton, calling out the fact that just a few months earlier, Zillow was bullish on the future of the Zillow Offers business:

> **THILL**: And can I follow up one with Rich? ***Just last quarter, we all heard you kind of commit and say you had increasing support for the business in that every quarter that passed, you had more conviction. And then all of a sudden, the record scratches this quarter and we understand that things change. But what was it versus last quarter to now that really changed your perspective? Was there 1 or 2 events that triggered? Or just -- I think everyone was trying to reconcile what you said last quarter to what just happened*** and sort of go back as well on that, but I want to make sure we truly understand what you were meaning there.

211.    Similarly, a November 3, 2021 Wedbush report, titled "A Shocking End to an Ambitious Project," noted that the termination of Zillow Offers was "a hasty exit from a business in which Zillow significantly accelerated *just this past August*." A Barclays' report the same day, titled "Unwinding Homes, Refocus on Core," explained that Zillow's decision to "[e]xit[] Homes *marks a sharp pivot in strategy vs. just a few quarters ago*, at which time the company was encouraged with progress and leaning in on its efforts to scale the business." Berenberg Capital Markets issued a report on November 5, 2021, titled "Resetting focus on core business," that also emphasized the point that as recently as "ZG's 8/5 Q221 call, management said the company was on track to meet its long-term iBuying goals of buying 5k a month and reaching $20bn in revenue. However, that was no longer the case by 11/2's Q321 earnings as the company announced it was winding down operations, following numerous warning signs from Bloomberg reports."

212.    Piper Sandler likewise highlighted in a November 19, 2021 report, titled "ZOffers Epilogue: A Pro-forma Investment Framework for Core IMT," the short time period between Defendants' positive comments about Zillow Offers in late summer 2021 and the announcement

that the business was being shuttered, writing: "Management reiterated their long-term financial targets as recently as August …. Events suggest a string of poor decision making by management over a number of months With OPEN, OPAD and RDFN having reported, the evidence is accumulating of a considerable execution misstep. ***More recent news of internal memos titled 'Project Ketchup' that encouraged ZOffers homebuyers to accelerate purchases to 'catch up' with Open Door are particularly worrying. Management should be accountable***."

213.   And a February 8, 2022 report by Stephens, titled "Model Correction; Zillow Preview Recap," stated that:

> Zillow's decision to close the doors on its Zillow Offers (iBuying) business was, perhaps, the most shocking news that hit the U.S. real estate vertical in 2021 …. [I]t was the suddenness of the announcement that added to the shock factor as Zillow was coming off a record rate of home purchases, and it was just a few months removed from a quarter (2Q21) in which the Company really applauded the success it was seeing in expanding ZO (the 2Q21 shareholder letter highlighted Zillow's improvements in "pricing models and automation when providing offers to customers"). Clearly, faster is not always better and Zillow (and the stock) paid dearly for its, arguably, reckless approach to share gains.

214.   The proximity between Defendants' statements touting the accuracy of Zillow Offers' algorithms, offer prices, value proposition, and customer demand, and the "durability" or sustainability of the segments' financial performance and the revelation just a quarter later that the entire Zillow Offers business was being shuttered, supports the strong inference that Defendants knew, or were deliberately reckless in not knowing, the false and/or misleading nature and positive representations about the Zillow Offers business as set forth above during the Class Period.

## VII.   PARTIAL DISCLOSURE OF THE TRUTH, LOSS CAUSATION, AND ZILLOW'S LOSS OF CREDIBILITY WITH THE ANALYSTS

215.   Defendants' false and/or misleading statements and omissions directly and proximately caused the economic loss suffered by Plaintiff and the Class. As a result of Defendants' materially false and misleading statements, omissions of fact, and fraudulent course of conduct, Zillow's Common Stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market prices for Zillow Common Stock and public information relating to Zillow, during the Class Period, Plaintiff and other Class members purchased or

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 67
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

otherwise acquired Zillow Common Stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. The prices of Zillow Common Stock significantly declined when the relevant truth concealed by Defendants' materially false and misleading statements and omissions, or the direct, proximate, and foreseeable effects thereof, were revealed, causing Plaintiff and other Class members to suffer losses. As a result of their purchases and acquisitions of Zillow Common Stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth in this Section, Plaintiff and the Class suffered economic losses (i.e., damages) under the federal securities laws.

216.    Zillow's Class A stock traded as high as $112.50 on August 5, 2021, and Zillow's Class C stock traded as high as $111.67 on August 5, 2021. Defendants' misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Zillow Common Stock served to maintain the inflation in the price of Zillow Common Stock.

217.    Had Defendants been truthful about the state of the Zillow Offers business, Plaintiff and other Class members would not have purchased or otherwise acquired their Zillow Common Stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price of Zillow Common Stock and that the revelation of the relevant truth concealed by those misrepresentations and omissions would cause Zillow's Common Stock prices to decline. The economic losses (i.e., damages suffered by Plaintiff and other members of the Class) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact.

218.    Plaintiff and other Class members suffered actual economic loss and were damaged when the material facts and/or foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions were partially revealed and/or materialized through the disclosure of new information concerning Zillow on four dates: October 4, 2021; October 17-18, 2021; November 1, 2021; and November 2, 2021.

A.   **October 4, 2021**

219.   On October 4, 2021, analysts from RBC Capital Markets lowered their price target for Zillow, warning that "[a]n analysis of Zillow-owned homes for sale in Phoenix" suggests that Zillow Offers would likely miss quarterly expectations. Specifically, RBC Capital Markets did an in-depth "analysis of 32 live Phoenix area homes" and concluded that home price reductions in those listings suggested that "the company likely still has ***meaningful inventory*** to work through into Q4 that was ***bought at too high a price*** and thus we would expect Q3 results and Q4 guidance to reflect this." On this news, which partially revealed the material facts and/or foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions, the price of Zillow Common Stock (ZG) declined $5.72 per share, or more than 6%, from a close of $91.40 per share on October 1, 2021, to a close of $85.68 per share on October 4, 2021. Similarly, the price of Zillow Capital Stock (Z) declined $4.98 per share, or approximately 5.5%, from a close of $90.36 per share on October 1, 2021, to a close of $85.38 per share on October 4, 2021.

220.   Zillow's Common Stock prices remained inflated, however. Indeed, other analysts disagreed with RBC's conclusions. For example, that same day, analyst BTIG issued a report based on its "own data (2 independently derived datasets) and c[a]me to a different conclusion." More specifically, BTIG wrote that: "[t]hird-party data has sparked debate around whether ZG might be headed towards a miss on iBuyer revenue in 3Q, but our tracking points to segment revenue at or above the high-end of guidance."

B.   **October 17-18, 2021**

221.   Several weeks later, on October 17, 2021, Bloomberg reported that Zillow would pause its buying of homes in its Zillow Offers business, through at least year-end, due to capacity constraints. The article quoted a Zillow spokesperson as saying: "We are beyond operational capacity in our Zillow Offers business and are not taking on additional contracts to purchase homes at this time.... We continue to process the purchase of homes from sellers who are already under contract, as quickly as possible." Analyst Wedbush explained that: "According to the [Bloomberg] article, Zillow has run into a labor capacity issue in its iBuying business which relies on inspectors visiting a property before purchasing the home as well as contractors to make repairs like replacing

appliances and repainting interiors." Wedbush further noted that: "*[t]his would be a material negative development in our view as much of Zillow's growth, including in Premier Agent, would hinge on the success of Zillow Offers*." Wedbush also explained: "*The core issue at hand for Zillow seems to be labor shortages impacting capacity constraints, but particularly around the renovation piece of the transaction*. That issue should theoretically translate to Opendoor as well, particularly since it is ~2x the volume of Zillow right now in more markets. *But the news report also includes a comment from an Opendoor source that it is 'open for business' indicating it is not seeing any impact*. That could imply a number of things, from Opendoor potentially spending more to hire contractors, to just generally running more efficient operating capabilities. If the latter is the case then *Opendoor can gain significant share while Zillow is out of the market, further strengthening its lead*."

222.    The following day, on October 18, 2021, Zillow confirmed the reports in a press release, disclosing that: "Due to a *backlog in renovations and operational capacity constraints*," Zillow Offers "will not sign any new, additional contracts to buy homes through the end of the year." According to Defendant Wacksman, the Company's Chief Operating Officer, Zillow was "operating within a labor- and supply-constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces," and had "not been exempt from these market and capacity issues."

223.    On this news, which partially revealed the material facts and/or foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions, the price of Zillow Common Stock (ZG) declined $8.84 per share, or more than 9%, from a close of $94.30 per share on October 15, 2021, to a close of $85.46 per share on October 18, 2021. Similarly, the price of Zillow Capital Stock (Z) declined $8.97 per share, or more than 9%, from a close of $94.97 per share on October 15, 2021, to a close of $86.00 per share on October 18, 2021.

224.    In an October 18, 2021 report, BTIG wrote that "ZG is hitting pause on signing new iBuyer contracts through year end." It further noted that "[w]hile ZG uses algorithms to inform initial offers, *it needs people to inspect homes and complete renovations and that is where [] the bottleneck appears to be*," and that "[p]ausing on new contracts will be a significant drag on 1H22

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 70
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

iBuyer revenue (BTIGe $3.5B) and it will likely take into 2H22 to rebuild inventory." BTIG also indicated that "[t]he two questions we are getting from investors is whether the pause might also be due to eroding unit economics (our data is not encouraging) and whether Opendoor (OPEN, Neutral) might be experiencing similar issues (not that we can see)." It concluded that "[o]ur bias at this point is that this may be more of ZG-specific issue." In a same-day report, Piper Sandler wrote that "Over the weekend, reports surfaced that ZG was pausing home buying within the ZOffers unit. The company confirmed the reports this morning citing capacity constraints on labor and materials." It further noted, however, that "[f]ollowing this morning's release, we find ourselves with more questions than answers" and "*it's also possible that ZG's home-buying pricing algorithm is not working optimally*." Piper Sandler noted that as a result of the news, "Shares are down ~10% this morning, and we expect the stock to be under pressure in trading today. We will concede less confidence in our forecasts and reflect this in our valuation view by reducing the multiple we ascribe to the Homes segment from 3.0x '22 revenue to 0.75x."

225.   Zillow's Common Stock prices remained inflated, however. In fact, some other analysts viewed the pause as a positive indicator of demand for Zillow Offers. For example, RBC wrote in an October 17, 2021 report that the news was "noise, if not a positive long-term sign, given *it indicates stronger-than-expected inbound demand from homeowners* and Zillow's likely buying ahead-of-expectations." On October 18, 2021, analyst JMP likewise reported that "[t]his morning, Zillow Group announced that Zillow Offers has paused making new home acquisition offers for the remainder of the year as the company works through its backlog of renovations" and "*we view this as a sign of demand*." In a same-day report, Berenberg reiterated its "Market Outperform" rating, writing that the news might simply indicate that Zillow had met its volume goals: "In 2019, the company indicated it was aiming to purchase 5,000 homes per month. Additionally, on the Q221 earnings call, management reiterated that long-term goal, stating 'we are now back on track with our original objective to purchase 5,000 homes per month … within the original three to five-year timeline.' *In our view, this pause in purchases could mean ZG has reached an interim milestone in its iBuying business*." Stephens wrote that "we do not find this

all too troubling. In addition, ***we do like that ZG is taking on the iBuying expansion in what appears to be a disciplined fashion***."

**C.     November 1, 2021**

226.    Leading into the Company's third quarter 2021 earnings call, investors were eager for clarity from the Company on the reasons for the iBuyer pause and when it would resume purchasing homes. For example, in an October 31, 2021 report, Canaccord Genuity wrote: "Investors will be looking for additional color on when Zillow began to experience the aforementioned supply constraints along with a timeline for when it will resume home purchases." In a same-day report, Truist reported: "We expect Homes segment to be the key area of discussion for the call, and expect mgt to provide clarity on reasons for the recent pause in home purchases, timeline for resumption and P&L implications."

227.    On November 1, 2021, media outlets, including MarketWatch and the Los Angeles Times reported that, pursuant to a detailed analysis by KeyBanc on October 31, 2021, most of the homes in Zillow Offers inventory were now worth less than the Company paid for them, and that Zillow was looking to sell off 7,000 homes. In its October 31 analysis, KeyBanc concluded: "Zillow may have leaned into home acquisition at the wrong time" given that most of the homes in the Zillow Offers inventory were now worth less than what the Company paid for them. Specifically, KeyBanc found that: (1) 66% of Zillow's homes are currently listed below the purchase price (at an average discount of 4.5% versus the purchase price); and (2) 94.3% of homes in San Diego, California, 93.4% of homes in Phoenix, Arizona, and 92.6% of homes in Mesa, Arizona, were listed below Zillow's purchase price.

228.    Later that day, Bloomberg reported that Zillow "is looking to sell about 7,000 homes as it seeks to recover from a fumble in its high-tech home-flipping business." According to sources interviewed by Bloomberg, "[t]he company is seeking ***roughly $2.8 billion for the houses***, which are being pitched to institutional investors … as Zillow seeks to recover from an operational stumble that saw it buy too many houses, ***with many now being listed for less than it paid***."

229.    In response to this news, which partially revealed the material facts and/or foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions, the

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

price of Zillow Common Stock (ZG) declined $20.24 per share over two trading days, or more than 19%, from a close of $105.72 per share on October 29, 2021, to a close of $85.48 per share on November 2, 2021. Similarly, the price of Zillow Capital Stock (Z) declined $16.43 per share, or nearly 16%, from a close of $103.63 per share on October 29, 2021, to a close of $87.20 per share on November 2, 2021.

230.    In a November 1, 2021 article, titled "Zillow stock dives after analyst highlights two-thirds of homes bought are underwater," MarketWatch placed blame for the stock price decline squarely on the news that Zillow had overpaid for homes: "Shares of Zillow Group Inc. took a dive Monday, after KeyBanc analyst Edward Yruma highlighted how most of the homes the real estate services company purchased, with an aim to flip them, were now worth less than what they paid for them."

**D.    November 2, 2021**

231.    After the market close on November 2, 2021, Zillow released its third quarter 2021 financial results and announced that it was "wind[ing] down" the Zillow Offers program and would be reducing its workforce ***by 25%***. In doing so, Zillow revealed that it would need to take ***write-downs of approximately $569 million*** because Zillow expected to sell the homes in its inventory for significantly less than it had purchased them for. Indeed, during the same-day earnings conference call, Barton disclosed that the Company "expect[ed] unit economics to be between negative 500 to negative 700 basis points."

232.    During the same call, Parker provided "additional details behind the inventory valuation process and the recognition and timing of losses. For inventory on our balance sheet, at period end, we compare our cost basis, our purchase price of inventory and other capitalized inventory costs to the estimated net realizable value, our estimated future selling price of those homes less estimated cost to sell. This resulted in the recognition of a ***$304 million inventory write-down included in Homes segment cost of revenue in Q3. We expect to recognize additional inventory losses in Q4 of approximately $240 million to $265 million***. These estimated losses primarily relate to homes that were under contract to purchase as of the end of Q3 that we expect to acquire during Q4 and that we expect to resell for less than purchased."

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 73
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

233.    Moreover, Zillow disclosed that "we expect to record additional pretax charges of approximately $175 million to $230 million related to the wind-down of Zillow Offers operations, primarily in Q4 and the first half of 2022. These charges are expected to include certain employee retention and termination costs, cost to exit contractual obligations, including borrowing and lease arrangements and write-offs of long-lived assets."

234.    Zillow further revealed that it was shutting down Zillow Offers because its algorithm had not been able to accurately forecast home prices. For example, during the earnings conference call, Barton stated: "When we decided to take a big swing on Zillow Offers 3.5 years ago, our aim was to become a market maker, not a market risk taker. And this was *underpinned by the need to forecast the price of homes accurately 3 to 6 months into the future*." Yet, he disclosed: "*We have been unable to accurately forecast future home prices* at different times in both directions by much more than we modeled as possible, with Zillow Offers unit economics on a quarterly basis swinging from plus 576 basis points in Q2 to an expected minus 500 to minus 700 basis points in Q4. Put simply, our observed error rate has been far more volatile than we ever expected possible and makes us look far more like a leveraged housing trader than the market maker we set out to be."

235.    Ultimately, Barton explained, the Company's inability to accurately forecast home prices created too much risk to continue: "With the price forecasting volatility we have observed and now must expect in the future, we have determined that the scale would require too much equity capital, create too much volatility in our earnings and balance sheet and ultimately result in a far lower return on equity than we imagined." He likewise noted that the price forecasting accuracy "volatility contributed to operational volatility and cash flow and balance sheet volatility that is beyond the tolerance level that we are comfortable with moving forward." In other words, "*fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in*." Barton further explained that given the inaccuracies in the forecast there, was "a high likelihood, at some point, of putting the whole company at risk, not just the business." He concluded that: "*What it boils down to is our inability to have confidence in pricing in the future, enough confidence to put our own capital at risk that we don't have to*."

236.    During the call, analyst Ryan McKeveny from Zelman & Associates LLC noted that home prices were "still going up, albeit at a much slower pace," and asked how much of Zillow Offers' "volatility and the unit margin swing" were related to "the forecasting side of things" "versus a very volatile swing in natural prices within the broader housing market." In response, Barton again placed the blame squarely on the Company's inability to accurately price homes: "It was -- forecasting volatility, Ryan, is the short answer."

237.    The Company also pinned some of the blame for the Zillow Offers shutdown on the labor issues and resulting renovations backlog that it had concealed during the Class Period. For example, it noted: "We have also **experienced significant capacity and demand planning challenges**, exacerbated by an admittedly difficult labor and supply chain environment. The combination of these factors has **caused a meaningful backup in our processing of homes in the Zillow pipeline**, which we announced 2 weeks ago. We judged future significant volume volatility to be a tough impediment to ramp a scaled operation, and any interruptions in the supply chain like we recently experienced will result in increased holding times, further increasing our exposure to volatility and lowering our return on equity."

238.    On this news, which partially revealed the material facts and/or foreseeable risks concealed or obscured by Defendants' misrepresentations and omissions, the price of Zillow common stock (ZG) plummeted an additional $19.62 per share, or approximately 23%, to close at $65.86 per share on November 3, 2021. Similarly, the price of Zillow capital stock (Z) fell $21.73 per share, or approximately 25%, to close at $65.47 per share on November 3, 2021.

E.    **Analysts Were Shocked and Called for Management Accountability**

239.    The response to Defendants' disclosures was swift and severe. Market commentators noted the significant negative impact that the shutdown would have on Zillow's overall business, given that Zillow Offers was a "central piece" of Zillow's strategy that Defendants had described as "essential to its growth." For example, during the Q3 2021 earnings conference call, an analyst from Wedbush noted: "The way you're talking about Zillow Offers is really different than how you've talked about it in the past, that it serves a narrow part of your customers. And **what you've talked about in the past is really a central piece to the puzzled**

1    *offering, a central piece to Zillow 360, expecting it to drive partner leads, expecting it, as Allen*

2    *just mentioned, on purchase originations on the mortgage side*. So it does feel like there's a little

3    bit of a *hole here in the middle of the vision*."

4         240.   During the call, Brent John Thill of Jefferies LLC similarly noted that Defendants

5    had very recently been singing a very different tune:

6              *Just last quarter, we all heard you kind of commit and say you had*
              *increasing support for the business in that every quarter that*
7              *passed, you had more conviction*. And then all of a sudden, the
              record scratches this quarter and we understand that things change.
8              But what was it versus last quarter to now that really changed your
              perspective? Was there 1 or 2 events that triggered? Or just -- I think
9              *everyone was trying to reconcile what you said last quarter to what*
              *just happened and sort of go back as well on that, but I want to*
10             *make sure we truly understand what you were meaning there*.

11        241.   Following the Q2 2021 earnings call, analysts likewise place the blame for the

12   shutdown on the Company's inability to accurately price homes. For example, in a November 2,

13   2021 report, Berenberg wrote: "[T]he company noted that because of the difficulties in forecasting

14   home prices, the scale necessary to generate the targeted returns would necessitate greater capital

15   resources and could contribute even more volatility to earnings." Canaccord Genuity echoed these

16   explanations, writing in a November 2, 2021 report that "[c]hallenges in forecasting future home

17   prices as accurately as originally anticipated resulted in significant volatility in Homes segment

18   unit economics, a dynamic that was exacerbated by a backlog in its renovation pipeline caused by

19   ongoing labor and supply chain disruptions."

20        242.   The following day, BTIG reported: "The big news is if of course ZG's plan to exit

21   the iBuyer business given an inability to accurately forecast home prices and the risk that creates

22   for the business." The Wall Street Journal reported: "Mr. Barton admitted that the company's

23   algorithm had failed to accurately predict swings in home prices, upward and downward."

24        243.   On November 3, 2021, Evercore wrote that Zillow had "to *record a $304MM write*

25   *down on inventory due to pricing homes inaccurately*." In a same-day report, Piper Sandler

26   similarly reported that "*ZG overpaid for 9700 purchased homes in 3Q*, resulting in a $304MM

27   impairment charge (with another ~ $250MM in charges expected next quarter on 8200 homes in

28   contract)." Truist reported that "[a]s a result of *overly aggressive home acquisition efforts driven*

*by an inability to forecast housing prices*, ZG was negatively impacted by a $304M write-down on inventory owned at the end of 3Q."

244.    Also on November 3, 2021, Barclays issued a report lowering its price estimates and wrote: "We would not be surprised to see some downgrades as well, as iBuying was a key bull thesis. As investors refocus on core IMT, growth normalizing/slowing may give pause, and it's likely the stock underperforms near-term as the investor base turns over." Barclays continued, writing that "[e]xiting Homes *marks a sharp pivot in strategy vs. just a few quarters ago, at which time the company was encouraged with progress and leaning in on its efforts to scale the business*." RBC wrote: "Zillow's unexpected iBuying exit throws cold water on our downfunnel bull thesis and clear path to expanding monetization opportunities." Truist similarly reported: "[W]e believe exit from iBuyer *removes a NT growth catalyst* and creates uncertainty around efforts to drive monetization through additional services (e.g. mortgage, title/escrow). Business Insider described it as a "*debacle*, which sent its shares plummeting and *shuttered a business line that executives had, until recently, described as essential to its growth*."

245.    In a same-day report, titled "Bye Bye (i)Buy," analyst Benchmark lowered it price target from $200 to $105 and wrote: "*In the famous words of Ron Burgundy, "boy, that escalated quickly*." It further noted that "Zillow will probably be in the short-term penalty box and need to come up with a more concrete 2.0 game plan to *regain investor trust*." BTIG downgraded Zillow and lowered its price target, reporting: "[W]e can't justify a Buy rating on ZG without the iBuyer business. Our prior PT of $145 incorporated $55/share in value for the iBuyer piece with the rest at ~$90/share. The stock closed today at $87. What could change our mind would be signs of success with Zillow 2.0, but *in light of the missteps on the Offers business we aren't inclined to underwrite success until we see traction*." DA Davidson likewise wrote in a November 3, 2021 report that: "[W]e find ourselves a bit disheartened to see ZG wind down Offers in such sudden fashion" and "*ZG's path/ strategy for achieving [its] vision seems less clear now* without iBuying providing an important on-ramp for home-sellers to ZG's broader product portfolio/ecosystem."

246.    Market commentators further highlighted that the sudden and "major strategic retreat" left them questioning Defendants' execution and credibility. For example, The Wall Street

1    Journal reported: "***Zillow conceded failure in what amounts to one of the sharpest recent***
2    ***American corporate retreats***." The New York Times reported that "[t]he announcement was a
3    ***major strategic retreat and a black eye for Richard Barton***, Zillow's chief executive," noting that
4    "[l]ast year, Mr. Barton predicted Zillow Offers, which made instant offers on homes in a practice
5    known as iBuying, could generate $20 billion a year." Wedbush described the disclosure as "***a***
6    ***tremendous setback***," noting that "[i]t is ***a hasty exit from a business in which Zillow***
7    ***significantly accelerated just this past August***." It further reported: "The execution never ended
8    up getting to where it needed to, and Zillow is now bailing…. The vision needs to be rebuilt and
9    in light of how iBuying transpired, ***management will need to rebuild credibility*** that it can
10   successfully implement that vision over time."

11          247.    Piper Sandler wrote that "***it's a major strategic shift and raises questions about***
12   ***future direction and execution capability***." It further noted: "We downgrade to Neutral because
13   ex-Home we no longer see upside to shares. Also, management's ***abrupt strategic shift leaves us***
14   ***questioning the long-term strategy. Execution may be a problem***." On November 5, 2021,
15   Berenberg cut its price target from $162 to $82, explaining that "***[m]anagement needs to regain***
16   ***credibility. On ZG's 8/5 Q221 call, management said the company was on track to meet its long-***
17   ***term iBuying goals of buying 5k a month and reaching $20bn in revenue. However, that was no***
18   ***longer the case by 11/2's Q321 earnings*** as the company announced it was winding down
19   operations." Evercore wrote that "[m]anagement cited pricing accuracy, higher conversion rates
20   causing capacity constraints, and balance sheet and cash flow risks as key reasons for the exit, but
21   ***we believe the exit calls into question execution***, given the remaining players in the market
22   OPAD/OPEN that are still in operations." It further noted that "the ***surprising shift in strategy***
23   causes us to acknowledge our limited visibility into the company's outlook and to retrench our
24   rating." And Business insider reported, "Current and former employees at the company said those
25   explanations [for why Zillow was shutting down Zillow Offers] ***omitted Zillow's role in the***
26   ***debacle***."

27          248.    In a scathing November 19, 2021 report, Piper Sandler wrote: "***Repairing Trust:***
28   In our view, the math matters little until ***management takes full ownership for mistakes. Press***

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 78
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1     *reports call into account execution…. Management reiterated their long-term financial targets*

2     *as recently as August….*" It further noted that "the ZOffers wind down and resulting layoff of ¼

3     of the work force is a *major execution misstep and begs questions about the model going*

4     *forward.*" Piper Sandler also wrote that "*[e]vents suggest a string of poor decision making by*

5     *management over a number of months*" and "*the evidence is accumulating of a considerable*

6     *execution misstep. More recent news of internal memos titled 'Project Ketchup' that encouraged*

7     *ZOffers homebuyers to accelerate purchases to 'catch up' with Open Door are particularly*

8     *worrying. Management should be accountable*."

9         249.    On February 8, 2022, analyst Stephens reported: "Zillow's decision to close the

10    doors on its Zillow Offers (iBuying) business was, perhaps, *the most shocking news that hit the*

11    *U.S. real estate vertical in 2021… it was the suddenness of the announcement that added to the*

12    *shock factor as Zillow was coming off a record rate of home purchases, and it was just a few*

13    *months removed from a quarter (2Q21) in which the Company really applauded the success it*

14    *was seeing in expanding ZO* (the 2Q21 shareholder letter highlighted Zillow's improvements in

15    'pricing models and automation when providing offers to customers'). Clearly, faster is not always

16    better and *Zillow (and the stock) paid dearly for its, arguably, reckless approach to share gains*."

17            **VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

18         250.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-

19    looking statements under certain circumstances does not apply to any of the false and misleading

20    statements alleged herein.

21         251.     None of the statements complained of herein was a forward-looking statement.

22    Rather, they were historical statements or statements of purportedly current facts and conditions

23    at the time the statements were made.

24         252.    To the extent that any materially false or misleading statement alleged herein, or

25    any portion thereof, can be construed as forward-looking, such statement was a mixed statement

26    of present and/or historical facts and future intent, and is not entitled to safe harbor protection with

27    respect to the part of the statement that refers to the present and/or past.

28

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 79
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

253. To the extent that any of the materially false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, as set forth above, any generalized risk disclosures made by Zillow were insufficient to insulate Defendants from liability for their materially false and misleading statements.

254. To the extent that the statutory safe harbor doctrine does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and/or misleading forward-looking statements because, at the time each of those statements was made, Defendants did not actually believe the statements, had no reasonable basis for the statements, or were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## IX.    THE PRESUMPTION OF RELIANCE

255. At all relevant times, the markets for Zillow Common Stock were efficient for the following reasons, among others:

   a. That Zillow's Common Stock met the requirements for listing, and was listed and actively traded on the Nasdaq Stock Market, a highly efficient and automated market;

   b. As a regulated issuer, Zillow filed periodic reports with the SEC and the Nasdaq Stock Market;

   c. Zillow regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

   d. Zillow was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.



256.    As a result of the foregoing, the markets for Zillow Common Stock reasonably and promptly digested current information regarding Zillow from all publicly available sources, and reflected such information in the prices of Zillow's Common Stock. All purchasers and acquirers of Zillow Common Stock during the Class Period suffered similar injury through their purchase or acquisition of Zillow Common Stock at artificially inflated prices, and Plaintiff and other Class members are entitled to a presumption of reliance upon the integrity of the market.

257.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliate Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.    CLASS ACTION ALLEGATIONS

258.    Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired Zillow Common Stock between August 5, 2021, and November 2, 2021, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the directors and officers of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors, or assigns, Defendants' liability insurance carriers and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

259.    The Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zillow Common Stock was actively traded on the Nasdaq Stock Market. As of October 26, 2021, 61,373,807 shares of Class A common stock and 187,212,368 shares of Class C capital stock were outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of Class members. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Class members who purchased or otherwise acquired Zillow Common Stock may be identified from

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 81
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    records maintained by Zillow or its transfer agent(s), and may be notified of this class action using

2    a form of notice similar to that customarily used in securities class actions.

3        260.    Questions of law and fact exist and are common to all Class members and

4    predominate over questions solely affecting individual Class members. Among the questions of

5    fact and law common to the Class are:

6        a.    whether Defendants violated the Exchange Act;

7        b.    whether Defendants omitted and/or misrepresented material facts in statements

8            made to the investing public;

9        c.    whether Defendants acted with the requisite scienter;

10       d.    whether the prices of Zillow Common Stock were artificially inflated during the

11           Class Period due to the misrepresentations and/or omissions alleged herein;

12       e.    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine

13           and/or the *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S.

14           128 (1972) presumption; and

15       f.    the appropriate measure of damages.

16       261.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

17   were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws

18   as complained of herein.

19       262.    Plaintiff will fairly and adequately protect the interests of the Class and has retained

20   counsel who are experienced in class actions and securities litigation. Plaintiff has no interests that

21   conflict with those of the Class.

22       263.    A class action is superior to other available methods for the fair and efficient

23   adjudication of this controversy. For instance, joinder of all Class members is impracticable and

24   there will be no difficulty in the manageability of this action as a class action. In addition, the

25   damage suffered by some individual Class members may be relatively small compared to the

26   burden and expense of individual litigation, making it impossible for such members to individually

27   redress the wrong done to them.

28

HAGENS BERMAN

1

## XI.    CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

2

## COUNT I

3

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND
SEC RULE 10b-5 PROMULGATED THEREUNDER
(AGAINST ALL DEFENDANTS)**

4

5      264.    Plaintiff repeats, realleges, and incorporates by reference the allegations in the

6    preceding paragraphs as if fully set forth herein.

7      265.    This Count is asserted on behalf of Plaintiff and all other Class members against

8    each Defendant for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC

9    Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10     266.    During the Class Period, Defendants carried out a plan, scheme, and course of

11   conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing

12   public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class economic harm.

13     267.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

14   (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material

15   fact and/or omitted material facts necessary to make the statements not misleading; and

16   (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

17   the purchasers of the Zillow's Common Stock during the Class Period.

18     268.    Defendants, individually and in concert, directly and indirectly, by the use, means,

19   or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

20   continuous course of conduct to conceal adverse material information about the Company's

21   financial well-being, operations, and prospects.

22     269.    During the Class Period, Defendants made the false and misleading statements

23   specified above, which they knew, or recklessly disregarded, were materially misleading in that

24   they contained misrepresentations and failed to disclose material facts necessary to make the

25   statements made, in light of the circumstances under which they were made, not misleading.

26     270.    Defendants acted with scienter throughout the Class Period, in that they had actual

27   knowledge of the misrepresentations and omissions of materials facts set forth herein or recklessly

28   disregarded the true facts that were available to them.



271.     Defendant Zillow is liable for all materially false and misleading statements made during the Class Period, as alleged above. The Executive Defendants, as top executive officers of the Company during their respective tenures, were individually and collectively responsible for making the materially false or misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

272.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased or acquired Zillow common stock at artificially inflated prices, which inflation was removed from its price when the relevant truth about Zillow negatively impacted the price of those securities. Plaintiff and the Class would not have purchased or acquired Zillow Common Stock at the prices they paid or at which they acquired them, or at all, had the market been aware of the relevant truth about Zillow.

273.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases or acquisitions of Zillow's Common Stock during the Class Period.

274.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (AGAINST THE EXECUTIVE DEFENDANTS)

275.     Plaintiff repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

276.     This Count is asserted on behalf of all Class members against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

277.     As alleged above, the Company and the Executive Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by making materially

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

false and misleading statements and/or omissions of material fact in connection with the purchase or sale of Zillow's Common Stock and by participating in a fraudulent scheme and course of business throughout the Class Period. This fraudulent conduct was undertaken with scienter, and the Company is charged with the knowledge and scienter of each of the Executive Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's and/or the other Executive Defendants' statements alleged herein to have been materially false and misleading when made and/or omitted material facts necessary to make the statements not misleading in light of the circumstances under which they were made, and the fraudulent nature of the Company's and the Executive Defendants' scheme during the Class Period.

278.    During the Class Period, each of the Executive Defendants was a "controlling person" of Zillow within the meaning of Section 20(a) of the Exchange Act. By reason of their high-level positions of control and authority at Zillow and their participation in and/or awareness of the Company's operations and/or knowledge of the materially false and misleading statements and omissions of material fact in statements disseminated to the investing public, each of the Executive Defendants had the power and authority to influence and control, and did influence and control, directly or indirectly, the decision making of the Company and its executives, including the content and dissemination of the various statements Plaintiff contends were materially false and misleading. In that regard, the Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

279.    The Executive Defendants were culpable participants in Zillow's fraud alleged herein by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's Common Stock during the Class Period.

280.    By virtue of their positions as controlling persons, and as a result of their own aforementioned conduct, the Executive Defendants are also liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 85
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Section 10(b) of the Exchange Act and Rule 10b-5 and are liable under Section 20(a) of the Exchange Act.

281.   As a direct and proximate result of this wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of Zillow Common Stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as class representative, and designating Lead Counsel as Class Counsel;

B.   Awarding Plaintiff and the Class all damages and other remedies available under the Exchange Act in an amount to be determined at trial, together with pre-judgment and post-judgment interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees; and

D.   Awarding such equitable, injunctive, or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 11, 2022                     HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ *Steve W. Berman*
    Steve W. Berman, WSBA No. 12536
    Catherine Y. N. Gannon, WSBA No. 47664
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: catherineg@hbsslaw.com

CORRECTED CONSOLIDATED CLASS ACTION COMPLAINT - 86
Case No. 2:21-cv-01551-TSZ
011060-11/1888848 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Reed R. Kathrein (*pro hac vice* forthcoming)
Lucas E. Gilmore (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiff Jaeger*

Stacey M. Kaplan (*pro hac vice* forthcoming)
KESSLER TOPAZ MELTZER
 & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
Email: skaplan@ktmc.com

Gregory M. Castaldo (*pro hac vice* forthcoming)
Evan R. Hoey (*pro hac vice* forthcoming)
Helen J. Bass (*pro hac vice* forthcoming)
KESSLER TOPAZ MELTZER
 & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: gcastaldo@ktmc.com
Email: ehoey@ktmc.com
Email: hbass@ktmc.com

*Additional Counsel for Lead Plaintiff Jaeger*



HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594