The Honorable Thomas S. Zilly

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

**AT SEATTLE**

DIBAKAR BARUA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ZILLOW GROUP, INC., RICHARD BARTON, ALLEN PARKER, AND JEREMY WACKSMAN,

Defendants.

CASE NO. 2:21-cv-01551-TSZ

**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**NOTE ON MOTION CALENDAR: OCTOBER 14, 2022**

**ORAL ARGUMENT REQUESTED**



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

A. Overview of Zillow Offers ..... 4

B. Zillow Discloses Operational and Pricing Initiatives to Meet Its Targets ..... 5

C. Zillow Discloses the Continued Need to Improve Pricing and Reduce Costs ..... 7

D. A Sudden Decline in Home Price Appreciation Growth in Q3 Results in an Unanticipated Write-Down, Leading to Zillow's Decision to Wind Down ZO ..... 8

PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(**b**) ..... 9

I. PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT ..... 9

A. Plaintiffs Fail to Plead a Misstatement Concerning Pricing Methodology ..... 9

1. Zillow's Statements Are Not Inconsistent With Its Use of Price Adjustments ..... 10

(a) Zillow's August 5, 2021 Statements Were Not False or Misleading ..... 10

(b) Zillow's Sept. 13, 2021 Statements Were Not False or Misleading ..... 12

2. Plaintiffs Fail to Plead that Zillow "Deliberately" Overpaid for Homes ..... 13

B. Plaintiffs Fail to Plead a Misstatement Concerning Operational Improvements ..... 16

1. Zillow's Statements Are Not Inconsistent With Paying Contractors Less or Reducing the Scope of Renovations ..... 16

2. Plaintiffs Fail to Plead that Zillow's Contractor Payment and Scope of Renovation Practices Were "Unsustainable" ..... 17

C. In Any Event, Most of the Alleged Misstatements Are Legally Inactionable ..... 18

1. Plaintiffs Cannot State a Claim Based on Forward-Looking Statements ..... 19




**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

2. Plaintiffs Cannot State a Claim Based on Zillow's Inactionable Puffery ..... 21

II. PLAINTIFFS FAIL TO PLEAD SCIENTER ..... 22

A. Plaintiffs Cannot Plead Scienter Based on the Individual Defendants' Positions ..... 22

1. Plaintiffs Do Not Identify Specific Information Related to the Fraud ..... 23

2. It Is Not "Absurd To Suggest" Defendants Were Without Knowledge ..... 25

B. The Court Should Not Infer Scienter From the Alleged Temporal "Proximity" Between Zillow's Challenged Statements and Its Decision to End Zillow Offers ..... 26

C. Lack of Motive Negates Any Inference of Scienter ..... 27

D. Viewed Holistically, Plaintiffs' Scienter Allegations Are Implausible ..... 27

III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ..... 28

PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(**a**) ..... 30




**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

## TABLE OF AUTHORITIES

PAGE(S)

### CASES

*In re Apple Inc. Securities Litigation*,
No. 19-CV-02033-YGR
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ....27

*Avila v. LifeLock Inc.*,
No. CV-15-01398-PHX-SRB,
2016 WL 4157358 (D. Ariz. Aug. 3, 2016) ....11

*In re BofI Holding, Inc. Securities Litigation*,
977 F.3d 781 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021) ....28

*Brody v. Transitional Hospitals Corp.*,
280 F.3d 1006 (9th Cir. 2002) ....13

*Browning v. Amyris, Inc.*,
No. 13–cv–02209–WHO,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ....20

*Callan v. Motricity Inc.*,
No. C11–1340 TSZ,
2013 WL 5492957 (W.D. Wash. Oct. 1, 2013),
*aff'd sub nom.*, *Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) ....1

*Callan v. Motricity*,
No. C11–1340 TSZ,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013),
*aff'd sub nom.*, *Mosco v. Morricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) .... *passim*

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017) ....24

*City of Roseville Employees' Retirement System v. Sterling Financial, Co.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) ....28

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
No. 18-cv-04844-BLF,
2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ....25

*In re Cutera Securities Litigation*,
610 F.3d 1103 (9th Cir. 2010) ....21

*In re Diebold Nixdorf, Inc. Securities Litigation*,
No. 19-CV-6180 (LAP),
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....22



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

*DiLeo v. Ernst & Young*,
901 F.3d 624 (7th Cir. 1990) ....................1

*In re Downey Securities Litigation*,
No. CV 08–3261–JFW (RZx),
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)....................27

*Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) ....................21

*In re Fairway Group Holdings Corp. Securities Litigation*,
No. 14 Civ. 0950(LAK)(AJP),
2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*,
No. 14 Civ. 0950(LAK)(AJP), 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015)....................20

*In re Ferrellgas Partners, L.P. Securities Litigation*,
No. 16 Civ. 7840 (RJS),
2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
*aff'd*, 764 F. App'x 127 (2d Cir. 2019)....................21

*Frazier v. VitalWorks, Inc.*,
341 F. Supp. 2d 142 (D. Conn. 2004)....................21

*In re Fusion-io, Inc. Securities Litigation*,
No. 13–CV–05368–LHK,
2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ....................15, 20

*Gammel v. Hewlett-Packard Co.*,
905 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................25, 26

*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ....................22, 23

*Ikeda v. Baidu, Inc.*,
No. 20-CV-02768-LHK,
2021 WL 1299046 (N.D. Cal. Apr. 7, 2021)....................12

*Janbay v. Canadian Solar, Inc.*,
No. 10 Civ. 4430,
2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013),
*aff'd sub nom.*, *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24 (2d Cir. 2013)....................18

*Johnson v. Costco Wholesale Corp.*,
No. C18-1611 TSZ,
2020 WL 4816225 (W.D. Wash. Aug. 19, 2020),
*aff'd sub nom. Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116 (9th Cir. 2021).........3, 27, 28



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

*Johnson v. Costco Wholesale Corp.*,
No. C18-1611 TSZ,
2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ....................14, 18

*Lefter v. Yirendai Ltd.*,
No. CV 16–06437–MWF (AGRx),
2017 WL 2857535 (C.D. Cal. June, 20, 2017) ....................12

*Limantour v. Cray, Inc.*,
432 F. Supp. 2d 1129 (W.D. Wa. 2006) .................... *passim*

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ....................24

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ....................30

*Marcu v. Cheetah Mobile, Inc.*,
No. 18-CV-11184 (JMF),
2020 WL 4016645 (S.D.N.Y. July 16, 2020) ....................12

*Mazzaferro v. Aruba Networks Inc.*,
No. 13–cv–02342–VC,
2015 WL 456534 (N.D. Cal. Feb. 2, 2015), *aff'd sub nom. PAR Investment Partners, L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017)....................19

*McGuire v. Dendreon Corp.*,
No. C07–800MJP,
2008 WL 1791381 (W.D. Wash. Apr. 18, 2008)....................12

*Melot v. JAKKS Pacific, Inc.*,
No. LA CV13-05388 JAK (SSx),
2014 WL 12589334 (C.D. Cal. June 6, 2014) ....................30

*In re Metawave Communications Corp. Securities Litigation*,
298 F. Supp. 2d 1056 (W.D. Wash. 2003)....................14

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....................9, 23, 29

*National Elevator Industry Pension Fund v. Flex Ltd.*,
No. 21-15050,
2021 WL 6101391 (9th Cir. Dec. 21, 2021)....................16, 21

*In re Nektar Therapeutics Securities Litigation*,
34 F.4th 828 (9th Cir. 2022) ....................14



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

*In re Neustar Securities Litigation*,
83 F. Supp. 3d 671 (E.D. Va. 2015) ....................15, 18

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ....................3, 22, 27, 28

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014) .................... 22-23

*In re Oracle Corp. Securities Litigation*,
627 F.3d 376 (9th Cir. 2010) ....................1

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) ....................21, 28

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .................... *passim*

*Rand v. Starter Corp.*,
No. 94 CIV. 5325 (DC),
1995 WL 322024 (S.D.N.Y. May 30, 1995) ....................4, 11, 12, 16, 17

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) ....................9, 27

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ....................1, 10, 16, 17

*Roofers Local No. 149 Pension Fund v. Dreamworks Animation SKG, Inc.*,
677 F. App'x 376 (9th Cir. 2017)....................30

*In re STAC Electronics Securities Litigation*,
89 F.3d 1399 (9th Cir. 1996) ....................10

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020)....................22

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)....................9

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
551 U.S. 308 (2007)....................4, 22, 27

*In re WatchGuard Securities Litigation*,
No. C05-678J,
2006 WL 2038656 (W.D. Wash. Apr. 21, 2006)....................4



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

*Weston Family Partnership LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ....................20, 26

*In re Wet Seal, Inc. Securities Litigation*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ....................15

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................19, 30

*In re Worlds of Wonder Securities Litigation*,
35 F.3d 1407 (9th Cir. 1994) ....................1

*Xu v. ChinaCache International Holdings Ltd.*,
No. CV15-07952-CAS (RAOx),
2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ....................10, 17

*Yourish v. California Amplifier*,
191 F.3d 983 (9th Cir. 1999) ....................10, 26

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .................... *passim*

**STATUTES**

15 U.S.C. § 78u-5 ....................19, 20



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

Defendants Zillow Group, Inc. ("Zillow" or the "Company"), Richard Barton, Allen Parker, and Jeremy Wacksman ("Individual Defendants," and with Zillow "Defendants") respectfully submit this motion to dismiss Plaintiffs' Consolidated Complaint (ECF 71, "CC") pursuant to FRCP 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.[1]

## PRELIMINARY STATEMENT

It is axiomatic that "the securities laws do not insulate investors against stock downturns which are caused by events not foreseeable to the company's management, nor do they provide insurance against risks that were disclosed to investors at the time they purchased the securities." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) ("When a company fails, it does not automatically mean that a violation of the securities laws has occurred."); *Callan v. Motricity Inc.*, 2013 WL 5492957, at *7 (W.D. Wash. Oct. 1, 2013) (Zilly, J.) ("[T]he fact that [defendant's] forecast turned out to be incorrect does not retroactively make it" securities fraud. (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 389 (9th Cir. 2010))); *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001) ("Fraud by hindsight is not actionable.") If the law were otherwise, and investors were awarded damages every time a company attempted a corporate initiative that did not work out, that "would discourage firms from taking risk in the first place," to the overall detriment of investors. *DiLeo v. Ernst & Young*, 901 F.3d 624, 627 (7th Cir. 1990). Despite this well settled law, Plaintiffs seek to hold Defendants liable for precisely this reason—Zillow made a business decision to enter a new line of business, disclosing all of the risk in doing so, that in the end simply did not work out as the Company had hoped. That is not securities fraud.

Specifically, in 2018, Zillow launched "Zillow Offers" ("ZO"). Through ZO, Zillow directly bought homes, made certain repairs and updates to the homes, and re-sold them. (CC ¶ 59; Ex. 1 at 13.) From the outset, Zillow made clear to investors that ZO was an inherently risky business that faced barriers to success. (*See generally* Ex. 1 at 11-15.) Nonetheless, ZO grew rapidly through its first few years, generating significant revenue. (*See* CC ¶ 115.) However, with the onset of the global pandemic in 2020 came unforeseen and unprecedented volatility in home values. Zillow responded diligently with initiatives to keep up with the rapidly changing market, while continuing to keep investors informed along the way.

[1] All references to "Ex." refer to the Exhibits attached to the Declaration of Sean C. Knowles filed concurrently herewith. Unless otherwise noted, all emphases are added, and all citations and original alterations are omitted from quoted materials.



Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

But after over a year of continuous, almost never seen before, acceleration in home price appreciation, the market, in the third quarter of 2021, suddenly shifted with a rapid and unexpected decline in those growth trends. (*Id.* ¶ 236.) By the end of the quarter, Zillow took a write-down in the value of its homes inventory and ultimately determined that the real estate market had become too volatile and risky. (Ex. 5 at 4, 5, 7.) Promptly thereafter, Zillow announced to the market that it would discontinue ZO in the best interests of the Company and its investors going forward. (*Id.*)

Despite Zillow's sound business judgment to exit ZO to protect shareholders from market volatility and avoid potential risk to its core business lines, and the consistent risk disclosures it provided concerning specific pricing and operational challenges ZO faced, Plaintiffs bring this lawsuit alleging securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act. The Complaint's pleading failures are particularly apparent.

***First***, Plaintiffs cannot allege a fraudulent misstatement or omission when Zillow disclosed the very information Plaintiffs claim was concealed. Plaintiffs allege Zillow executives caused the demise of ZO by "deliberately" overpaying for homes and knowingly making "unsustainable" changes to renovation scope, and concealing such injurious activity only to later voluntarily confess the alleged "fraud" when Zillow chose to wind down ZO. (CC ¶ 187.) Fatal to Plaintiffs' case, however, is that throughout the life of ZO, Zillow consistently disclosed the very risks and challenges Plaintiffs now claim it concealed.

To start, from day one of ZO, Zillow disclosed the inherent pricing risks that came with ZO, including disclosing that ZO was an "unproven business model" that relied on Zillow's "ability to accurately value homes," which could vary due to "the pace of home appreciation." (Ex. 1 at 9, 11, 13.) Even in the first quarter of 2021 ("Q1"), when ZO posted record profits (CC ¶ 90), Zillow publicly warned shareholders that it "continue[d] to work on refining [its] models to catch up with the rapid acceleration in home price appreciation," and, as a result, it had not acquired homes "quite at the pace [it] planned." (Ex. 2 at 7.) Zillow explained that the inability to keep up with home price appreciation trends undermined ZO's ability to scale, which it viewed as critical to its success. (Ex. 2 at 13.)

Zillow, in turn, disclosed the measures it was implementing to address those issues. (Ex. 2 at 16; CC ¶ 88.) When, by the end of Q2 2021, those measures did not solve the challenges ZO faced, Zillow disclosed that fact as well, transparently admitting that it had to "get better." (Ex. 3 at 10.) During Q3



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

2021, when home price appreciation growth suddenly slowed, resulting in the write-down and leading to the tough choice to end ZO, Zillow promptly disclosed this to the market. Indeed, Zillow had even disclosed that if home values declined, it could "be required to write down [its] inventory." (Ex. 1 at 15.)

Zillow likewise disclosed the operational risks that it faced. For example, Zillow disclosed it relied on third-party contractors to make repairs to homes prior to resale and that it could not guarantee sufficient "access to their services." (Ex. 1 at 15.) In early 2021, at the same time Zillow disclosed that it was trying to improve its pricing methodology, Zillow also disclosed attempts to cut operational costs by, for example, getting "better and smarter about what needs to be done" to repair a home. (Ex. 2 at 16.) In August and September, Zillow continued to disclose that it still saw "opportunities for continued operational improvements" (Ex. 3 at 8) and that "operational challenge[s]" were "acute." (Ex. 6 at 8.) As this Court has held, consistent and thorough disclosures such as these preclude a finding of falsity as a matter of law. *See Limantour v. Cray, Inc.*, 432 F. Supp. 2d 1129, 1154 (W.D. Wa. 2006) (Zilly, J.).

***Second***, Plaintiffs cannot, as they must, allege any intent to defraud. As the Ninth Circuit has made clear, the federal securities laws "neither allow[] nor require[] [courts] to check [their] disbelief at the door," and courts reject theories of fraud that "do[] not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). That is precisely the case here. Although Plaintiffs allege that Zillow executives engaged in deception by hiding the "truth" about ZO, Plaintiffs fail to allege any reason why Zillow executives would engage in fraud or that anyone actually took advantage of the purported fraud. For example, Plaintiffs do not allege that the Individual Defendants suspiciously sold any of their stock while Zillow stock prices were allegedly artificially inflated due to the claimed fraud, or otherwise benefitted in any way from the purported fraud. (*See generally* CC.) Plaintiffs' "theory" boils down to the illogical claim that the Defendants hid the truth only to later confess to concealing information, but did not take advantage of their purported fraudulent acts. This very Court has rejected similar theories of fraud, and should do the same here. *Johnson v. Costco Wholesale Corp.*, 2020 WL 4816225, at *8 (W.D. Wash. Aug. 19, 2020) (Zilly, J.) (no scienter where "[p]laintiffs do not offer any explanation for why Defendants would have concealed a weakness in June 2018 only to disclose it a few months later"). Simply stated, Plaintiffs' theory of fraud "does not make a whole lot of sense." *Nguyen*, 962 F.3d at 415.

Indeed, the counter-inference—which the Court must consider at the pleading stage—is far more



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

compelling. *See Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007). Zillow decided to enter a new business segment, disclosing all of the risks of doing so. (Ex. 1 at 13-15.) It enjoyed early success, but also faced pricing and operational challenges, which it disclosed. (Ex. 3 at 8, 10; Ex. 4 at 7.) Zillow took steps to address those challenges, which it also disclosed. (Ex. 3 at 10.) Ultimately, however, Zillow's efforts were unsuccessful, and it wrote down its inventory and made the business decision to wind down ZO, all of which it too disclosed to the market. (Ex. 5 at 4-5, 7.) As opposed to an inference that Zillow sabotaged ZO by "deliberately" overpaying for homes, and knowingly making "unsustainable" changes to renovations scope (CC ¶ 187), without ever taking advantage of such "fraud," the more compelling inference is "that [Zillow's] prediction was wrong, or that its choice of words was insufficiently precise for plaintiff's liking, neither of which present a strong inference of fraud." *Rand v. Starter Corp.*, 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995); *see also In re WatchGuard Sec. Litig.*, 2006 WL 2038656, at *5-6 (W.D. Wash. Apr. 21, 2006) ("[c]onsistent disclosure" negates scienter). For these reasons, and those below, this Court should dismiss the Complaint in its entirety and with prejudice.

## BACKGROUND

### A. Overview of Zillow Offers

In April 2018, Zillow announced the launch of ZO, its "iBuying" or "Instant Buying" business. (CC ¶ 2.) iBuyers use technology to present cash offers to homeowners, make repairs to purchased homes, and resell them. (*Id.* ¶¶ 3, 59.) When a potential seller requested an offer from Zillow, ZO used a mix of algorithms and human pricing experts to present the seller with an offer price. (*Id.* ¶¶ 71-73.) The offer price was in part based on a forecast of the value of the home at the time of resale, usually three to six months after purchase. (*Id.* ¶ 171.) Zillow would deduct from the offer price estimated costs of renovations needed to re-sell the home. (*Id.* ¶ 127.) If the seller accepted the offer and Zillow acquired the home, Zillow used contractors to perform those renovations. (*Id.* ¶¶ 20-21.)

Zillow consistently disclosed to investors the risks inherent in the ZO business. For instance, in its Form 10-K for fiscal year 2020, filed on February 12, 2021, Zillow explained that "Zillow Offers is an unproven business model that relies on," among other things, Zillow's "ability to accurately value homes and manage inventory," and "third parties to renovate and repair homes before resale." (Ex. 1 at 9.) Zillow explained that, "there can be no assurance that [Zillow would] be able to acquire homes to meet our needs



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

at the prices we expect. . . . We may acquire homes priced above our expectations or pay more than expected to renovate homes, which may adversely impact our profitability and results of operations." (*Id.* at 14.) Further, because of "changes in economic conditions and other factors," including volatility in home prices, Zillow "may be required to write down our inventory if net realizable value is lower than cost." (*Id.* at 15.) Zillow's disclosures about the risks associated with volatility in the real estate market were far from hypothetical. Zillow disclosed that COVID-related market disruptions caused it to pause home acquisitions in early 2020. (CC ¶ 69.) Zillow consistently made risk disclosures dating back to the inception of ZO.[2]

Zillow also disclosed the purpose of creating ZO. As Zillow explained, ZO was part of a larger transition for Zillow from a purely media tech company, into a residential real estate transactions services company, dubbed as Zillow 2.0. (CC ¶¶ 60-61, 65.) As Zillow's CEO, Defendant Richard Barton disclosed, ZO was one part of a "vision [] to create an integrated real estate experience that combines advanced technology with high touch services into a single platform to remove friction and one day, make moving between homes as simple as trading in your car." (Ex. 7 at 4.)

In line with that strategic objective, Zillow disclosed that it endeavored to be a market maker, not a home-flipper. It prioritized scaling the business and reducing operational expenses over short-term profitability. (CC ¶¶ 81-82.) Consistent with that strategic objective, Zillow communicated a profit "guardrail" to the market of plus or minus 200 basis points in 2019. (*Id.* ¶¶ 11, 192.) This meant that Zillow would aim for a 2% profit or loss per home. (*Id.* ¶ 81.) Zillow consistently met these profit guardrails from 2019 through Q3 2020. (*Id.* ¶ 115.)

**B. <u>Zillow Discloses Operational and Pricing Initiatives to Meet Its Targets</u>**

It was not until Q4 2020 and Q1 2021 that ZO began missing its +/- 2% profit guardrails, experiencing 6.68% and 5.49% profit margins, respectively, amidst unprecedented home price appreciation. (*Id.* ¶ 86, 88.) As Zillow disclosed, the high profit margins were a result of Zillow's pricing methodology being unable to keep up with the historic appreciation rates—it was buying low and selling

[2] *See* Ex. 9 at 18 (2019 10-K disclosing: "The success of the Homes business depends in part on our ability to efficiently acquire, renovate, and sell properties"; "our estimates of what homes are worth may not be accurate, and we may pay more for homes than the price at which we are able to resell them"; "homes we purchase may suffer decreases in value due to . . . forces outside of our control"; "[c]ompetition for the purchase of homes may result in . . . fewer properties, higher purchase prices, and lower margins - or losses - realized on the sale of our homes"), 19; Ex. 10 at 8-11 (2020 10-K disclosing same).



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

high after appreciation. (*Id.*) For that same reason, Zillow acquired fewer homes in Q1 2021 than it had planned despite available inventory, a further indication that Zillow's offer prices were too low. (*Id.*) While Plaintiffs characterize the high profit margins as a "positive" (*id.* ¶¶ 86-87), Zillow executives disclosed that it was not. On the May 4, 2021 earnings call, Mr. Barton explained: "[T]he margins that we're earning on a unit basis right now are not what our goal is. . . . [ZO is] only going to be a giant business when the pricing is perceived to be fair to consumers. So it's not our goal to have 549 basis points." (Ex. 2 at 13.)

To that end, in the Spring of 2021, Zillow began implementing operational and pricing initiatives aimed at increasing the strength of Zillow's purchase offers, thus increasing the number of acquisitions, to get back in line with Zillow's profit guardrails, known internally as Project Ketchup. (CC ¶¶ 100.) And while perhaps not using the term "Project Ketchup," as early as the May 4, 2021 earnings call, Zillow began publicly discussing these steps taken to "focus on unit costs, automation, adding capacity and sharpening pricing models to improve offer strength as we continue to scale." (*Id.* ¶ 88.)

Project Ketchup's operational initiatives included a significant increase in hires to ZO's acquisition and re-sale operations team to increase ZO's capacity to buy, renovate, and resell homes at a faster pace. Zillow disclosed this: "We're heavily staffing . . . hiring a net 2,000 people in 2021, and a lot of that will be for [ZO]. And we're making other investments in ZO as well." (Ex. 2 at 9.) Project Ketchup also sought to cut renovation costs in order to improve offer strength, such as by reducing the scope of renovations by being more selective in the projects Zillow would perform before resale. (CC ¶¶ 129, 135.) Zillow disclosed this too on May 4, explaining ZO reduced renovation costs by "get[ting] better and smarter about what [renovation] needs to be done and what the customer is willing to pay for, who is repurchasing the home" and that Zillow would continue to "see benefits in that area." (Ex. 2 at 16.)

Project Ketchup's pricing initiatives included making adjustments to Zillow's pricing model when Zillow realized that the home value forecasts generated by its existing machine learning algorithm were not keeping up with the unprecedented month over month home price appreciation growth. (CC ¶ 13.) As a means to stay in line with the current appreciation trends, Zillow would add percentage points to its forecast—known as gross price overlays ("GPOs") or offer calibration systems ("OCS"). (*Id.* ¶¶ 100, 111.) As the Complaint explains, the GPOs were not separate and apart from Zillow's machine-learning pricing methodology, but adjustments to that methodology. (*Id.* ¶ 114 (describing the pricing spreadsheet created



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

by Zillow's pricing algorithm and that GPO "value was added on top in the spreadsheet" to "adjust for where the Machine Learning team believed the home values would be in 60 to 90 days"); *id.* ¶ 123 (alleging the "Machine Learning Team was 'completely adamant' that machine learning was working as it should and the OCS amount was correct"); *id.* ¶ 187(a) (alleging GPOs were "coded into" the "system").) On May 4, Zillow disclosed it was "work[ing] on refining our models to catch up with the rapid acceleration in home price appreciation." (*Id.* ¶ 14.) In response to a question about how Zillow would "catch up" to its acquisition goals, Zillow's CFO, Defendant Allen Parker, disclosed "we are continually figuring out how to improve our Offer strength." (Ex. 2 at 13; *see id.* at 14 (Mr. Barton disclosing "forecast of home price appreciation is a very important part of pricing . . . and we're learning really quickly").)

On the August 5, 2021 earnings call for Q2 2021, Zillow made further direct reference to GPOs. As the Complaint alleges, the GPOs and other Project Ketchup initiatives resulted in a significant increase in acquisitions in Q2. (CC ¶ 115.) On the earnings call, Zillow explained "this step-up in pace . . . result[ed] from the progress we have made in strengthening our pricing models." (Ex. 3 at 9.) Zillow made further direct reference to GPOs, disclosing "we've been testing price elasticity in this hot housing market, and we saw rapid conversion gains throughout the quarter as we improved offer strength." (*Id.* at 5; *id.* at 15 ("test[ing] pricing and elasticity" in order to "get the most accurate pricing to be fair to the customer").)

### C. Zillow Discloses the Continued Need to Improve Pricing and Reduce Costs

While Zillow saw an increase in acquisitions during Q2, it disclosed that profit margins actually ***increased*** from 5.49% to 5.76%—in other words, contrary to Plaintiffs' allegations Zillow was knowingly "overpaying" for homes in Q2 (*see* CC ¶¶ 118, 157), re-sale data by the end of Q2 indicated that, if anything Zillow had still ***underpaid*** for homes. Thus, while Zillow expressed confidence ZO was "back on track with our original objective to purchase 5,000 homes per month" (*Id.* ¶ 183; Ex. 3 at 6), Mr. Barton disclosed the pricing methodology was still behind home price appreciation trends, explaining: "price is moving really quickly . . . and it's hard for us to keep up with it." (Ex. 3 at 14.) He further admitted the "most important . . . constraint" to the success of ZO was "ourselves," and described ZO as a "challenge" because "we're growing this thing as rapidly as we can and really quickly in an operationally complex way and we're tuning it simultaneously." (*Id.* at 10.) Zillow had to "get better and better at pricing." (*Id.*)

On the operations side, while Zillow noted "largely durable operational improvements"



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

contributed to improvements in renovation, holding and selling costs (Ex. 3 at 8), it also disclosed there are "opportunities for continued operational improvements over time," and it "ha[s] to reduce costs." (*Id.* at 8, 10; *id.* at 15 ( "[W]e're focused on . . . reduc[ing] our cost structure").)

On September 13, 2021, Defendant Jeremy Wacksman (Zillow's COO) participated in the Piper Sandler 2021 Virtual Global Technology Conference. (Ex. 6.) During the conference, Mr. Wacksman cautioned that, "as excit[ed] as we get about Zillow Offers . . . it's still incredibly early." (*Id.* at 8.) He noted "this year has seen quite some extremes in the real estate market," and that while still rising, home prices "[a]re not quite appreciating as quickly as they were before." (*Id.* at 5.) Mr. Wacksman explained that because of this volatility, "keeping up with rising home price appreciation . . . on [the] acquisition side and then finding that price in the markets we're in, that continue[d] to be a new and unique challenge coming out of the pandemic." (*Id.* at 7, 8.) He further disclosed that Zillow was experiencing "***acute***" "operational challenge[s]" caused by the significant increase in "demand" for offers. (*Id.* at 8.)

**D. <u>A Sudden Decline in Home Price Appreciation Growth in Q3 Results in an Unanticipated Write-Down, Leading to Zillow's Decision to Wind Down ZO</u>**

However, in Q3 2021, home price appreciation growth suddenly and precipitously declined after over a year of continuous acceleration. (CC ¶ 236 (alleging in Q3, home price appreciation was "going up, albeit at a much slower pace").) As a result, the earlier adjustments Zillow made to its pricing model based on the assumption home price appreciation growth would continue to rise resulted in Zillow paying more for homes than for what Zillow estimated it would be able to sell them. (Ex. 5 at 5, 7, 12 (Zillow disclosing that pricing methodology proved inaccurate in "volatile" market "in both directions" due to the fact home price appreciation growth was "declin[ing] significantly" in the "second half of the year").)

On October 4, 2021, RBC Capital Markets analysts lowered their price target for Zillow after an "analysis of 32 live Phoenix area homes" suggested Zillow bought homes "at too high a price." (CC ¶ 219.) By mid-October, Zillow announced that it would pause its home acquisitions "[d]ue to a backlog in renovations and operational capacity constraints." (*Id.* ¶¶ 221-22.) By the beginning of November, media outlets reported that an analysis conducted by KeyBanc found that most of the homes in Zillow's inventory were worth less than what it paid for them. (*Id.* ¶¶ 227, 230.)

Zillow ultimately determined it would need to write-down $304 million in the value of the home



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

inventory it owned at the end of Q3 2021 that it expected to resell for less than it purchased. Subsequently, Zillow made the business decision to wind down ZO operations and promptly announced its decision on November 2, 2021, as part of Zillow's Q3 2021 financial results release. (*Id.* ¶¶ 33, 170.) Zillow also announced the write-down in homes inventory. (*Id.* ¶¶ 33, 232.) That same day, Zillow hosted a conference call to discuss the Q3 2021 earnings and its decision to wind down ZO. (Ex. 5.) Mr. Barton stated that "further scaling up [ZO] is too risky, too volatile to our earnings and operations, too low of a return on equity opportunity and too narrow in its ability to serve our customers." (*Id.* at 4.) He explained:

> [I]n our short tenure operating [ZO], we've experienced a series of extraordinary events: a global pandemic, a temporary freezing of the housing market and then a supply-demand imbalance that led to a rise in home prices at a rate that was without precedent. We have been unable to accurately forecast future home prices at different times in both directions by much more than we modeled as possible . . . .

(*Id.* at 5.) Zillow's stock price declined following the announcement.

## PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 10(b)

To state a claim under Section 10(b), Plaintiffs must allege, among other things, (i) a material misrepresentation or omission; (ii) scienter; and (iii) loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Plaintiffs do not satisfy any of these three elements.

## I. PLAINTIFFS FAIL TO PLEAD A FALSE OR MISLEADING STATEMENT

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). As explained below, Plaintiffs' allegations fail to plead that any of Zillow's public statements were false or misleading. Moreover, several of the challenged statements are inactionable either because they are forward-looking statements subject to the PSLRA's safe harbor provision, or they are puffery.

### A. Plaintiffs Fail to Plead a Misstatement Concerning Pricing Methodology

Plaintiffs claim that eleven Zillow statements created a false impression that Zillow strengthened its offer prices and increased its acquisitions solely by making adjustments to its "algorithm and pricing models" (CC ¶ 187), when in fact Zillow was increasing its offer prices by use of GPOs or OCS (*id.* ¶¶ 17,



Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

103, 187(a))—as if there is a distinction, which there is not.[3] Plaintiffs allege that, as a result, Zillow paid more for homes than what it believed the eventual resale price would be—what Plaintiffs describe as "deliberately over-paying" for homes. (*Id.* ¶ 187(a), (b) (d).) These claims fail.

**1. Zillow's Statements Are Not Inconsistent With Its Use of Price Adjustments**

To plead falsity, a complaint must "contain allegations of specific contemporaneous statements or conditions that demonstrate the . . . misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432. Statements that are "not necessarily inconsistent" with the contemporaneous facts the plaintiff pleads are not misleading. *See id.*; *Yourish v. Cal. Amplifier*, 191 F.3d 983, 994 (9th Cir. 1999) ("contemporaneous statements" must be "inconsistent" with other facts "available to the defendants"). When evaluating a company's statements, investors look at the statements holistically and in context of the company's other statements. *See, e.g.*, *In re STAC Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) (statements are "read in light of all the information then available to the market"); *Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) (similar).

**(a) Zillow's August 5, 2021 Statements Were Not False or Misleading**

Plaintiffs claim that Defendants' August 5, 2021 statements reporting that Zillow had seen "strong customer demand," "accelerated" and "record" home purchases, "improv[ed]" or "strengthen[ed]" pricing models, "sharpened" offer strength, and "gains in conversation rates" were misleading because those statements suggested that the increase in acquisitions was based on improvements to Zillow's "algorithm and pricing models," as opposed to the use of GPO and OCS pricing adjustments. (CC ¶¶ 26, 187.)

---

[3] These statements include (1) in Zillow's August 5, 2021 Q2 2021 earnings release, "Zillow Offers[] continues to accelerate" (CC ¶ 181); (2) in Zillow's August 5, 2021 Q2 shareholder letter, (a) "Zillow is back on track" (*id.* ¶ 182); (b) "the strong customer demand for Zillow Offers . . . continued to accelerate in Q2 . . . . The record number of homes purchased . . . is a direct reflection of the customer value proposition, the progress we have made in strengthening our pricing models and automation when providing offers to customers" (*id.*); and (c) "[w]e expect homes . . . to have tighter pricing assumptions . . . over the course of the second half of the year" (*id.*); (3) in Zillow's August 5, 2021 earnings call, (a) ZO sold a record number of homes and achieved record revenue, and "has proved more than durable even in the sizzling hot sellers' market" (*id.* ¶ 183); (b) "we saw significant customer demand at the beginning of Q2" and "continued to see strong growth in customer demand as we entered Q3" (*id.*); (c) "we are now back on track with our original [acquisition volume] objective," and "we are seeing more and more signals from our customers that validate our integration thesis and growth strategy" (*id.*); (d) "[w]e made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength . . . . These improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases" (*id.*); (e) noting "the progress we have made in strengthening our pricing models and automating the top of the funnel" (*id.* ¶ 184); and (f) "I confess to being quite excited by how well Zillow Offers is doing in such a hot sellers' market" (*id.* ¶ 185); and (4) at the September 13, 2021 Piper Sandler Virtual Global Technology Conference, ZO is "a business that exists across all housing market cycles" and "the strength and appeal of Zillow Offers just continues to grow." (CC ¶ 191.)



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

Plaintiffs' claim fails at the outset because there is no distinction between adjustments to Zillow's algorithm and pricing models and Zillow's use of GPO and OCS pricing adjustments. They are the same—all are "improved" or "strengthened" pricing models, that "sharpened" offer strength and resulted in "gains in conversation rates." Far from contradicting Zillow's disclosures, Zillow's use of GPOs and OCS were part of the ***very*** pricing model improvements Zillow referenced. Indeed, Plaintiffs acknowledge that the Machine Learning team incorporated GPOs and OCS ***into*** Zillow's pricing model to keep up with record home price appreciation and make offers more attractive. (*See id.* ¶¶ 100, 102, 107, 114, 123, 187(a).) While not using the terms "GPO" or "OCS," Zillow described its use of these tools to investors. Zillow explained that, "despite [its] efforts," its profit per home in Q2 was above its desired "plus or minus 200 basis point guardrails," due to rapid home price appreciation. (Ex. 3 at 5; *see also id.* at 14 (disclosing that the market prices for homes were "moving really quickly" and Zillow was trying "hard" to "keep up").) As a result, it had been "testing price elasticity in this hot housing market" as it "improved [its] offer strength" and expected to be within its profit target in "the second half of the year." (*Id.* at 5.) In other words, Zillow paid more for homes to decrease its profits and increase acquisitions—a reference to GPOs and OCS. None of Plaintiffs' confidential witnesses, discussed below, suggests Zillow's statements about pricing adjustments to keep up with home price appreciation were references to anything other than GPOs.

Given these disclosures, Plaintiffs' contention that Zillow's use of GPOs and OCS "hid from the market the increased risk" (CC ¶ 187(d)) amounts to quibbles over word choice. *See Rand*, 1995 WL 322024, at *4 (that defendants' "choice of words was insufficiently precise for plaintiff's liking" does not constitute fraud); *Limantour*, 432 F. Supp. 2d 1129 at 1147 (no falsity where challenged statements "were made simultaneously with the disclosure to analysts" regarding allegedly concealed facts); *Avila v. LifeLock Inc.*, 2016 WL 4157358, at *6-7 (D. Ariz. Aug. 3, 2016) (rejecting allegation that defendants downplayed severity of investigation where defendants "did, in fact, disclose the [ ] investigation" and "continued to disclose the development of the investigation and warned investors of its possible effects on [defendant's] business operations" and thus plaintiff "failed to identify any undisclosed information that would have altered the 'total mix' of information"). Zillow had no obligation to adopt Plaintiffs' preferred negative characterization of the GPOs and OCS or predict they would result in overpayments. *See Rand*, 1995 WL 322024, at *4 ("Corporations are not required to characterize either possible results or their



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

operations in a pejorative manner[.]").

Indeed, none of Zillow's statements even implies that Zillow was not using tools such as GPOs or OCS in its effort to "strengthen" its offers. While "launching the neural Zestimate"—an algorithmic model—was also among its pricing improvements (CC ¶¶ 24, 99, 152), Zillow did not suggest this was the only improvement. *See Marcu v. Cheetah Mobile, Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) ("disclosures explaining the drivers of revenues and profits" did not "rule out other factors playing a role"). Nor did Zillow suggest that its pricing models would always result in accurate forecasts or were risk-free. In its August 5, 2021 earnings call, for example, Zillow explained that it still needed to "focus on increasing automation" "to get better and better at pricing," and it was both "strengthening [its] pricing models and automating the top of the funnel." (Ex. 3 at 9-10.) Zillow also disclosed that its pricing methodology was a combination of "proprietary algorithms" and "[Zillow's] knowledge of the real estate market[]," and its pricing "may be inaccurate." (Ex. 1 at 13.) It warned that it "may acquire homes priced above [its] expectations . . . which may adversely impact [its] profitability and results." (Ex. 1 at 14; *see also* CC ¶ 88 (disclosing on May 4, 2021 that Zillow needed to "refin[e] [its pricing] models to catch up with the rapid acceleration in home price appreciation").) Thus, Zillow's statements made clear that ZO faced risks from pricing uncertainty; nothing more was required. *See McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *6 (W.D. Wash. Apr. 18, 2008) (dismissing when "none of the . . . statements suggested that [FDA] *approval* was expected" by certain date but "only that [defendant] expected FDA *action* by" a certain date and thus statements were not inconsistent with alleged truth (emphases in original)); *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, *13 (N.D. Cal. Apr. 7, 2021) (dismissing statements that did not give "the impression that [the company] was in perfect compliance with" regulations); *Lefter v. Yirendai Ltd.*, 2017 WL 2857535, at *7 (C.D. Cal. June, 20, 2017) (dismissing where statements did not suggest lack of risk; "they simply did not explain the risk in the manner or level of detail that [p]laintiff would have preferred").

**(b) Zillow's Sept. 13, 2021 Statements Were Not False or Misleading**

Plaintiffs' challenge to Mr. Wacksman's September 13, 2021 statements that ZO was "a business that exists across all housing market cycles" and that "the strength and the appeal for [ZO] just continues to grow" fares no better. These statements do not state nor create an impression that Zillow guaranteed that its pricing model would always accurately forecast home prices or that its pricing model could not



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

result in Zillow overpaying. (CC ¶¶ 191, 195.) These statements do not even mention Zillow's pricing method. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002) (press release that did not mention potential merger did not create a misleading impression about the merger). Indeed, during the conference, Mr. Wacksman actually told investors that accurately "keeping up with rising home price appreciation . . . continue[s] to be a new and unique challenge." (Ex. 6 at 7-8.) Given this caveat, no reasonable investor could conclude Zillow's pricing models posed zero risk of overpayment.

### 2. Plaintiffs Fail to Plead that Zillow "Deliberately" Overpaid for Homes

Plaintiffs' claim also fails because Plaintiffs do not allege sufficient facts to support their theory that Zillow somehow "deliberately" overpaid for homes in the first instance, which is the crux of Plaintiffs' claim as to why Zillow's public statements were misleading. (CC ¶ 187(d).)

Plaintiffs' only purported facts supporting this "deliberate overpayment" theory come from unnamed former employees and anonymously sourced news articles. (*Id.* ¶¶ 100-26, 187(d).) To allege securities fraud using confidential witnesses, a plaintiff must describe the witnesses "with sufficient particularity to establish their reliability and personal knowledge," and the allegations themselves must support securities fraud. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); *see also Limantour*, 432 F. Supp. 2d 1129 at 1141. Plaintiffs fail to plead facts to satisfy the standard for crediting the purported confidential witnesses' allegations.

First, Plaintiffs rely on FE-1 to claim that Zillow's price adjustments "almost always meant that Zillow was overpaying for a home." (CC ¶ 122.) FE-1 was an "acquisition analyst" who worked in a single region, used a "pre-programmed pricing spreadsheet to price homes," and reported to middle management. (*Id.* ¶ 51.) As he did not develop Zillow's pricing model, assess market values, or forecast home price appreciation, FE-1 was in no position to know how Zillow's pricing adjustments worked or whether they resulted in Zillow overpaying for any home relative to then-existing values, let alone homes nationwide. *See Limantour*, 432 F. Supp. 2d at 1143 (rejecting multiple witnesses' allegations regarding projects "[they] did not work on"); *Callan v. Motricity*, 2013 WL 195194, at *18 (W.D. Wash. Jan. 17, 2013) (Zilly, J.) (complaint did not support a finding of witness's personal knowledge when it "lack[ed] sufficient information for the Court to conclude how and when [the witness] acquired his alleged knowledge").

FE-1 also provides no facts showing that Zillow "almost always" overpaid for homes. *See In re*



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

*Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) (rejecting "vague and hyperbolic" conclusions from witness); *Limantour*, 432 F. Supp. 2d at 1144 (witness allegations that issues were "openly discussed" were "too vague to meet the heightened PSLRA standard"). While FE-1 claims an "OCS value was added on top in the spreadsheet," he admits that the OCS reflected—not a deliberate overpayment relative to then-existing values—but "where the Machine Learning team believed the home values would be in 60 to 90 days," when Zillow sold the home, and the team believed its price adjustments were "correct." (CC ¶¶ 114, 122-23.) FE-1 also describes an analysis he performed at an unspecified time on an unspecified number of homes he priced that had not sold quickly. (*Id.* ¶ 122.) While asserting that they had not sold "because the OCS value was too high," FE-1 provides no basis for this conclusion. (*Id.*)

Plaintiffs also rely on FE-3 to claim "that it was widely known" within Zillow that its "offers to purchase homes . . . exceeded the worth of the homes." (*Id.* ¶ 109.) Courts disregard allegations from "witnesses [who] were simply not positioned to know the information alleged," and where the allegations are "conclusory" or based on hearsay. *Zucco*, 552 F.3d at 996. FE-3 provides no factual basis for his claim. As he worked on home renovations (CC ¶ 53), he does not allege to, nor could he, have any personal knowledge about whether Zillow was overpaying for homes in the summer, much less whether that was widely known. *See Callan*, 2013 WL 195194, at *17 (witness must speak from "personal knowledge" rather than "regurgitat[e] gossip and innuendo"); *see also In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) (Zilly, J.) (same); *Limantour*, 432 F. Supp. 2d at 1143 (rejecting witnesses' allegations regarding projects "[they] did not work on").

Plaintiffs' reliance on FE-4—another renovations worker who managed contractors in the Southeastern U.S.—to claim that "by mid-summer 2021, Zillow was over-paying $30,000 to $100,000 over the initial Zestimate" (CC ¶ 125) fails for the same reason. Again, as with FE-3, Plaintiffs plead nothing suggesting a renovations worker would know that any payment over "the initial Zestimate" constituted an "overpayment" in light of market conditions, anticipated home price appreciation, and Zillow's profit guardrails. (*Id.* ¶¶ 108, 125.) Indeed, FE-4 merely repeats what he purportedly heard from the General Manager and Assistant General Manager for his region or at "regional market meetings." (*Id.* ¶¶ 108, 125); *Johnson*, 2019 WL 6327580, at *7 (confidential witness "unreliable" because "he relies on hearsay"). Even if FE-4 were credible, his allegations do not establish falsity because the allegation that



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

Zillow was paying more than the "initial Zestimate" for homes is consistent with Zillow's disclosures that it had "sharpened [its] offer strength." (CC ¶ 187.) *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (rejecting witness allegations that did not contradict company's statements).

Finally, Plaintiffs rely on articles from The Wall Street Journal and Business Insider to support their claim that Zillow added GPOs to its algorithm and that "overexuberance of human managers" caused Zillow to "pay too much for homes." (CC ¶¶ 101-02, 105, 118-19.) Those articles, which rely on anonymous former Zillow employees, also fail to meet the *Zucco* standard. *See In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) (rejecting allegations based on anonymously sourced news reports "because they provide no specific facts to corroborate the reliability of the report, nor is the reliability corroborated by the fact it was referenced in the newspaper"); *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 686 (E.D. Va. 2015) (discounting article where court had "no way to assess the credibility of anonymous sources quoted in the article, whether the sources have personal knowledge of the events described, and whether the sources were in a position to learn of such events personally"). The news reports here do not explain what jobs the employees held or how they would have personal knowledge.

In any event, even if the Court were to credit the FE allegations or articles, these allegations do not support the conclusion that any "overpayments" were "***deliberate***" or otherwise inconsistent with the adjustments that Zillow itself disclosed. (CC ¶ 187.) For example, as discussed above, FE-1 alleges the Machine Learning Team was "adamant" that the GPO pricing adjustments were "correct" and the "machine learning was working as it should" to keep up with home price appreciation trends. (*Id.* ¶¶ 114, 122-23.) FE-1, and by extension Plaintiffs, with the benefit of hindsight simply ***disagree*** with the Machine Learning Team's initial pricing judgments simply because, months later, the value of the homes had not appreciated as predicted and Zillow had to write-down its inventory. This does not mean Zillow knew it was overpaying at the time of the offers. *See Callan*, 2013 WL 195194, at *23 ("The fact that a prediction proves to be wrong in hindsight does not render the statement untrue when made."). Similarly, the Wall Street Journal article asserts that when anonymous staffers raised concerns over the pricing adjustments, managers ***disagreed***. (CC ¶ 118.) Disagreement with defendants' decisions does not state a securities claim. *See Zucco*, 552 F.3d at 998 (disagreement over accounting processes not indicative of fraud); *Rand*, 1995 WL 322024, at *4 ("That [plaintiff] in hindsight, does not agree with defendant's then prediction



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

does not make the June release misleading.") Plaintiffs provide no facts showing Zillow deliberately overpaid for homes, as opposed to trying to keep up with home price appreciation, as Zillow disclosed.[4]

### B. Plaintiffs Fail to Plead a Misstatement Concerning Operational Improvements

Plaintiffs also claim that Zillow's statements in its August 5, 2021 earnings call that it had made "durable operational improvements," leading to reduced "renovation, holding and selling costs," were misleading because the improvements supposedly consisted of "unsustainable" reductions in contractor pay and the scope of renovation work. (CC ¶¶ 27, 157, 187, 190, 192, 196.) This claim likewise fails.

#### 1. Zillow's Statements Are Not Inconsistent With Paying Contractors Less or Reducing the Scope of Renovations

Plaintiffs fail to plead "specific contemporaneous statements or conditions" that make Zillow's statements that it achieved "largely durable operational improvements" related to costs for renovating and selling homes false or misleading, for several reasons. (*Id.* ¶¶ 184, 192); *Ronconi*, 253 F.3d at 432.

***First***, Plaintiffs' allegation that such statements were misleading fails for the simple reason that Zillow ***explicitly disclosed*** that it had reduced contractor payments and scope of renovations. During its May 4, 2021 investor conference call, Zillow told the market that it had reduced "renovations and selling costs" by 2.8% compared to 2020 by getting "better and smarter about what [renovations work] needs to be done and what the customer is willing to pay for." (Ex. 2 at 16.) Since Zillow disclosed exactly what Plaintiffs claim it concealed, there was no fraud. *See Limantour*, 432 F. Supp. 2d 1129 at 1147.

***Second***, in any event, Plaintiffs do not show how such measures were inconsistent with Zillow making durable, cost-saving improvements. Plaintiffs plead nothing showing that the "operational improvements" Zillow made were not "largely durable." Plaintiffs plead no facts suggesting that Zillow did not in fact make durable improvements along with its supposedly "unsustainable" reductions in contractor pay and the scope of its renovations. *See Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *1 (9th Cir. Dec. 21, 2021) (rejecting "allegations about 'serious operational problems' in a new business" that did not "directly contradict[]" issuer's "statements about . . . successes"). In fact, Zillow also reported on "meaningful operational progress in improving our cost per home sold" (CC ¶ 86)

[4] Plaintiffs also claim the adjustments created "artificial[]" rather than "organic" demand for offers. (CC ¶ 189.) No facts support Zillow was creating demand with high offers—*i.e.*, inducing sellers who were not otherwise interested in selling—rather than responding to existing demand in a competitive market. Not even the FEs or news articles purport to make this leap.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

and "durable operational improvements" (*id.* ¶ 88) in February and May 2021. Plaintiffs do not claim these statements were false. Thus, by the time Zillow repeated the statements on August 5, 2021, it had a six-month track record of operational improvements, making them "durable." Even if that were not the case, again, the securities laws do not require Zillow to adopt Plaintiffs' preferred negative characterization of its operational improvements. *See Rand*, 1995 WL 322024, at *4.

***Third***, by stating it had made "durable operational improvements," Zillow did not state or imply that it had not encountered other operational challenges, including from contractor availability. *See Ronconi*, 253 F.3d at 434 ("A company could experience serious operational problems . . . and still have increasing revenues."). Here, Zillow made clear it could encounter challenges with its contractors. Zillow's 2021 Form 10-K disclosed that Zillow Offers "relies on local and national third-party general contractors . . . to make upgrades to . . . homes prior to resale, and ***we can provide no assurances*** . . . that we will have uninterrupted or unlimited access to their services or that we will be able to effectively control the timing and costs of their projects." (Ex. 1 at 15.) Given this disclosure, investors could not have understood Zillow's statements about operational improvements as guarantees it had no issues with contractors notwithstanding any improvements Zillow was making. *See Xu*, 2017 WL 114401, at *6.

### 2. Plaintiffs Fail to Plead that Zillow's Contractor Payment and Scope of Renovation Practices Were "Unsustainable"

In any event, Plaintiffs fail to plead facts supporting that paying contractors less or reducing the scope of renovations was unsustainable, much less so unsustainable that it rendered Zillow's statements false. Plaintiffs once again rely entirely on confidential witness allegations to support their claim. (CC ¶¶ 127-50.) However, Plaintiffs fail to establish that these witnesses are legally reliable or sufficient to satisfy the Ninth Circuit's exacting standard. *See Zucco*, 552 F.3d at 995.

Plaintiffs rely on a Business Insider article sourced to four anonymous Zillow employees and two contractors to claim that Zillow's reductions in contractor pay led to: (i) fewer contractors being willing to take Zillow jobs; (ii) increased turnaround times; and (iii) increased costs. (CC ¶¶ 127-33.) However, the article does not describe the employees' roles, or how two individual contractors would know about Zillow's experience with contractors nationwide. Because Plaintiffs provide "no way to assess the credibility of anonymous sources quoted in the article, whether the sources have personal knowledge of



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

the events described, and whether the sources were in a position to learn of such events personally," the Court should reject the Business Insider allegations. *Neustar*, 83 F. Supp. 3d at 686.

Plaintiffs also rely on FE-3. However, FE-3 himself alleges that "the shrinking of renovation scopes" occurred in some "markets but not all of them" (CC ¶ 137), defeating any suggestion that shrinking the scope of home renovations led to unwilling contractors nationwide.

Plaintiffs' reliance on FE-4 is equally misplaced. (CC ¶ 54.) FE-4 claims that after Zillow shrank the scope of its home renovations, contractors were unwilling to work with Zillow, which led to a nationwide backlog of homes awaiting renovations. (*Id.* ¶¶ 135-36, 138, 141-44.) However, FE-4 worked only in the Southeastern U.S.; Plaintiffs plead no facts substantiating his claim that the alleged renovations backlog was widespread. *See, e.g., Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (rejecting allegations of low level employee who only had information about operations in one state). Instead, Plaintiffs plead that FE-4 heard about "the nationwide backlog problem" in undescribed meetings and "conversations with other Renovation employees." (CC ¶ 144.) FE-4's impression is based on hearsay rather than the requisite personal knowledge. *See Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013) ("[S]econd-hand information, obtained only through intermediaries, undermines the likelihood that he had personal knowledge[.]").

Finally, Plaintiffs rely on FE-5—a worker who inspected homes in the "Southern United States"—to allege that Zillow started paying contractors below market rates in the summer of 2021, which purportedly led to contractors declining to "bid on Zillow jobs." (CC ¶¶ 55, 139-40.) However, Plaintiffs admit that FE-5 left Zillow in March 2021, before Zillow is alleged to have reduced its pay rates for contractors. (*Id.* ¶ 55); *see Johnson*, 2019 WL 6327580, at *7 (rejecting allegations from confidential witness who did not work "during the class period"). FE-5's allegations are thus based on what he heard second-hand from a handful of contractors after he left Zillow and conversations with unidentified "former colleagues still at Zillow" (CC ¶¶ 139-40), not personal knowledge. *Janbay*, 2013 WL 1287326, at *8.

**C. <u>In Any Event, Most of the Alleged Misstatements Are Legally Inactionable</u>**

Even if Plaintiffs adequately alleged a supposed true state of affairs regarding Zillow's pricing and operational issues that was not disclosed and was inconsistent with Zillow's affirmative statements (they do not), most of the challenged statements are inactionable in any event because they are: (i) forward-



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

looking statements protected by the PSLRA's safe harbor; and/or (ii) inactionable puffery.

**1. Plaintiffs Cannot State a Claim Based on Forward-Looking Statements**

The PSLRA shields from liability certain "forward-looking statements," which include, among other things, statements regarding "plans and objectives of management for future operations" or "future economic performance." 15 U.S.C. § 78u-5(*i*)(1)(B), (C); *see also Intuitive*, 759 F.3d at 1059 (statements about future revenue growth, markets that will "continue to expand," or areas that "may increase" were forward-looking). This "safe harbor" provision applies in either one of two circumstances—if: (i) the forward-looking statement is identified as such "and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," 15 U.S.C. § 78u-5(c)(1)(A)(i); ***or*** (ii) the plaintiff fails to plead facts creating a strong inference that the statement "was made with actual knowledge . . . that the statement was false or misleading." *Id.* § 78u-5(c)(1)(B)(i).

Here, the statements Plaintiffs challenge are forward-looking, were identified as such, and were accompanied by meaningful cautionary language, invoking the first prong of the safe harbor. Zillow's statements in its August 5, 2021 shareholder letter or earnings call that: (i) "[w]e expect homes that we purchase to have tighter pricing assumptions closer to our self-imposed guardrails" (CC ¶ 182); (ii) "[i]n Q3, we expect our Homes segment revenue to increase sequentially" (*id.* ¶ 184); and (iii) "we expect [strong growth] will favorably impact revenue in future quarters," (*id.* ¶ 183) are all statements of future economic performance, and therefore, forward-looking. Likewise, Zillow's statement that it implemented "durable" operational improvements (*id.* ¶¶ 23, 27) is a prediction that cost improvements will hold true going forward. It is inherently forward-looking. *See Mazzaferro v. Aruba Networks Inc.*, 2015 WL 456534, at *3 (N.D. Cal. Feb. 2, 2015) (statement that "trend will continue" "is forward-looking"). Similarly, Zillow's statements that it was "back on track" after Q2 2021 (CC ¶¶ 182-83), represented its predictions that Zillow would meet its future goals; they were also forward-looking. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (statements that company was "on track" to meet a goal were "merely alternative ways of declaring or reaffirming the objective itself" and were thus forward-looking).

These forward-looking statements were identified as such. *See* 15 U.S.C. § 78u-5(c)(1). To identify forward-looking statements, a company may alert investors that the earnings call or written communication contains forward-looking statements and refer investors to the risk disclosures contained



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

in its SEC filings. *See Intuitive*, 759 F.3d at 1059 (language in earnings call stating that forward-looking statements would follow and directing investors to public filings was sufficient); *Fusion-io*, 2015 WL 661869, at *13 (reference to SEC filings in press release sufficient); *see also* 15 U.S.C. § 78u-5(c)(2)(B). Here, Zillow's August 5, 2021 earnings call and shareholder letter alerted investors that it would "make forward-looking statements about [its] future performance and operating plans" and encouraged investors to "consider the risk factors described in [its] SEC filings for additional information." (Ex. 3 at 4; *see* Ex. 4 at 11.) Both Zillow's shareholder letter and Form 10-K explained that statements using phrases such as "expect" or "will," and "all" other "statements that are not historical facts" should be considered forward-looking. (Ex. 1 at 1; Ex. 4 at 11.) Such language is sufficient. *See In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *15 (S.D.N.Y. Aug. 19, 2015) (language that forward-looking statements include words such as "will," "expect," and "other words and terms of similar meaning" was adequate).

Finally, Zillow provided adequate cautionary statements. 15 U.S.C. § 78u-5(c)(1). Cautionary language must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Weston Family P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 623 (9th Cir. 2022). In its Form 10-K, Zillow disclosed that mistaken assumptions or judgments could lead it to pay more for homes than it could later sell them:

> We . . . price the homes we buy and sell through [ZO] using in-person evaluations and data science and proprietary algorithms based on a number of factors, including our knowledge of the real estate markets in which [ZO] operates. These assessments include the estimated time from purchase to sale, the cost of updating a home, market conditions and potential resale proceeds, closing costs and holding costs. ***These assessments may be inaccurate.***

(Ex. 1 at 13.) Zillow also told investors that it may run into operational challenges that could harm its business by lengthening the time it took to sell acquired homes: "If we have excess inventory or our average days to sale increases, the results of our operations may be adversely affected because we may be unable to liquidate such inventory at prices that allow us to meet profitability targets or to recover our costs." (*Id.* at 14.) It further warned that ZO depends on "our ability to expeditiously sell inventory, ***relies on third parties to renovate and repair homes before resale***, and homes we buy may decline in value and ***result in inventory write downs***." (*Id.* at 9.) These disclosures "go straight to the heart of the [plaintiff's] complaints." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *14 (N.D. Cal. Mar. 24, 2014). They are more than sufficient cautionary statements to invoke the safe harbor. *See id.*



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

Separately, several of Mr. Wacksman's September 13, 2021 statements were also forward-looking and protected under the second prong of the safe harbor. The statement that "you're ***going to see*** us book those improvements as unit economic savings to the unit and be able to pass those back onto the customer" describes a plan and objective of management. (CC ¶ 192.) Mr. Wacksman's statement that "some of those unit economic improvements are durable" (*id.*) is a prediction that economic improvements will sustain into the future. *See Flex*, 2021 WL 6101391, at *2 (statement about "sustaining profitability" was forward-looking). Although not accompanied by cautionary language, they are subject to the second prong of the safe harbor unless the plaintiff alleges "facts that would create a strong inference that the defendant[] made the forecasts with ***actual knowledge*** that the statements were" misleading. *Emps. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004). As explained below, in Section II, Plaintiffs fail to plead that Mr. Wacksman made any statement with actual knowledge that it was false. Accordingly, the statements are shielded by the safe harbor. *See Clorox*, 353 F.3d at 1133.[5]

### 2. Plaintiffs Cannot State a Claim Based on Zillow's Inactionable Puffery

Finally, statements that are "inherently subjective puffing," as opposed to those "that can be true or false on an objective standard," are inactionable. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). This is because "investors do not rely on vague statements of optimism" in making investments. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "[A] statement is non-actionable puffery if it is a 'general, subjective claim,' rather than a statement about 'specific or absolute characteristics.'" *Callan*, 2013 WL 195194, at *19. The following statements are inactionable puffery:

- Zillow Offers "is proving attractive to sellers even in this sizzling-hot seller's market" (CC ¶ 181), *see Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 153 (D. Conn. 2004) (saying that product "will be very attractive to our . . . customer base" "is merely puffery").
- "Zillow is back on track" (CC ¶ 182), and "we are now back on track . . . . Today, we are seeing more . . . signals from our customers that validate our integration thesis and growth strategy" (*id.* ¶ 183), *see Callan*, 2013 WL 195194, at *23 ("on track" statements "too vague to be actionable").
- "Importantly, the Zillow Offers value proposition of a fast, fair, flexible and convenient close has proved more than durable even in the sizzling hot sellers' market" (CC ¶ 183), *see In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018) ("uniquely durable and valuable" "are non-actionable expressions of generalized confidence").

[5] As shown below, Plaintiffs also fail to allege that Zillow made the August 5, 2021 forward-looking statements with actual knowledge of their falsity. As such these statements fall within the safe-harbor regardless of whether the Court concludes they were accompanied by adequate cautionary language. *See Clorox*, 353 F.3d at 1133.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

- "This step-up in pace demonstrates our confidence in our ability to scale, resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel" (CC ¶ 184), *see In re Diebold Nixdorf, Inc. Sec. Litig.*, 2021 WL 1226627, at *7, *9 & n.8 (S.D.N.Y. Mar. 30, 2021) (statements touting "progress" of initiative that would "strengthen our competitiveness" were "precisely the type of puffery" that have been "held to be nonactionable").
- "I [am] quite excited by how well [ZO] is doing in such a hot sellers' market" (CC ¶ 185), and "management feels confident about margin improvements" (*id.* ¶ 193), *see Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 366 (S.D.N.Y. 2019) (CEO's statement that he had "never been more confident and excited about the [company's] future" was puffery).
- "[W]hat we've learned is that this business, Zillow Offers, is a business that exists across all housing market cycles, right? . . . So we were really encouraged to see while we saw these incredibly hot markets, the strength and the appeal for Zillow Offers just continues to grow, and we're even more confident now that this is going to be a service really in all weather markets" (CC ¶ 191), *see Limantour*, 432 F. Supp. 2d at 1146 (statements "outlook is promising and Defendants were confident in long-term growth prospects" "clearly fall in the category of puffery").

## II. PLAINTIFFS FAIL TO PLEAD SCIENTER

Plaintiffs also fail to allege scienter—a "mental state embracing intent to deceive, manipulate, or defraud." *Nguyen*, 962 F.3d at 414. To plead scienter, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with . . . no less than a degree of recklessness that strongly suggests actual intent." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 742-43 (9th Cir. 2008). In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. To impute scienter to Zillow, Plaintiffs must first plead the scienter of the Individual Defendants. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

### A. Plaintiffs Cannot Plead Scienter Based on the Individual Defendants' Positions

Plaintiffs claim that, "[b]ecause of their positions and possession of and/or access to material, non-public information," the Individual Defendants must have known at the time of the August 5 and September 13 statements that Zillow had paid more for homes than for what it would later be able to resell them, and its reduced contractor pay and scope of renovations had caused a renovations backlog. (CC ¶¶ 48-49.) Courts routinely dismiss allegations that defendants must have known information contrary to the company's statements by virtue of their senior positions or role in preparing the statements. *See, e.g.*, *Metzler*, 540 F.3d at 1068 ("corporate management's general awareness of the day-to-day



Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

workings of the company's business does not establish scienter"); *Glazer*, 549 F.3d at 746 (allegations of "attendance at meetings" and "receipt of unspecified weekly or monthly reports" are insufficient).

Rather, a court can infer scienter based on the defendants' role only: (i) when the complaint includes "additional allegation[s] of specific information conveyed to management and related to the fraud,"; or (ii) in the "unusual circumstance[]" where "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *NVIDIA*, 768 F.3d at 1063-64; *see also Callan*, 2013 WL 195194, at *16 (plaintiff must "bridge the gap" between "mere access to information and an inference of knowledge"). Plaintiffs fail to allege scienter under either theory.

**1. Plaintiffs Do Not Identify Specific Information Related to the Fraud**

Plaintiffs fail to plead that the Individual Defendants had specific information related to the alleged fraud. "Proof under this theory is not easy. A plaintiff must produce either specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive* 759 F.3d at 1062; *Callan*, 2013 WL 195194, at *16 ("most cases" require facts of "defendant's own public statements, confidential witness reports about a defendant's specific activities," or "insider trading").

Plaintiffs fail to point to any admissions by the Individual Defendants that they monitored every detail about ZO, such as up-to-the-minute pricing decisions and the status of contractors. Nor do they allege that such monitoring informed the Individual Defendants as of the time they made the challenged statements that those statements were false. Instead, Plaintiffs rely on vague statements from Mr. Barton, Mr. Wacksman, and Mr. Parker that Zillow was "focused on . . . trying to get the most accurate pricing" and "d[id] all these estimates, . . . ha[d] all these models, . . . [and] s[aw] all the data in real-time as it's coming in" to suggest they "were knowledgeable about and actively involved in" every detail of ZO. (CC ¶¶ 198-99, 203.) At best, the statements show the Individual Defendants' familiarity with Zillow's pricing monitoring practices in general; they do not suggest the Individual Defendants knew the pricing adjustments were causing Zillow to pay more for homes than for what it could later sell them ***in the future***, let alone the ultimate extent of those overpayments. *Intuitive*, 759 F.3d at 1062 (statements supported a "mere inference of [defendants'] knowledge of all core operations, not scienter"); *Zucco*, 552 F.3d at 1000 (that management "closely reviewed the accounting numbers" was "not enough" to prove they knew



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

numbers were misstated).

Plaintiffs also point to a May 2020 Investor Relations Presentation describing Zillow's "robust, data-based visibility," "dashboards of 50+ datasets," and "Daily dashboards with leading indicators." (CC ¶¶ 94-95, 140, 145, 204.) However, the CC does not plead that: (i) the Individual Defendants actually accessed these dashboards; or (ii) the dashboards contained information contradicting Zillow's public statements at the time. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (rejecting allegations that defendants had "access to" documents in a "data room" because no allegation defendants "personally accessed the data room"); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002) (allegation that defendant "could regularly track its sales data" insufficient because it did not allege contents of reports). Thus, the May 2020 presentation cannot show scienter.

Finally, Plaintiffs rely on the FEs to attempt to show that the Individual Defendants had information contradicting their public statements. To plead scienter, the "statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter," meaning the allegations must be "detailed," not based on "unreliable hearsay," and not "conclusory." *Zucco*, 552 F.3d at 995-97. None of Plaintiffs' FE allegations meets this standard. For example, FE-2 alleges he "believed that Jeremy Wacksman" attended some forecasting and planning meetings, and FE-4 "recall[ed] hearing about the increased offers on at least one company-wide All Hands meeting that was attended by Rich Barton." (CC ¶¶ 92, 125.) But such allegations simply state that two Individual Defendants ***may*** have attended non-descript meetings where planning and/or increased offers ***may*** have been discussed. These allegations nowhere plead, as they must, that such supposed meetings involved any discussion that ZO's increased offers necessarily meant that ZO was deliberately overpaying for homes, much less that homes could not be sold at a profit in the future. *Intuitive*, 759 F.3d at 1063 (no scienter where "allegations linking specific reports and their contents to the executives, not to mention the link between the [former employees] and the executives" were "missing"); *Limantour*, 432 F. Supp. 2d at 1155 (witnesses did not show defendants knew of software problems because they did not "specify the extent of the . . . problems, the timing of any specific problem" and did not allege they "reported their 'information' about software problems to any of the Defendants").



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

Plaintiffs' FEs also allege that they discussed concerns that Zillow's offer prices were too high, or that Zillow was not paying enough to contractors, with their direct managers, and that these problems were widely known within the Company. (CC ¶¶ 96, 107, 108, 118, 120, 123, 124, 126, 136, 141, 144.) However, none of the FEs alleges that their concerns were ever shared with the Individual Defendants. Therefore, they are not indicative of scienter. *Zucco*, 552 F.3d at 998 ("generalized claims about corporate knowledge" insufficient to plead scienter); *see also Intuitive*, 759 F.3d at 1062-63 (same); *Limantour*, 432 F. Supp. 2d at 1155 (same). Nor do these allegations show management agreed Plaintiffs' complaints were justified. "[A]t best" these allegations describe "disagreement and questioning" within Zillow about ZO's direction—not that management defrauded investors. *Zucco*, 552 F.3d at 999 (rejecting similar allegations). Plaintiffs simply have not alleged that any Individual Defendant knew or should have known as of August 5 or September 13 that the statements on those days were false or misleading, much less that any Individual Defendant could have or should have predicted the future of the market or ZO itself.

**2. It Is Not "Absurd To Suggest" Defendants Were Without Knowledge**

Plaintiffs allege that ZO "was a core operation at Zillow . . . demonstrating that [Individual Defendants] were knowledgeable about and actively involved in those operations." (CC ¶ 198.) To rely on this theory, Plaintiffs must plead particularized facts showing that "the nature" of the information the Individual Defendants are supposed to have known "is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Zucco*, 552 F.3d at 1000. The cases where a "core operations inference" will be "sufficient under the PSLRA" are "exceedingly rare." *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1077 (C.D. Cal. 2012). This is not such a case.

Plaintiffs plead nothing supporting that "it would be 'absurd' to suggest that management was without knowledge" that Zillow was paying more for homes than for what it would later be able to sell them, or that its contractor payment and scope of work policies were unsustainable. *Zucco*, 552 F.3d at 1000; *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *21 (N.D. Cal. Dec. 17, 2019) (that "Cloud business" was important to company did not make "every piece of information" about Cloud business "critical to [its] core operations"). Information imputed to executives under the core operations doctrine must be "readily apparent" because it concerns "prominent facts" "obvious from the operations of the company." *Zucco*, 552 F.3d at 1001.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

***First***, the "core operations" doctrine presupposes that somebody within Zillow knew by August 5 or September 13 that its overpayment of homes and contractor issues were so severe they rendered Zillow's statements misleading. Here, the CC is devoid of such allegations. It would not be knowable—let alone obvious—from Zillow's day-to-day operations that it was significantly "overpaying" for homes. When ZO entered into agreements to purchase homes, it could not know whether it would sell them at a profit until several months later, when the homes actually sold. (Ex. 2 at 9, 13; Ex. 3 at 5.) Indeed, Zillow's unit profit margins for Q2 2021 as reported on its August 5 earnings call were more than double its profit guardrails (CC ¶ 115), foreclosing any notion that Defendants must have known then it was overpaying for homes.

***Second***, Zillow would not know whether its contractor pay and renovations policies were "unsustainable" until it had seen widespread adverse effects, which Plaintiffs do not allege had occurred at the time of Zillow's statements. Thus, it is not "'absurd' to suggest" that Defendants would not know about the alleged effect of Zillow's contractor and renovations policies in real time. *See Gammel*, 905 F. Supp. 2d at 1077-78 ("it does not automatically follow from the 'core' nature of" webOS product that "each Individual Defendant was immediately aware of developments in HP's webOS strategy").

**B. <u>The Court Should Not Infer Scienter From the Alleged Temporal "Proximity" Between Zillow's Challenged Statements and Its Decision to End Zillow Offers</u>**

The alleged temporal "proximity of the August and September statements" and the "November 2, 2021 announcement that [Zillow] was terminating Zillow Offers" also fails to support scienter. (CC ¶¶ 206, 209, 214.) "[T]emporal proximity alone does not satisfy the particularity requirements of Rule 9(b)." *Twitter*, 29 F.4th at 622; *see also Yourish*, 191 F.3d at 997 (temporal proximity of the challenged statements and disclosure "without more, is insufficient").[6] Rather, Plaintiffs must allege "other adequately pleaded allegations" of contemporaneous information contradicting Defendants' statements "for the temporal proximity to bolster." *Yourish*, 191 F.3d at 997. Plaintiffs fail to do so here. Plaintiffs plead no facts to support that because Zillow observed adverse effects on ZO at the end of Q3—effects that it described in detail in its Q3 earnings call (Ex. 5 at 5, 7, 12)—it necessarily observed those effects earlier in the quarter as well. On the contrary, there was a multi-month lag between Zillow's offer to purchase a home and the purchase, renovation, and re-sale. (Ex. 2 at 9, 13; Ex. 3 at 5.) Thus, Zillow would not learn

[6] Courts typically analyze temporal proximity in relation to ***falsity***, rather than as a method to establish scienter. *See Yourish*, 191 F.3d at 997. Here, however, Plaintiffs allege temporal proximity as part of their scienter allegations. (CC ¶¶ 206, 209, 214.)



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

its "strengthened" Q2 offers were so unprofitable until home price appreciation growth started to precipitously decline—as it started to do in Q3—and Zillow reached the end of the quarter. (Ex. 5 at 5.) Likewise, Plaintiffs acknowledge Zillow increased its offers and purchases in Q2 and Q3. (CC ¶ 18.) It stands to reason that Zillow would not see any renovations backlog until it had closed on these extra homes in Q3. (Ex. 5 at 7.) Thus, Plaintiffs allegations about temporal proximity fail for this reason alone.

Moreover, the premise of a "temporal proximity" theory is that a short time between the alleged misstatements and the corrective disclosures "makes more plausible that intervening events did not cause the inconsistent statements." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10 (N.D. Cal. Nov. 4, 2020). Here, there was an unforeseen intervening event—the unexpected slowdown in home price appreciation in Q3 2021 after over a year of continuous growth, which is why Zillow's pricing adjustments in Q2 overshot their mark when it came time to re-sell those homes in Q3, leading to a write-down. (CC ¶ 236; Ex. 5 at 12.) Thus, the "temporal proximity" argument fails here for this reason as well.

### C. <u>Lack of Motive Negates Any Inference of Scienter</u>

Any inference of scienter is negated because the CC fails to plead that the Individual Defendants had any motive to commit fraud. Absent a personal benefit flowing to the Individual Defendants even a "strong inference of scienter is negated," such as "when there is an absence of stock sales or where such sales are minimal." *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009); *see also Rigel*, 697 F.3d at 884-85 (no scienter absent suspicious stock sales by defendants). Here, Plaintiffs do not allege the Individual Defendants made suspicious stock sales at inflated prices, and Plaintiffs do not otherwise allege how Defendants benefited in any way from the alleged fraud. *See Johnson*, 2020 WL 4816225, at *8 (no scienter where "[p]laintiffs do not allege that [d]efendants profited from the alleged fraud or were otherwise motivated to conceal information that they would later reveal"). The telling absence of any allegations of motive undermines any assertion of scienter.

### D. <u>Viewed Holistically, Plaintiffs' Scienter Allegations Are Implausible</u>

Plaintiffs do not establish an inference of scienter that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324. "[T]he PSLRA neither allows nor requires [courts] to check [their] disbelief at the door" when a scienter theory "does not resonate in common experience." *Nguyen*, 962 F.3d at 415. Here, it strains credulity to conclude that Defendants would sabotage ZO by deliberately



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

paying more for homes than what its guardrails allowed and for what it believed Zillow could later resell them (CC ¶ 187(d)); dramatically increase Zillow's home purchases while knowing that Zillow could not timely renovate the homes (*id.* ¶ 187(c)); do nothing to benefit from the "fraud," and then voluntarily reveal the "fraud" a few months later. *See Nguyen*, 962 F.3d at 415; *Johnson*, 2020 WL 4816225, at *8.

Further, it makes no sense for Zillow to repeatedly disclose that its pricing models and operations were undergoing development and could be inaccurate if it intended to mislead investors about their risks. *See supra*, §§ C, I.A.1, I.B.1 (collecting statements where Zillow discussed its efforts to improve pricing and operations). In light of Zillow's voluntary disclosure of these risks, it is implausible that Defendants intended to mislead investors. *See Limantour*, 432 F. Supp. 2d at 1148 (decreasing customer orders "provides no evidence of scienter because it was disclosed to analysts in conference calls"); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Co.*, 963 F. Supp. 2d 1092, 1142 (E.D. Wash. 2013) ("Robust disclosure of risks and problems . . . 'negates an inference that the company acted with intent to defraud.'"). The more compelling explanation is the one Zillow disclosed: it believed it had improved its pricing model and operations in Q2, but its forecast of home price appreciation turned out to be incorrect, its strengthened offers overshot the mark, and its operations became overstrained while attempting to scale (Ex. 5 at 5); *Johnson*, 2020 WL 4816225, at *8 ("[T]he more plausible inference is that [defendants] were unaware of any material weakness" at time of statement but "became aware" later.). This is not fraud.

## III. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Plaintiffs also fail to plead loss causation—a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered." *Apollo*, 774 F.3d at 608. To allege loss causation, "the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known'; and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020). "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790. "A corrective disclosure occurs when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* Plaintiffs must plead loss causation with particularity. *Apollo*, 774 F.3d at 605.

Plaintiffs allege Zillow's "fraud" was revealed to the market on five different occasions from



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

October 4, 2021 to November 2, 2021, which caused Zillow's stock price to drop. (CC ¶¶ 215-38.) However, none of the disclosures identified in the CC discusses or corrects the misimpressions Zillow's statements supposedly created. No disclosure revealed Zillow used GPO adjustments to deliberately overpay for homes. The disclosures stated only: (i) an analyst's October 4, 2021 opinion that Zillow had purchased some homes for more than it could sell them (CC ¶ 219); (ii) that as of November 1, many of Zillow's homes could not be sold at a profit (*id.* ¶ 227); and (iii) on November 2, Zillow recorded a $304 million write-down on its homes inventory and decided to wind down Zillow Offers. (*Id.* ¶¶ 232-34.) These disclosures at most show that Zillow's pricing assumptions had been incorrect at the time of its statements—something Zillow disclosed as a possibility—not that it had intentionally overpaid for homes.

Similarly, no disclosure revealed that Zillow's statements that it had made durable operational improvements were false, or that paying contractors less and reducing their scope of work created a renovations backlog. Plaintiffs allege: (i) a disclosure that, by October 17, Zillow was dealing with contractor shortages (*id.* ¶ 221); and (ii) that Zillow paused new home buying on October 18 (*id.* ¶ 222), but neither of these reveals that Zillow had made no durable improvements to its renovations business, or attributes the contractor shortages to Zillow's reduced payments and renovations, as opposed to "capacity and demand [] challenges" and a "difficult labor and supply chain environment" that arose after Defendants made the statements at issue. (Ex. 5 at 5); *see also Metzler*, 540 F.3d at 1063 (no loss causation where statements did not reveal "the fraudulent activity that [plaintiff] contends forced down the stock").

The November 2 disclosure particularly illustrates the defect in Plaintiffs' loss causation theory. Plaintiffs allege that Zillow's November 2 statements attributing the decision to wind down ZO in part to inaccurate pricing methodologies revealed the previously undisclosed "truth" about the use of GPOs and OCS. (CC ¶ 234.) But Zillow did not specifically mention GPOs, OCS, or any other details regarding its pricing methodologies; indeed, Zillow made the same general references to Zillow's pricing "model" and "forecast[]" methodologies as it had done on August 5. (Ex. 5 at 12.) Thus, if Zillow somehow revealed the use of GPOs and OCS on November 2, then that necessarily means Zillow had disclosed the same on August 5, because Zillow's November 2 statements were not substantively different or more detailed than its August 5 statements. *See supra*, I.A.1 (explaining that the August 5 and November 2 statements are not inconsistent with one another). Accordingly, one of two things must be true: either (i) Zillow disclosed



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

the use of GPOs and OCS on August 5 and therefore its statements were not false or misleading for concealing those practices, *see Loos v. Immersion Corp*., 762 F.3d 880, 889 (9th Cir. 2014) (noting that a corrective disclosure must reveal new information to the market); or (ii) Zillow did not disclose the use of GPOs or OCS on either August 5 or November 2, and Plaintiffs' purported "loss" cannot have been caused by the "revelation" that Zillow was using GPOs or OCS. Either way, Plaintiffs' claims fail.

In reality, Zillow's stock did not drop on these dates because of alleged revelations about GPOs or renovation budgets. Rather, the market reacted to the alleged ***consequences*** of those decisions: the $304 million write-down and the decision to wind down ZO. (CC ¶ 232, 234.) An obvious alternative explanation for a stock price drop can rebut a loss causation theory, particularly when the plaintiff fails to allege facts showing "the market ever became aware of the alleged fraud." *Melot v. JAKKS Pac., Inc.*, 2014 WL 12589334, at *17 (C.D. Cal. June 6, 2014). This obvious alternative explanation here—$304 million write-down and the end of a business segment—combined with Plaintiffs' failure to plead true corrective disclosures is fatal. *See Roofers Local No. 149 Pension Fund v. Dreamworks Animation SKG, Inc.*, 677 F. App'x 376, 377 (9th Cir. 2017) ("Plaintiff does not adequately allege that the write-down and resulting stock decline resulted from a revelation of fraud, rather than from investors' disappointment.").[7]

**PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 20(a)**

"To be liable under § 20(a), a defendant must be liable under another section of the [] Exchange Act." *Limantour*, 432 F. Supp. 2d at 1162. Because Plaintiffs fail to plead a violation of Section 10(b), their Section 20(a) claim fails as well. *Id.* The Court should dismiss the entire CC with prejudice.

[7] At the very least the Court should reject the October 4, 17, and 18 disclosures because Zillow's stock price recovered almost immediately. A rapid stock price recovery after a purported corrective disclosure defeats any inference of loss causation because it shows that there was no sustained market reaction to the revelation of the alleged "fraud." *See Wochos*, 985 F.3d at 1198. Here, while Zillow's stock price dropped from $91.40 to $85.68 between October 1 and October 4, it rose to $93.22 by October 7—a mere three days later. (Ex. 8.) Similarly, while Zillow's stock price dropped from $94.30 to $85.46 between October 15 and October 18, it had recovered to $96.36 by October 25, a mere week later. (*Id.*) These rapid recoveries are fatal to Plaintiffs' theory that the October 4, 17, and 18 disclosures are "corrective disclosures." *See Wochos*, 985 F.3d at 1198.



**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000

DATED: July 11, 2022

By: /s/ Peter B. Morrison
Peter B. Morrison (admitted pro hac vice)
peter.morrison@skadden.com
Virginia F. Milstead (admitted pro hac vice)
virginia.milstead@skadden.com
Winston Hsiao (admitted pro hac vice)
winston.hsiao@skadden.com
Raza Rasheed (admitted pro hac vice)
raza.rasheed@skadden.com
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600

By: /s/ Sean C. Knowles
Sean C. Knowles, WSBA No. 39893
**PERKINS COIE LLP**
1201 Third Avenue, Ste. 4900
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
Email: sknowles@perkinscoie.com

*Attorneys for Defendants Zillow Group, Inc., Richard Barton, Allen Parker, and Jeremy Wacksman*