The Honorable Thomas S. Zilly

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

DIBAKAR BARUA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ZILLOW GROUP, INC., RICHARD BARTON, ALLEN PARKER, and JEREMY WACKSMAN,

Defendants.

No. 2:21-cv-01551-TSZ

CLASS ACTION

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**NOTE ON MOTION CALENDAR**:
October 14, 2022

***Oral Argument Requested***



**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ........................................................................................ 4

III.  ARGUMENT ............................................................................................................. 9

    A.    The Complaint Alleges "Falsity" ................................................................... 9

        1.    Plaintiff Adequately Alleges That Defendants' Statements About the Reasons for Zillow's Increased Volumes Were False and Misleading ............................................................... 10

        2.    Plaintiff Adequately Alleges That Defendants' Statements About Demand for ZO Were False and Misleading ............................... 17

        3.    Plaintiff Adequately Alleges That Defendants' Statements About Zillow's Operational Improvements Were False and Misleading ........................................................................................... 18

        4.    The Alleged False and Misleading Statements Are Actionable ......................................................................................... 21

    B.    The Complaint Pleads a Strong Inference of Scienter ......................................... 24

        1.    Defendants Knew or Recklessly Disregarded That Zillow Was Driving Volumes by Applying Overlays on Top of Its Bona Fide Pricing Models ........................................................... 25

        2.    Defendants Knew or Recklessly Disregarded That the "Improvements" They Were Touting Had Caused a Large Backlog of Homes......................................................................... 27

        3.    It Is Implausible to Suggest That Defendants Did Not Know About Project Ketchup or the Swelling Housing Inventory Backlog................................................................... 28

        4.    The Complaint Also Alleges Strong Circumstantial Indicia of Scienter ................................................................. 30

    C.    Defendants' Challenges to Scienter Fail................................................................. 32

        1.    Defendants' Challenges to the Former Employees Fall Flat .................... 32

        2.    Defendants' Motive and "Plausibility" Arguments Miss the Mark......................................................................... 33

    D.    The Complaint Adequately Pleads Loss Causation ............................................. 34

    E.    Plaintiff Has Established Control Person Liability .............................................. 35

IV.   CONCLUSION.......................................................................................................... 35



# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ....................................................................................21, 27, 34

*Angres v. Smallworldwide PLC*,
94 F. Supp. 2d 1167 (D. Colo. 2000)....................................................................................14

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................................16

*Avila v. LifeLock Inc.*,
2016 WL 4157358 (D. Ariz. Aug. 3, 2016)............................................................................12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................................................ *passim*

*In re BioMarin Pharm. Inc. Sec. Litig.*,
2022 WL 164299 (N.D. Cal. Jan. 6, 2022).............................................................................22

*In re BofI Holdings, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..........................................................................................34, 35

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013).....................................................................16

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011) ......................................................................................3, 11, 12, 20

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................................................20

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................24

*In re CV Scis., Inc.*,
2019 U.S. Dist. LEXIS 212562 (D. Nev. Dec. 10, 2019).....................................................34

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ..............................................................................................32

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................................34

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017)..........................................................................25



*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................20

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..............................................................................9, 34

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002) ....................................................................................9

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015)...................................................................................22

*In re Hi/fn, Inc. Sec. Litig.*,
   2000 WL 33775286 (N.D. Cal. Aug. 9, 2000) .........................................................22

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) .................................................................................28

*In re Iso Ray, Inc. Sec. Lit.*,
   189 F. Supp. 3d 1057 (E.D. Wash. 2016)................................................................29

*Janbay v. Canadian Solar, Inc.*,
   2013 WL 1287326 (S.D.N.Y. Mar. 28, 2013) ..........................................................20

*Johnson v. Costco Wholesale Corp.*,
   2019 WL 6327580 (W.D. Wash. Nov. 26, 2019)................................................16, 33

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .......................................................................12, 14, 19

*Kipling v. Flex Ltd.*,
   2020 WL 2793463 (N.D. Cal. May 29, 2020)...........................................................22

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   237 F. Supp. 3d 943 (N.D. Cal. 2017) .....................................................................30

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006)..........................................................12, 16

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) .................................................................................34

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ...................................................................................23

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..............................................................................4, 30

*Marcu v. Cheetah Mobile Inc.*,
   2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..........................................................14

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - iii
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013)........................................................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................................33

*Mazzaferro v. Aruba Networks Inc.*,
    2015 WL 456534 (N.D. Cal. Feb. 2, 2015) ................................................................22

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................................16

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ....................................................................................35

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ........................................................................................9

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) .............................................................................. *passim*

*Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*,
    2021 WL 6101391 (9th Cir. Dec. 21, 2021) ...............................................................18

*Nathanson v. Polycom, Inc.*,
    87 F. Supp. 3d 966 (N.D. Cal. 2015) ..........................................................................34

*In re Network Assocs., Inc., Sec. Litig.*,
    2000 WL 33376577 (N.D. Cal. Sept. 5, 2000) ...........................................................24

*Nguyen v. Radient Pharms. Corp.*,
    946 F. Supp. 2d 1025 (C.D. Cal. 2013) ......................................................................11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ...................................................................................9, 33

*In re Nuvelo, Inc. Sec. Litig.*,
    668 F. Supp. 2d 1217 (N.D. Cal. 2009) ......................................................................21

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ..........................................................................31, 32

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ......................................................................................28

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ................................................... *passim*

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ....................................................................................20

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - iv
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ..................................................................................27, 28

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ...............................................................................28, 30, 31

*Rihn v. Acadia Pharms. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016)...........................................................30

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)............................................................30

*S. Ferry LP No. 2 v. Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005)..................................................................23

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ...............................................................................25, 28

*In re Salix Pharms., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..............................................................24

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ...................................................................9, 19, 24, 33

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..............................................................14, 26, 29

*SEC v. Mozilo*,
   2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ...........................................................23

*SEC v. Todd*,
   642 F.3d 1207 (9th Cir. 2011) .................................................................................10

*In re SemGroup Energy Partners, L.P.*,
   729 F. Supp. 2d 1276 (N.D. Okla. 2010)....................................................................24

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ....................................................................31

*Silverman v. Motorola, Inc.*,
   798 F. Supp. 2d 954 (N.D. Ill. 2011) ........................................................................35

*In re St. Jude Med., Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011).........................................................................23

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011) ............................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007).........................................................................................24, 25

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - v
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*In re Thoratec Corp. Sec. Litig.*,
  2006 WL 1305226 (N.D. Cal. May 11, 2006) ...............................................................11

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .......................................................................................................11

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................22, 26, 31

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
  2017 WL 2378369 (C.D. Cal. May 31, 2017) ...............................................................23

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ....................................................................................24, 33

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)...........................................................................................35

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015) .................................................................23

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) .........................................................................16

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .......................................................................................34

**STATUTES**

15 U.S.C. § 78(u)-5(c)(1)......................................................................................................22

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - vi
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## I. INTRODUCTION

This is a securities class action against Zillow Group Inc.,[1] and three of its top officers— Richard Barton (CEO), Allen Parker (CFO), and Jeremy Wacksman (COO)—for violating Sections 10(b) and 20(a) of the Securities Exchange Act. It arises from Defendants' false and misleading statements about a reckless and undisclosed bet that culminated in an unprecedented $569 million write-down, the shocking wind-down of a business line representing 60% of Zillow's revenue, and the overnight layoff of 25% of Zillow's work force. ¶¶ 170, 181. According to investor analysts and commentators, the shuttering of Zillow Offers ("ZO") represented a "financial disaster" and "a drastic and unexpected move." ¶¶ 177, 178. Others were flabbergasted by the suddenness of the destruction given the rosy statements Defendants made only weeks earlier. According to one analyst during an earnings call shortly after the announcement, "I think everyone [is] trying to reconcile what you said last quarter to what just happened." ¶ 240. And still others demanded that "management should be accountable" for their "reckless approach" and that ZO's downfall was akin to "a black eye for Richard Barton." ¶¶ 177, 179-180.

Zillow is known for operating the most visited real estate website in the United States, "zillow.com." ¶ 2. Zillow announced in April 2018 that it was undergoing a fundamental shift and entering the "iBuyer" space. ¶ 59. iBuyers use technology to estimate the value of a particular home and—based on that value—instantly make an offer to a potential seller. *Id.* If a homeowner accepts the offer, the iBuyer then completes a series of repairs and lists the home for sale. *Id.* Although Zillow was new to the iBuyer market, the Company explained that it had a competitive advantage in the industry stemming from its 15 years of experience using artificial intelligence and algorithmic pricing models to effectively buy and sell homes. ¶ 76. ZO grew quickly. But to succeed in the long term, Defendants also told investors they were "in a race … to scale" and set a target of purchasing 5,000 homes per month. ¶ 183. Defendants also reassured the market that

---

[1] All "¶" references are to the Corrected Consolidated Class Action Complaint, ECF No. 71 ("Complaint"), unless otherwise indicated. All emphasized terms are added. All references to "Mot." or "Motion" are to Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ECF No. 85.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 1
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

they did not plan to take undue risk, by setting "guardrails" of plus or minus 2% on ZO's profits. ¶¶ 81, 88, 97, 182.

By March 2021, however, ZO was behind target and losing ground to its iBuyer competitors. ¶ 91. Internally, management declared a "code red" and executed a plan called "Project Ketchup" (a play on the word "catch up") to change direction. ¶¶ 91, 100. Project Ketchup was twofold. ¶ 114. The first goal was to increase market share by making "lucrative offers" to homeowners. ¶ 109. To accomplish this on a systematic scale, automatic price "overlays" were perfunctorily added *over and above* the offer prices that Zillow's algorithms and human analysts identified as the true market value. ¶¶ 100-105. These overlays could increase the offer price of a home as much as seven or eight percent. ¶ 111. Not surprisingly, many homeowners accepted ZO's artificially inflated offers and soon Defendants were touting the "strong demand" for ZO to investors. ¶ 154. Yet, Defendants never disclosed that this increased demand was due to artificially inflated offer prices, or that the Company was also taking on increased risk by systematically purchasing homes for higher than what its pricing models deemed market value. ¶ 187.

Zillow also understood that it had to slash costs to counter the effect of the secret overlays. So the second goal was to drastically reduce the rates of pay for contractors and narrow the extent or "scope" of renovations for the homes that ZO had already purchased. ¶¶ 136, 138. Defendants characterized these changes to investors as "durable operational improvements," ¶ 157, but they were anything but durable. Indeed, soon after these cost-cutting measures were put into place, contractors started refusing work on ZO properties. Zillow's inventory of houses began to swell because of this renovations backlog, which in turn increased Zillow's holding costs. ¶¶ 127-150. Yet, Defendants never disclosed the backlog or housing inventory risk to the market either. ¶ 187.

The Class Period begins on August 5, 2021, when Defendants announced: "The record number of homes purchased was more than double that of Q1 2021 and is a direct reflection of … the progress we have made in strengthening our pricing models." ¶ 151. During the conference call, Parker similarly represented that "[w]e made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength" and that "[t]hese improvements drove rapid gains in conversion rates in Q2 when compared to Q1 resulting

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

in record purchases." ¶ 152. Parker also highlighted Zillow's "353 basis point improvement from a year ago in renovation, holding and selling costs," ¶ 151, which he claimed were "largely durable operational improvements," ¶ 157. On September 13, 2021, Wacksman also reiterated "record demand for Zillow Offers" and "durable" economic improvements. ¶¶ 191-192. But at no point did Defendants disclose to investors that it had taken on the increased risk by adding automatic overlays to its offer prices or that ZO was suffering through a housing inventory backlog. ¶ 187. But just weeks later, the truth concealed by Defendants' misleading statements was revealed through a series of partial disclosures, culminating in the November 2, 2021, announcement that Zillow was: (1) shuttering ZO; (2) taking a massive $569 million impairment charge because it had paid too much for around 18,000 homes; and (3) axing 25% of its workforce. ¶ 170. Yet, Defendants contend that Plaintiff has not asserted a claim. Their arguments are meritless.

*First*, Defendants' Motion seeks to recast this case as one about a business venture that simply "did not work out." Mot. at 1. It is not. This case is about Defendants making specific misleading statements designed to conceal: (1) the risky overlays they were using to drive growth and (2) the significant negative impacts of their cost cuts—e.g., renovations delay and housing inventory backlog. ¶ 187.

*Second*, Defendants blame ZO's woes on a "rapid and unexpected decline" in the housing market. Mot. at 1-2. But this narrative belies the well-pled facts and underscores Defendants' deception. Indeed, ZO's competitors, like OpenDoor, did *not* suffer comparable results due to purported market volatility; nor did Zillow's market analysts buy Defendants' excuse. *See, e.g.*, ¶¶ 241-249.

*Third*, Defendants argue that they "disclosed the very information Plaintiff[] claim[s] was concealed." Mot. at 2. But none of the "disclosures" they point to reveal that ZO was applying risky overlays on top of its bona fide pricing models, or that it *already* had a significant backlog of homes. Moreover, the "truth-on-the-market" defense "is a merits issue to be reached at trial." *Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) (whether "news of the [truth] credibly entered the market … is a matter for trial").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 3
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*Fourth*, Defendants' "scienter" arguments fare no better. This case centers on Defendants' false and misleading statements and concealment of Project Ketchup, the overlays, and the housing inventory backlog. And, notably, Defendants' Motion does not dispute Defendants' knowledge of these issues. Nor could they plausibly do so; rather, these were "prominent facts" that were "obvious from the operations of the company."

*Fifth*, Defendants claim it is "illogical" that they would "sabotage ZO" by deliberately overpaying. But that is not Plaintiff's theory. Rather, Plaintiff alleges that Defendants were so motivated to grow ZO's market share that they chanced a risky bet that the market would outpace their pricing models, *plus* the automatic overlays. But the bet did not work out, and so "Zillow (and the stock) paid dearly for [Defendants'] reckless approach to share gains." ¶ 180.[2]

The Court should deny Defendants' Motion.

## II.   STATEMENT OF FACTS

Traditionally, Zillow made money by selling advertisements and leads to real estate agents. ¶¶ 1-2, 58, 60. By 2018, however, Zillow's core business had slowed, and its stock prices were stagnating. ¶¶ 2, 58.[3] To spur growth, Zillow announced that it would shift its business model and enter the "iBuyer" market. ¶¶ 2, 59. iBuyers make offers to buy homes based on their pricing algorithms, then make repairs and sell. ¶¶ 3, 59. The iBuyer market was already crowded when Zillow joined, with competitors including Opendoor, Offerpad, and Redfin Now. ¶¶ 3, 67.

Zillow's iBuying business, ZO, provided Zillow with a new revenue source to re-accelerate growth. ¶¶ 4, 60. Indeed, Zillow made clear that its new business model revolved around ZO's success. ¶¶ 6, 60-66. As one commentator noted, "[t]he company will pin its future on [ZO]." *Id.* In February 2019, Zillow announced that Barton would return as CEO to oversee the shift. ¶¶ 5,

---

[2] *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (Posner, J.) (rejecting argument that defendants had no motive because "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.").

[3] From 2011 to August 2015, Zillow issued Class A common stock, which traded under the ticker symbol "Z" and entitled holders to one vote per share. ¶ 1. In August 2015, Zillow created a new class of non-voting stock: Class C capital stock. *Id.* Then Zillow Class C capital stock traded under the symbol "Z" and Class A common stock traded under the ticker symbol "ZG." *Id.*

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 4
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

64. Zillow then quickly expanded ZO; and by mid-2021, it accounted for 60% of Zillow's revenues. ¶¶ 8, 69.

Several factors were critical to ZO's success. *First*, ZO's pricing models had to accurately predict home values at the time of resale. ¶¶ 9, 70. If ZO made offers too high, it risked overpaying and losing money; but if it made offers too low, sellers would not accept. ¶ 70. As The Wall Street Journal reported, ZO's "business model rested on the assumption that Zillow's algorithm, fed by the company's trove of data, would be able to predict home prices with pinpoint accuracy." ¶ 74. Indeed, leading up to the Class Period, Defendants[4] repeatedly touted the algorithm's accuracy, stating that ZO was uniquely positioned to make accurate offers because Zillow had been estimating home values for 15 years. For example, Barton boasted, "we have 15 years of Zestimate and data to inform the AI algorithms that then figure out what we should offer on [ZO]." ¶ 76.

*Second*, the longer ZO took to renovate and sell a home, the higher its holding costs.[5] ¶¶ 10, 128, 133, 148-150. Thus, ZO had to drive down its costs by renovating homes for less—and selling them more quickly. ¶¶ 10, 81-83. Additionally, because ZO was highly unprofitable in its first few years, analysts closely monitored the cost structure, housing inventory, and holding periods for hints that ZO could eventually turn a profit. ¶¶ 10, 84.

*Third*, ZO needed to scale by purchasing more homes. ¶¶ 11, 81-84. Scaling not only allowed ZO to see "costs come down," but it was also essential to catch up with competitors. *Id.* As Barton explained, "scale is super important" and "we're racing to scale." *Id.*

To achieve the necessary scale, Zillow set lofty volume targets for 2021. ¶ 11. As Q1 2021 results rolled in, however, "it became clear that the company was on track to significantly miss its annual target for the number of homes it wanted to buy," causing one senior executive to declare a "code red" at an internal meeting. ¶¶ 12, 91. Zillow also internally determined that it was missing

---

[4] The Corporate Defendant is Zillow Group, Inc. ("Zillow" or "the Company") and the Executive Defendants are Richard Barton ("Barton"), Allen Parker ("Parker"), and Jeremy Wacksman ("Wacksman"). Defendants Barton, Parker, and Wacksman are referred to as the Executive Defendants.

[5] Holding costs, or carrying costs, are any expenses the owner must pay on investment property over the course of owning it. These costs usually include utilities, debt service payments, taxes, and insurance, among other items.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 5
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

volume targets because its much-vaunted pricing algorithm was pricing offers too low. ¶¶ 13, 92, 95-96.

A few months before the Class Period, during Zillow's May 2021 earnings call, Parker acknowledged that volume was "not quite at the pace we planned" but also said, "we continue to work on refining our models to catch up with the rapid acceleration in home price appreciation" ¶¶ 14, 88, 97. Then in June, Zillow announced that it had improved its pricing models by incorporating a "neural Zestimate," which "allow[ed] the algorithm to react more quickly to current market trends." ¶¶ 14, 99. The press release touted Zillow's "hundreds of millions of data points" and its "increasing confidence" in the "accuracy" of its algorithm, and told investors that, "[a]s a result of this update, the Zestimate can now react more quickly to dynamic market conditions." *Id.*

Unbeknownst to investors, however, Zillow had instead decided to drive up volume through a secret initiative called "Project Ketchup." ¶¶ 15-18, 100-117. Via this initiative, Zillow simply added an overlay—sometimes as high as 700 basis points—on top of its bona fide pricing models to manufacture artificially higher offer prices. ¶¶ 16-17, 110-111, 117, 231. Management internally justified these "aggressive" increases by telling employees that ZO had an "*increased appetite for risk*." ¶¶ 107, 126. The overlays had their intended effect, quickly doubling and then quadrupling ZO's home volumes. ¶¶ 18, 116, 151 182-183. Employees across the Company repeatedly raised concerns to management and at meetings that ZO was overpaying compared to the pricing models. ¶¶ 19, 118-126. But these concerns fell on deaf ears.

Through Project Ketchup, ZO also undertook initiatives to drive down renovation costs. ¶¶ 20, 127, 129. In particular, ZO reduced the price it paid contractors and shrunk the scope of renovations. ¶¶ 20, 129. The result was strained relationships with ZO's contractors, which led them to deprioritize or outright reject ZO projects. ¶¶ 21-22, 130-143. This, in turn, led to labor shortages and homes needing repairs lingered on Zillow's balance sheet for longer, thereby increasing Zillow's holding costs. *Id.* And by June 2021, the nationwide backlog of houses needing renovation was being discussed in meetings with Zillow senior management. ¶¶ 27, 143-144. The backlog was also visible to upper management through Zillow's Tableau database. ¶ 145. Barton

HB HAGENS BERMAN

even acknowledged being aware of the backlog problem during an internal call in the July/August 2021 timeframe, stating that Zillow was coming up with a plan to address the backlog. ¶ 147.

When Defendants announced second-quarter earnings on August 5, 2021, they nevertheless concealed the overlays. Instead, Defendants lauded the strong demand for ZO, telling investors that the higher volumes were "a direct reflection of … the progress we made in strengthening our pricing models." ¶¶ 23-24, 151, 181-183, 187-189. For example, Parker said, "[w]e made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength," and that "[t]hese improvements drove rapid gains in conversion rates in Q2 when compared to Q1, resulting in record purchases." ¶ 183. Defendants also emphasized their "confidence in our ability to scale, resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel." ¶ 152. Analysts latched on to the importance of these statements. ¶¶ 155-156, 186.

Defendants also detailed the "durability" of ZO's renovation cost improvements, while concealing the negative impacts those "improvements" were having (*i.e.* the housing inventory backlog). ¶¶ 23, 27, 29, 88, 157-158, 190. For example, Parker highlighted that the quarter's unit economics "were 665 basis points higher than Q2 2020," attributing it to "durable operational improvements" in renovation, holding, and selling costs. ¶¶ 157, 184. Analysts again latched on to the importance of these statements. ¶¶ 158, 160.

On September 13, 2021, Wacksman reiterated these comments in response to an analyst question about how Zillow was able to better react to a rising housing market. Wacksman responded, "we're still seeing record demand for [ZO] … the strength and appeal of [ZO] just continues to grow, and we're even more confident now that it is going to be a service really in all weather markets." ¶ 191. Wacksman was also asked about ZO's margin improvements. ¶ 192. He responded that "some of those unit economic improvements are durable." *Id.* Analysts, yet again, responded with enthusiasm to these statements. ¶¶ 158, 160.

Less than three weeks later, however, the cracks in the façade emerged. *First*, on October 4, 2021, RBC Capital Markets warned investors that its internal analysis of Phoenix housing listings suggested that Zillow had "meaningful inventory" that it "bought at too high a price."

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 7
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

¶¶ 30, 162. On this news, Zillow's common stock price (ZG) declined 6%, and Zillow's capital stock (Z) declined 5.5%. ¶¶ 30, 163. Then, on October 17, 2021, Bloomberg leaked a report that Zillow would soon pause its home buying. ¶ 164. The next day, Zillow confirmed the report, stating that "[d]ue to a backlog in renovations and operational capacity constraints," ZO "will not sign any new, additional contracts to buy homes through the end of the year." ¶¶ 31, 165. On this news, the prices of Zillow common stock (ZG) and Zillow capital stock (Z) declined over 9%. ¶¶ 31, 166. And, only two weeks later, KeyBanc Capital Markets reported that most homes in ZO's inventory were now worth less than it paid for them—with Zillow listing 66% of its homes at an average discount of 4.5% below its purchase price. ¶¶ 32, 167. Later that day, Bloomberg reported that Zillow was looking to sell about 7,000 homes (for about $2.8 billion) to institutional investors to "recover from a fumble in its high-tech home-flipping business." ¶ 168. In response, Zillow common stock (ZG) declined over 19% and Zillow capital stock (Z) declined nearly 16%. ¶ 169.

On November 2, 2021, Defendants disclosed that Zillow was "wind[ing] down" ZO and laying off 25% of its workforce. ¶¶ 33, 170. Zillow also revealed that it would take an inventory write-down as high as $569 million, admitting it had paid too much for a staggering 18,000 homes. ¶¶ 33, 115, 170, 173. Defendants blamed the very same pricing models they had extolled just months earlier, claiming that: "we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." ¶¶ 33, 171. Defendants also pinned blame on the inventory backlog they had concealed during the Class Period, noting that ZO had "experienced significant capacity and demand planning challenges," which "caused a meaningful backup in our processing of homes in [the] Zillow pipeline." ¶¶ 33, 171. In response, Zillow's common stock price (ZG) fell around 23% and Zillow's capital stock price (Z) fell around 25%. ¶¶ 34, 174.

Commentators were outraged, calling the announcement a "debacle," a "drastic and unexpected move," a "major strategic retreat and a black eye," and a "financial disaster," and questioned Defendants' actions and credibility. ¶¶ 35, 175, 177, 210-211, 239-249. For example, a Jeffries analyst said, "I think everyone was trying to reconcile what you said last quarter to what just happened" ¶¶ 210, 240. Piper Sandler wrote: *the math matters little until management takes full ownership for mistakes*…. Management reiterated their long-term financial targets as recently

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

as August.… More recent news of internal memos titled 'Project Ketchup' that encouraged ZOffers homebuyers to accelerate purchases to 'catch up' with Open Door are particularly worrying. *Management should be accountable*." ¶¶ 179, 248. Stephens specifically noted "the shock factor" given that the previous shareholder letter "highlighted Zillow's improvements in pricing models." ¶¶ 36, 180, 213, 249. Stephens also concluded that "*Zillow (and the stock) paid dearly for its, arguably, reckless approach to share gains*." *Id.*

## III.    ARGUMENT

In resolving a motion to dismiss, courts must "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Dismissal is inappropriate "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

## A.    The Complaint Alleges "Falsity"

To plead "falsity" under Section 10(b), a plaintiff must allege that the defendant's statement "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) (citation omitted). Thus, if a company presents positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). "Generally, 'whether a public statement is misleading, or whether adverse facts were adequately disclosed[,] is a mixed question to be decided by the trier of fact,'" and resolution "as a matter of law is only appropriate when the adequacy of the disclosure is 'so obvious that reasonable minds

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 9
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

could not differ.'" *SEC v. Todd*, 642 F.3d 1207 (9th Cir. 2011) (citation omitted). The Complaint readily meets these standards.

### 1.    Plaintiff Adequately Alleges That Defendants' Statements About the Reasons for Zillow's Increased Volumes Were False and Misleading

In Spring 2021, Zillow launched a secret initiative called Project Ketchup, whose purpose was to quickly increase Zillow's housing purchasing volumes. To do so, Zillow put large "overlays" on top of the values generated by its pricing models to make "lucrative offers" to homeowners. ¶¶ 100, 109. These overlays had their intended effect; in a single quarter, ZO's purchase volumes more than doubled. But the secret overlays also injected significant new risk into the ZO business. Because ZO was not making offers based on trends determined by its pricing model, but was instead bluntly adding overlays on top, it was making a risky bet that the market would not only continue to rise—but continue to rise *rapidly*.

When Defendants announced the increased second quarter housing volumes on August 5, 2021, however, they concealed the overlays. Instead, they attributed the increases to improvements Zillow had made to its algorithmic pricing models. ¶¶ 15-18, 100-117. For example, Zillow stated that the "record number of homes purchased" was "a direct reflection of the progress we have made in strengthening our pricing models." ¶¶ 23-24, 151, 181-183, 187-189. Parker said that the "rapid gains" and "record purchases" were driven by "progress this quarter in improving our pricing models, including launching the neural Zestimate." *Id.*

These statements were materially false and misleading. In truth, the Company's higher volumes resulted from the blunt use of the concealed price overlays distinct from its publicly praised, bona fide pricing models. Investors were thus misled to believe that Zillow had successfully improved its bona fide pricing models to more carefully predict market trends—when, in fact, ZO was simply bumping up offers to drive volume. ¶¶ 17, 102, 187. The Complaint thus pleads precisely how Defendants' statements gave "a reasonable investor the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Berson*, 527 F.3d at 985. Defendants contend that these allegations are insufficient for two reasons. Neither withstands basic scrutiny.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 10
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

### a.   Defendants' Truth-on-the-Market Argument Fails

Defendants argue that their statements were not misleading because "Zillow disclosed the very information Plaintiff[] claim[s] was concealed." Mot. at 2. This argument runs headfirst into controlling authority. Arguments that statements "were not misleading in light of other statements Defendants made is an attempt to argue the affirmative defense of truth-on-the-market." *Nguyen v. Radient Pharms. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013). This defense is improper at the pleading stage. *See, e.g.*, *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at *4 (N.D. Cal. May 11, 2006) ("truth-on-the-market defense is available in principle … but not at the pleading stage") (citation omitted). This is because the "the truth-on-the-market defense is a method of refuting an alleged misrepresentation's materiality," *Amgen*, 660 F.3d at 1177, and materiality questions are "peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Thus, whether "news of the [truth] credibly entered the market and dissipated the effects of [] misstatements … is a matter for trial." *Amgen*, 568 U.S. at 481-82 (citation omitted).

And even if a truth-on-the-market defense was permissible, Defendants' purported "disclosures" came nowhere near disclosing the truth. The disclosures they point to—for example, that ZO's success was based on its "ability to accurately value homes" and that its algorithms "may be inaccurate" (Mot. at 4, 12)—are a far cry from a disclosure that Zillow was intentionally overriding its much-touted algorithms by adding risky overlays on top to grow market share.

Defendants also say they did not "suggest that [ZO's] pricing models would always result in accurate forecasts." Mot. at 12. But Plaintiff never alleged that they did; rather, Plaintiff alleges that Defendants misled investors by representing that the Company was stewardly managing risk through self-imposed guardrails and that the increased volumes resulted from improvements to the pricing model—while concealing that the increased volume was, in fact, due to the secret price overlays of several hundred basis points that introduced significant additional risk to the overall Company. Thus, Defendants' authorities thus do not apply. *Id.* (citing *McGuire v. Dendreon Corp.*, 2008 WL 1791381, at *6 (W.D. Wash. Apr. 18, 2008); *Ikeda v. Baidu, Inc.*, 2021 WL 1299046, at

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*13 (N.D. Cal. Apr. 7, 2021); *Lefter v. Yirendai Ltd.*, 2017 WL 2857535, at *7 (C.D. Cal. June 20, 2017)).

Faced with these troubling facts, Defendants resort to arguing that the false statements themselves somehow disclosed the overlays. In particular, Defendants *now* claim that their statements that the increased volume resulted from "improving our pricing models, including launching the neural Zestimate" *were actually* a disclosure to investors that Zillow was transparently putting automatic price overlays on top of ZO's bona fide pricing models. Mot. at 7, 10 n.3, 11. But in this Circuit, whether a statement is materially misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure … is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018). Defendants' dubious attempt to reinterpret their statements falls short of this high hurdle.[6]

Zillow's investors also understood that ZO's offer prices were based on its algorithmic pricing models, with a cross-check by Zillow's pricing analysts. Indeed, Barton boasted, "We have 15 years of Zestimate and data to inform the AI algorithms that then figure out what we should offer on [ZO]." ¶ 75. Thus, when Defendants told investors that ZO had "improved its pricing models," investors reasonably believed that ZO had improved its algorithmic pricing models to better predict market shifts.

Indeed, this is exactly what analysts took away from Defendants' statements. For example, Piper Sandler wrote that "ZG recently updated its ZOffers algorithm to adapt to a rapidly changing market" and "it appears the updates seem to be working" so much so that "[w]e see the growth inflection back on track." ¶ 28. BTIG said that "getting back on track in Offers after having to retool pricing algos back in 1Q was encouraging" and gave "increased comfort in the ability to ramp the Offers platform over the next several years." ¶ 156. Similarly, Stephens reported that

---

[6] Defendants' authorities (Mot. at 11), by contrast, involved specific disclosures of the precise facts allegedly concealed. For example, in *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1147 (W.D. Wash. 2006), plaintiff alleged that defendants concealed a "decreased X1 backlog" but the alleged false statements were made "simultaneously with the disclosure to analysts that the order backlog for the X1 had decreased." In all events, *Limantour* predated *Amgen*. In *Avila v. LifeLock Inc.*, 2016 WL 4157358, at *6 (D. Ariz. Aug. 3, 2016), plaintiffs alleged that defendants concealed the severity of an FTC investigation, but the court found that defendants made repeated disclosures about the FTC investigation and "its possible adverse consequences."

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 12
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

"ZG accredited some of the strength in the quarter to increased automation and its new 'neural Zestimate,' which is helping the Company better price homes relative to the past methods[.]" ¶ 156.[7] Defendants, on the other hand, do not point to a single analyst (or anyone else) who understood Defendants' statements to mean that ZO was driving volume by transparently putting automatic overlays on top of its bona fide pricing models' outputs to catch up with competitors. Simply put, "it's far from clear that a reasonable investor could have decoded this meaning at the time" and, "[a]bsent undisputed evidence," Defendants' argument fails. *Berson*, 527 F.3d at 986-87 (reversing holding that defendants adequately disclosed concealed information). Thus, dismissal of these claims is inappropriate at this stage.

Defendants also contend that there was "no distinction" between the overlays and ZO's pricing algorithm. Mot. at 11. But Plaintiff alleges that the overlays were *entirely distinct* from and applied *on top* of ZO's bona fide pricing models—and the Court is required at the motion to dismiss stage to accept this distinction as true. ¶¶ 97-126. Further, Plaintiff's allegations are corroborated by reputable sources. For example, Business Insider, in a post-Class Period exposé, reported that "to speed up the pace and volume of home purchases," Zillow used "automatic price add-ons," including one called the "gross pricing overlay" that could add as much as 7%, which resulted in Zillow "offering prices *well above what its algorithm and analysts picked as market value*." ¶¶ 16-17, 101. Former employees ("FE") also confirm this account. In particular, FE-2 stated that Zillow did not adjust its algorithms to increase offer prices. ¶¶ 110-111. Instead, ZO applied an adjustment called a "gross pricing overlay" on top of the offer price calculated by the pricing models. *Id.*

Defendants also argue that their statements were not misleading because they did not specifically say that they were *not* using overlays. Mot. at 12. But the law does not require statements to take a specific form to mislead. Instead, the pertinent question is whether the

---

[7] These "statements made by analysts underscore the plausibility and reasonableness of the false impression that [p]laintiffs allege [d]efendants' statements conveyed." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011); *accord Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 243 (1st Cir. 2013) (reversing dismissal in part because "analyst reports should have been considered" by the district court because they "reflected the meaning of [defendant's] words in the market in which they were used").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 13
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

statements Defendants *did* make were misleading—and Plaintiff alleges that they were. ¶¶ 187-196.[8] Nor is the distinction between improvements to the bona fide pricing models and overlays simply "quibbles over word choice," as Defendants contend. Mot. at 11. To the contrary, Defendants' statements left investors with the misleading impression that Zillow had improved its algorithms to "adapt to a rapidly changing market," which would allow the company to "better price homes" to avoid the risk of overpayment. ¶¶ 155-156. In reality, Defendants were simply adding "overlays" on top of the algorithm in a risky bet that the market would continue rising.[9]

At best, Defendants raise a factual dispute that cannot be resolved here. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131-32 (N.D. Cal. 2020) ("the Court must adopt Plaintiff's interpretation that [defendant] was discussing the impact of competition generally because the Court may not resolve any disputes about the actual meaning of the statement in this procedural posture").[10] Rather, "courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Khoja*, 899 F.3d at 998-99.

### b.    Defendants' "Deliberate Overpayment" Arguments Are Irrelevant

Citing a single subsection of a single paragraph of the 87-page Complaint, Defendants claim that "the crux of Plaintiff['s] claim" is that ZO "'deliberately' overpaid for homes." Mot. at 13. This mischaracterizes the Complaint's allegations. Plaintiff's claim is that to drive the volume of homes to meet Zillow's purchasing goals, Defendants made a risky (and undisclosed) bet by *offering beyond* the values derived from ZO's bona fide pricing models, and then concealed that

---

[8] In *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020)—unlike here—defendants' statements about revenue drivers "overtly acknowledged that other factors might play a role."

[9] Defendants' argument that ZO's sudden shut down and bloated inventory resulted from a "rapid and unexpected decline" in the market only underscores this point. Mot. at 2. Indeed, Defendants told investors that ZO had improved its algorithm so that it could predict and react to such declines. And in any event, market analysts immediately rebuffed this unexpected decline excuse, noting that competitors like Opendoor did not see the same impact due to the purported market volatility. ¶¶ 221, 224, 249.

[10] *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *15 (N.D. Cal. Aug. 17, 2022) (rejecting argument that alleged misstatement disclosed the truth because "reasonable minds could differ as to whether the statements in question disclosed to the market the information that plaintiffs allege was omitted from the challenged statements"); *Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1174 (D. Colo. 2000) ("[The] dispute over how reasonable investors understand a term contained within defendants' statements is a factual inquiry which cannot be determined on a motion to dismiss.").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 14
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

risky bet from investors.[11] In other words, Plaintiff alleges that Defendants misled investors by telling them that ZO's increased volumes resulted from improvements in Zillow's algorithmic pricing models when, in reality, the increased volumes resulted from the artificial overlays and not whether Defendants knew they were overpaying for homes.

In all events, Plaintiff does allege that the extra risk of overpayment posed by the overlays was clear to Defendants; indeed, after ZO began applying overlays, many employees raised concerns that they were causing ZO to overpay. ¶¶ 118-126. These employee testimonies are also corroborated by The Wall Street Journal, who reported based on interviews with Zillow's "former and current employees," that ZO "disregarded internal concerns that it was overpaying for homes," and that "Zillow employees complained about the pricing in company [employee chat program or "Slack"] channels and meetings, but their concerns went largely unaddressed." ¶¶ 118-119. Additionally, Bloomberg reported, based on accounts of "former employees," that "[w]hen staffers raised concerns with their superiors, management reassured them it was all part of the plan." ¶ 120.

Plaintiff's investigation also corroborates these accounts. For example, FE-1 told his manager the overlays were "screwing the value" and said that as the overlays increased, employees began "red flagging" them and complaining on an internal employee chat program (i.e., a Slack channel) that they were too high. ¶ 123. FE-3 said it was widely known within Zillow that ZO's offers during Project Ketchup exceeded the worth of the homes. ¶ 109. And FE-4 recalled that by mid-summer 2021, ZO was paying $30,000 to $100,000 over the initial Zestimate to purchase homes. ¶ 125. FE-4 also said that starting in May 2021, Zillow overpaying for homes was raised in regional market meetings he attended. ¶ 125.

Notably, Defendants' attacks on the well-pled FE allegations miss the mark. For example, Defendants argue that FE-1 "was in no position" to know how the overlays worked or whether the pricing was too high. Mot. at 13. But FE-1's *primary responsibility* was pricing homes for ZO.

---

[11] And that is what the subsection pleads. ¶ 187(d) ("Zillow hid from the market the increased risk it took on by deliberately over-paying for homes *well beyond the prices set by its algorithms and analyst pricing*"). Nor do Defendants challenge this narrative. Rather, they admit that when ZO realized the "home value forecasts generated by its existing machine learning algorithm" were inaccurate, they "add[ed] percentage points to its forecast" through overlays. Mot. at 6-7; *see also* ¶¶ 107, 126.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 15
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

¶ 51. FE-1 was also in a position to know how the overlays worked because *he regularly used* the Excel spreadsheet where these overlays were applied. ¶¶ 51, 114.[12] There is also no question that FE-4 was in a position to know that overpayments were discussed at meetings *he personally attended*. ¶¶ 124-125.[13]

Defendants also argue that the Court should discount the detailed and corroborating accounts by well-respected publications like The Wall Street Journal, Bloomberg, and Business Insider. Mot. at 15. But courts have repeatedly rejected such arguments. For example, in *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000), defendants, as here, argued that allegations from "newspaper articles should be discounted because they are hearsay." Judge Whyte disagreed, reasoning that "[e]ven under the Reform Act, plaintiffs are only required to plead facts, not to produce admissible evidence." *Id.* Thus, "if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter." *Id.* Plaintiff's investigation has corroborated these articles, which only underscores their reliability. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *11 (N.D. Cal. Nov. 4, 2020) (rejecting argument that "plaintiff cannot rely on these allegations because they stem from news reports that relied on anonymous sources," reasoning that "[w]hen other types of information corroborate the witness statements, such detailed descriptions are not necessary"). In contrast, Defendants' sole in-Circuit authority involved "conclusory" allegations in news articles that plaintiffs had done nothing to verify. *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172-73 (C.D. Cal. 2007) (plaintiffs cited only "conclusory allegations of wrongdoing" in a newspaper article and otherwise "provide[d] no specific facts to corroborate" those reports).

[12] In *Limantour*, 432 F. Supp. 2d at 1147, by contrast, plaintiff conceded that the FE did not work on the software project at issue. In *Callan v. Motricity Inc.*, 2013 WL 195194, at *18 (W.D. Wash. Jan. 17, 2013), unlike here, it was "unclear from the pleadings exactly what [the FE's] responsibilities entailed and how they would have provided him with personal knowledge."

[13] *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *9 (W.D. Wash. Nov. 26, 2019), does not apply. There, the FE no longer worked at the company and his statements were based entirely on hearsay from employees still at the company. Here, the FE statements are based on their own personal experience at the company, including meetings they personally attended.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 16
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## 2. Plaintiff Adequately Alleges That Defendants' Statements About Demand for ZO Were False and Misleading

When Zillow announced blockbuster volume results on August 5, 2021,[14] Defendants lauded the "strong customer demand" for ZO. ¶¶ 181-186, 189.[15] These statements gave investors the misleading impression that the higher volumes stemmed from organic consumer demand for ZO, when in truth ZO had artificially created "demand" by adding overlays to ratchet up its offers. *See Plantronics*, 2022 WL 3653333, at *8 (upholding claims that "[d]efendants misled investors by falsely claiming that the positive revenue results … were caused by organic consumer demand … even though, in reality, the results were a by-product of the Company's adoption of an undisclosed sales practice").

Yet in a footnote, Defendants contend that these statements were not misleading because "[n]o facts support Zillow was creating demand with high offers." Mot. at 16, n.4. But, this argument ignores the multiple corroborating sources which all confirm that Zillow applied significant price overlays on top of its pricing models specifically to specifically drive demand. ¶¶ 113-114. For instance, Business Insider reported after the Class Period that "Zillow put together a plan [Project Ketchup] to speed up the pace and volume of home purchases" and that the plan was "to buy more homes by spending more money, offering prices well above what its algorithm and analysts picked as market value." ¶¶ 16, 101. In other words, Zillow "boost[ed] offering prices to get more home sellers to say yes." ¶¶ 17, 102. Plaintiff's investigation also substantiated this account. In fact, FE-3 confirmed that the goal of Project Ketchup was to buy as many homes as possible, and that to do so Zillow made "more lucrative" offers. ¶ 109. FE-2 similarly explained that starting in May 2021, Zillow applied overlays on top of its pricing models of up to 7-8% to increase offer prices. ¶ 110. FE-1 recalled that, through the overlays, Zillow was increasing home offer prices by as much as $100,000 to drive volume. ¶¶ 121-122.

---

[14] August 5, 2021 is the first day of the Class Period.

[15] Similarly, on September 13, 2021, an analyst noted that Zillow had "effectively rebuilt inventory in [2Q]" after suffering "a challenge in 1Q" and asked, "what changed in the interim and how the company is getting better able to react to the current pricing environment." ¶ 191. Wacksman responded that demand for ZO was high despite difficult conditions: "In a super hot market, it's not as hard to sell your house, yet we're still seeing record demand for [ZO]."

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 17
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

The effect of the overlays is also clear from the numbers. In the two quarters before Zillow applied overlays, its purchase volume averaged 1,823 per quarter. ¶¶ 115-116. In the three quarters after Zillow applied overlays, it averaged 7,359 purchases per quarter—an increase of over 300%. *Id.*[16]

### 3. Plaintiff Adequately Alleges That Defendants' Statements About Zillow's Operational Improvements Were False and Misleading

In early 2021, ZO cut its renovation pay rates and reduced the scope of renovations. ¶¶ 129, 134-137. This resulted in a cascade of negative impacts, including contractors refusing to work for ZO, which in turn caused a large (and costly) backlog of homes that ZO could not renovate. ¶¶ 129-150. Yet, on August 5, 2021, Defendants chose to laud Zillow's "durable" improvements "in renovation, holding, and selling costs," all the while concealing the significant negative impacts these changes were already having. ¶ 157. Likewise, on September 13, 2021, a Piper Sandler analyst noted that "getting the economics right at the unit level is really paramount for this business to be successful" and asked Defendants, "[h]ow are you feeling about the ability to profitably run the business, especially on some of those line items below gross profit at the unit level?" ¶ 192. Wacksman responded by touting the improvements and stating that "some of those unit economic improvements are durable." ¶¶ 158, 192. These statements thus gave the misleading impression that the cost cuts were having a positive and "durable" impact, when in truth they were having a substantial negative impact. ¶ 159.[17]

Nevertheless, Defendants respond that Plaintiff "plead[s] nothing" showing that the cost cuts were not durable. Mot. at 16. Yet the Complaint is full of particularized allegations demonstrating that the cuts caused widespread negative effects. ¶¶ 129-150. In fact, after the Class Period, Business Insider reported that the changes "hurt the firm's reputation with contractors" and "prompted some to de-prioritize Zillow jobs or cut ties with the Company." ¶ 131. As a result,

---

[16] Defendants also argue that their September 13, 2021 statements did not mislead the market because they did not explicitly mention Zillow's pricing model. Mot. at 12-13. But those statements reaffirmed and built upon the statements made in August that demand stemmed from "strengthening our pricing models." ¶¶ 182, 184.

[17] *Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *1 (9th Cir. Dec. 21, 2021), does not counsel otherwise. Mot. at 16. There, the alleged false statements were profitability projections, and the plaintiffs did not plead that the allegedly concealed operational problems could have impacted profitability. *Flex*, 2021 WL 6101391, at *1.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 18
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Zillow "had a lot of difficulty finding contractors because their pricing was terrible." *Id.* Business Insider also noted that the changes "were responsible for [Zillow's] backlog of homes" and that "[h]omes it had acquired lingered on its balance sheet for longer periods because it couldn't make the necessary repairs," which "ate into the business' profitability." *Id.* Likewise, FE-4 said that by Summer 2021, many contractors were refusing to work for ZO because of lowered rates and narrowed scopes. ¶ 138. FE-5 likewise confirmed that contractors refused to work with ZO because of pricing. ¶ 139. And FE-3 said the changes led to an inability to renovate homes and a resulting backlog. ¶ 142. Similarly, FE-4 reported that by June 2021, the contractor shortage led to a backlog of homes across Zillow's operations nationwide, including 700 in FE-4's area alone. ¶ 144. And finally, FE-3 corroborated that there were hundreds of homes sitting vacant for months in his area, which caused Zillow to lose money. ¶¶ 145-150.

Yet, Defendants claim their statements were not misleading because they *may* have been referring to changes other than renovation costs. Mot. at 16. But Defendants had already likened "renovation" costs with "improvements." ¶ 184 ("improvement from a year ago in *renovation*, holding and selling costs, were largely durable operational improvements"); ¶ 192 ("some of those unit economic improvements are durable," including "the work we're doing on … dynamic *renovation*"). More to the point, the Ninth Circuit instructs that once Defendants touted the "operational improvements," they were required to "disclos[e] adverse information that cuts against the positive information." *Schueneman*, 840 F.3d at 706. *Berson* is also instructive. There, defendants "touted the company's backlog" (work contracted for but not yet performed) without disclosing that it included contracts subject to stop-work orders. *Berson*, 527 F.3d 983-86. The Ninth Circuit found falsity adequately pled, reasoning that "[n]othing alerts the reader that … what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether." *Id.* at 986. Here, nothing in Defendants' statements alerted investors that the "operational improvements" were having significant negative impacts. ¶¶ 129-150. *See Khoja*, 899 F.3d at 1010 ("once [defendant] chose to tout the apparently positive 25 percent interim results, [it] had the obligation also to disclose that they were likely unreliable").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 19
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Defendants' attacks on the FE allegations are also of no merit. For instance, Defendants argue that FE-4 provides "no facts" showing that the backlog was widespread. Mot. at 18. But FE-4 personally attended the Market Level Meetings and Renovations All Hands Meetings in June 2021 where the nationwide backlog was discussed. ¶ 144.[18] Given FE-4's personal attendance at these meetings, his account is not "second-hand information, obtained only through intermediaries" or mere "hearsay," as Defendants *post facto* suggest. Mot. at 18. Plus, FE-4's account is corroborated by multiple sources, including news reports and other former employees. *See, e.g.*, ¶¶ 129-133, 136, 142.[19]

Defendants also argue that because FE-5 left Zillow in March 2021, his allegations are not based on personal knowledge. Mot. at 18. But the Complaint states that after FE-5 left Zillow, he went to work for a Zillow contractor. ¶ 139. As a result, FE-5 personally saw Zillow's renovation rates and had direct knowledge that Zillow had dropped renovation rates below market rates offered by Zillow's competitors. *Id.* FE-5 also specifically reported that the contractor he worked for decided not to take on Zillow jobs because of the lowered rates and told Zillow as much through ZO's Vendor Management feedback process. ¶¶ 139-140.

Finally, Defendants again argue that their statements were not misleading because Zillow "disclosed exactly what Plaintiff[] claim[s] it concealed." Mot. at 16-17. But as discussed in Section III.A.1.a., *supra*, Defendant's premature truth-on-the-market argument is foreclosed by controlling authority. *See Amgen*, 568 U.S. at 481-82 (truth-on-the-market argument "is a matter for trial"). And, in any event, even if Zillow had "reduced renovation costs" or was "getting 'better and smarter about what needs to be done' to repair a home," these statements are a far cry from

---

[18] Far from "undescribed meetings" (Mot. at 18), FE-4 identified when the meetings occurred (May 2021), what they were called, and who attended. Market meetings were attended by all managers in FE-4's region. ¶ 125. Renovations All Hands Meetings included Renovations upper management like Josh Swift (Senior Vice President, ZO) and Judith Simon (Vice President, Field Operations). *Id.* In *Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013), by contrast, the FE did not personally attend the relevant meeting. In *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014), the only allegation was "a single statement by a lone witness" who did not specify whether he "refer[red] exclusively to the Florida market."

[19] *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (crediting allegations where "numerous confidential witnesses … span[ning] different levels of the Company hierarchy … remain consistent across different time periods … [and] tell what is essentially the same story"); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010) ("The fact that this case involves '[c]orroboration from multiple sources also supports an inference of a scienter.'") (citation omitted).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 20
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN

disclosing the concealed truth—that the changes were having a severe negative impact on Zillow's housing inventory and that its holding costs were rapidly increasingly. ¶¶ 27, 127-150.

Nor are Defendants shielded from liability by Zillow's generic warnings that it could experience issues with contractor availability. Mot. at 17. Rather, "[r]isk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not alert the reader that some of these risks may already have come to fruition can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021) (citing *Berson*, 527 F.3d at 985-87) (cleaned up). Here, Defendants' warning that ZO could experience issues with contractor availability was misleading because it did not disclose that ZO was *already* experiencing issues with contractor availability starting from early summer. *See Berson*, 527 F.3d at 986 (representation that something "might" occur is "quite different" from statement it has "in fact" occurred because "[o]ne indicates a risk, the other a certainty … [and] investors would treat the two differently").

### 4.    The Alleged False and Misleading Statements Are Actionable

#### a.    The Alleged Statements Are Not Forward-Looking

Defendants' argument that certain of their statements were "forward-looking" is a red herring. With limited exception, the statements Defendants point to *are not* alleged by Plaintiff to be false or misleading because the purported "improvements" were *already* having a significant negative effect on the Company. Mot. at 19. Thus, it was clear that they were not "durable."[20] *See In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230-31 (N.D. Cal. 2009) (safe harbor did not apply when "statements were not allegedly misleading because they failed to predict the future, but because they concealed or downplayed" current undisclosed facts). Indeed, Defendants concede in their motion that Zillow would "know" that the improvements were not sustainable or durable when "it had seen widespread adverse effects" (Mot. at 26), which is precisely the state of affairs that the Complaint pleads. ¶¶ 127-150.

---

[20] The Complaint makes clear that the statements Plaintiff alleges were "materially false and misleading" are those in "bold and italics" (¶ 24 n.1), and most of the statements that Defendants claim are "forward-looking" were *not* set forth in bold and italics.



In contrast, Defendants' authorities (Mot. at 19) are inapposite as they all involved specific predictions about what would happen in the future. For example, in *Kipling v. Flex Ltd.*, 2020 WL 2793463, at *10 (N.D. Cal. May 29, 2020), the statement was "[w]e anticipate and see profitability being achieved in Q4 next year and then sustaining that going forward." In *Mazzaferro v. Aruba Networks Inc.*, 2015 WL 456534, at *3 (N.D. Cal. Feb. 2, 2015), defendants said the "win rate against our biggest competitor" "will continue" to "improv[e] steadily every month."

And, even if Defendants' statements were forward-looking (which they were not), the PSLRA only protects "forward-looking statement[s] … accompanied by meaningful cautionary statements." 15 U.S.C. § 78(u)-5(c)(1). Indeed, the cautionary language must "discredit the [allegedly misleading statement] so obviously that the risk of real deception drops to nil." *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022). Here, Defendants concede that their September 2021 statements were not accompanied by any cautionary language. Mot. at 21. Nor were the generic warnings Defendants point to meaningful enough to immunize their August statements. Mot. at 19-20. Cautionary language cannot be "meaningful" if it warns of risks that have already come to pass. *See, e.g.*, *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015) ("If a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated, … its cautionary language would be inadequate to meet the safe harbor standard."). Here, warning investors that ZO *could* experience issues with contractor availability was insufficient because Defendants knew ZO was *already* experiencing contractor availability issues. ¶ 187(c). *See In re Hi/fn, Inc. Sec. Litig.*, 2000 WL 33775286, at *5 (N.D. Cal. Aug. 9, 2000) (cautionary language "warn[ing] of the risk of a reduction in orders" insufficient because given "the imminent reduction of orders from Hi/fn's two largest customer[s], this generalized potential risk had become a reality").

Finally, as explained in Section III.B.4, *infra*, Plaintiff also adequately alleges the requisite mental state for forward-looking statements because Plaintiff pled that Defendants were "aware of undisclosed facts tending seriously to undermine the statement's accuracy." *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972-73 & n.12 (N.D. Cal. 2009).



**b.      The Alleged Statements Are Not Immaterial as a Matter of Law**

Only "statements on the extreme edge of generality and vagueness may be insufficient as a basis for a securities fraud claim. … '[T]he exception for puffery is narrowly drawn.'" *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005) (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)). Defendants' attempt to cast their misleading statements as immaterial puffery fails on multiple fronts. *First*, "[s]tatements by a company that are capable of objective verification are not 'puffery.'" *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *12 (C.D. Cal. May 31, 2017) (citation omitted). For example, Defendants' statement that the "step-up in pace" of home sales had "resulted from the progress we have made in strengthening our pricing models" was objectively false—Defendants knew (or recklessly disregarded) that the increased volumes resulted from the automatic overlays placed on top of their bona fide pricing models. ¶¶ 184-187.

*Second*, statements involving matters of central importance to a company are not immaterial. *See, e.g.*, *Vancouver Alumni*, 2017 WL 2378369, at *13 ("Given the alleged importance of the BlueTEC vehicles to Defendants' business, it is plausible that a reasonable investor would view Daimler AG's failure to live up to this environmentally friendly claim as significantly altering the 'total mix' of information available."); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, fraudulent comments regarding [] a fundamental aspect of [defendant's] business are of vital importance to investors."); *SEC v. Mozilo*, 2010 WL 3656068, at *11 (C.D. Cal. Sept. 16, 2010) (misstatements material where they concerned factors affecting company's "core business").

*Third*, the materiality of Defendants' statements is also highlighted by the fact they were made in direct response to analyst questions. *See*, *e.g.*, ¶¶ 158, 191-192.[21] That sophisticated market analysts highlighted Defendants' statements in their reports underscores that these

---

[21] *See also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2006) (statement "went well beyond puffery: it was a direct response to an analyst's inquiry"); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (statements not too vague to be material and actionable were made in response to specific analyst questions).



statements were not immaterial to the market. ¶¶ 28, 98, 155-156, 160, 186. *See, In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016) (statements more than corporate optimism where they "could and did mislead a number of reasonable investors, as evidenced by the comments of analysts").

*Fourth*, even a statement that could be considered puffery in one context can be actionable in another, especially "where material, nondisclosed information undermines the truth of those statements." *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1294 (N.D. Okla. 2010).[22] Here, Defendants told investors that ZO was "back on track" (¶ 187) and that "we're even more confident now that this is going to be a service really in all weather markets" (¶ 191)—even when Defendants knew they had made a risky bet that the market would rapidly rise (¶¶ 100-126) and ZO had built up a costly backlog of homes (¶¶ 141-147). So severe were these issues that just a month later, Defendants shut ZO down entirely, admitting that it had overpaid for around 18,000 homes (¶¶ 33, 170-171) and would need to take a half a billion-dollar inventory write-down. ¶¶ 33, 170, 232.

## B.    The Complaint Pleads a Strong Inference of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705 (quotation marks and citations omitted). In this Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). The inference of scienter "need not be irrefutable … or even the most plausible." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Nor must the scienter inference be "of the 'smoking-gun' genre." *Id.* Rather, the inference of scienter must merely be one that is "cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. And, because it is "rare that a wrongdoer will admit to the required state of mind," scienter "can be proven and pled through circumstantial evidence." *See In re Network Assocs., Inc., Sec.*

---

[22] *See also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) (while descriptions like "high quality" generally constitute puffery, "[plaintiff] adequately alleges that [defendant's] practices so departed from its public statements that even 'high quality' became materially false or misleading").

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 24
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

*Litig.*, 2000 WL 33376577, at \*8 (N.D. Cal. Sept. 5, 2000) ("PSLRA calls for a 'strong inference,' not an outright confession or an airtight case at the pleading stage."). Finally, the Supreme Court in *Tellabs* emphasized that courts should focus on "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The Complaint readily pleads Defendants' scienter.

### 1.    Defendants Knew or Recklessly Disregarded That Zillow Was Driving Volumes by Applying Overlays on Top of Its Bona Fide Pricing Models

The Complaint alleges that Defendants misled investors by attributing ZO's increased volumes to improvements made to ZO's algorithmic pricing models. ¶ 151. In truth, Zillow was driving volumes by bluntly applying significant and aggressive price overlays on top of these bona fide pricing models. ¶ 153. For purposes of scienter, therefore, the pertinent question is whether Defendants were aware of Project Ketchup, including ZO's efforts to drive up home purchase volumes through price overlays, and were aware of the inventory backlog created by the supposed "durable" operational improvements. Here, the Complaint alleges that Defendants knew, or at least recklessly disregarded, facts to the contrary.

Scienter can be pled by alleging that defendants actually knew of, or had access to, information contradicting the challenged statements. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).[23] Here, multiple former employees confirm that Zillow's senior executives knew well before the Class Period of Project Ketchup and its strategy to overrule the pricing models and make higher offers to drive volume. For example, according to FE-2, ZO's management said during a May or June 2021 Forecasting and Planning ("F&P") meeting that ZO would be aggressively adjusting the Company's home offer pricing upwards. ¶ 107. FE-2 also said the shift to a more aggressive home buying strategy was done alongside the Zillow executive level. *Id.* Additionally FE-2 believed that Luis Poggi, Vice-President of Product & Engineering at

---

[23] *See also In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at \*7 (N.D. Cal. May 1, 2017) ("even if [the CEO and Chairman] were not directly involved in these negotiations, they filed either aware or should have been aware of this materially relevant business information. And if for some reason they were not, … as the leaders of the company, [they] had access to it and could have sought it out").

Zillow, was the architect of Project Ketchup. *Id.* FE-2 also said that it was widely known within Zillow that ZO was using the overlays and recalled that the overlays were definitely discussed at the monthly Forecasting and Planning ("F&P") meetings attended by ZO executives. ¶¶ 92, 113. FE-2 also believed that Wacksman sometimes attended these meetings. ¶ 92. Finally, FE-2 also said that he would be very surprised if Barton and Parker did not know of the overlays, as they were one of the biggest pricing initiatives ZO had ever done and that it would have a huge impact on business. ¶ 113. *See UTStarcom*, 617 F. Supp. 2d at 975 (finding inference of scienter where undisclosed practices "were well known throughout the Company").

According to FE-3, Vice-President Simon, who worked directly with Barton, explained the goals of Project Ketchup—including the strategy to make more lucrative offers—during an All Hands Call around February 2021. ¶ 109. Similarly, FE-4 confirmed that the higher offers were discussed during regional market meetings, Renovations All Hands Meetings, and at least one company-wide All Hands Meeting. FE-4 also recalled learning of Project Ketchup at a Renovations All Hands Meeting in April or May 2021—which was attended by Senior Vice President Swift, and Vice President Simon—where a nationwide strategy to pay more for homes to establish higher market share was discussed. ¶ 124. FE-4 also recalled hearing about the increased offers on at least one company-wide All Hands Meeting attended by Barton. ¶ 125. Finally, FE-4 revealed that he was told by his manager at a regional market meeting in May 2021 that the overpayments were being done at the direction of Zillow leadership. *Id.* Thus, ample facts demonstrate that Zillow's executives knew that the aggressive and systematic price overlays were responsible for driving volumes. And "that the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter." *Align*, 485 F. Supp. 3d at 1133-34.

Defendants do not dispute their knowledge about Project Ketchup, or that they knew that overlays were put in place to drive volume. Instead, they contend the Complaint's particularized allegations fail because Plaintiff does not allege that Defendants "necessarily" knew "that ZO was deliberately overpaying for homes." Mot. at 24. But as discussed in Section III.A.1.b., *supra*, Plaintiff's claim here is not that Defendants knew with certainty that they were overpaying for

homes. Rather, Plaintiff alleges that *Defendants misled the market* to believe that ZO's volume improvements stemmed from improvements to ZO's algorithmic pricing model—when, in fact, they resulted from the concealed aggressive price overlays added to the pricing model outputs. Given Defendants' failure to challenge their knowledge that Zillow was driving volume through the overlays, scienter is sufficiently pled. *See Plantronics*, 2022 WL 3653333, at \*19 (scienter adequately pled because motion to dismiss was "predicated on the notion that Plaintiffs must allege facts showing that Individual Defendants had knowledge of improper transactions with any channel partner" but "[b]ecause Plaintiffs are not proceeding under a theory predicated on illicit channel stuffing …, these arguments are irrelevant.").

### 2. Defendants Knew or Recklessly Disregarded That the "Improvements" They Were Touting Had Caused a Large Backlog of Homes

Defendants also misled the market by touting Zillow's "durable operational improvements" while concealing that the "improvements" had caused a contractor shortage and a resulting backlog of homes. ¶¶ 127-148. Thus the Complaint "raise[s] a strong inference of scienter" through its "particularized allegations that defendants had 'actual access to the disputed information'"—namely, the contractor shortage and backlog. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (citation omitted). For instance, FE-4 recalled that the contractor shortage was discussed at both Market Level Meetings and during Renovations All Hands Meetings attended by Senior Vice President Swift. ¶ 141. FE-4 further stated that by April or May 2021, ZO management mentioned that they were trying increase contractor capacity to deal with ZO's backlog of homes. *Id.* FE-4 similarly recalled attending a Renovations All Hands Meeting in June 2021, attended by Senior Vice President Swift and Vice President Simon, where the participants discussed the nationwide backlog problem. ¶ 144. By July or August 2021, FE-4 also heard during a Renovations All Hands Meeting that ZO would loosen contractor requirements to counter the shortage. ¶ 141. In light of these facts, it is "not plausible" that ZO's top management would have concealed such a major problem from Zillow's CEO. *See Alphabet*, 1 F.4th at 706. And in any event, the Complaint pleads that *Barton himself* was aware of the backlog. Indeed, FE-3 recalled an All Hands Meeting he attended in July or August 2021 where a Zillow employee

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

asked Barton about the backlog, and Barton responded that Zillow was coming up with a plan to try to clear the backlog that could involve slowing down or stopping purchases. ¶ 147.

Even putting aside the direct allegations of Defendants' knowledge, the Complaint also contains particularized allegations demonstrating Defendants' access to this information. *See Quality Sys.*, 865 F.3d at 1145 ("particularized allegations that defendants had 'actual access to the disputed information' … raise a strong inference of scienter"); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (scienter based on "data to which [defendant] had access"). For instance, FE-3 explained that ZO's backlog was visible Zillow's Tableau database, which was updated constantly. ¶¶ 145-150. FE-3 also checked Tableau daily and said that the backlog in his area was climbing continuously and numbered in the hundreds. *Id.* FE-4 likewise confirmed there was a backlog of 700 homes in his area by June 2021, and that ZO's backlog problem was nationwide. Tableau was also readily accessible to Zillow employees, including Defendants. ¶ 145. At minimum, these allegations reflect deliberate recklessness, which is shown "'if [a defendant] had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)); *Howard*, 228 F.3d at 1057 ("[defendant] cannot simply argue that he looked the other way").

### 3. It Is Implausible to Suggest That Defendants Did Not Know About Project Ketchup or the Swelling Housing Inventory Backlog

Information is imputed to Defendants under the core operations theory where it concerns "prominent facts" "obvious from the operations of the company." Mot. at 25 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009)). *See also S. Ferry LP, No. 2*, 542 F.3d at 782, 786 ("it may be inferred that facts critical to a business's 'core operations' … are known to key company officers … where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *accord Berson*, 527 F.3d at 988; *Reese*, 747 F.3d at 569.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 28
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

There can be no real dispute that ZO—*which accounted for 60% of Zillow's revenues*—was a core operation. ¶ 8. Indeed, with Zillow's traditional revenue sources slowing, ZO was expected to drive its future growth. Additionally, Barton returned to the Company specifically to oversee ZO, which he touted as the centerpiece of Zillow's new strategy. ¶¶ 5-7, 65, 198. As one analyst put it, "[t]he Company will pin its future on [ZO]." ¶¶ 58-66. It is thus unsurprising that ZO was "the primary stock sentiment driver." ¶ 68. *See, In re Iso Ray, Inc. Sec. Lit.*, 189 F. Supp. 3d 1057, 1078-79 (E.D. Wash. 2016) (absurd for defendant to lack knowledge about product critical to company's success).

Nor is there any doubt that the concealed facts here—Project Ketchup, the price overlays and rapidly growing housing inventory backlog—were "prominent facts" that were "obvious from the operations of the company." The Complaint alleges that Project Ketchup was a massive initiative that was known across the entire Company. ¶ 113. Zillow even distributed "Project Ketchup" T-shirts, ketchup bottles, and water bottles that resembled ketchup bottles to its employees. ¶¶ 103, 106. Thus, when ZO began offering 700-800 basis points above the bona fide pricing models, Zillow's senior management would have been made aware. Indeed, several employees confirmed that ZO was paying up to $100,000 more per home through the overlays. ¶¶ 121, 125. And, FE-2 "said he would be very surprised if Barton and Parker were unaware" of the overlay, "because *it was one of the biggest pricing initiatives [ZO] had ever done* and would have a *huge impact* on [Zillow's] business. ¶ 113. Given the sheer scope of Project Ketchup, and the size of the pricing changes that stemmed from it, it is absurd to suggest that Defendants were unaware of it. *See Align*, 485 F. Supp. 3d at 1134 ("the implementation of a substantial discount on Align's main revenue source squarely qualifies as 'facts critical to a business's core operations'").

It is just as absurd to suggest that Defendants were unaware of the large backlog of homes that ZO had languishing on its books and driving up costs. Former employees have confirmed that ZO had a nationwide backlog problem by no later than June 2021—two months before Defendants made their misleading statements. Nor was this backlog insubstantial. Rather, multiple employees confirmed that the backlogs in their areas numbered in the hundreds. It was also costing Zillow up

to $300 per day to maintain *each* unsold home. Given the strong focus on Zillow's cost structure, and that it was critical for ZO to quickly flip homes, it is truly absurd to suggest that Defendants were unaware of a significant backlog of homes sitting on Zillow's books. *See Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (scienter supported by "scope and significance of the events" at issue); *Tellabs*, 513 F.3d at 711 (finding it "exceedingly unlikely" that CEO was "unaware of the problems of his company's two major products").

Yet, rather than addressing the allegations that Zillow's executives would have kept tabs on a business line representing 60% of Zillow's revenue head on, Defendants instead insist they were not required to "monitor [] every detail about ZO." Mot. at 23. But the concealed facts were not small abstract details. Instead the allegations suggest they were "prominent facts" that were "obvious from the operations of the company."

**4.      The Complaint Also Alleges Strong Circumstantial Indicia of Scienter**

Other indicia reinforce a strong inference of scienter. *First*, the "[t]emporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese*, 747 F.3d at 574; *Berson*, 527 F.3d at 988 n.5 (temporal proximity "bolsters the inference" of scienter). Here, less than two months passed between Defendants' last rosy statement of ZO performance and the decision to kill ZO—which bolsters the inference of scienter. *See, e.g.*, ¶¶ 210-213. *See also, Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015) (six-month gap supports scienter).[24] Multiple analysts also specifically commented about the speed at which Defendants changed their tune. *Id.*

Nevertheless, Defendants argue Zillow's disclosure of impacts in November does not mean it "necessarily observed those facts earlier in the quarter as well." Mot. at 26. But Defendants told investors in August and September that they had driven volumes through improvements to ZO's algorithms, only to admit in November that ZO's algorithm had never been able to accurately

---

[24] *See also In re Leapfrog Enter., Inc. Sec. Litig.*, 237 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017) (a write-off of long-lived assets two months after statements so supported scienter); *Rihn*, 2016 WL 5076147, at *9 (temporal proximity between statement that company was on track to submit an NDA and an admission less than a month later that submission was delayed supported scienter).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 30
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

predict market movements in the first place.[25] *See Reese*, 747 F.3d at 575 (temporal proximity of three to six months supported scienter "given the relatively constant, long-term nature of the information"). Likewise, Defendants' claim—that they had no idea about the backlog in September, in spite of their much-touted expertise in predicting real estate prices, *but only one month later* Zillow realized that the backlog was so severe that they had to shut down operations entirely—is simply not plausible.[26]

*Second*, a defendant's extensive discussion of the subject of the fraud in public statements supports scienter. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019). Here, Defendants extensively spoke about ZO (¶¶ 70-89, 97-99, 151-160, 181-196), and regularly faced questions on ZO's performance, consumer demand, and house volumes. *See, e.g.*, ¶¶ 191-192, 205. Defendants' detailed statements shows "they were knowledgeable about and actively involved in [ZO]'s operations" and thus supports scienter. ¶ 198.

*Third*, when defendants generate public excitement about specific targets, the "pressure to live up to the targets announced" can contribute to a strong inference of scienter. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017). Here, Barton announced early on that ZO planned to purchase 5,000 homes per month and generate $20 billion in revenue in three to five years. ¶¶ 7, 65-66, 183. Investors understood the magnitude of these targets. ¶¶ 10, 84, 127.

*Fourth*, the sheer magnitude of Defendants' risk-taking reinforces a strong inference of scienter when viewed collectively with Plaintiff's other allegations. Indeed, Zillow overpaid for approximately *18,000 homes*, which is *triple* the roughly 6,000 homes Zillow purchased in the previous five quarters *combined* (Q1 2020 through Q1 2021). ¶ 115. Moreover, Zillow disclosed that it had overpaid by *$569 million*, which works out to an average overpayment of more than *$31,000 per home*. ¶¶ 33, 115, 170, 173. *See UTStarcom*, 617 F. Supp. 2d at 975 ("the Court finds

---

[25] *Compare* ¶ 183 to ¶¶ 236, 241-242.

[26] Defendants argue that ZO increased home purchases in Q2 and Q3 and so it "stands to reason" that there was no backlog until those "extra homes" closed. Mot. at 27. But the Complaint contains particularized allegations demonstrating that ZO had a nationwide backlog problem by June 2021 that was made even worse by ZO's additional volumes. ¶¶ 141-147. At this stage, the Complaint's well-pled allegations must be accepted as true.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 31
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

that the magnitude and extent of the problems, as alleged in the Complaint, gives rise to at least an equally strong inference of scienter").

C.      **Defendants' Challenges to Scienter Fail**

1.      **Defendants' Challenges to the Former Employees Fall Flat**

Courts in this Circuit credit former employees' accounts if the witnesses are identified with "sufficient particularity" to support "the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Such accounts are accepted if it is "plausible" that the witness "would know, or could reasonably deduce," the information attributed to them. *Berson*, 527 F.3d at 985.

The Complaint details each former employee's job title, experience, responsibilities, period of employment, and group at Zillow.[27] Simply put, the FE statements are sufficiently reliable, plausible, and coherent. *See LifeLock*, 780 F. App'x at 485 (finding allegations attributed to FE were credible as they formed "a plausible and coherent narrative" and the FE was "in a position to be personally knowledgeable" of the stated facts). Defendants do not meaningfully challenge the plausibility of the five FEs having access to the information underlying their statements, nor their statements' coherence. Mot. at 24-25. Instead, Defendants assert that FE statements cannot be relied upon because of hearsay. Mot. at 24. But the Ninth Circuit has squarely rejected Defendants' hearsay argument: "the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus. Instead, we examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent." *See LifeLock*, 780 F. App'x at 484 n.5 (citation omitted).

---

[27]     *See, e.g.*, ¶¶ 51, 109 (describing FE-1, an acquisitions analyst who worked at Zillow during the Class Period and whose primary responsibility was pricing homes for ZO); ¶ 52 (describing FE-2, a senior data scientist who worked at Zillow during the Class Period and whose team was responsible for assembling a forecasting dashboard and assisting with the monthly forecasting and planning meetings attended by key ZO executives); ¶ 53 (describing FE-3, who worked at Zillow during the Class Period as a Renovations Superintendent and Assistant General Manager whose role included managing teams that would scope and renovate homes for ZO); ¶ 54 (describing FE-4, who worked at Zillow during the Class Period as a Renovations Superintendent and whose responsibilities included training renovation evaluators, enforcing a ZO standard of renovation work); ¶ 55 (describing FE-5, who worked at Zillow from 2019 through March 2021 as a Renovation Estimator and Renovation Superintendent, and whose main responsibilities were to inspect homes, prepare reports and work with general contractors). The Complaint further details the bases for each witness' information. *See, e.g.*, ¶¶ 53, 92, 124.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 32
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**2.      Defendants' Motive and "Plausibility" Arguments Miss the Mark**

Defendants next claim that scienter is negated because the Complaint does not plead an adequate motive. Mot. at 27. As an initial matter, "the absence of a motive allegation, though relevant, is not dispositive." *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *Schueneman*, 840 F.3d at 709 n.8. Likewise, in this Circuit "[s]cienter can be established even if the officers who made the misleading statements did not sell stock." *Am. W. Holding*, 320 F.3d at 944.[28]

But more to the point, the Complaint alleges a compelling and plausible motive. As Barton himself made clear, for ZO to succeed, it had to rapidly scale. ¶ 83 Yet in early 2021, ZO was missing its volume targets. ¶¶ 13, 91, 156. Rather than falling further behind competitors, Defendants decided to simply apply overlays to drive volume. In other words, Defendants were so motivated to grow volume that they took a risky bet that the market would continue its rapid appreciation. Thus, Defendants' argument that Plaintiff alleges an "implausible" story that Defendants "sabotage[d] ZO … deliberately" misses the mark. Mot. at 27-28. There is nothing that "strains credulity" about a tech company taking massive risks to chase growth at all costs. *Id.* Nor would there have been anything improper about it, if Defendants had honestly disclosed to investors what they were doing. Instead Defendants chose to falsely assure the market that they were lowering risk by improving their algorithm to predict market movements more carefully, rather than increasing risk to grab volume.[29] Viewed collectively, as they must be under Ninth Circuit law, the facts establish a strong inference of scienter. *See VeriFone*, 704 F.3d at 710 ("Although [defendants] attack individual allegations in isolation, they cannot overcome the

---

[28] Defendants' cases do not show otherwise. Mot. at 27. Indeed, *Downey* predates both *Matrixx* and *Schueneman.* And this Court's holding in *Johnson* does not apply under these circumstances. And this Court's holding in Johnson does not apply under these circumstances. In *Johnson*, plaintiffs' allegations merely supported mismanagement, not scienter, and that the more plausible inference was that, at the time of their statements, the individual defendants were unaware of any material weakness in internal controls.

[29] Defendants also argue their purported "disclosures" of risks negate their scienter. Mot. at 28. But as Judge Tigar recently explained in rejecting a similar argument, "[b]ecause reasonable minds could differ as to what the disclosures in question revealed, … the disclosures to which defendants point do not undermine or preclude a finding that the [complaint] raises a strong inference of scienter." *Plantronics*, 2022 WL 3653333, at *19.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 33
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

H3 HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

overwhelming inference drawn from a holistic view."). The Complaint sufficiently pleads scienter.[30]

## D.    The Complaint Adequately Pleads Loss Causation

A complaint need only provide the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). Pleading loss causation therefore "'should not prove burdensome,' for even under Rule 9(b) the [] allegations will suffice so long as they give the defendant 'notice of plaintiffs' loss causation theory' and [] the court 'some assurance that the theory has a basis in fact.'" *In re BofI Holdings, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020) (quoting *Berson*, 527 F.3d at 989-90). Indeed, loss causation "requires no more than the familiar test for proximate cause," and there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018). Allegations of a "'causal connection between the material misrepresentation and the loss'" suffice. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016) (quoting *Dura Pharms.*, 544 U.S. at 342). Ultimately, a complaint need only "raise a reasonable expectation that discovery will reveal evidence of loss causation." *Gilead*, 536 F.3d at 1057 (citation omitted).

Here, the relevant truth concealed by Defendants' misleading statements was gradually revealed through four partial disclosures on October 4, October 17-18, November 1, and November 2, 2021—each of which is causally connected to the fraud and each of which caused Zillow's stock prices to plummet.[31] ¶¶ 161-180, 215-249. Defendants argue these disclosures do

---

[30] Since Plaintiff has alleged scienter for Zillow's senior controlling officers, scienter is pled for Zillow. *Alphabet*, 1 F.4th at 705 ("scienter of the senior controlling officers of a corporation may be attributed to the corporation itself").

[31] Defendants cite *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021) to argue Zillow's stock price recovery after two of the earlier disclosures defeats loss causation. But in *Tesla* the Ninth Circuit found that the truth was fully disclosed a month earlier than alleged by plaintiffs. 985 F.3d at n.4. Moreover, the stock fell only 3.9% and "rebounded immediately" the next trading day. *Id.* at 1198. Here, Zillow's stock price plummeted nearly 40% after the final alleged disclosure in November and Defendants do not claim it ever recovered. ¶¶ 230, 238. Even for the earlier partial corrective dates, Defendants do not point to "immediate" next day recoveries. Courts regularly reject similar arguments at the pleading stage. *See, e.g.*, *In re CV Scis., Inc.*, 2019 U.S. Dist. LEXIS 212562, at *15-16 (D. Nev. Dec. 10, 2019) ("basic economic principles preclude dismissing a complaint on grounds that the stock price recovered after falling significantly because the rebound can often be explained by external events") (citing *Acticon AG v. China N. E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) ("At this stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains")); *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 984 (N.D. Cal. 2015) (same).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 34
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

not suffice because they did not directly disclose the overlays or that the price cuts had caused the backlog. Mot. at 28-29. But disclosures "need not precisely mirror the earlier misrepresentation." *BofI*, 977 F.3d at 790 (citation omitted).[32] Indeed, the Ninth Circuit has held: "A plaintiff may [] prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 753-54. And Defendants' cases are not to the contrary.[33]

Here Defendants *admit* that the disclosures at issue resulted from the very information they concealed during the Class Period. For instance, they admit that the concealed overlays "resulted in Zillow paying more for homes than for what Zillow estimated it would be able to sell them." Mot. at 8. They also admit that on the disclosure dates, "the market reacted to the alleged consequences of [the overlays and renovation cost cuts]—$304 million write-down and the decision to wind down ZO." Mot. at 29. Accordingly, loss causation is adequately pled.

**E.    Plaintiff Has Established Control Person Liability**

Defendants do not dispute the adequacy of the control person allegations. Mot. at 30. Nor do they dispute that Section 20(a) claims must survive where, as here, the Complaint pleads a primary violation under Section 10(b).

### IV.    CONCLUSION

Defendants' Motion should be denied in its entirety. If, however, the Court grants any part of the Motion, Plaintiff requests leave to amend the complaint under Fed. R. Civ. P. 15.

---

[32] *First Solar*, 881 F.3d at 753 ("Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.") (citation omitted); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016) ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."); *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954 (N.D. Ill. 2011) ("a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity").

[33] Mot. at 28-30 (citing *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008); *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014); *Or. Pub. Emps. Ret . Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014)). Rather, as the Ninth Circuit explained in *First Solar*, the plaintiffs in those cases specifically "plead a causation theory based on market revelation of the fraud" and so the courts in those cases "naturally evaluate[d] whether plaintiffs have pleaded or proved the facts relevant to their theory." 881 F.3d at 752-54. For instance, in *Metzler*, the plaintiff pled that "Corinthian's fraud was revealed to the market, causing Metzler's losses." *Id.* at 754. Here, Plaintiff has not explicitly pled that Defendants' "fraud was revealed to the market," and thus the standard applied in Defendants' authorities is inapplicable.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
CONSOLIDATED CLASS ACTION COMPLAINT - 35
Case No. 2:21-cv-01551-TSZ
011060-11/2015751 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

DATED: September 2, 2022

Respectfully submitted,

By: /s/ *Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
By: /s/ *Catherine Y. N. Gannon*
Catherine Y. N. Gannon (WSBA No. 47664)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: catherineg@hbsslaw.com

Reed R. Kathrein (*pro hac vice*)
Lucas E. Gilmore (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com

*Lead Counsel for Lead Plaintiff Jaeger*

Stacey M. Kaplan (*pro hac vice*)
KESSLER TOPAZ MELTZER & CHECK, LLP
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
Email: skaplan@ktmc.com

Gregory M. Castaldo (*pro hac vice*)
Evan R. Hoey (*pro hac vice*)
Helen J. Bass (*pro hac vice*)
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: gcastaldo@ktmc.com
Email: ehoey@ktmc.com
Email: hbass@ktmc.com

*Additional Counsel for Lead Plaintiff Jaeger*

