1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JEREMY JAEGER,[1] on behalf of
himself and all others similarly
situated,

            Plaintiff,

    v.

ZILLOW GROUP, INC., et al.,

            Defendants.

C21-1551 TSZ

ORDER

THIS MATTER comes before the Court on Defendants' motion to dismiss, docket

no. 85, the Corrected Consolidated Class Action Complaint ("CAC"), docket no. 71, for

failure to state a claim. Plaintiff Jeremy Jaeger brings this action on behalf of a putative

class of persons who purchased or otherwise acquired shares of Class A or Class C

common stock in Zillow Group, Inc. ("Zillow") between August 5, 2021, and November

2, 2021 (the "Class Period"). CAC ¶ 258. Plaintiff sues all Defendants under Section

10(b) of the Securities Exchange Act of 1934, 5 U.S.C. § 78j(b), and Rule 10b-5

_____

[1] By Order entered February 16, 2022, docket no. 61, the Court appointed Jeremy Jaeger as lead plaintiff.
All future filings shall bear the same caption as this Order.

ORDER - 1

1  promulgated by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-

2  5. Plaintiff also sues Defendants Richard Barton, Jeremy Wacksman, and Allen Parker

3  (the "Executive Defendants") as control persons of Zillow under Section 20(a) of the

4  Exchange Act, 15 U.S.C. § 78t(a). Having reviewed all papers filed in support of, and in

5  opposition to, the motion, the Court enters the following Order.

6  **Background**

7      Defendant Zillow is a Washington corporation.[2] CAC ¶ 1. Zillow is alleged to

8  operate the most visited real estate website in the United States, "zillow.com," and other

9  real estate websites, such as "trulia.com" and "streeteasy.com." CAC ¶ 2. Until 2018,

10 Zillow generated most of its revenue from advertising and from referral fees received

11 when it matched prospective buyers and sellers with real estate agents and brokers. *Id.*

12 **A.    Zillow Offers**

13     According to the operative pleading, in April 2018, in response to slow growth in

14 Zillow's core business and stagnating stock price, Zillow entered the "iBuyer" or "Instant

15 Buyer" market. CAC ¶ 2. In the iBuyer market, companies "use algorithms and

16 technology to buy and resell homes quickly." CAC ¶ 3. Zillow's new iBuyer business

17 was called Zillow Offers.[3] CAC ¶ 4.

18

19

20 [2] Zillow's Class A common stock trades on the Nasdaq exchange under the ticker symbol "ZG," and its Class C capital stock trades on the Nasdaq exchange under the ticker symbol "Z." CAC ¶ 43.

21 [3] Through Zillow Offers, Zillow would make offers to buy homes directly from homeowners. If a homeowner accepted an offer from Zillow Offers, then Zillow would purchase the home, make certain
22 repairs and updates, and then list it for sale on the open market. For each home it resold, Zillow would recognize a profit, in the form of transaction fees, at the time of closing. CAC ¶ 59.

23

ORDER - 2

In February 2019, Defendant Richard Barton returned to his former role as Zillow's Chief Executive Officer ("CEO"). CAC ¶ 44. Coinciding with his resumption of CEO duties, Barton announced a goal for Zillow Offers of $20 billion in revenue over five years, with a target of purchasing and selling 5,000 homes per month. CAC ¶ 66.

Barton acknowledged that Zillow Offers was behind some of its competitors, like Opendoor and Offerpad, which had entered the iBuyer market a few years earlier. CAC ¶ 67. To catch up, Zillow Offers needed to scale up quickly. CAC ¶ 83. Doing so would also allow Zillow Offers to improve its cost structure. CAC ¶ 11. As a result, in the years leading up to the Class Period, Zillow's executives were, according to the CAC, "laser-focused on increasing Zillow's home purchasing volumes to achieve Barton's targets of 5,000 homes per month by 2024." *Id.*

Defendants are alleged to have touted the accuracy of the algorithms used to price homes. CAC ¶ 75. On May 7, 2020, Barton stated, "it's just the machines getting smarter . . . . [W]e have just gotten a whole lot better at how to figure out what to buy, where to buy it, how to rehab it, how to appraise it, how to price drop it, and all of this is informed by data." CAC ¶ 76 (alteration in original).

**B.    Zestimate Offer and Project Ketchup**

On February 25, 2021, Zillow announced that it had launched in certain markets a new program, Zestimate[4] offer, which would provide an initial purchase offer from

---

[4] "Zestimate" is Zillow's proprietary pricing model that estimated the current value of over 100 million homes in the United States. CAC ¶ 71. Consumers could visit Zillow's website and look up the Zestimate for their home. *Id.* If a consumer liked the Zestimate, then he or she could contact Zillow and request that

Zillow Offers to homeowners. CAC ¶ 77. This process eliminated the involvement of a pricing expert and made Zillow even more reliant on its Zestimate and other algorithms. In a press release, Zillow stated, "This exciting advancement demonstrates the confidence we have in the Zestimate . . . . This is a proud moment for Zillow's tech team and speaks to the advancements they've made in machine learning and AI technology." *Id.*

On June 15, 2021, after having missed its inventory-acquisition targets and concluded that it was "under-modeling" the level of home appreciation,[5] Zillow issued a press release stating that it had improved its algorithms. The press release said, in relevant part, that "Zillow today launches significant upgrades to its Zestimate® home valuation model. *The changes allow the algorithm to react more quickly to current market trends . . . .*" CAC ¶ 99 (emphasis in original). As a result of this update, Zillow said that "*the Zestimate can now react more quickly to dynamic market conditions, providing homeowners with a more accurate estimate [prediction] of a home's current value.*" *Id.* (emphasis and alteration in original).

---

the Company make an initial offer for the consumer's home. *Id.* After the consumer contacted Zillow, Zillow would send out a pricing expert, who would adjust the Zestimate and report his or her recommendation to Zillow. Zillow then applied computer models to estimate the length of time required to sell the home and how the value of the home would change during that timeframe. CAC ¶ 72. Zillow would eventually arrive at the home's estimated value and make an initial offer to purchase the consumer's home. *Id.*

[5] In alleging that Zillow did not meet its home-buying goals and that it was underestimating the increase in house values over time, Plaintiff relies on statements by former Zillow employees. *See* CAC ¶¶ 92–96. Defendants attempt to discredit the former employees' statements, particularly as they relate to scienter. Defs.' Mot. at 24 (docket no. 85). The CAC, however, details each former employee's job title and group at Zillow, responsibilities, period of employment, and experience, and the statements of these confidential witnesses may therefore be considered. *See In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015–16 (9th Cir. 2005).

Behind the scenes, however, Zillow was not meeting its home-purchasing goals. CAC at ¶ 100. As a result, Zillow initiated Project Ketchup. *Id.* Under Project Ketchup, Zillow "applied systematic 'overlays' to drive up offers well above the pricing indicated by its algorithm and pricing analysts." *Id.* These overlays are alleged to have caused Zillow to "significantly overpay for thousands of homes." *Id.*

Between late May or early June and August 2021, Zillow increased its home offer prices by, on average, between 400 and 800 base points across all markets. CAC ¶¶ 111, 112.

Project Ketchup had other consequences. Because Zillow purchased homes at prices that often exceeded their market value, it attempted to save money by decreasing the scope and costs of renovations to be completed before reselling them. *See* CAC ¶ 127. "These changes were unsustainable" because Zillow's strategy "squeezed" longtime contractors, as Zillow asked them to renovate more homes for less money than previously charged for the same work. CAC ¶ 128. As a result, Zillow's contractors began refusing jobs. *Id.* Without sufficient contractors to complete renovations, a substantial backlog of homes developed on Zillow's balance sheet. *Id.* This backlog increased Zillow's holding and interest rate costs, exposing it to additional risks from broader market movements. *Id.*

C.   **Allegedly False or Misleading Statements**

Plaintiff alleges that Defendants made several false and/or misleading statements to the market on two dates: (i) on August 5, 2021, in a shareholder letter and earnings call, and (ii) on September 13, 2021, at a Piper Sandler investment conference. These allegedly false or misleading statements fall into three categories: (i) statements about

1 Zillow's reliance on and improvements to its algorithms; (ii) statements concerning the

2 durability of operational, unit economic, and/or renovation process improvements; and

3 (iii) statements attributing Zillow's inventory growth to consumer demand. *See* CAC

4 ¶¶ 183–84, 191–92. Between October 18, 2021, and November 3, 2021, Defendants

5 made a series of corrective disclosures to the market. CAC ¶¶ 164–65, 170–72.

6 According to the operative pleading, these disclosures shocked market analysts. CAC

7 ¶¶ 175–180. Each disclosure coincided with a decline in both Zillow's common and

8 capital stock price. CAC ¶¶ 163, 166, 169, & 174.

9        Defendants now move to dismiss all of Plaintiff's causes of action.

10 **<u>Discussion</u>**

11        To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient

12 factual matter that, when accepted as true, states a claim that is plausible on its face.

13 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the

14 plaintiff pleads factual content that allows the court to draw the reasonable inference that

15 the defendant is liable for the misconduct alleged." *Id.* Although this standard is not a

16 probability requirement, "[w]here a complaint pleads facts that are merely consistent with

17 a defendant's liability, it stops short of the line between possibility and plausibility of

18 entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining

19 whether a plaintiff has met this plausibility standard, the Court must "accept all factual

20

21

22

23

ORDER - 6

1   allegations in the complaint as true and construe the pleadings in the light most

2   favorable" to the plaintiff.[6] *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

3   **A.      Section 10(b) Claim**

4          To prevail on a Section 10(b) claim, a plaintiff must prove six elements: (1) a

5   material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

6   between the misrepresentation or omission and the purchase or sale of a security;

7   (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

8   causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051–52 (9th Cir. 2014)

9   (citation and internal quotation marks omitted). Federal Rule of Civil Procedure 9(b),

10  which "applies to all elements of a securities fraud action, including loss causation," *Ore.*

11  *Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014), requires

12  that "the circumstances constituting fraud . . . be stated with particularity." Fed. R. Civ. P.

13  9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003). Defendants

14  move to dismiss Plaintiff's § 10(b) and Rule 10b-5 claim with respect to the first, second,

15  and sixth elements, arguing that the CAC does not adequately allege an actionable

16

17  _____

18  [6] Defendants request that the Court take judicial notice, or consider under the incorporation-by-reference
    doctrine, docket no. 87, ten exhibits in docket no. 86, namely, (i) Zillow's 2020 10-K; (ii) a copy of the

19  transcript for Zillow's May 4, 2021, earnings call; (iii) a copy of the transcript for Zillow's August 5,
    2021, earnings call; (iv) a copy of the shareholder letter for Q2 of 2021, which was included as an exhibit
    to Zillow's 8-K; (v) a copy of the transcript for Zillow's November 2, 2021, earnings call; (vi) a copy of

20  the transcript of Zillow's presentation at the Piper Sandler 2021 Virtual Global Technology conference;
    (vii) a copy of the transcript of Zillow's November 7, 2019, earnings call; (viii) a copy of the historical
    stock price for ZG from January 4, 2021, through December 31, 2021; (ix) excerpts from Zillow's 2018

21  10-K; and (x) excerpts from Zillow's 2019 10-K. The Court takes judicial notice of exhibits i-vi and
    exhibits viii, ix, and x in docket no. 86. It does not take judicial notice of exhibit vii as it is not

22  incorporated by reference in the CAC. *See Kuzmenko v. Lynch*, 606 F. App'x 399, 400 (9th Cir. 2015).

23

1   misrepresentation or omission, scienter, or loss causation. Except as to two statements,

2   which are forward looking, and for the reasons stated in this order, Defendants' motion is

3   denied.

4       1.   **Safe Harbor**

5       "Even where a plaintiff has properly pleaded all six elements of a Section 10(b)

6   violation, the allegedly false or misleading statement may still be shielded from liability

7   by the 'safe harbor' provision of" the Private Securities Litigation Reform Act

8   ("PSLRA"). *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

> The PSLRA exempts from liability any forward-looking statement that is
> "identified as a forward-looking statement, and is accompanied by
> meaningful cautionary statements identifying important factors that could
> cause actual results to differ materially from those in the forward-looking
> statement," or that the plaintiff fails to prove was made "with actual
> knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-
> 5(c)(1). That is, a defendant will not be liable for a false or misleading
> statement if it is forward-looking and either is accompanied by cautionary
> language or is made without actual knowledge that it is false or misleading.

14  *Id.* The Court agrees with Defendants that the statements reproduced in Paragraph 192 of

15  the operative pleading are forward looking and that Plaintiff has not pleaded they were

16  made with actual knowledge of any falsity or misleading nature.[7] In Paragraph 192, the

17  CAC recounts the following interaction between Piper Sandler analyst Thomas Steven

18  Champion and Zillow's Chief Operating Officer Jeremy Wacksman:

19  _____

20  [7] Defendants concede that the statements made on September 13, 2021, during the Piper Sandler
    investment conference were not accompanied by any cautionary language. *See* Defs.' Mot. at 21 (docket

21  no. 85). To the extent Defendants rely on generic warnings relating to their statements during the August
    5, 2021, earnings call, Plaintiff alleges a plausible claim that the boilerplate notices were insufficient
    because the risks at issue had already materialized. *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791

22  F.3d 90, 102–03 (D.C. Cir. 2015).

23

ORDER - 8

CHAMPION: So getting the economics right at the unit level is really paramount for this business to be successful and to hit the kind of the long-term margin targets that you've laid out. Kind of -- can you talk about that? How are you feeling about the ability to profitably run the business, especially on some of those line items below gross profit at the unit level?

WACKSMAN: And we talk about wanting to run the business at a plus or minus 200-basis point guardrail on the unit level. And [i]n Q2, we saw unit economics of nearly 600 basis points, I think 576 basis points. And so, yes a good chunk of that is home price appreciation, right, and the market and you saw that in HPA itself, but also in kind of holding costs correlated with the velocity of sale. **But some of those unit economic improvements are durable, right. The work we're doing on more dynamic renovation**, the work we're doing on selling costs as our Homes brokerage improvements roll out more gradually, **you're going to see us book those improvements as unit economic savings to the unit and be able to pass those back onto the customer and eventually to the bottom line.**

CAC ¶ 192 (emphasis in original).

The statement "some of those unit economic improvements are durable" deals with economic indicators that Zillow expects to maintain in the future. The referenced durability is not about the past, but rather concerns a trend that Zillow hopes will continue. The subsequent sentence bolsters this conclusion. The phrase "you're going to see us book" is in the future tense, and the actions it describes are projected to happen in the future. As is clear from their context, the statements about durability are forward looking and they therefore find safe harbor in the PSLRA. *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1056 (N.D. Cal. 2016).

Defendants' contention that, at this stage of the proceedings, the PSLRA otherwise insulates them from liability lacks merit. Defendants argue that (i) the phrases "we expect" or "going to be," when inserted into a sentence, transform the entire statement

into a forward-looking one; (ii) the word "durable" is an intrinsically forward-looking term because it indicates that the current trend will continue into the future; and (iii) the phrase "back on track" is inherently forward-looking.[8] The Court disagrees.

A future-tense phrase does not automatically immunize a statement from containing separable, present- or backward-looking aspects, and simply appending "magic words" does not itself obviate any potential to mislead investors. *See Omnicare, Inc. v. Lab. Dist. Council Const. Indus. Pens. Fund*, 575 U.S. 175, 193 (2015). To fall under the PSLRA's safe harbor, the statement must be forward-looking in substance, not merely in form, with no separable present- or backward-looking aspects. Thus, after the Court's examination, except for CAC ¶ 192, all other statements are not protected by the PSLRA safe harbor provision.

With respect to the PSLRA defense, Defendants' motion is GRANTED as to CAC ¶ 192, and Plaintiff's claims related to the statements in CAC ¶ 192 are DISMISSED without prejudice and with leave to amend, although the Court is skeptical that Plaintiff can cure the deficiency. To the extent premised on the PSLRA, Defendants' motion is otherwise DENIED.

---

[8] The phrase "back on track," however, presupposes that Zillow left a track at some point in the past. The statement that Zillow is "back on track" indicates that Zillow got back on the track sometime before the statement was made. Thus, "back on track" is not forward looking, but rather contains representations of past and present facts. The phrase "back on track" is different from the statement "on track to achieve [a] goal," and *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021), is therefore distinguishable.

1       2.    **Misrepresentation or Omission**

2       In order to plead an actionable misrepresentation or omission, the complaint must

3 "specify each statement alleged to have been misleading [and] the reason or reasons why

4 the statement is misleading[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308,

5 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1)). "In setting forth the reasons why they

6 contend that each challenged statement is misleading, securities plaintiffs may rely on

7 either an affirmative misrepresentation theory or an omission theory." *Wochos*, 985 F.3d

8 at 1188 (citing 17 C.F.R. § 240.10b-5(b)). "[A]n affirmative misrepresentation is an

9 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a

10 material fact necessary in order to make the statements made, in the light of the

11 circumstances under which they were made, not misleading.'" *Id.* (citation omitted).

12       A plaintiff can allege falsity by "point[ing] to defendant's statements that directly

13 contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*,

14 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). "Even if a statement is not false, it

15 may be misleading if it omits material information." *Id.* at 1008–09 (citation omitted).

16 Courts apply the objective standard of a "reasonable investor" to determine whether a

17 statement is misleading. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993).

18 "Disclosure [of omitted information] is required . . . only when necessary 'to make . . .

19 statements made, in the light of the circumstances under which they were made, not

20 misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17

21 C.F.R. § 240.10b-5(b)). As such, "companies can control what they have to disclose

22 under these provisions by controlling what they say to the market." *Id.* at 45. "But once

23

1   defendants [choose] to tout positive information to the market, they [are] bound to do so

2   in a manner that wouldn't mislead investors, including disclosing adverse information

3   that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d

4   698, 705–06 (9th Cir. 2016) (quotation marks and citation omitted).

5        Defendants argue that Plaintiff's § 10(b) and Rule 10b-5 claim should be

6   dismissed because (i) Plaintiff's allegations do not raise the inference that the challenged

7   statements were false or misleading, (ii) Defendants themselves adequately disclosed the

8   requisite information to the market,[9] and (iii) some of the statements at issue amount to

9   inactionable puffery.

10                    a.        **False or Misleading Statements**

11       Contrary to defendants' contention, Plaintiff has plausibly pleaded that the

12   challenged statements would have been misleading to a reasonable investor. Plaintiff

13   alleges that Defendants' statements about the algorithms and pricing models were false

14   and/or misleading because Zillow was not, in fact, basing their pricing and inventory

15   decisions on the algorithms' price and was not, in fact, "sharpening" its pricing models.[10]

16   _____

17   [9] Plaintiff labels this defense "truth on the market," but Plaintiff is mistaken. The truth-on-the-market
     defense occurs when a third party releases the information at issue to the marketplace, not when a
18   defendant itself releases that information. *See Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1135 (W.D.
     Wash. 2006). This distinction is important because the truth-on-the-market defense is a highly factual
19   inquiry, which makes it inappropriate to address on a motion to dismiss. *See id.* Defendants instead
     contend that they themselves adequately disclosed the truth or, in other words, that their own adequate
20   disclosure of the truth negates falsity, which is an argument the Court can consider on a motion to
     dismiss.

21   [10] Defendants admit that Zillow did not rely solely on the algorithms to make pricing and inventory
     decisions. *See* Defs.' Mot. at 11–12 (docket no. 85). Defendants argue, however, that "there is no
22   distinction between adjustments to Zillow's algorithm and pricing models and Zillow's use of GPO [gross
     price overlays] and OCS [offer calibration system] pricing adjustments." *Id.* at 11. This argument

23

According to the CAC, Defendants concealed the broader, more complicated, human-driven process implemented by Project Ketchup, as well as the resultant "offer calibration" practice, and instead created the misleading impression that Zillow was still advancing its automation efforts. Plaintiff quotes Zillow's Chief Financial Officer Allen Parker as stating, for example, "This step-up in pace [in home buying] demonstrates our confidence in our ability to scale, *resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel*." (emphasis in original to indicate aspects that Plaintiff alleges are materially false and/or misleading). CAC ¶ 184.

Plaintiff further alleges that Zillow's statements about "durable operational improvements" were misleading because Zillow could not sustain its cost cuts, which had caused contractors to de-prioritize or refuse Zillow's renovation jobs.[11] *See* CAC ¶¶ 129–150.

Finally, Plaintiff alleges that Defendants' statements about consumer demand were misleading because the higher volume of transactions did not result from consumer demand for Zillow Offers, but rather from the significant price overlays added to Zillow's pricing models, which drove up the rate of home acquisitions. CAC ¶¶ 113–17. In

---

attempts to contradict the allegations of the CAC, which the Court must, in deciding the pending Rule 12(b)(6) motion, accept as true. *See* CAC ¶¶ 101–04 (indicating that the overlays were human-driven decisions, whereas the pricing models were automated).

[11] Defendants suggest that these statements might have referred to other durable improvements, but they point to nothing else that could have been meant. *See* Defs.' Mot. at 16–17 (docket no. 85). The Court will not divine reasons on Defendants' behalf.

1  support of this theory, Plaintiff cites to media reports, statements of former Zillow

2  employees ("FEs"), and Zillow's home-buying statistics.[12] Defendants counter as

3  follows: "No facts support Zillow was creating demand with high offers—i.e., inducing

4  sellers who were not otherwise interested in selling—rather than responding to existing

5  demand in a competitive market. Not even the FEs or news articles purport to make this

6  leap." Defs.' Mot. at 16 (docket no. 85). Plaintiff, however, is entitled to the reasonable

7  inferences to be drawn from the factual allegations of the CAC, and in light of those

8  favorable inferences, Plaintiff has plausibly pleaded that Zillow's statements about

9  consumer demand were misleading.

10              **b.    Defendants' Disclosures**

11              Defendants argue that, although they did not explicitly disclose Project Ketchup

12  and the pricing overlays, they gave the market enough information to determine that

13  Defendants used pricing overlays. In support of this contention, Defendants cite their

14  statement that they were "testing price elasticity in this hot housing market" as they

15  "improved [their] offer strength" and expected to be within their profit target in "the

16  second half of the year." Zillow FQ2 2021 Earnings Call Transcript at 5, Ex. 3 to

17  Knowles Decl. (docket no. 86-3). Plaintiff, however, has pleaded enough factual material

18  to establish a plausible claim that Defendants' disclosures were inadequate. Defendants

19

20  _____

21  [12] Prior to Project Ketchup, Zillow struggled to meet its inventory targets. CAC ¶¶ 83–90. In the two quarters before Zillow applied overlays, its purchase volume averaged 1,823 homes per quarter. CAC

22  ¶¶ 115–16. In the three quarters after implementation of Project Ketchup, Zillow averaged 7,359 purchases per quarter. *Id.*

23

had a duty not to mislead the market to believe that Zillow was progressing automation

for pricing and inventory decisions—a trend that Defendants had repeatedly touted—

when, as the CAC alleges, Zillow had introduced overlays that reduced automation. CAC

¶¶ 101–04; *see also Schueneman*, 840 F.3d at 705–06. Plaintiff has alleged that analysts

drew from Defendants' public statements the (incorrect) conclusion that Defendants had

sharpened their algorithms' response to the market, i.e., had *increased automation*. The

perceptions of analysts are an acceptable measure of what reasonable investors would

have understood. *See* CAC ¶¶ 175–77; *see also In re STEC Inc. Sec. Litig.*, 2011 WL

2669217, at *8 (C.D. Cal. June 17, 2011).

Defendants also argue that they disclosed to the market the truth about reduced

payments to contractors, Defs.' Mot. at 16 (docket no. 85) (citing Zillow FQ1 2021

Earnings Call Transcript at 16, Ex. 2 to Knowles Decl. (docket no. 86-2)), and the risks

associated with Zillow's reliance on "contractors, vendors, and service providers," as to

whom Zillow could make no assurances of "uninterrupted, unlimited access," *see* Form

10-K (FY 2020) at 15, Ex. 1 to Knowles Decl. (docket no. 86-1). Plaintiff, however, has

alleged more than reduced payments to Zillow's contractors, and the disclosures cited by

Defendants do not mention that contractors were refusing, stopping, or delaying jobs as a

result of the reductions or that the lower renovation costs might not be sustainable or

were likely not durable.

### c.    Puffery

Defendants contend that seven statements are mere puffery, but Plaintiff does not

challenge two of the statements listed by Defendants (CAC ¶¶ 181, 185), and one of the

statements was not made by Defendants, but rather by Piper Sandler (CAC ¶ 193). Thus, the Court addresses only whether the statements quoted in CAC ¶¶ 182, 183, 184, and 191 are actionable. "Puffing" involves expressions of opinion, as opposed to statements of fact, and vague statements of optimism cannot be the foundation of a § 10(b) and Rule 10b-5 claim. *Ore. Pub. Emps. Ret. Fund*, 774 F.3d at 606. Statements by a company that are capable of objective verification do not, however, constitute "puffery," and are actionable. *Id.*

With regard to CAC ¶ 182, Defendants focus on the phrase "Zillow is back on track," while ignoring the rest of the verbiage, which recites the number of home purchases during the first and second quarters of 2021, and draws a connection to "strong customer demand" and "progress . . . in strengthening our pricing models and automation." Defendants are similarly myopic in asserting that the statements reproduced in CAC ¶¶ 183 and 184 are puffery. Contrary to Defendants' contention, CAC ¶¶ 182–184 contain statements of fact and conclusions or projections drawn from facts; they are not puffery. CAC ¶ 191 describes what "we've learned" and what "we're still seeing," which concern the past and the present, respectively, and Defendants' assertion that these statements are analogous to expressions about a promising outlook lack merit.

### 3.   **Scienter**

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter[.]" *Matrixx*, 563 U.S. at 48 (citation and internal quotation marks omitted). Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'" *Schueneman*, 840

F.3d at 705 (internal citations omitted). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted).

In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. A complaint not meeting these requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A). The Supreme Court has explained that the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23. When conducting this holistic review, courts must "take into account plausible opposing inferences" that could weigh against a finding of scienter. *Id.* at 323.

### a.    <u>FE Statements</u>

A plaintiff can plead scienter by alleging that defendants actually knew of, or had access to, information contradicting the challenged statements. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Here, Plaintiff quotes multiple FEs as indicating that Zillow's senior executives knew of Project Ketchup well before the Class Period. FE-2, for example, reported that during a monthly forecasting and planning ("F&P") meeting, which took place in either May or June 2021, Zillow Offers'

management said that Zillow Offers would start systematically increasing the algorithms' pricing recommendations. CAC ¶ 107. FE-2 also said that Zillow Offers' shift toward a more aggressive home buying strategy was done in conjunction with Zillow's executive level, and that the Vice President of Product & Engineering was the architect of Project Ketchup. *Id.* FE-2 also said that Zillow Offers' use of pricing overlays was widely known within the company, and specifically recalled that the overlays were discussed at monthly F&P meetings attended by Zillow Offers executives. CAC ¶¶ 92, 113. FE-2 also believed that Defendant Wacksman sometimes attended these meetings. CAC ¶ 92.

Other FEs gave similar accounts. According to FE-3, Vice-President Simon, who allegedly worked directly with Barton, explained the goals of Project Ketchup during an all hands call around February 2021. CAC ¶ 109. Similarly, FE-4 confirmed that the systematic use of pricing overlays was discussed during regional market meetings and at least one company-wide all hands meeting attended by Defendant Barton. CAC ¶ 125.

Plaintiff also relies on the statements of former employees to plead that Defendants knew about, or acted in reckless disregard concerning, the inventory backlog. FE-3 recalled an all hands meeting he attended in July or August 2021 during which a Zillow employee asked Barton about the backlog. CAC ¶ 147. Barton responded that Zillow was coming up with a plan to try to clear the backlog that could involve slowing down or stopping purchases. *Id.*

### b.   <u>Core Operations</u>

The Court may infer "that facts critical to a business's core operations . . . are known to a company's key officers." *S. Ferry*, 542 F.3d at 783. Allegations regarding

management's role in a company may support scienter in three circumstances: "(1) 'in any form,' as part of a holistic analysis; (2) on their own, 'where they are particular and suggest that defendants had actual access to the disputed information'; and (3) on their own 'in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (quoting *S. Ferry*, 542 F.3d at 785–86).

Plaintiff alleges that Zillow Offers was a core operation because it accounted for 60% of Zillow's revenue during the quarter just preceding the class period. CAC ¶ 8. With Zillow's traditional revenue sources slowing, Zillow expected that Zillow Offers would drive its future growth—so much so that Defendant Barton likened its implementation to Netflix's watershed shift from mailing DVDs to offering streaming content. *See* CAC ¶ 59. With that expectation, Barton returned to his position as Zillow's CEO specifically to oversee Zillow Offers, which he claimed was the centerpiece of Zillow's new strategy. CAC ¶¶ 5–7, 65, 198. As one analyst put it, "[t]he Company will pin its future on Zillow Offers." CAC ¶¶ 58–66. The CAC alleges that Zillow Offers was "the primary stock sentiment driver." CAC ¶ 68. *See In re Iso Ray, Inc. Sec. Lit.*, 189 F. Supp. 3d 1057, 1078–79 (E.D. Wash. 2016) (concluding that it was absurd for defendant to lack knowledge about a product critical to the company's success). Plaintiff's factual material supports an inference that the faltering or failure of Zillow Offers would not go unnoticed.

1    The CAC further alleges that Project Ketchup was a massive initiative that was

2   known across the entire company. CAC ¶ 113. Zillow even distributed "Project Ketchup"

3   swag, including t-shirts and water bottles resembling ketchup bottles, to its employees.

4   CAC ¶¶ 103, 106. Plaintiff's factual assertions suggest that, when Zillow Offers began

5   purchasing homes at up to 800 basis points above the algorithms' recommendations,

6   Zillow's senior management would have been aware.[13] Given the sheer scope and

7   magnitude of Project Ketchup and the pricing and inventory changes that resulted,

8   Plaintiff has plausibly pleaded a claim that Defendants' lack of knowledge about Project

9   Ketchup would be an absurd concept. *See, e.g.*, *SEB Inv. Mgmt. AB v. Align Tech.*, *Inc.*,

10   485 F. Supp. 3d 1113,1134 (N.D. Cal. 2020). In sum, when taken together, the accounts

11   of former employees and the core operations doctrine provide at least as compelling an

12   inference of scienter as any opposing inference.

13       **4.   Loss Causation**

14       A plaintiff pleads loss causation by providing a "short and plain statement" giving

15   defendants "some indication of the loss and the causal connection that plaintiff has in

16   mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). A plaintiff must

17   plead that "the truth became known" when a corrective disclosure occurred, causing a

18   stock price drop from which the plaintiff claims a loss. *Id.* at 347. "[L]oss causation is a

19

20   ────────────────

21   [13] Indeed, several employees confirmed that Zillow Offers was paying up to $100,000 more per home
     through the overlays. CAC ¶¶ 121, 125. And FE-2 said that "he would be very surprised if Barton and
22   Parker were unaware" of the pricing overlays "because it was one of the biggest pricing initiatives [Zillow
     Offers] had ever done and would have a huge impact on [Zillow's] business." CAC ¶ 113.

23

ORDER - 20

'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (citation omitted).

A complaint sufficiently alleges loss causation when it contains "enough fact to raise a reasonable expectation that discovery will reveal evidence of loss causation." *In re Gilead Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (citation and internal quotation marks omitted). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.*

Plaintiff sufficiently alleges that the "truth became known" as a result of the various partial disclosures. CAC ¶¶ 171–77. A resultant stock drop accompanied each of these disclosures. *Id.* Defendants' reliance on *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008), to argue that Plaintiff fails to plead loss causation because the stock price recovered, is misplaced. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1264 (D. Nev. 2019) (citing *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015)).

## B.   <u>Section 20(a) Claims</u>

Section 20(a) of the Exchange Act establishes joint and several liability for control persons who aid and abet securities violations. 15 U.S.C. § 78t(a). To establish control person liability, a plaintiff must allege that "a primary violation of federal securities law"

1   occurred and that "the defendant exercised actual power or control over the primary

2   violator." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)

3   (quotation omitted). "Courts have found general allegations concerning an individual's

4   title and responsibilities to be sufficient to establish control at the motion to dismiss

5   stage." *In re Energy Recovery Inc. Sec. Litig.*, No. 15-cv-00265, 2016 WL 324150, at *25

6   (N.D. Cal. Jan. 27, 2016) (quotation omitted).

7        Plaintiff's allegations that, as corporate officers, the Executive Defendants

8   exercised control over Zillow are adequate to survive Defendants' Rule 12(b)(6) motion.

9   *Brendon*, 412 F. Supp. 3d at 1265.

10   **<u>Conclusion</u>**

11        For the foregoing reasons, the Court ORDERS:

12        (1)    Defendants' motion to dismiss, docket no. 85, is GRANTED in part and

13   DENIED in part as follows. Plaintiff's § 10(b)/Rule 10b-5 and § 20(a) claims relating to

14   the statements set forth in CAC ¶ 192 are DISMISSED without prejudice and with leave

15   to amend within fourteen (14) days of the date of this Order. Defendants' motion

16   otherwise is DENIED.

17        (2)    The Clerk is directed to send a copy of this Order to all counsel of record.

18        IT IS SO ORDERED.

19        Dated this 7th day of December, 2022.

20

21

22

23

Thomas S. Zilly
United States District Judge