The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEREMY JAEGER, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  v.<br><br>ZILLOW GROUP, INC., RICHARD BARTON, ALLEN PARKER, AND JEREMY WACKSMAN,<br><br>     Defendants. | No. 2:21-CV-01551-TSZ<br><br>CLASS ACTION<br><br>**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**<br><br>**NOTE ON MOTION CALENDAR: JUNE 14, 2024**<br><br>**ORAL ARGUMENT REQUESTED** |

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ)

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT .............................................................................1

FACTUAL BACKGROUND ...................................................................................4

    I.      BACKGROUND OF ZILLOW OFFERS ....................................................4

    II.    A SUDDEN CHANGE IN THE HOUSING MARKET RESULTS IN AN UNANTICIPATED WRITE-DOWN AND THE DECISION TO WIND DOWN ZO ...............................................................................................5

    III.   SECURITIES LITIGATION COMMENCES ............................................6

ARGUMENT ...........................................................................................................7

    I.      INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE BECAUSE DEFENDANTS CAN REBUT THE FRAUD-ON-THE-MARKET PRESUMPTION ...........................................................................................7

        A.    The Alleged Misstatements Had No Immediate Price Impact.........8

            1.     August 5, 2021 Statements ...................................................9

            2.     September 13, 2021 Piper Sandler Conference Statements ...................................................................................10

        B.    The Alleged Misstatements Had No "Back-End Impact".............11

            1.     October 4, 2021 RBC Analyst Report .............................12

            2.     October 17, 2021 Bloomberg Article and October 18, 2021 Zillow Press Release ...........................................................14

            3.     October 31, 2021 KeyBanc Analyst Report and November 1, 2021 Bloomberg Report.................................................15

            4.     November 2, 2021 Earnings Call.....................................18

    II.    PLAINTIFF IS ATYPICAL BECAUSE HE IS SUBJECT TO UNIQUE DEFENSES ................................................................................................21

    III.   CONCLUSION..........................................................................................23

WORD LIMIT CERTIFICATION ........................................................................24

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - i

**Skadden, Arps, Slate, Meagher &**
**Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)................................................................................................8

*In re American International Group, Inc. Securities Litigation*,
265 F.R.D. 157 (S.D.N.Y. 2010) ("*AIG*"), *vacated and remanded on other
grounds*, 689 F.3d 229 (2d Cir. 2012) ...........................................................12

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds*,
568 U.S. 455 (2013)...............................................................................................7

*In re Apache Corp. Securities Litigation*,
No. 4:21-cv-00575,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) .........................................12,  15, 16

*Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. 2023) ...............................................................11, 12, 13, 15

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...............................................................................................8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)..................................................................................................7

*Crago v. Charles Schwab & Co., Inc.*,
No. 4:21-cv-00575,
2021 WL 4990234 (N.D. Cal. Oct. 27, 2021).......................................................8

*Edwards v. McDermott International, Inc.*,
No. 4:18-cv-04330,
2024 WL 873054 (S.D. Tex. Feb. 29, 2024) ......................................13, 15, 16, 19

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................................................................................7

*Espy v. J2 Global, Inc.*,
_ F.4th _, No. 22-55829,
2024 WL 1689091 (9th Cir. 2024) .........................................................................9

*In re FibroGen Securities Litigation*,
No. 21-cv-02623-EMC,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)....................................................17

*In re Finisar Corp. Securities Litigation*,
        No. 5:11-cv-01252-EJD,
        2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ................................................................1, 9

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
        903 F.2d 176 (2d Cir. 1990)........................................................................................21

*George v. China Automotive Systems, Inc.*,
        No. 11 Civ. 7533(KBF),
        2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................................................21

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
        594 U.S. 113 (2022)........................................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
        573 U.S. 258 (2014)...........................................................................................1, 3, 7, 8

*Hanon v. Dataproducts Corp.*,
        976 F.2d 497 (9th Cir. 1992) .......................................................................................21

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
        818 F.3d 775 (8th Cir. 2016) .........................................................................................9

*In re Kirkland Lake Gold Ltd. Securities Litigation*,
        No. 20-CV-4953 (JPO),
        2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) .................................................12, 15, 16, 20

*LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*,
        No. 21-cv-07751-BLF,
        2022 WL 2119122 (N.D. Cal. June 13, 2022) ...................................................................8

*In re Moody's Corp. Securities Litigation*,
        274 F.R.D. 480 (S.D.N.Y. 2011) ...............................................................................8, 12

*Mulderrig v. Amyris, Inc.*,
        340 F.R.D. 575 (N.D. Cal. 2021).........................................................................4, 21, 22

*In re Qualcomm Inc. Securities Litigation*,
        No.: 17cv121-JO-MSB,
        2023 WL 2583306 .....................................................................................................12

*Rocco v. Nam Tai Electronics, Inc.*,
        245 F.R.D. 131 (S.D.N.Y. 2007) ..................................................................................22

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*,
        136 F.R.D. 658 (D. Or. 1991) .................................................................................21, 22

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - iii

**Skadden, Arps, Slate, Meagher &**
**Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

*In re Valence Technology Securities Litigation*,
      No. C 95-20459 JW,
      1996 WL 119468 (N.D. Cal. Mar. 14, 1996)....................................................................21

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability
      Litigation*,
      2 F.4th 1199 (9th Cir. 2021) ..........................................................................................8

**RULES**

Fed. R. Civ. P. 23 ........................................................................................................ passim

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - iv

**Skadden, Arps, Slate, Meagher &
Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Defendants Zillow Group, Inc. ("Zillow"), Richard Barton, Allen Parker, and Jeremy Wacksman (collectively, "Defendants"), respectfully submit this Brief in Opposition to Plaintiff's Motion for Class Certification ("Motion").

## PRELIMINARY STATEMENT

The Court should deny Plaintiff's Motion for two independent reasons—Plaintiff fails to satisfy (1) the predominance requirement under Rule 23(b)(3), because individualized issues of reliance predominate over common ones; and (2) the typicality requirement under Rule 23(a)(3), because Plaintiff is subject to unique defenses.

First, Plaintiff cannot establish that common issues predominate over individual issues under Rule 23(a)(3). Plaintiff's claims require him to prove reliance—that he relied on the alleged misstatements when deciding to trade in Zillow stock. To do so, Plaintiff attempts to rely on a *presumption* of reliance pursuant to the "fraud-on-the-market" theory, as explained below. This presumption is rebuttable where, as here, Defendants show that the alleged misstatements did not impact the price of Zillow's stock. Without the benefit of the presumption, Plaintiff must—but cannot—prove each class member's individual reliance on the alleged misstatements. Such individualized inquiry into each class member's reliance renders certification inappropriate. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).

When considering whether an alleged misstatement impacted the price of a company's stock, courts examine whether the stock price increased after the alleged misstatements were made—a result known as "front-end" impact. If the alleged misstatements do not immediately cause the stock price to become "inflated," courts find there is no "front-end" price impact. *See In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at \*7 (N.D. Cal. Dec. 5, 2017). When statements do not cause a "front-end" impact, a plaintiff may instead argue the "price maintenance" theory of stock price impact—that, while the alleged misstatements did not cause the price to increase, they nonetheless prevented the price from declining, thus "maintaining" a price that otherwise would have fallen. Under this theory, a plaintiff examines whether the company's stock price declined

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 1

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

following a purported "corrective disclosure"—the revelation of the falsity of the earlier misstatements. If so, a plaintiff argues that the later "price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2022). This result is called "back-end" impact. *Id.*

Here, there was no front-end or back-end impact on Zillow stock. On the front end, Plaintiff alleges Defendants made misstatements on two dates—August 5 and September 13, 2021—related to (i) Zillow's reliance on, and improvements to, its pricing algorithms in its iBuying business, Zillow Offers ("ZO"); and (ii) the durability of operational improvements in ZO. (Corrected Complaint, Dkt. #71 ("CC") ¶¶182-91.) These statements did not cause the stock price to increase when they were made. In fact, the stock price ***declined*** after the August 5 statements, and the movement on September 13 was before the statements were made. This is unsurprising: Zillow made nearly identical statements regarding the same issues on May 4 and June 15, 2021—months ***before*** the alleged misstatements—and Zillow's stock price did not experience a statistically significant increase on those days either. (Ex. 1 (Report of Faten Sabry, Ph.D. ("Sabry")) ¶¶88-112.) Thus, the alleged misstatements did not impact Zillow's stock price on the "front end."

There was no "back-end" impact either. Plaintiff alleges that the truth was revealed through four corrective disclosures between October 4 and November 2, 2021 that supposedly caused a decline in Zillow's stock price. Under Plaintiff's theory, the stock price decline following the supposed "corrective disclosures" approximates the amount of artificial inflation the "front-end" alleged misstatements caused. *See Goldman*, 594 U.S. at 123. Thus, Plaintiff's theory boils down to the position that the alleged misstatements on August 5 and September 13, 2021 that had no effect on Zillow's stock price when they were made somehow maintained ***$11 billion*** in inflation— half of Zillow's average market capitalization at the time (Mot. 16)—which supposedly came out of the stock when the truth was revealed. (Sabry ¶167.) Defendants, of course, strongly dispute this figure, but it is what Plaintiff's expert's analysis purports. (*Id.*) Thus, Plaintiff's theory is that statements on a mere two dates, August 5 and September 13, 2021, which revealed no new

<table>
<tr><td>DEFENDANTS' OPPOSITION TO<br>LEAD PLAINTIFF'S MOTION FOR<br>CLASS CERTIFICATION<br>(No. 2:21-cv-01551-TSZ) - 2</td><td>**Skadden, Arps, Slate, Meagher &**<br>**Flom, LLP**<br>300 South Grand Avenue, Ste. 3400<br>Los Angeles, CA 90071<br>Phone: (213) 687-5000</td><td>**Perkins Coie LLP**<br>1201 Third Avenue, Suite 4900<br>Seattle, WA 98101-3099<br>Phone: (206) 359-8000<br>Fax: (206) 359-9000</td></tr>
</table>

information and did not cause the stock price to increase, somehow nonetheless did such an enormous amount of work that they propped up Zillow's stock price to the tune of $11 billion. Common sense alone defeats this theory. *See Goldman*, 594 U.S. at 122 ("good dose of common sense" is relevant in "assessing price impact").

Plaintiff's "back-end" impact theory fails regardless. To support an inference of price impact, the "back-end" alleged corrective disclosures must reveal the alleged misrepresentations in the "front-end" public statements. If "there is a mismatch between the contents of the misrepresentation and the corrective disclosure," "there is less reason to infer front-end price inflation—that is, price impact—from the back end price drop." *Id.* at 123. Here, none of the four corrective disclosures said anything about, let alone corrected, the alleged misstatements. They did not disclose the alleged facts about pricing nor the reductions in scope of renovations that Plaintiff claims rendered Zillow's statements misleading. Rather, the alleged misstatements disclosed information that was either already known to the market or information unrelated to the alleged misstatements—such as the strategic decisions to pause homebuying or wind down ZO—which were the real causes of the stock price declines, not the revelation of any fraud. (Sabry ¶168.) Contrary to Plaintiff's "back-end" theory, the same specific facts on which Plaintiff stakes his claims of misstatements were not publicly revealed until November 9 and 17, 2021—*after* the Class Period ended. When that occurred, Zillow's stock price had no statistically significant movement, demonstrating that the alleged misrepresentations did *not* impact Zillow's stock price on the "back-end" either. Class certification should be denied based on the lack of stock price impact alone. *See Halliburton*, 573 U.S. at 275-76.

Class certification also separately fails under Rule 23(a)(3) because Plaintiff is subject to at least *two* unique defenses rendering him atypical. *First*, Plaintiff consistently purchased Zillow stock immediately after a price decline, including *after three of the four* alleged corrective disclosures. Such trading indicates that Plaintiff did not rely on Zillow's statements when trading Zillow stock, thus subjecting him to unique reliance defenses rendering him atypical of the class.

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 3

**Skadden, Arps, Slate, Meagher & Flom, LLP** 300 South Grand Avenue, Ste. 3400 Los Angeles, CA 90071 Phone: (213) 687-5000

**Perkins Coie LLP** 1201 Third Avenue, Suite 4900 Seattle, WA 98101-3099 Phone: (206) 359-8000 Fax: (206) 359-9000

*See Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 582 (N.D. Cal. 2021). *Second*, when a putative class representative testifies at odds with the allegations in the complaint, "he is in a uniquely different situation than the other class members," particularly when that testimony was based on his unique knowledge of defendant's business or industry. *Id.* at 582. Here, as discussed below, Plaintiff—a real estate investor and developer—contradicted the core factual allegations of this action and admitted that facts the Complaint alleges were concealed were in fact disclosed to investors.

## FACTUAL BACKGROUND

### I.    BACKGROUND OF ZILLOW OFFERS

In April 2018, Zillow launched ZO, its "iBuying" business, in which Zillow would purchase homes directly from sellers, perform renovations, and re-sell the homes for a small profit margin. (Ex. 2 at 4.) When a seller requested an offer, Zillow used computer programs and human pricing experts to set the value of the offer price, which was based, in part, on Zillow's forecast of the value of the home at resale (usually three to six months after purchase), minus estimated costs of renovations needed to re-sell the home. If the seller accepted the offer and Zillow acquired the home, Zillow used contractors to perform those renovations. (*Id.* at 13.)

In late 2020 or early 2021, the real estate market experienced unprecedented growth in the rate of home price appreciation ("HPA"). (Ex. 3 at 7, 9, 13-14.) Zillow realized that its forecasting was not keeping up with the market, and so its purchase offers were lower than they needed to be in order to be accepted by sellers. This led to Zillow (i) making a greater profit on the homes it bought and sold than intended; and (ii) acquiring fewer homes than it needed to scale. (*Id.*)

To address that circumstance, in March or April 2021, Zillow launched a set of initiatives to catch up to its acquisition and profit margin goals, known internally as "Project Ketchup." As early as its May 4, 2021 earnings call, Zillow disclosed the substance and aims of the Project Ketchup initiatives (although not the project name itself), discussing steps taken to "focus on unit costs, automation, adding capacity and sharpening pricing models to improve offer strength as we

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 4

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

continue to scale." (*Id.* at 7.) These steps included, among other things: (i) improving pricing by adjusting Zillow's algorithms and models in an effort to keep pace with growth trends in HPA and to make Zillow's offers more competitive; and (ii) reducing the scope and cost of after-purchase renovation projects, with savings passed on to the home seller, thus making Zillow's purchase offers even more competitive. (*Id.* at 9, 13, 16.)

On its August 5, 2021 earnings call, Zillow spoke further on these initiatives. Zillow explained that it had increased acquisitions, and that "this step-up in pace … result[ed] from the progress we have made in strengthening our pricing models." (Ex. 4 at 9.) Zillow also disclosed that "we've been testing price elasticity in this hot housing market, and we saw rapid conversion gains throughout the quarter as we improved our offer strength." (*Id*. at 5, 15.) On the operations side, while Zillow noted "largely durable operational improvements" in renovation, holding, and selling costs, it also disclosed there are "opportunities for continued operational improvements over time," and that it "ha[d] to reduce costs." (*Id.* at 8, 10, 15.)

On September 13, 2021, Wacksman (Zillow's COO) participated in the Piper Sandler 2021 Virtual Global Technology Conference. He cautioned "this year has seen quite some extremes in the real estate market," and that while still rising, home prices "[a]re not quite appreciating as quickly as they were before." (Ex. 5 at 5.) Because of this volatility, "keeping up with rising [HPA] … on [the] acquisition side and then finding that price in the markets we're in, that continue[s] to be a new and unique challenge coming out of the pandemic." (*Id.* at 7, 8.) Wacksman also disclosed Zillow was experiencing "***acute***" "operational challenge[s]" caused by the significant increase in "demand" for offers. (*Id.* at 8.)

## II. A SUDDEN CHANGE IN THE HOUSING MARKET RESULTS IN AN UNANTICIPATED WRITE-DOWN AND THE DECISION TO WIND DOWN ZO

In the summer of 2021, the rate of growth in HPA suddenly and precipitously slowed. (Ex. 6 at 12.) As a result, Zillow's earlier adjustments to pricing began to overshoot, resulting in offer prices above later resale prices. (*Id.* at 5, 7, 12.)

On October 4, 2021, RBC Capital Markets ("RBC") issued a report stating that, based on

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 5

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

a review of public listings, Zillow appeared to have too much inventory it bought "at too high a price." (Ex. 7.) On October 17, 2021, Bloomberg reported ZO was suspending new home acquisitions (Ex. 8), a fact Zillow confirmed the next day in a press release, explaining the suspension was due to a "backlog in renovations and operational capacity constraints" with respect to its existing inventory. (Ex. 9.) Between October 19 and October 29, multiple analyses of Zillow's publicly available home listings concluded that Zillow had overpaid for homes in the recent quarter. (Sabry ¶¶141-49.) On November 1, 2021, additional media outlets reported ZO inventory was worth much less than Zillow paid. (CC ¶227; Ex. 10.) Ultimately, on its November 2, 2021 earnings call, Zillow announced it was (i) writing down over $500 million in home inventory; and (ii) winding down ZO, because it determined that the housing market was too volatile for Zillow's pricing projections, and that the potential losses moving forward could jeopardize its entire business. (Ex. 6 at 4-5.)

## III. SECURITIES LITIGATION COMMENCES

Upon the announcement of the ZO wind-down, the market reacted to the news Zillow was ending a business segment, and this lawsuit followed. Plaintiff alleges Zillow's August 5, 2021 and September 13, 2021 statements related to (i) its reliance on and improvements to its algorithms; (ii) its attributing Zillow's inventory growth to consumer demand; and (iii) the durability of operational, unit economic, and/or renovation process improvements were misleading because Zillow did not adequately disclose Project Ketchup. (CC ¶¶181-86, 191-93.) Specifically, as to categories (i) and (ii), Plaintiff claims that, while Zillow stated that its increase in acquisitions was due in part to its improving its pricing model, Zillow concealed the fact that it had also manually applied what it called "gross price overlays" ("GPOs") to offer prices to keep up with HPA where the algorithm did not, and these GPOs are what created demand. (*Id.* ¶187(a), (b), (d).) As to category (iii), Plaintiff claims Zillow concealed the fact it cut costs by reducing the scope and pay of renovation projects Zillow hired contractors to perform prior to re-sale, causing contractors to "de-prioritize" Zillow or "declin[e] jobs altogether," resulting in capacity issues. (*Id.* ¶187(c).)

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 6

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

## ARGUMENT

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To do so, Plaintiff must "'prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation" under Rule 23(a), and also "satisfy through evidentiary proof" one of the provisions of Rule 23(b). *Id.* The Court must engage in a "rigorous analysis" of each requirement even if its "determination . . . is intimately involved with the merits of the claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). Plaintiff here fails to demonstrate two required elements for certification of a putative class: (i) predominance under Rule 23(b)(3); and (ii) typicality under Rule 23(a)(3).

## I.    INDIVIDUAL ISSUES OF RELIANCE PREDOMINATE BECAUSE DEFENDANTS CAN REBUT THE FRAUD-ON-THE-MARKET PRESUMPTION

Plaintiff does not satisfy Rule 23(b)(3) because individual issues of reliance predominate over issues common to the proposed class. Plaintiff seeks to certify claims asserted under Sections 10(b) and 20(a) of the Exchange Act, which require him to prove, among other things, that he relied on alleged misstatements in deciding to purchase or sell a security. *See Halliburton*, 573 U.S. at 268. To meet this burden, plaintiffs often invoke the "fraud-on-the-market" presumption of reliance. This doctrine creates a presumption that plaintiffs relied on the alleged misstatements so long as, among other things, the stock at issue trades in an efficient market. *Id.* at 268. According to the theory, "the market price of shares traded on well-developed markets"—known as efficient markets—"reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 268. If a company whose stock trades in an efficient market makes an alleged misstatement, the price of that stock will incorporate that alleged misstatement by inflating the price of that stock. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013). Thus, when plaintiffs buy the stock at the allegedly inflated price, the court presumes that such class members have relied on the alleged misstatement. *Id.*

Defendants, however, may rebut this presumption. If they do, plaintiffs cannot satisfy the

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - 7

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

predominance requirement because each putative class member would instead have to prove "that he was aware of a company's statement and engaged in a relevant transaction based on that specific misrepresentation." *Id.* at 463. This necessarily requires individual evidence for each putative class member, rendering satisfaction of the predominance requirement impossible.[1]

Defendants can rebut the fraud-on-the-market presumption if they show the alleged misstatements did not impact the price of the stock. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988). If the alleged misstatements did not impact the stock price, "the basis for finding that the fraud had been transmitted through market price would be gone," *id.*, and there is, in turn, no basis to presume the plaintiff relied on the alleged misrepresentations, *Halliburton*, 573 U.S. at 283. At the class certification stage, a defendant must demonstrate a lack of price impact "by a preponderance of the evidence." *Goldman*, 594 U.S. at 126. "The district court's task is simply to assess all the evidence of price impact … and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 126-27. Here, the preponderance of the evidence shows that it is more likely than not the alleged misstatements had no impact on Zillow's stock price.

### A.    The Alleged Misstatements Had No Immediate Price Impact

Because, in an efficient market, if an alleged misstatement impacts the stock price, it should

---

[1] Plaintiff briefly argues he is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). (Mot. 19.) Not so. "[T]he *Affiliated Ute* presumption is limited to cases that primarily allege omissions." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). "Such 'pure omissions' cases are distinguishable from 'mixed' cases involving both omissions and affirmative misrepresentations," *LifeLine Legacy Holdings, LLC v. OZY Media, Inc.*, 2022 WL 2119122, at *4 (N.D. Cal. June 13, 2022), and thus, the Court must "analytically characterize" the case before it "as either primarily a nondisclosure case (which would make the presumption applicable), or a positive misrepresentation case (where the presumption would be unavailable)," *Volkwagen*, 2 F.4th at 1204-05. Here, Plaintiff primarily brings a positive misrepresentation case. While Plaintiff alleges that Zillow omitted information in its August 5 and September 13, 2021 statements (CC ¶¶187-90, 193-96), Plaintiff expressly alleges that such omission rendered Zillow's **affirmative statements** misleading (*Id.* ¶¶24-27). Under such circumstances, courts routinely find that *Affiliated Ute* does not apply. *See Volkswagen*, 2 F.4th at 1206 (*Affiliated Ute* inapplicable despite allegation that "Volkswagen failed to disclose … it was secretly installing defeat devices in its 'clean diesel'" cars); *Crago v. Charles Schwab & Co., Inc.*, 2021 WL 4990234, at *4 (N.D. Cal. Oct. 27, 2021) (*Affiliated Ute* inapplicable because "[t]he omission … is relevant to proving that affirmative statements … were inaccurate").

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 8

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

cause the price to increase, a defendant may "sever[] the link" between the alleged misstatements and any stock price impact by demonstrating that "there is no date on which any alleged misrepresentation caused a statistically significant increase in the price." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (reversing certification where price impact was caused by non-fraudulent statements); *Finisar*, 2017 WL 6026244, at \*7-9 (denying certification where there was no statistically significant price increase on date of alleged misstatement). Here, Defendants' expert, Dr. Faten Sabry, shows that Zillow's August 5 and September 13, 2021 statements caused no statistically significant increase in Zillow's stock price when they were made.

### 1.    August 5, 2021 Statements

Rather than increase, as one would expect if a misleading statement impacted stock price, Zillow's stock price actually declined following the alleged misstatements on August 5, 2021. Under the fraud-on-the-market theory, only "new" information affects the stock price when disclosed. *See Espy v. J2 Global, Inc.*, _ F.4th _, 2024 WL 1689091, at \*8 (9th Cir. 2024); (Ex. 22 at 31:8-12.) Here, because the information contained in the alleged misstatements on August 5, 2021 merely repeated information Zillow previously had disclosed on May 4, 2021 and June 15, 2021, and therefore, was not "new," it should be no surprise that the August 5 statements had no "front-end" price impact.

In particular, on August 5, 2021, Zillow stated that improvements in "unit economics," including "in renovation, holding and selling costs, were largely durable operational improvements." (CC ¶184.) But Zillow already previously disclosed "durable operational improvements" as the source of improving "unit economics" three months earlier. (Sabry ¶91.) In particular, on May 4, Zillow stated it "tightened [its] unit economics" in that quarter, and it had made "durable operational improvements in overall cost per home." (Ex. 3 at 7; Ex. 11 at 4; Sabry ¶¶90-91.) Far from causing a stock price increase, Zillow's stock price *declined* after these May 4 announcements. (Sabry ¶92.) Information that causes no positive price impact even when it is

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 9

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

"new" certainly cannot cause price impact when it is later repeated.

Similarly, on August 5, 2021, Zillow stated that "[t]he record number of homes purchased" reflected the fact that it "made progress this quarter in improving our pricing models, including launching the neural Zestimate, which sharpened our offer strength." (CC ¶¶183-84.) But a month-and-a-half earlier, on June 15, 2021, Zillow had already disclosed the same information concerning its pricing model with no effect on the price of Zillow stock. That day, Zillow announced its "new Neural Zestimate, Yielding Major Accuracy Gains," which would allow its "algorithm to react more quickly to current market trends." (Ex. 12.) "As a result of the company's increasing confidence in Zestimate accuracy, in February Zillow began using the Zestimate as a live, initial cash offer through" ZO. (*Id.*) Zillow's stock had no statistically significant reaction to this June 15 announcement, indicating that "this information [about how Zillow was improving its pricing methodologies] was not important to investors." (Sabry ¶¶93-97.)

Unsurprisingly, therefore, the market took no heed of the August 5, 2021 repetitions of information. Indeed, contrary to Plaintiff's theory, following the August 5 earnings call, a majority of analysts *reduced* their valuations of ZO. (*Id.* ¶¶100-01.) Multiple analysts expressed skepticism that ZO's increase in acquisitions was due to the improved algorithm—as opposed to industry factors—or that expanding ZO was desirable. (*Id.* ¶¶102-04.) As such, Zillow's stock price *declined* following the alleged misstatements on August 5. (*Id.* ¶99.) Because the stock price declined, rather than increased, following the alleged August 5 misstatements, there was no "front-end" impact.

### 2.    September 13, 2021 Piper Sandler Conference Statements

At the Piper Sandler conference, Zillow allegedly stated ZO was "still seeing record demand" even in a "super hot market," and "the strength and the appeal for [ZO] just continues to grow." (CC ¶191.) It also stated that "unit economic improvements are durable." (*Id.* ¶158.) Again, if this were new information that impacted Zillow's stock, the price should have experienced a statistically significant increase. It did not.

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 10

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

As an initial matter, Zillow already had disclosed "significant customer demand" even in a "hot housing market" on August 5, 2021. (Ex. 4 at 5; Sabry ¶108.) It had also disclosed "durable" improvements in "unit economics." (Sabry ¶¶106-09.) Thus, the September 13 information was not new.

Moreover, any stock price movement on September 13, 2021 could not be attributable to the statements at the conference, and were otherwise not statistically significant. Rather, while the stock price increased that day, 73.05% of the Class A stock price increase and 63.91% of the Class C stock price increase occurred *before* the conference took place that afternoon. (Sabry ¶¶110-12.) After the conference, the stock price increased by only 0.73% and 1.03%. (*Id.*) Therefore, the September 13 statements caused no impact.

### B.    The Alleged Misstatements Had No "Back-End Impact"

Where, as here, the alleged misstatements did not cause the stock price to increase, a plaintiff may instead assert the price maintenance theory, under which "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman*, 594 U.S. at 123. To determine whether the alleged misstatements maintained inflation, courts examine price impact on the stock on the "back end," when the alleged truth about the alleged misstatements is disclosed. "[T]he back-end price drop—what happens when the truth is finally disclosed—operates as an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price. Simply put . . . back-end price drop equals front-end inflation." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 80 (2d Cir. 2023).

In assessing the link between a back-end price drop and alleged front-end inflation, "courts should be open to *all* probative evidence on that question—qualitative as well as quantitative— aided by a good dose of common sense." *Goldman*, 594 U.S. at 122. The link "starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* at 123. As such, a mere "subject-matter match" between the alleged misstatement

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 11

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

and later disclosure is not sufficient to support an inference that the back-end price drop equaled the alleged inflation. *Goldman II*, 77 F.4th at 93. Rather, "*Goldman* requires that any gap among the front- and back-end statements as written be limited." *Id.* at 99.

Here, Plaintiff's case boils down to the allegation that Zillow's stock price was propped up because the market did not know that (i) growth in acquisitions was due to Zillow's use of GPOs to increase offer prices; and (ii) Zillow reduced the scope and pay of renovation projects which caused contractors to "deprioritize" Zillow jobs. (CC ¶187.) But, as shown below, none of the purported corrective disclosures actually revealed any of this. Consequently, the alleged corrective disclosures could not have removed the inflation that was supposedly maintained in the stock.

### 1.    October 4, 2021 RBC Analyst Report

Plaintiff alleges that an October 4, 2021 report from RBC disclosed that Zillow had reduced asking prices on its Phoenix homes and "likely still has meaningful inventory to work through into Q4 that was bought at too high a price." (Ex. 7.) Plaintiff claims this "partially revealed" unspecified facts "concealed" by Defendants' misrepresentations, causing a decline in Zillow's stock price. (CC ¶219.) This "back end" disclosure does not support an inference of price impact.

*First*, as an initial matter, Zillow's stock price did not even significantly decline following October 4. "[T]he absence of a price decline on the day a fraud was disclosed will strongly indicate that there was also no price increase on the day the fraud occurred." *In re Am. Int'l Grp., Inc. Sec. Litig.* ("*AIG*"), 265 F.R.D. 157, 182 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *10 (S.D.N.Y. Mar. 29, 2024) (same); *Moody's*, 274 F.R.D. at 490 (same); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (similar). A stock price decline is statistically significant at the 5% significance level or 95% confidence level, meaning "there is a five percent or less chance that a movement as large or larger than the actual movement in a company's stock price would have occurred if the alleged misrepresentation (or corrective disclosure) had not impacted the stock price." (Sabry ¶¶74-75 (discussing 5% significance or 95%

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - 12

**Skadden, Arps, Slate, Meagher &**
**Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

confidence level as accepted standard)); *see also In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *11 (S.D. Tex. Feb. 9, 2024) (same).

There was no statistically significant stock price decline in response to the RBC report. (Sabry ¶117.) This stands to reason. As explained above, Part I.A.1, only "new" information can impact a company's stock price. The RBC report, however, was based on publicly available third-party data and itself commented, "we think this is generally already understood and discounted in the stock." (*Id.* ¶119 (citing Ex. 7).) The third-party data—prices at which Zillow purchased and listed homes—were readily available to analysts and investors. (Sabry ¶¶118-19.) As the RBC report revealed nothing new, it did not impact the stock price.

*Second*, there is a "mismatch" between the contents of the RBC report and the alleged misstatements because the RBC report does not "correct" any alleged misstatement. *See Goldman*, 594 U.S. at 123. Such a mismatch occurs when the alleged "corrective disclosure" does not "expressly identif[y]," "implicate[]," or "render[] false" the "alleged misstatements themselves." *Goldman II*, 77 F.4th at 97-98. The RBC disclosure does not expressly identify, implicate, or render false the alleged misstatements. That it turns out, based on sales prices analyzed after the fact, that Zillow bought homes at too high a price says nothing about Zillow's alleged misstatements, let alone contradict that Zillow had, as it stated, "strengthen[ed] [its] pricing model" in the prior quarter (CC ¶184); made "durable operational improvements" (*id.*); or that "customer interest" and "demand" had "accelerated" in the prior quarter (*id.* ¶183). Because the RBC report says nothing different from any of the alleged misstatements, it did not correct them.

*Third*, a "mismatch" occurs when the alleged corrective disclosure does not reveal the facts the plaintiff claims were misleadingly omitted. *See Edwards v. McDermott Int'l, Inc.*, 2024 WL 873054, at *21 (S.D. Tex. Feb. 29, 2024) (finding no price impact when the alleged corrective disclosures did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint.") As stated above, Plaintiff claims that Zillow's statements were misleading because they omitted the use of GPOs and that contractors de-prioritized

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 13

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

Zillow's renovation jobs due to reduced scope and pay. (CC ¶187(a)-(e).) Therefore, revelation of these facts would be necessary to "reveal" those alleged misstatements. However, the RBC report does not reveal those facts. (Sabry ¶116.) All the RBC report does is rely on publicly-available third-party data "generally already understood and discounted in the stock" to conclude that Zillow overpaid for homes. (Sabry ¶119 (citing Ex. 7).) The RBC report does not state that such overpayment was deliberate or attributable to Zillow's express use of GPOs, as Plaintiff alleges. (*Id.* ¶116.) Nor does the RBC report reveal that Zillow's decision to reduce renovation scopes had caused contractors to de-prioritize Zillow. (*Id.*) Therefore, the RBC report did not "correct" the alleged misstatements.

### 2. October 17, 2021 Bloomberg Article and October 18, 2021 Zillow Press Release

Plaintiff alleges that on October 17, 2021, Bloomberg reported that ZO would "pause" its acquisition of homes. The article quoted a Zillow spokesperson who said, "We are beyond operational capacity in our [ZO] business and are not taking on additional contracts to purchase homes at this time." (Ex. 8.) Further, on October 18, 2021, before the start of trading, Zillow issued a press release stating that the pause was "[d]ue to a backlog in renovations and operational capacity constraints," brought on by a "labor- and supply-constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces." (Ex. 9.) Plaintiff alleges these disclosures "partially revealed" unspecified facts concealed by Defendants' alleged misstatements, causing the stock price to decline. (CC ¶223.) These disclosures do not support an inference of inflation.

*First*, there is a "mismatch" between the October 17 and 18 disclosures and the alleged misstatements because the disclosures did not correct the misstatements. *See Goldman*, 594 U.S. at 123. That Zillow hit a backlog in renovating homes and was beyond operational capacity in October 2021 due to labor constraints does not show that Zillow's prior statements on August 5 and September 13 were false. Namely, the October 17 and 18 disclosures do not reveal that Zillow had not improved its pricing algorithm in the prior quarter, the operational improvements it had

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 14

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

described were not "durable," or its inventory growth was not due to customer demand.

*Second,* the October 17 and 18 disclosures also did not disclose the allegedly omitted information that supposedly made Zillow's statements misleading—the use of GPOs or reduced renovation scopes causing contractors to de-prioritize Zillow jobs—and therefore could not reveal those statements to be misleading. *See Edwards*, 2024 WL 873054, *21. While Zillow's October 18 release discloses a "backlog in renovations" caused by contractor constraints, it does not reveal the information Plaintiff claims rendered Zillow's earlier August 5 and September 13 statements false—that any "backlog" was *caused by* contractors refusing to work with Zillow because Zillow had reduced the scope and pay of renovation projects. (Sabry ¶¶124-27; Ex. 9.) To the contrary, Zillow's October 18 press release attributed the backlog to larger labor and supply shortages in the economy. (Sabry ¶¶128-30; Ex. 9); *see Goldman II,* 77 F.4th at 93 (a mere subject-matter match between the alleged corrective disclosures and the alleged misstatements does not establish price impact).

*Third*, "[e]vidence from contemporaneous analyst reports also supports the absence of price impact." *Kirkland*, 2024 WL 1342800, at *9. If the October 17 and 18 disclosures revealed alleged misstatements, one would expect analysts to discuss them. *See id.* at *12. However, "no equity analyst reported or speculated that Zillow had created a 'pricing overlay,'" and "[n]o equity analysts attributed the pause in purchases to Zillow's alleged reduction to the scope of renovations." (Sabry ¶131.) Instead, analysts attributed the acquisitions pause to other issues—the "economy-wide labor shortage," "market softening," or "Zillow's untimely increase in home acquisitions," among other things. (*Id.* ¶¶132-35); *see Apache*, 2024 WL 532315, at *10 (finding no price impact where defendants "presented compelling evidence that the market reacted" for a "reason wholly unrelated" to the alleged fraud).

### 3. October 31, 2021 KeyBanc Analyst Report and November 1, 2021 Bloomberg Report

Plaintiff alleges that an October 31, 2021 report from KeyBanc, November 1, 2021 media reports describing it, and a November 1, 2021 report from Bloomberg "partially revealed"

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - 15

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

unspecified facts "concealed" by Defendants' alleged misstatements, causing a decline in Zillow's stock price. (CC ¶229.) In its report, KeyBanc stated that 66% of Zillow's homes were for sale below their purchase price. (Ex. 13.) "Across the entire sample set," KeyBanc reported, "the value weighted pricing was a 2.0% discount vs. purchase price." (*Id.*) News outlets repeated KeyBanc's report on November 1, 2021, and Bloomberg reported that Zillow planned to divest approximately 7,000 homes for approximately $2.8 billion to private investors. (CC ¶¶227-28; Exs. 10, 21.) Any stock price movement following these reports does not show price impact.

*First*, again, there is a "mismatch" between the contents of the reports and the alleged misstatements because the reports did not correct any misstatement. *See Goldman*, 594 U.S. at 123. As with the RBC report, the fact that it turns out, based on an after-the-fact sales price analysis, that Zillow overpaid for homes relative to their resale prices, does not contradict Zillow's earlier statements that it improved its pricing algorithm in the prior quarter, implemented "durable" operational improvements, or experienced growth from customer demand. Nor does the fact that Zillow was planning to divest homes to private investors call into question Zillow's statements. The reports do not mention Zillow's prior statements, let alone suggest they were misleading.

*Second*, the KeyBanc and related reports did not disclose the facts that Plaintiff claims made Zillow's statements misleading. *See Edwards*, 2024 WL 873054, *21. They did not attribute the overpayment to the use of GPOs (or anything related to Zillow's algorithm). Nor did they report that Zillow reduced the scope or pricing of its renovations. (Sabry ¶¶139-40.) Without disclosing these facts, these reports could not have revealed Zillow's statements to be misleading.

*Third*, analysts who discussed the reports did not perceive them as announcing anything related to the alleged misstatements. *See Kirkland*, 2024 WL 1342800, at *12. Analysts who issued reports between October 31 and November 2 commented, not on "the potential use of overlays, or whether Zillow was reducing the scope of house renovations," but on the "untimely surge in home acquisitions given changes in housing prices and narrow or negative returns on home sales. Analysts also cited labor shortages, markets softness, and undisciplined execution." (Sabry ¶154.)

| DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 16 | **Skadden, Arps, Slate, Meagher & Flom, LLP** 300 South Grand Avenue, Ste. 3400 Los Angeles, CA 90071 Phone: (213) 687-5000 | **Perkins Coie LLP** 1201 Third Avenue, Suite 4900 Seattle, WA 98101-3099 Phone: (206) 359-8000 Fax: (206) 359-9000 |

As for the Bloomberg report, analysts commented that the sale of 7,000 homes signaled (i) Zillow's decision to exit the iBuying business; (ii) the continuation of the previously announced acquisitions pause; or (iii) a partnership with another iBuyer. (*Id.*  ¶155.) "The November 1, 2021 news therefore likely signaled to investors that Zillow was taking additional strategic actions that would reduce or end the company's commitment to its iBuying business." (*Id.*) It did not reveal any misstatement.

*Fourth*, the KeyBanc and related reports could not have had any price impact because the information contained in the KeyBanc report was already public by the time the report was issued. *See Apache*, 2024 WL 532315, at *10 (emphasizing a "disclosure is considered corrective only when it "reveals *new* facts that, taken as true, render some aspect of the defendant's prior statements false or misleading"). The fact that Zillow had overpaid for homes—based on analysis of **publicly available** data—had already been disclosed to the public on multiple occasions, as early as the October 4 RBC report discussed above, *supra* I.B.1. Moreover, from October 19 through October 29, no fewer than **seven analyst or news reports** discussed Zillow's home inventory, demonstrating that Zillow was listing homes for resale at prices lower than for what it purchased them because Zillow had been paying "top dollar to fuel acquisitions at a time when the market was cooling and other iBuyers were pumping the breaks." (Sabry ¶¶141-50; Exs. 14-20.) Some reports attributed this to the fact Zillow had "tweaked the algorithms that power its home-flipping operation to make higher offers" and that "[s]lowing price appreciation means it will sell many homes at a loss." (Ex. 18 at 7.) On October 28, 2021, a Bank of America analyst reported, just as KeyBanc did several days later, "On average Zillow is selling for 2% less than the purchase price, current selling prices are 6% lower than the initial price." (Ex. 19); *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024) (finding no back-end price impact where alleged corrective disclosures "was already public knowledge" and discussed by "several analyst reports").

None of these reports was followed by a statistically significant price decrease. (Sabry ¶150.) Instead, Zillow's stock price **increased** by roughly $16 per share (or by 20%) in that 10-day

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - 17

**Skadden, Arps, Slate, Meagher &
Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

span when the same supposedly corrective information was being published to the market. (Dkt. 116-1 at p. 134, 142.) In fact, Zillow's stock price closed higher at the end of trading on November 1 (after the KeyBanc report) than on October 27 (immediately prior to the Bank of America report). (Sabry ¶151.) Thus, the KeyBanc report and related news simply regurgitated the general findings and specific data points disclosed by numerous reports in the 10-day span prior. (*Id.* ¶141.)

### 4.    November 2, 2021 Earnings Call

Finally, Plaintiff alleges that, in its November 2, 2021 earnings call, Zillow announced its plan to wind down ZO and write down approximately $569 million in inventory valuation. (CC ¶¶231-38.) Plaintiff alleges that this news also "partially revealed" unspecified facts "concealed" by Defendants' alleged misstatements and caused a decline in Zillow's stock price. (*Id.* ¶238.) The November 2, 2021 disclosure also cannot support an inference of price impact.

*First*, there is a "mismatch" between the contents of the November 2, 2021 disclosure and the alleged misstatements because the disclosure did not correct any alleged misstatement. *See Goldman*, 594 U.S. at 123. To begin with, the November 2 disclosure did not undermine Zillow's prior statement that it was making "durable operational improvements" in "renovation, holding, and selling costs." (CC ¶184.) On November 2, Zillow discussed "significant capacity and demand planning challenges." However, Zillow did not concede that these capacity challenges were caused by prior "operational improvements" turning out not to be "durable"; rather Zillow attributed the challenges to macroeconomic labor and supply shortages (not as a result of any actions Zillow took). Indeed, Zillow's November 2 discussion of capacity constraints brought on by macroeconomic conditions is the *same* explanation Zillow gave on October 18 when announcing it had paused acquisitions. As discussed above (*supra* Part I.B.2), there was no price impact when Zillow made this disclosure on October 18, and therefore, there can be no price impact when Zillow simply repeated the same information on November 2. (Sabry ¶157.)

Similarly, the November 2, 2021 disclosure did not call into question Zillow's statements about improving its pricing model or attributing growth to customer demand. (CC ¶183-84.) In the

disclosure, Zillow stated that ZO had purchased the homes at "fair market price from the start"—not, as Plaintiff claims, by "enticing sellers" with "overpayments" (*Id.* ¶189)—but that "price forecasting volatility" meant that scaling the business would require "too much equity capital, create too much volatility in our earnings and balance sheet and ultimately result in a far lower return on equity than we imagined." (Ex. 6 at 5.) These statements only describe Zillow's challenge in predicting future resale prices at the time of a home purchase and the implications of those challenges for Zillow's decision to continue to operate ZO. They do not, as Plaintiff claims, reveal that Zillow had "artificially created 'demand' through "overpayments" (CC ¶189) or contradict that Zillow had made improvements to its pricing model in the prior quarter.

*Second*, the November 2 disclosures did not reveal the facts that Plaintiff claims made Zillow's statements misleading. *See Edwards*, 2024 WL 873054, *21. Again, Plaintiff claims that Zillow's statements were misleading for omitting that contractors supposedly deprioritized Zillow jobs due to reductions in renovation scope and costs. (CC ¶187(c).) However, the November 2 disclosure did not report that there were any difficulties with contractors from reduced renovations. (Sabry ¶157.)

Likewise, Plaintiff claims that Zillow's statements were misleading for omitting the use of GPOs. (CC ¶187.) But the November 2 disclosures say nothing about GPOs. (Sabry ¶157.) That Zillow disclosed an approximate $569 million inventory impairment, amounting to a 5% to 7% loss per home, and that it had "been unable to accurately forecast future home prices at different times in both directions" (Ex. 6 at 5) does not transform the November 2 disclosure into a corrective one about the use of GPOs. Regardless, the market already knew or expected inventory impairment and pricing difficulties, a separate reason why these disclosures could not be corrective. As explained above, by November 2, multiple sources had reported that Zillow had overpaid for homes relative to their resale value. (*See supra* I.B.1, I.B.3.) Those reports disclosed Zillow was selling homes at an average 2% discount from their purchase price, which, as Dr. Sabry explains, would represent a 10.4% loss per home after accounting for additional costs.

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 19

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

(Sabry ¶162.) This is even greater than the 5% to 7% loss Zillow ultimately reported. (*Id.*) Thus, the market was already aware before November 2 that Zillow had not been able to forecast prices and would experience these losses. (*Id.* ¶161.) Therefore, the same information in the November 2 disclosure could not be the cause of any stock price decline.

*Third*, analysts likewise did not view the November 2, 2021 disclosures as revealing the allegedly omitted facts. *See Kirkland*, 2024 WL 1342800, at \*12; (Sabry ¶159.) Instead, they provided entirely different reasons for Zillow's stock price decline. As Dr. Sabry explains, the stock price decline

> reflects Zillow's strategic decision in the face of previously disclosed difficulties of the iBuyer industry, including its earnings volatility and its capital-intensive nature. These risks had been previously understood by market participants, including by Zillow's risk disclosures that were disclosed in 2020.

(Sabry ¶¶163-65.) Dr. Sabry's review of analyst statements following November 2 disclosures reveals that most analysts attributed the announcements to Zillow's (already public) inability to forecast housing prices, volatility with the business model, or excessive capital requirements, among other issues. (*Id.* ¶160.) No analyst commented that Zillow had made misstatements, much less specifically about GPOs or Zillow reducing the scope of renovations. (*Id.*) This further proves the lack of price impact.

*Finally*, when the market did allegedly learn the facts that Plaintiff claims were concealed—the use of GPOs and that contractors allegedly deprioritized Zillow jobs due to reduce scope of renovations—it was through a November 9, 2021 *Business Insider* article and November 17, 2021 *Wall Street Journal* article after the end of the Class Period. These articles disclosed precisely the allegedly concealed information Plaintiff claims maintained an inflated stock price— indeed, the Complaint heavily borrows from those publications when making such allegations. (CC ¶¶9-22, 74-91, 101-04, 118-19, 129-33, 177, 242.)[2] However, when the articles were

___

[2] To be clear, Defendants ***did*** sufficiently disclose the substance of the allegedly concealed facts regarding ZO before and during the Class Period. Plaintiffs allege Zillow did not do so because Zillow did not use

*(cont'd)*

| DEFENDANTS' OPPOSITION TO | **Skadden, Arps, Slate, Meagher &** | **Perkins Coie LLP** |
|---|---|---|
| LEAD PLAINTIFF'S MOTION FOR | **Flom, LLP** | 1201 Third Avenue, Suite 4900 |
| CLASS CERTIFICATION | 300 South Grand Avenue, Ste. 3400 | Seattle, WA 98101-3099 |
| (No. 2:21-cv-01551-TSZ) - 20 | Los Angeles, CA 90071 | Phone: (206) 359-8000 |
| | Phone: (213) 687-5000 | Fax: (206) 359-9000 |

published, Zillow's stock price had no statistically significant reaction. (Sabry ¶¶170-76.) The fact that Zillow's stock reacted significantly when *different* facts were disclosed, but not at all when the very facts on which the Complaint is based were disclosed, severs any tie between the alleged misstatements and the price Plaintiff paid for his Zillow stock. This further proves a lack of price impact.

## II.    PLAINTIFF IS ATYPICAL BECAUSE HE IS SUBJECT TO UNIQUE DEFENSES

To demonstrate typicality, the putative class representative must show that the named party's claims are typical of the class. *See* Fed. R. Civ. P. 23(a)(3). A putative class representative is not typical, and "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "It is the threat of unique defenses to preoccupy class representatives, rather than the viability of those defenses, that determines whether a proposed class representative should be deemed typical for purposes of class certification." *Mulderrig*, 340 F.R.D. at 582. Here, Plaintiff is subject to at least two unique defenses that threaten to become the focus of the litigation, rendering him atypical.

*First*, Plaintiff purchased Zillow shares *after* the alleged fraud was supposedly revealed. "A named plaintiff who has engaged in a post-disclosure purchase is subject to the defense that the alleged misstatements or omissions were really not a factor in the purchasing decision but rather that other investment considerations drove the decision." *George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179-80 (2d Cir. 1990) (same); *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996) (same); *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (same).

Here, on October 4, 2021—*after* the first alleged "corrective disclosure"—Plaintiff

words such as "Project Ketchup" or "GPOs." However, if that is so, then by that same token those facts were not revealed by the four corrective disclosures which also said nothing about "Project Ketchup" or "GPOs." *Business Insider* and *WSJ* first used such descriptions.

| DEFENDANTS' OPPOSITION TO | **Skadden, Arps, Slate, Meagher &** | **Perkins Coie LLP** |
|---|---|---|
| LEAD PLAINTIFF'S MOTION FOR | **Flom, LLP** | 1201 Third Avenue, Suite 4900 |
| CLASS CERTIFICATION | 300 South Grand Avenue, Ste. 3400 | Seattle, WA 98101-3099 |
| (No. 2:21-cv-01551-TSZ) - 21 | Los Angeles, CA 90071 | Phone: (206) 359-8000 |
| | Phone: (213) 687-5000 | Fax: (206) 359-9000 |

purchased 3,500 shares of Zillow stock at a price of **$298,200** ($85.20/share) (Dkt. 28-2 at p. 2), and on November 2, 2021—the day of the last alleged corrective disclosure and *after* the prior three supposed corrective disclosures—Plaintiff purchased an additional 9,000 shares of Zillow stock for **$787,100** ($86.50-$87.95/share) (*id.*), "even though it had declined by almost $50 from the prior price of previous acquisitions" (Ex. 23 at 114:23-115:03). Plaintiff testified he was "very excited" about Zillow "even as the price was declining." (*Id.* at 93:11-24; 115:17-18 ("I would not buy something that I thought was not a good purchase").) That Plaintiff continued to purchase stock even *after* alleged corrective disclosures were made "severs the link between the alleged misrepresentations of defendants and the stock purchases made by [him] and acts to rebut the [fraud-on-the-market] presumption." *Rolex*, 136 F.R.D. at 664 (plaintiff atypical where he "testified that his decision to invest in the stock was based, in part, on his personal belief that the stock represented good value in the long term"); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (plaintiff atypical where "post-class purchases indicate … that he was relying not on the market, but on his own assessment of the value of the stock").

*Second*, Plaintiff's deposition testimony demonstrates "he is in a uniquely different situation than the other class members," in that his testimony contradicts basic allegations in the Complaint. *See Mulderrig*, 340 F.R.D. at 582 (plaintiff atypical where testimony demonstrated his particular knowledge of defendant's business enabled him to "underst[and] the very statements he now asserts were misleading," and where he admitted alleged concealed fact was disclosed).

Here, Plaintiff's deposition testimony is at odds with basic premises of the case. The Complaint alleges that Defendants falsely represented that the improvements to Zillow's pricing model "sharpened [ZO's] offer strength" (CC ¶183), because Zillow allegedly altered its pricing model by adding GPOs. Specifically, the Complaint alleges Defendants' statements were misleading because they gave the "impression that the increased volume, demand, and conversion rates for [ZO] were…based upon Zillow's…algorithm and pricing models, rather than pricing overlays." (*Id.* ¶188.) According to the Complaint, this misimpression was supposedly material

DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 22

**Skadden, Arps, Slate, Meagher & Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

because, had investors known Zillow was actually using overlays, they would have somehow recognized the risk and changed their investment decisions accordingly. But Plaintiff testified he uses Zillow's pricing estimates in his own real estate dealings, finds them "extremely accurate," and does not care *how* Zillow arrives at its pricing estimates. (Ex. 23 at 24:20-25:8; 27:22-28:10 (testifying "I would have no idea what – what their algorithm is are or how they come up with that estimate").) According to Plaintiff's testimony, then, the specific methodologies Zillow was using to adjust its pricing—the use of overlays versus another mechanism—were *immaterial* to him. Thus, Plaintiff contradicts a key element of his claim—that Zillow's alleged failure to disclose the overlays was material to investors—and is subject to unique defenses rendering him atypical.

The Complaint also alleges that Zillow failed to disclose it had cut costs by reducing the scope of renovation projects it would perform (and thereby reducing the pay Zillow was giving third-party contractors to do these renovations). The Complaint alleges that, had investors known Zillow was cutting costs in this fashion, they would have recognized it was a bad decision and changed their investment actions accordingly. (CC ¶¶157-59.) But Plaintiff testified *the exact opposite*: Zillow *did in fact* disclose this measure in May 2021, and that based on his experience in the real estate industry he *agreed* with that decision as a smart way to reduce costs. (Ex. 23 at 177:1-6; 179:9-18.) Thus, Plaintiff is again at odds with the putative class as to the core theories of fraud, rendering him atypical.

## III.    CONCLUSION

For the reasons stated herein, the Court should deny Plaintiff's Motion.

DATED: April 26, 2024

By:    */s/ Peter B. Morrison*
Peter B. Morrison (admitted pro hac vice)
Virginia F. Milstead (admitted pro hac vice)
Winston Hsiao (admitted pro hac vice)
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP**
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 521-5000

| DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (No. 2:21-cv-01551-TSZ) - 23 | **Skadden, Arps, Slate, Meagher & Flom, LLP** 300 South Grand Avenue, Ste. 3400 Los Angeles, CA 90071 Phone: (213) 687-5000 | **Perkins Coie LLP** 1201 Third Avenue, Suite 4900 Seattle, WA 98101-3099 Phone: (206) 359-8000 Fax: (206) 359-9000 |
| --- | --- | --- |

Peter.Morrison@skadden.com
Virginia.Milstead@skadden.com
Winston.Hsiao@skadden.com

By: _____ */s/ Sean C. Knowles* _____
Sean C. Knowles, WSBA No. 39893
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
SKnowles@perkinscoie.com

*Attorneys for Defendants*
*Zillow Group, Inc., Richard Barton,*
*Allen Parker, and Jeremy Wacksman*

## WORD LIMIT CERTIFICATION

I certify that this memorandum contains 8,394 words, in compliance with the Local Civil Rules.

DATED: April 26, 2024

By: _____ */s/ Peter B. Morrison* _____
Peter B. Morrison (admitted pro hac vice)

DEFENDANTS' OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION
(No. 2:21-cv-01551-TSZ) - 24

**Skadden, Arps, Slate, Meagher &**
**Flom, LLP**
300 South Grand Avenue, Ste. 3400
Los Angeles, CA 90071
Phone: (213) 687-5000

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000