UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEREMY JAEGER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZILLOW GROUP, INC., et al.,<br><br>Defendants. | C21-1551 TSZ<br><br>ORDER |

THIS MATTER comes before the Court on the motion for class certification, appointment of class representative, and appointment of class counsel, docket no. 115,[1]

---

[1] Jaeger's motion for class certification was filed on March 14, 2024, *see* docket no. 115, and his reply was filed on June 7, 2024, *see* docket no. 121. On July 5, 2024, after the Court had begun considering Jaeger's motion for class certification, Jaeger filed a motion to amend his complaint, *see* Mot. (docket no. 123), which Defendants did not oppose, *see* Resp. (docket no. 132). Although the Court granted leave to amend, *see* Minute Order (docket no. 133), and Jaeger's First Amended Consolidated Class Action Complaint ("FAC") is now the operative pleading, *see* docket no. 135, the Court has decided the motion for class certification on the basis of the earlier Corrected Consolidated Class Action Complaint, *see* docket no. 71, which was in effect at the time Jaeger moved for class certification, and which was not substantively revised with respect to the claims asserted in this action or the class allegations when the FAC was filed. *See* FAC at § I (Summary of Amendments) (docket no. 135).

ORDER - 1

brought by lead plaintiff Jeremy Jaeger. Jaeger moves to certify the following Rule 23(b)(3) class:

> All persons or entities who purchased or otherwise acquired Zillow Group, Inc. Class A common stock or Class C capital stock during the period from August 5, 2021, to November 2, 2021, inclusive, and were damaged thereby.

Having reviewed all papers filed in support of, and in opposition to, the motion, the Court enters the following Order.

**Background**

**A.    Zillow Offers**

Defendant Zillow Group, Inc. ("Zillow") operates several real estate websites including zillow.com and streeteasy.com. Corrected Consol. Class Action Compl. [hereinafter "Consol. Compl."] at ¶ 2 (docket no. 71). In 2018, facing changing market conditions, Zillow decided to expand from merely operating real estate websites to buying houses directly from consumers via cash offers, renovating those houses, and reselling them for a profit. *Id.* at ¶¶ 2–3. This latter business is known as the "Instant Buyer" or "iBuyer" market, *i.e.*, "iBuying," and Zillow branded its entry into this business as "Zillow Offers." *Id.* at ¶¶ 2–4. Zillow told investors it had a competitive advantage in iBuying from its experience using algorithmic pricing models to value homes. *Id.* at ¶ 76. Zillow also represented that it intended to grow Zillow Offers quickly, with a target of purchasing 5,000 homes per month. *Id.* at ¶ 183. By late 2020 and early 2021, Zillow Offers was already falling behind its iBuying competitors. *Id.* at ¶¶ 16, 90–91, 100. Wanting to catch up to its competitors, Zillow launched "Project

ORDER - 2

Ketchup," a program intended to accelerate Zillow's acquisitions of homes. *Id.* at ¶¶ 16, 100.

Project Ketchup modified how Zillow Offers priced houses targeted for acquisition. Originally, Zillow Offers based its offer prices on an algorithm and on input from specialized housing pricing analysts. *Id.* at ¶¶ 71–73  Project Ketchup introduced the use of systemic "overlays," which saw purchasing managers increasing the algorithmically determined offer price by as much as seven percent. *Id.* at ¶¶ 100, 111–12  After the introduction of the overlays, Zillow Offers' acquisition volumes more than doubled in a single quarter. *Id.* at ¶ 182.

Zillow did not credit Zillow Offers' increased acquisition volume to the use of the overlays. Instead, Zillow represented that the increase was based on "improving [its] pricing models, including launching the neural[2] Zestimate, which sharpened [its] offer strength" and "strong growth in consumer demand." *Id.* at ¶¶ 182–86.

Project Ketchup also saw Zillow Offers reducing the scope of jobs for which it would hire contractors and the rates it would pay those contractors. *Id.* at ¶ 127. The combination of reduced scopes of work and reduced rates resulted in many contractors scaling back the amount of work they would do for Zillow Offers or outright declining to take on new Zillow Offers projects. *Id.* at ¶ 128. Zillow Offers' inability to get contractors to perform renovations on acquired houses led to it developing a significant

---

[2] The neural Zestimate is an enhanced version of Zillow's Zestimate home valuation model. *See* Consol. Compl. at ¶ 99 (docket no. 71). "In the case of the Zestimate algorithm, the neural network model correlates home facts, location, housing market trends and home values." *Id.*

ORDER - 3

backlog of houses that it was unable to sell. *Id.* This backlog in turn increased Zillow's holding costs and further exposed Zillow to risks from a housing market slowdown. *Id.*

Relevant now are three sets of statements that Jaeger alleges corrected Zillow's previously misleading statements.[3] First, on October 17, 2021, Bloomberg published an article stating that Zillow Offers would be ceasing new acquisitions through the end of the year. *Id.* at ¶164. The acquisitions pause was confirmed the next day, October 18, 2021, by a Zillow press release which stated that the pause was "[d]ue to a backlog in renovations and operational capacity constraints," caused by "a labor- and supply-constrained economy inside a competitive real estate market, especially in the construction, renovation and closing spaces." *Id.* at ¶ 165. Second, on October 31, 2021, KeyBanc Capital Markets ("KeyBanc") issued a report indicating that many of the houses Zillow was selling were listed for less than what Zillow had paid for the houses. *Id.* at ¶ 227. The next day, on November 1, 2021, Bloomberg published an article disclosing that Zillow planned to divest itself of approximately 7,000 houses for roughly $2.8 billion to private equity investors. *Id.* at ¶¶ 227–28. Finally, during its November 2, 2021, earnings call, Zillow announced that it was winding down Zillow Offers and laying off 25% of its workforce. *Id.* at ¶¶ 170, 231. Zillow also admitted that it had overpaid for nearly 18,000 homes and would need to take a write down of as high as $569 million. *Id.* at ¶¶ 33, 115, 170, 173. Zillow attributed this decision to issues with its algorithms and pricing models that had been lauded months earlier, stating: "fundamentally, we have

---

[3] For further discussion of the alleged misleading statements, see the Court's Order, docket no. 97.

ORDER - 4

been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." *Id.* at ¶ 171.  Zillow also pinned responsibility on the undisclosed backlogs, noting that it had "experienced significant capacity and demand planning challenges," which "caused a meaningful backup in our processing of homes in the Zillow pipeline." *Id.* at ¶ 172.

**Discussion**

**A.** **Class Action Standard**

Federal Rule of Civil Procedure 23 operates as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  To maintain a class action, the prerequisites of numerosity, commonality, typicality, and adequacy must be satisfied.  Fed. R. Civ. P. 23(a).  Additionally, a class action must satisfy one of the provisions of Rule 23(b).  *See Comcast*, 569 U.S. at 33.  The party seeking certification bears the burden of establishing by a preponderance of the evidence that these requirements have been met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *see Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022).

**B.** **Rule 23(a) Requirements**

Defendants' challenge involves only one of Rule 23(a)'s requirements, and they argue solely that Jaeger fails to satisfy Rule 23(a)(3)'s typicality requirement.  Nevertheless, the burden remains on Jaeger to "affirmatively demonstrate" that he satisfies all of the Rule 23 prerequisites.  *Wal-Mart*, 564 U.S. at 350.  Certification is

ORDER - 5

appropriate only if this Court is convinced "after a rigorous analysis" that Rule 23's prerequisites have been met. *Id.* at 350–51. The Court will, therefore, address numerosity, commonality, and adequacy to ensure they are satisfied before turning to Defendants' typicality arguments.

### 1. Numerosity

A putative "class [must be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). During the period from August 5, 2021, to November 2, 2021 (the putative "Class Period"), over 478 institutions held or traded Class A stock, and the total number of outstanding Class A shares, held by any type of investor, ranged from about 61.3 million to 61.4 million shares with, on average, nearly 3.2 million shares trading weekly. *See* Nye Report at ¶¶ 29, 46, Ex. A to Berman Decl. (docket no. 116-1). As to the Class C shares, over 703 institutions held or traded Class C stock, and the total number of outstanding Class C shares during the Class Period ranged between 180.1 and 187.2 million shares, with, on average, nearly 20.0 million shares trading weekly. *Id.* Numerosity is satisfied in this case. *Cf. Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575, 580–81 (N.D. Cal. 2021) (concluding that numerosity was satisfied when 43 million shares were outstanding at the beginning of the class period, approximately 77 million shares were outstanding by the end of the class period, and an average of 7.1 million shares were traded weekly).

### 2. Commonality

Commonality requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification ... is not the raising

ORDER - 6

of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). Only one question need generate common answers apt to drive the resolution of the litigation. *See Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). Jaeger alleges numerous questions common to the class, answers to which would drive the litigation. For example, the questions of "whether Defendants misrepresented or omitted material facts (or otherwise engaged in conduct violating SEC Rule 10b-5); whether Defendants acted with scienter;" and "whether the alleged stock price declines were causally connected to Defendants' misrepresentations, omissions, or conduct," *see* Mot. at 7 (docket no. 115), go to key elements of Jaeger's and the putative class's claims. The Court concludes that Jaeger has made a strong showing with respect to the existence of common questions.

### 3. Adequacy

A representative plaintiff is adequate if he or she is able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Having reviewed the parties' submissions, the Court is satisfied that Jaeger and his counsel do not have any conflicts of interest with unnamed class members and "will prosecute the action vigorously on behalf of the class." *Kazda v. Aetna Life Ins. Co.*, No. 19-CV-02512, 2022 WL 1225032, at *5 (N.D. Cal. Apr. 26, 2022) (internal quotation omitted).

### 4. **Typicality**

Typicality is satisfied when "the claims or defenses of the representative party are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(3)), *overruled on other grounds by Wal-Mart*, 564 U.S. at 338. Even if, however, a lead plaintiff's claims are reasonably coextensive with those of the absent class members, typicality can be defeated "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Defendants argue that Jaeger is atypical because he is subject to two unique defenses that threaten to become the focus of the litigation.

First, Defendants argue that typicality is defeated because Jaeger bought Zillow stock after some of the alleged corrective disclosures. Jaeger purchased 3,500 shares of Zillow stock at a price of $298,200 ($85.20/share) on October 4, 2021. Jaeger's Loss Chart, Ex. B to Berman Decl. (docket no. 28-2). He purchased an additional 9,000 shares of Zillow stock for $787,100 ($86.50-$87.95/share) on November 2, 2021. *Id.* In prior cases outside the Ninth Circuit, a lead plaintiff's purchasing of stock after corrective disclosures was the basis for deeming the lead plaintiff inappropriate as a class representative because of unique defenses that might become the focus of the litigation *See George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533, 2013 WL 3357170, at *6

ORDER - 8

1  (S.D.N.Y. July 3, 2013); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 119 F.R.D. 344, 348–49 (S.D.N.Y. 1988), *aff'd*, 903 F.2d 176 (2d Cir. 1990).  Courts within the Ninth Circuit, however, have recognized that "post-disclosure purchases are not, by themselves, sufficient to render a proposed representative atypical." *Mulderrig*, 340 F.R.D. at 582, *see also Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 346–48 (C.D. Cal. 2015) (collecting cases and observing that "many district courts in the Ninth Circuit have held that post-disclosure or even post-class period purchases do not necessarily defeat typicality").  Moreover, the Fifth Circuit has rejected the argument that a lead plaintiff is "categorically precluded" from acting as a class representative based on post-disclosure purchases.  *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005).

Jaeger testified that he continued purchasing Zillow stock after the alleged partial corrective disclosures because he was "very excited about where [he] thought the company was going."  Jaeger Dep. at 93:17–18, Ex. 23 to Hsiao Decl. (docket no. 118-2 at 248).  This sentiment is not unreasonable.  Moreover, Jaeger's post-disclosure purchases show that he was willing to purchase Zillow shares at a reduced price once the market had gone down, and not that he would have necessarily been willing to buy Zillow shares at a higher price if the concealed information had been known.  *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 284 (N.D. Cal. 2020); *In re NIO, Inc. Sec. Litig.*, No. 19-CV-1424, 2023 WL 5048615, at *7 (E.D.N.Y. Aug. 8, 2023) ("Once the truth is revealed and the price of shares drops to incorporate the newly disclosed facts,

the same investors can choose to invest without undermining the claim that they would not have paid the earlier, higher price had they known.").

Defendants' second argument as to why Jaeger is subject to unique defenses that threaten to overrun the litigation is that his deposition testimony is contrary to the allegations in the complaint.  In *Mulderrig*, a proposed class representative was found to be atypical because his pre-litigation conduct and deposition testimony suggested that he actually understood the disclosures he alleged were misleading, directly contradicting the allegations in the complaint.  See 340 F.R.D. at 581–82.  Here, by contrast, Defendants attempt to draw overly narrow distinctions between Jaeger's allegations and Jaeger's testimony to create the contradictions.  Jaeger testified that he trusted Zillow's Zestimate and did not care how the algorithm functioned.  See Jaeger Dep. at 24:20–25:8, 27:22–28:10 (docket no. 118-2 at 243–44 & 245–46).  Jaeger, however, said nothing about whether he considered the Zestimate to be useful for anticipating future home prices, as compared to using the Zestimate to determine a house's current value, or whether he knew about Zillow Offer's application of a *post hoc* overlay to algorithmically-determined prices.  Similarly, although Jaeger agreed with the deposing attorney's statement that "one way to cut down on renovation costs is to be more thoughtful about the projects that are being done," he said nothing about whether developing a renovations backlog because of reduced contractor rates was prudent.  See *id.* at 179:9–18.  Jaeger's testimony is not inconsistent with the allegations in the operative complaint, his claims are coextensive with those of the putative class, and he is not subject to any unique defenses that threaten to overwhelm the litigation.  Typicality is satisfied here.

ORDER - 10

### C. Rule 23(b) Requirements

Jaeger seeks certification of a Rule 23(b)(3) class and, therefore, the proposed class must satisfy the predominance and superiority requirements in addition to the prerequisites of Rule 23(a). Defendants challenge only the predominance requirement, arguing that individual questions of reliance will predominate over questions common to the class. The Court will first review Jaeger's submissions regarding the unchallenged requirement of superiority to ensure Jaeger has carried his burden on that element before turning to Defendants' predominance challenge.

#### 1. Superiority

To certify a Rule 23(b)(3) class, the Court must find that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts consider four factors when evaluating superiority: "(1) the interest of individuals within the class in controlling their own litigation; (2) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (3) the convenience and desirability of concentrating the litigation in a particular forum; and (4) the manageability of the class action." *In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387, 2020 WL 6318692, at *9 (W.D. Wash. Oct. 28, 2020) (citing Fed. R. Civ. P. 23(b)(3)(A)–(D) and *Zinzer v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001)). Here, the average claim is likely too small to be maintained as an individual action and, to the Court's knowledge, no other cases are currently pending that seek the same relief for Defendants' alleged misconduct. Additionally, Zillow is based in this District, making this Court a convenient venue to resolve the litigation, and the Court

foresees no management challenges in this case that would make it difficult or otherwise inconvenient to resolve as a class action. The Court finds that a class action is the superior means for adjudicating this controversy.

### 2. **Predominance**

In addition to superiority, Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." "Common issues predominate over individual issues when the common issues 'represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015) (quoting 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1778 (3d ed. 1998)).

Here, the Court must begin its predominance inquiry with the elements of a 10(b)-5 claim that Jaeger must prove, namely "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)). Material misrepresentations, scienter, and loss are well understood to be susceptible to classwide proof, and Jaeger need not prove materiality or loss causation at the class certification stage. *See Mulderrig*, 340 F.R.D. at 585–86. The remaining element of a 10b-5 claim, and the element that Defendants argue precludes a finding of predominance in this case, is reliance.

ORDER - 12

In securities class actions, "requiring proof of individualized reliance would effectively prevent plaintiffs from proceeding with a class action because individual issues would overwhelm the common ones." *Id.* at 586 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)). To prevent individual questions of reliance predominating over the litigation, Jaeger invokes, on behalf of the putative class, the fraud-on-the-market presumption first articulated by the Supreme Court in *Basic*. *See* 485 U.S. at 246. The *Basic* presumption is based on the premise that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458. Establishing the *Basic* presumption requires Jaeger to show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton*, 573 U.S. at 268 (citation omitted).

Defendants do not dispute that Jaeger has established the elements giving rise to the *Basic* presumption. They instead attempt to rebut the *Basic* presumption by arguing that the alleged misstatements and corrective disclosures had no impact on Zillow's stock price.[4] For this argument to be successful, Defendants "must 'in fact' 'seve[r] the link'

---

[4] Defendants also argue that Jaeger cannot establish predominance because any alleged misstatements did not cause Zillow's stock prices to rise. Jaeger does not, however, allege that Defendants' misrepresentations and omissions caused Zillow's stock price to rise, but rather that they "served to maintain the inflation in the price of Zillow" stock. Consol. Compl. at ¶ 216 (docket no. 71). Under such theory, any drop in Zillow's stock price after the disclosure of corrective information serves as a proxy for

ORDER - 13

between a misrepresentation and the price paid by the plaintiff,'" and they "must carry that burden by a preponderance of the evidence." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 125–26 (2021) (internal citations omitted). In assessing the link between a back-end price drop and alleged front-end price inflation, "courts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122.

Defendants attempt to "sever the link" between the alleged misrepresentations and the price Jaeger paid for his Zillow stock by asserting a "mismatch" between the allegedly misrepresented information and the information contained in the alleged corrective disclosures. A corrective disclosure, however, "need not 'precisely mirror' the misrepresentation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1184 (9th Cir. 2024). To prove that "the truth became known," a plaintiff need show only "the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (citation omitted). An event can be corrective when it merely discloses a consequence of concealed information (for example, an earnings miss), even if the connection between the cause and the consequence is not made explicitly in the disclosure. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018).

---

the price effect of the misleading statements. *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 80 (2d Cir. 2023). The Court will therefore focus its analysis on the back-end price impact of Zillow's corrective disclosures.

ORDER - 14

        a.      **October 17 Bloomberg Article & October 18 Press Release**

Defendants argue that the October 17, 2021, Bloomberg article and October 18, 2021, Zillow press release confirming the contents of the Bloomberg article did not cause a price impact because they were mismatched from, and did not actually disclose, the prior allegedly misleading statements. Defendants also assert that these disclosures did not have a price impact because analysts did not discuss the disclosures.

Defendants' contentions do not rebut the *Basic* presumption on which Jaeger relies. According to Jaeger, the backlog disclosed on October 17–18 happened because of the information Defendants concealed. *See* Consol. Compl. at ¶¶ 187, 221–23 (docket no. 71). Specifically, Jaeger alleges Zillow acquired increased house inventory because of its use of the undisclosed overlay. *See id.* at ¶ 187. After having acquired that inventory, Zillow was unable to renovate and relist the houses because contractors stopped working for it due to the reduced scopes of work and rates. *Id.* at ¶ 187. Because the October 17 Bloomberg article and the October 18 Zillow press release "render some aspect of [Zillow's] prior statements false or misleading," they are the type of corrective disclosures that might have affected stock prices. *See In re BofI*, 977 F.3d at 790.

Jaeger alleges, and evidence in the record reflects, that some analysts did write about the Bloomberg article and Zillow press release. *See* Sabry Report at ¶¶ 132–35, Ex. 1 to Hsiao Decl. (docket no. 118-1). That analysts also considered other reasons for why Zillow was pausing acquisitions goes to loss causation and the merits of Jaeger's and the putative class's claims, and such fact does not preclude class certification.

          **b.**        **October 31 KeyBanc Report & November 1 Bloomberg Article**

Defendants argue that the October 31, 2021, KeyBanc report, November 1, 2021, Bloomberg article, and related media coverage had no impact on Zillow's stock price. Defendants repeat the mismatch argument they made in relation to the October 17 Bloomberg article and October 18 press release, and their contention also fails with respect to the events of October 31 and November 1. The overpayments KeyBanc disclosed were, according to Jaeger's allegations, the result of Zillow's decision to apply overlays to increase acquisition volume rather than fixing its algorithms to accurately predict home price appreciation, as Zillow had told investors. *See* Consol. Compl. at ¶¶ 110, 187 (docket no. 71). Likewise, Zillow's sale of 7,000 homes at a loss to private equity allegedly flowed from its decision to "systematically overrule Zillow's highly-touted [pricing] algorithm in order to drive volume," *id.* at ¶ 17, causing Zillow Offers to "significantly overpay for thousands of homes." *Id.* at ¶¶ 100, 187, 226–229. Because the October 31 KeyBanc report and November 1 Bloomberg article disclose the consequences of Zillow's alleged misrepresentations, they are corrective disclosures capable of having a price impact. *See Mineworkers' Pension Scheme*, 881 F.3d at 753–54.

Defendants further assert, solely in relation to the October 31 KeyBanc report, that the report could not have had any price impact because it contained already public information. Defendants' contention is unpersuasive because "'a disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure,' like when 'the alleged corrective disclosure provides new information to the

ORDER - 16

1   market that was not yet reflected in the company's stock price.'" *In re Genius Brands*, 97
2   F.4th at 1186 (alterations omitted) (quoting *In re BofI Holding*, 977 F.3d at 795).
3   Defendants' argument cannot be reconciled with the multiple commentators who
4   attributed price declines to the KeyBanc report or the fact the report was widely discussed
5   in the media for weeks after its publication.  *See* Nye Rebuttal Report at ¶¶ 45–46 (docket
6   no. 121-2).  Additionally, a statistically significant stock price reaction occurred on
7   November 1–2.  *See* Sabry Dep. at 76:3–12, Ex. B to Berman Decl. (docket no. 121-3).
8   Neither Defendants nor their expert identify any reasons for these occurrences.
9   Defendants have not met their burden, in opposing class certification, of severing the link
10  between these disclosures and a price impact on Zillow's stock.

11              c.     **November 2 Earnings Call**

12          Defendants argue that the statements made during Zillow's November 2, 2021,
13  earnings call did not cause a price impact because, as they have argued for the other two
14  sets of allegedly corrective disclosures, a mismatch between the November 2 statements
15  and the misrepresentations at issue demonstrates that the November 2 statements did not
16  reveal any allegedly concealed facts.  According to Jaeger, Zillow had told investors that
17  it had improved its pricing algorithm's ability to forecast future home prices, but then on
18  November 2, Zillow admitted that it was shuttering Zillow Offers because its pricing
19  models had been unable to accurately forecast future home prices.  Consol. Compl. at ¶
20  234 (docket no. 71).  Contradicting earlier representations suffices to make a statement a
21  corrective disclosure.  *See In re Apple Inc. Sec. Litig*, No. 4:19-cv-2033, 2022 WL
22  354785, at *9 (N.D. Cal. Feb. 4, 2022) (finding that disclosure of underperformance was
23

ORDER - 17

a corrective disclosure because plaintiffs alleged "not merely that Cook misrepresented how poorly Apple was performing in China, but that it was, in fact, performing poorly at all"). Additionally, on November 2, Defendants disclosed that Zillow Offers had overpaid, on average, by 5-7% for its housing inventory, Consol. Compl. at ¶ 170 (docket no. 71), which was approximately the same percentage applied by Zillow Offers' overlays, *id.* at ¶ 102. Disclosing the consequences of concealed information constitutes a corrective disclosure. *See Mineworkers' Pension Scheme*, 881 F.3d at 753–54.

In sum, in opposing the pending motion for class certification, Defendants have failed to show by a preponderance of the evidence that the alleged misrepresentations and subsequent corrective disclosures had no impact on Zillow's stock price. Accordingly, Jaeger is entitled to *Basic*'s presumption of reliance,[5] and the Court concludes that common questions of fact predominate.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) Plaintiff Jeremy Jaeger's motion for class certification, appointment of class representative, and appointment of class counsel, docket no. 115, is GRANTED.

---

[5] Jaeger also argues that he is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption is only available in cases where the plaintiff primarily alleges misrepresentation by omission. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). Because Jaeger is entitled to *Basic*'s presumption of reliance, it is unnecessary for the Court to address this alternative argument.

ORDER - 18

(2) The following Class is hereby CERTIFIED pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons or entities who purchased or otherwise acquired Zillow Group, Inc. Class A common stock or Class C capital stock during the period from August 5, 2021, to November 2, 2021, inclusive (the "Class Period"), and were damaged thereby.

(3) The following entities and individuals are EXCLUDED from the Class: (i) all entities or individuals who, after receiving notice about this action and the certification of the Class, timely opt out of the Class; (ii) Defendant Zillow Group, Inc.; (iii) Defendants Richard Barton, Allen Parker, and Jeremy Wacksman (collectively, "Executive Defendants"), and their immediate families, legal representatives, heirs, agents, successors, and assigns; (iv) Zillow's other directors and officers during the Class Period and subsequent thereto, and their immediate families, legal representatives, heirs, agents, successors, and assigns; (v) Zillow's legal representatives, agents, affiliates, subsidiaries, successors, and assigns; (vi) Defendants' liability insurance carriers and any affiliates or subsidiaries thereof, and (vii) any entity in which Executive Defendants or a member of their immediate families currently have, or had during the Class Period, a controlling interest.

(4) Lead Plaintiff Jeremy Jaeger is APPOINTED as Class Representative. Hagens Berman Sobol Shapiro LLP is APPOINTED as Class Counsel; Kessler Topaz Meltzer & Check, LLP is APPOINTED as Local Class Counsel.

(5) The parties are DIRECTED to meet and confer and to file, no later than September 30, 2024, a Joint Status Report containing their proposed plan for providing

ORDER - 19

notice to the Class, along with a draft form of notice. If the parties cannot agree on such plan and/or notice, then they shall state their respective views in the Joint Status Report.

(6) The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 23rd day of August, 2024.

Thomas S. Zilly
United States District Judge

ORDER - 20